IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JASON KERNS, ARCHIE KERNS, and
MARY ANN KERNS,

    Plaintiffs,

vs.                                                                                                                          No. CIV 07-0771 JB/ACT

BOARD OF COMMISSIONERS OF
BERNALILLO COUNTY, BERNALILLO COUNTY
SHERIFF DARREN WHITE, in his individual and his
official capacity, BERNALILLO COUNTY SHERIFF'S
DETECTIVES BRIAN LINDLEY, RALPH GONZALES, and
JAMES HAMSTEN, in their individual capacities, BERNALILLO
COUNTY SHERIFF DEPUTIES LAWRENCE KOREN,
SEAN CONNORS, AARON WRIGHT, TIMOTHY HIX, and
RHONDA MOYA, in their individual capacities, THE CITY OF
ALBUQUERQUE, ALBUQUERQUE POLICE DEPARTMENT
OFFICERS DREW BADER, MATT THOMPSON, RUSSELL CARTER,
ROBERT JOHNSTON and JAMES MONTOYA,
in their individual capacities, METROPOLITAN FORENSIC
SCIENCE CENTER FIREARM AND TOOL MARK EXAMINER
MIKE HAAG, in his individual capacity, and JOHN DOES 1-10,
in their individual capacities,

    Defendants.

**MEMORANDUM OPINION**[1]

**THIS MATTER** comes before the Court on Defendants Drew Bader, Matthew Thompson, and Russell Carter's Motion for Summary Judgment and Memorandum in Support, Requesting Dismissal of Counts I, X, and XIII of Plaintiffs' First Amended Complaint [Doc. 5], filed February 17, 2009 (Doc. 117). The Court held a hearing on August 31, 2009. The primary issue is whether

---

[1] The Court has previously entered an Order denying Defendants Drew Bader, Matthew Thompson, and Russell Carter's Motion for Summary Judgment and Memorandum in Support, Requesting Dismissal of Counts I, X, and XIII of Plaintiffs' First Amended Complaint [Doc. 5]. See Order, filed September 30, 2009 (Doc. 242). This opinion is intended to explain more fully the Court's reasoning for its previous Order.

Defendants Drew Bader, Matthew Thompson, and Russell Carter are entitled to qualified immunity protection from the Plaintiffs' First and Tenth claims for relief.  There is a genuine issue of material fact whether exigent circumstances exist to make the warrantless entry into Plaintiffs' Jason Kerns, Archie Kerns, and Mary Ann Kerns' home lawful, the Court finds that Bader, Thompson, and Carter are not entitled to qualified immunity and will deny their motion for summary judgment requesting dismissal of claims I, X, and XIII.

## FACTUAL BACKGROUND

On or about August 6, 2005, at approximately 12:00 a.m., retired Deputy Chief Ed Sauer observed the Bernalillo County Sheriff's Department Metro One helicopter hovering in the area of Paradise Boulevard and Golf Course Road in Bernalillo County, New Mexico after he pulled into his driveway and exited his vehicle.  See Deposition of Edward Sauer 5:5-9 at 2, filed February 17, 2009 (Doc. 117-2).  As Sauer went to enter his residence, he heard a loud crack that sounded like a rifle shot.  See id. 5:17-7:8 at 2.  Sauer observed the Metro One helicopter go straight down to the ground after he heard the shot.  See id. 10:14-19 at 3.

Sauer drove to the intersection where he believed the helicopter went down to look for it; however, he was unable to immediately locate the helicopter.  See Sauer Depo. 10:24-11:5 at 3. Once Sauer walked on to the golf-course area, he saw that the helicopter had crashed in the backyard of a residence, where he saw an observer and the pilot emerging from the wreckage.  See id. 12:18-13:1; 14:18-15:11 at 4.  Two or three civilians approached Sauer coming from the crash, and Sauer instructed them to move back and stay away from the helicopter.  See id. 20:14-16 at 5.

Jason Kerns was one of the witnesses that approached Sauer.  According to J. Kerns, he recalls telling Sauer: "...I watched it go down, I think I heard where the pop noise came from."

Deposition of Jason Kerns 49:23-24 at 2 (taken Oct. 22, 2008), filed Feb. 17, 2009 (Doc. 117-3).[2] Sauer instructed J. Kerns to "[s]tay right here," and Sauer had another officer speak with J. Kerns. Sauer Depo. 22:9023:2 at 6. Members of the Albuquerque Police Department Tactical Unit arrived on the scene, and Officer Drew Bader and Sergeant Robert Johnston spoke to J. Kerns about what he witnessed. See Deposition of Sgt. Robert Johnston 9:13-24; 11:5-19 at 3-4 (taken Feb. 4, 2009), filed February 17, 2009 (Doc. 117-4); Deposition of Drew Bader 22:2-12 at 2 (taken Feb. 11, 2009), filed February 17, 2009 (Doc. 117-5).

J. Kerns told the police that he heard a pop noise that was so loud it made his ears ring. See J. Kerns Depo. 156:15-25 at 3. He explained that the pop noise sounded "like an engine back low or maybe a rifle report, like the sound of a gun going off." See id. 157:19-25 at 3. He also reported that he heard the sound of rocks kick up from the direction he believed he heard the pop noise originate from. See id. 162:6-8 at 4. J. Kerns also provided the police with a written statement wherein he stated that he was "standing on the edge of the property line and the golf course watching the helicopter hovering." Written Statement of Jason Kerns at 1, filed February 17, 2009 (Doc. 117-6).

J. Kerns gave Johnston directions to his home, which is located at Columbus Circle N.W., on the golf course, and in response to J. Kerns' report, Johnston sent members of the SWAT and K-9 units to the area of J. Kerns' residence so the officers could look for evidence where a gunshot might have taken place, or contact anybody else in the neighborhood who may have heard or seen something. See Johnston Depo. 15:10-15 at 5. Bader, Carter, and Thompson were among the

---

[2] Sauer stated in his deposition that J. Kerns "kept telling [him] the helicopter got shot down" and that J. Kerns further stated: "I know where the shot came from." Sauer Depo. 21:21-22:1 at 6. Kerns denies that he made these statements to Sauer. See Pl. Response at 3.

tactical officers who went to the area. See Defendant Drew Bader's Answers to Plaintiff Jason Kerns' First Set of Interrogatories and Request for Production of Documents to Defendant Drew Bader at 2, filed February 2, 2009 (Doc. 117-7)("Bader Ans."); Defendant Russell Carter's Answers to Plaintiff Jason Kerns' First Set of Interrogatories and Request for Production of Documents to Defendant Russell Carter at 2, filed February 2, 2009 (Doc. 117-8)("Carter Ans.");  Defendant Matthew Thompson's Answers to Plaintiff Jason Kerns' First Set of Interrogatories and Request for Production of Documents to Defendant Matthew Thompson at 2, filed February 17, 2009 (Doc. 117-9)("Thompson Ans."). Johnston instructed the officers to go through every yard around the circle area, and if they could see lights in the house or hear noise or movement inside, to knock on the door and ask if anyone saw or heard anything. See Johnston Depo. 16:11-25 at 5. The officers split into two groups to canvas the neighborhood. Johnston spoke to people at approximately four houses, but nobody at any of the houses had heard any gunshot or heard the helicopter crash. See id. 18:6-25 at 1, filed May 1, 2009 (Doc. 156-4).

Johnston directed Bader, Thompson, and Carter to investigate the area surrounding J. Kerns' residence. See Bader Ans. at 2; Carter Ans. at 2; Thompson Ans. at 2. There was music coming from J. Kerns' residence, multiple cars were at the residence, and miscellaneous items were along the side of the house. See id.; J. Kerns Depo. 124:16-24.[3] The officers investigated the outside perimeter of the J. Kerns' residence and discovered a broken window in the rear of the house. Archie Kerns explains that only the outside pane of the double-paned window had been broken when it was struck by a golf ball. See Deposition of Archie Kerns 88:1-6; 89:14-21, at 1 (taken Oct. 15,

---

[3] The facts are contested whether the garage door was open and whether the music was loud. See Kerns Depo. 124:16-24; 140:19-25;  Thompson Ans. at 2. Thompson stated that, while the officers were discussing J. Kerns' residence, the music stopped.

2008), filed May 1, 2009 (Doc. 156-7); Pl. Response Exhibit 8 at 1, filed May 1, 2009 (Doc. 156-8). Bader was concerned about the broken window, given the possibility of gunfire in the area; however, he did not closely inspect the broken glass, and he does not recall seeing a golf ball. See Bader Depo. 38:2-22; 46:6-10 at 3.

After checking the area around J. Kerns' residence for evidence or suspects, Bader and Thompson made several attempts to contact anyone inside the house by knocking and announcing that they were police officers. No one came to the door in response to their knocking and announcements.[4] See Bader Depo. at 4-5. The occupants inside the home, Archie and Mary Ann Kerns (J. Kerns' parents) and Michele Zisser (J. Kerns' girlfriend), were all asleep, and did not hear the officers' knocks and announcements or any sounds related to the helicopter crash. See Zisser Depo. at 39:5-15, at 2; Deposition of Archie Kerns 79:2-21, at 2 (taken Oct. 15, 2008), filed February 17, 2009 (Doc. 117-11); Deposition of Mary Ann Kerns 64:20-65:23, at 2 (taken Oct. 15, 2008), filed February 17, 2009 (Doc. 117-12). After the first knock and announce in which the officers were unable to make contact with anyone who might have been inside, Johnston came over to J. Kerns' residence and then radioed to the officers at the golf course to get more information from J. Kerns whether it was in fact his residence and where in relation to his residence it was that J. Kerns had heard or seen what he had said he heard or saw. See Johnston Depo. 24:2-9, at 2. Johnston did not request permission from J. Kerns to enter his residence or inquire whether anyone else was in the residence. See Johnston Dep. 24:11-21, at 3.

Johnston stated that, because it was late at night, music was playing, and no one answered

---

[4] The occupants of the Kerns' residence did not hear the knock and announce, so there is a dispute whether the attempts were made. See Deposition of Michelle Zisser at 2, filed February 17, 2009 (Doc. 117-10).

the door, the police officers were concerned. See Johnston Depo. 28:2-6, at 3. He also stated that he could not articulate anything that led him to believe that somebody may have been hurt or injured inside J. Kerns' residence. See id. 28:7-10, at 3. Thompson stated that, given the circumstances, he "thought that the occupants may be in danger from a possible armed suspect that may have fired at the police helicopter," that "it was possible debris from the [helicopter] could have lodged inside the home," and that "the broken glass could have resulted from a gunshot coming from or into the residence." Thompson Ans. at 2. According to Johnston, at that time there were lights on in J. Kerns' residence, and the music coming from the residence played the entire time. See Johnston Depo. 31:20-25, at 3. Bader stated that at the time he had no objective facts or knowledge that made him think that someone had taken refuge inside J. Kerns' residence. See Bader Depo. 69:4-7, at 4. Bader observed that the music that had been coming from J. Kerns' residence turned off, which raised concerns, and the officers moved to the rear of the residence. See Bader Depo. 39:24-40:13, at 3. Thompson and Bader knocked on a door at the side of the house and, after no response from within, found the door unlocked and entered J. Kerns' residence.[5] See Bader Ans. at 2; Thompson Ans. at 2.

After entering J. Kerns' residence, Bader, Thompson, and Carter were met by a female, later identified as Zisser. See Thompson Ans. at 2. Thompson identified himself as an officer with the Albuquerque Police Department and spoke with Zisser.[6] The officers asked Zisser's consent to look

---

[5] The Kerns contest that the officers entered after growing concerned for the safety of the individuals who may have been inside the house, as the officers contend. The Kerns also dispute whether they announced themselves upon entering. See Pl. Response ¶24, at 4; See Bader Depo at 6

[6] Thompson stated that he informed Zisser that a police helicopter had crashed as a result of a possible shooting that a witness had reported occurred in the area of the residence, and that the officers were looking for a possible shooting suspect in the area and were concerned that the shooter

around inside the house. Zisser stated that she did not feel she could deny the officers' request, as they had their weapons displayed. See Zisser Depo. 46:19-25, at 3. According to Zisser, the officers went quickly around the house with her, and when Zisser informed Bader, Thompson, and Carter that J. Kerns' parents were asleep in the master bedroom, they did not enter or investigate in that room. See id. 47:2-14, 48:24-25:4, at 3-4. The officers were in J. Kerns' residence for about five minutes. See id. 51:8-13, at 3. There may have been damage caused to a door inside J. Kerns' residence during the search. See id. 52:3-11, at 4.

## PROCEDURAL BACKGROUND

Bader, Thompson, and Carter move for summary judgment, pursuant to rule 56 of the Federal Rules of Civil Procedure and D.N.M. LR-Civ. 7, and request the Court dismiss Counts I, X, and XIII of the Plaintiffs' First Amended complaint. Count I asserts that Bader, Thompson, and Carter violated Kerns' Fourth Amendment right to be free of unreasonable searches and seizures when they illegally entered his residence without a warrant. See Complaint ¶¶ 125-126. Count X asserts that Bader, Thompson, and Carter's actions constitute trespass when they intentionally entered onto and remained on the Kerns' property. Count XIII asserts that Bader, Thompson, and Carter violated the Kerns' state constitutional rights. The Kerns filed a Notice of Stipulated Dismissal of Bernalillo County, Brian Lindley, Drew Bader, Matt Thompson, and Russell Carter regarding Count XIII, dismissing the count with prejudice, on September 4, 2009 (Doc. 230).

Bader, Thompson, and Carter argue that their entry into J. Kerns' residence was lawful because they reasonably believed there were exigent circumstances justifying their warrantless entry.

---

might be in the house because the garage was open and the door unsecured. See Thompson Ans. at 2. The Kerns contest that Thompson accurately recounts the nature of the conversation and disputes that the officers informed Zisser of the reason for their entry.

They argue that, based on the music they heard, the garage door they allege was open, and the broken window in the rear of J. Kerns' residence, they believed that someone in the Kerns' home could be in need of immediate aid. Bader, Thompson, and Carter also argue that they are immune from the claims in the Kerns' Count X under the New Mexico Tort Claims Act, which provides governmental entities with immunity from tort suits unless there is a specific waiver of that immunity set forth under the Act. See Weinstein v. City of Santa Fe, 121 N.M. 646, 649 (1996).

The Kerns argue that Bader, Thompson, and Carter do not qualify for the exigent-circumstances exception because there was no specific threat known to have originated from, or having a direct tie to, the Kerns' home. The Kerns also contend that Bader, Thompson, and Carter have waived immunity under the New Mexico Tort Claims Act.

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant meets this burden, rule 56 of the Federal Rules of Civil Procedure provides that "an opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

The mere existence of a scintilla of evidence will not avoid summary judgment. See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993). There must be sufficient evidence on which

the fact-finder could reasonably find for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). Qualified immunity "protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Royal v. City of Albuquerque, No. Civ. 08-0181, 2009 U.S. Dist. LEXIS 45670, at *29 (D.N.M. Apr. 28, 2009)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 129 S. Ct. 808, 815 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 129 S. Ct. at 815 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). The United States Court of Appeals for the Tenth Circuit has stated:

> When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden," [Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001)] (internal quotation marks omitted), demonstrating, first, that the defendant's actions violated a constitutional or statutory right and, second, that the right at issue was clearly established at the time of the defendant's allegedly unlawful conduct. In assessing whether the right was clearly established, we ask whether the right was sufficiently clear that a reasonable government officer in the defendant's shoes would understand that what he or she did violated that right. If the plaintiff fails to satisfy either part of the two-part inquiry,

we must grant the defendant qualified immunity.

Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).

A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned." Zweibon v. Mitchell, 720 F.2d 162, 172-173 (D.C. Cir. 1983), cert. denied, 469 U.S. 880 (1984). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Strepka v. Miller, 28 Fed. Appx. 823, 830 (10th Cir. 2001)(citing Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)). See Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether the 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

As the Supreme Court of the United States has observed, it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. at 640. However, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 635.

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court required that the courts decide whether the defendant's actions violated a constitutional right before determining whether the right was clearly established at the time of the defendant's allegedly unlawful conduct. See id. at 201. In Pearson v. Callahan, the Supreme Court revisited the proper procedure for lower courts to

evaluate a qualified-immunity defense, holding that, "while the sequence set forth [in Saucier v. Katz,] is often appropriate, it should no longer be regarded as mandatory." 129 S. Ct. at 818. Rather, lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." Id. The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz would often be beneficial. See Pearson v. Callahan, 129 S. Ct. at 819.

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. mend. IV. The Fourth Amendment generally requires a warrant for there to be a valid search and seizure. For the warrantless search to be valid and legal, the search must fall within a recognized exception to the Fourth Amendment's warrant requirement. See United States v. Aquino, 836 F.3d 1268, 1271 n.3 (1988)(stating "[p]olice violate the Fourth Amendment when they engage in a warrantless search and no exception to the warrant requirement applies.")(citation omitted).

"Searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980). The Supreme Court of the United States has previously stated that the home is entitled to the greatest Fourth-Amendment protection. See Kyllo v. United States, 533 U.S. 27, 31 (2001)("At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion.

With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no."); Payton v. New York, 445 U.S. at 585 (stating that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."). The Fourth Amendment does not prevent a government search of one's home in the absence of a warrant, but it protects against unreasonable searches. See United States v. Najar, 451 F.3d 710, 713-14 (10th Cir. 2006)(citing Illinois v. Rodriguez, 497 U.S. 177, 183 (1990)).

To enter a home, "police officers need either a warrant or probable cause plus exigent circumstances, in order to make lawful entry into a home." Kirk v. Louisiana, 536 U.S. 635, 638 (2002). The government bears the burden of proving the exigency exception to the warrant requirement applies. See United States v. Najar, 451 F.3d at 717 (citing United States v. Wicks, 995 F.2d 964, 970 (10th Cir. 1993)). "That burden is especially heavy when the exception must justify the warrantless entry of a home." United States v. Najar, 451 F.3d at 717 (citing United States v. Anderson, 981 F.2d 1560, 1567 (10th Cir. 1992)).

In Mincey v. Arizona, 437 U.S. 385 (1978), the Supreme Court instructed: "[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." Mincey v. Arizona, 437 U.S. at 392. The United States Court of Appeals for the Tenth Circuit, in United States v. Najar, set forth a two-part test for determining whether there are exigent circumstances present: "[O]ur test is now two-fold, whether (1) the officers have an objectively reasonable basis to believe that there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable (a modification of our former third prong)." 451 F.3d at 718. In the limited circumstances where the risk of danger to the officers or others gives rise to the exigent circumstance, the court does not require a separate showing of probable cause. See id.

**ANALYSIS**

The Kerns accuse Bader, Thompson, and Carter of unlawfully entering their residence on or about August 6, 2005, as these officers were looking for an offender who shot down the Bernalillo County Sheriff's Department Metro One helicopter. It is the officers' position that the exigency of the situation under the totality of the circumstances justified their entry into the residence. Further, because it is their position that they entered the Kerns' home lawfully, they argue that they are entitled to immunity from the Kerns' tort claims under the New Mexico Tort Claims Act.

The Court finds that, because Bader, Thompson, and Carter have not met the burden of showing that there were exigent circumstances present when the entered the Kerns' home, there is a factual issue whether they violated the Kerns' Fourth Amendment right to be free from unlawful searches and thus, Bader, Thompson, and Carter are not entitled to qualified immunity. Moreover, the Court finds that, because there is a genuine issue of material fact whether Bader, Thompson, and Carter's acts were supported by exigent circumstances, they do not enjoy immunity under the New Mexico Tort Claims Act.

**I.     BADER, THOMPSON, AND CARTER HAVE NOT SHOWN THAT THERE IS NO GENUINE ISSUE OF MATERIAL FACT WHETHER THERE WERE EXIGENT CIRCUMSTANCES PRESENT WHEN ENTERING THE KERNS' HOME.**

The Kerns have a Fourth Amendment expectation of privacy in their own home that is well-established. See Payton v. New York, 445 U.S. at 585. Generally, when a defendant asserts a qualified-immunity defense, the burden shifts to the plaintiff to show that the defendant (i) violated a constitutionally or statutory right and (ii) that the right at issue was clearly established at the time of the defendant's unlawful conduct. See Casey v. W. Las Vegas Indep. Sch. Dist., 472 F.3d 1323, 1327 (10th Cir. 2007). Bader, Thompson, and Carter bear the burden of proving the exigency exception to the warrant requirement applied to their actions when they entered the Kerns' residence

on August 6, 2005. Specifically, Bader, Thompson, and Carter must satisfy the two-part test that the Tenth Circuit has set forth for determining whether there were exigent circumstances present: (i) whether the officers had an objectively reasonable basis to believe that there was an immediate need to protect the lives or safety of themselves or others, and (ii) whether the manner and scope of the search was reasonable. See United States v. Najar, 451 F.3d at 718.

Bader, Thompson, and Carter argue that they had an objectively reasonable basis to believe that the offender of the possible Metro One shooting could be in the Kerns' residence, based on the music, the alleged open garage door, the possible gunshot heard from the area, and the broken window in the back of the Kerns' residence. Bader, Thompson, and Carter, as a matter of law, urge the Court to look at the totality of the circumstances. The Court does not find, however, as a matter of law, that the observations that Bader, Thompson, and Carter made would lead a reasonable officer to the conclusion that there was an immediate need to protect the lives or safety of themselves or others.

The Tenth Circuit has previously found no exigent circumstances when a possible threat was based on no more than speculation. See United States. v. Bute, 43 F.3d 531, 539 (10th Cir. 1994)(holding that speculating that a burglary may have taken place because a commercial building had an open garage door at night was not enough to "reasonably and objectively create[] the impression of an immediate threat to person or property as to justify a warrantless search of the premises."). Similarly, a reasonable fact finder could find that Bader, Thompson, and Carter acted on little more than speculation. In the canvassing of the neighborhood, Bader, Thompson, and Carter, and the other police officers dispatched to the area, had some information that might lead them to believe that the offender was in the area. After they arrived, however, their initial investigation did not produce much information that supported the lead from J. Kerns. The citizens

in the neighboring homes with whom the officers spoke did not hear a gunshot, nor did they realize that a helicopter had crashed nearby. They did not discover a gun, shell casings, or signs of a shooter. A reasonable fact finder might also conclude that the presence of music playing from the Kerns' home, miscellaneous items in the yard, and a possible open garage door, did not suggest danger. A reasonable fact finder might not find these circumstances to be particularly suggestive, given that Bader, Thompson, and Carter knew that the residence belonged to one of the witnesses back at the golf course, with whom Johnston was in contact via the police radio. A reasonable fact finder might conclude that these circumstances could be more readily and reasonably explained as attributable to a person who had left his home in a hurry after witnessing a helicopter crash. Bader, Thompson, and Carter contend that they grew concerned when the music coming from J. Kerns' home stopped playing and that this factored into the decision to enter. Johnston contends, however, that the music was continuously playing. See Johnston Depo. 31:20-24, at 3. Given the discrepancy in the facts, a reasonable fact finder might find that the music turning off is not a persuasive factor in the determination that persons inside J. Kerns' home were in danger. The Court finds that a reasonable fact finder might conclude that it was conjecture for Bader, Thompson, and Carter to make the leap that these were signs of an intruder into the Kerns' home.

      The broken window in the rear of the Kerns' home lends weight to the Bader, Thompson, and Carter's actions, but not enough to overcome the heavy burden they must meet when justifying the warrantless entry of a home. See United States v. Najar, 451 F.3d at 717. Bader, Thompson, and Carter argue that a broken window in what they characterized as a nice neighborhood is suspicious and could signal trouble, but the evidence suggests that none of them actually examined the broken window closely. If they had, perhaps they would have noticed that only one pane of the double-pane had been broken and that at the foot of the broken window was a golf ball. See Pl.

Response Exhibit 8. The golf ball is plainly visible even from the photograph of the Kerns' backyard, see id., and as the Kerns live directly on the golf course, a reasonable fact finder might conclude that Bader, Thompson, and Carter may have overlooked an obvious, rational explanation in favor of speculating that an intruder was in the Kerns' home.

The Court also finds weight in the Kerns' argument that, if there was concern for the safety of people possibly inside the Kerns' home, Bader, Thompson, and Carter could have learned if there were people in the Kerns' home directly from J. Kerns, with whom Johnston was in radio contact through the officers that remained at the golf course with J. Kerns. Johnston had been in radio contact with J. Kerns after the initial knock and announcements, but Johnston asked only whether the officers were at the right house and for clarification of where J. Kerns heard popping noises.

Finally, once Bader, Thompson, and Carter were inside on the rationale of checking for a possible offender, they did a walk-through of the home with Zisser, but they did not check on the welfare of all those in the home. Zisser informed Bader, Thompson, and Carter that there were two other people in the master bedroom, but they did not investigate that room. Bader, Thompson, and Carter's actions once in the home undercut their explanation for preceding without a warrant or consent to enter the Kerns home.

The evidence that the Kerns have presented and Bader, Thompson, and Carter inability to adequately demonstrate, as a matter of law, the first-prong of the exigent-circumstances test, leads the Court to find that there is sufficient evidence to deny Bader, Thompson, and Carter's motion for summary judgment. The Court, therefore, will not grant Bader, Thompson, and Carter qualified immunity on the Kerns' first claim.

## II.     BADER, THOMPSON, AND CARTER, AS LAW ENFORCEMENT OFFICERS, DO NOT HAVE IMMUNITY FROM LIABILITY FOR DEPRIVATION OF PROPERTY RIGHTS AND TRESPASS.

Bader, Thompson, and Carter also move for summary judgment on the Kerns' trespass claim and their claim that Bader, Thompson, and Carter's trespass into their home deprived them of their property rights because, they argue, they are entitled to immunity under the New Mexico Tort Claims Act. Bader, Thompson, and Carter argue that the State of New Mexico has not waived them immunity for the Kerns' state-law claims because there were exigent circumstances justifying the entry into the Kerns' home.

The New Mexico Tort Claims Act sets out the applicable waiver of immunity for the acts or omissions of law-enforcement officers. The New Mexico statute provides in relevant part:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

NMSA 1978, § 41-4-12. A trespass is a deprivation of property rights which consists of an unauthorized entry upon the land of another. North v. Pub. Serv. Co., 94 N.M.246, 247, 608 P.2d 1128, 1129 (1980). Restatement (Second) of Torts provides that one is subject to liability to another for trespass if he or she intentionally enters or remains on land in the possession of the other. See Restatement (Second) of Torts § 158 (1965). In Montes v. Gallegos, 812 F. Supp. 1165 (D.N.M. 1992)( Parker, J.), the court found that an officer who had entered the plaintiffs' home using an invalid search warrant was liable to the plaintiffs for trespass and was liable under § 41-4-12 of the New Mexico Tort Claims Act. See Montes v. Gallegos, 812 F. Supp. at 1170. There is evidence that Bader, Thompson, and Carter entered the Kerns' home without a warrant and without an

exception to the warrant requirement, and, in doing so, they may not say they have immunity from tort liability. The Court, therefore, will not grant summary judgment for Bader, Thompson, and Carter on the Kerns' tenth claim.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Marc M. Lowry
Carolyn M. Nichols
Rothstein, Donatelli, Hughes, Dahlstrom,
  Schoenburg & Bienvenu, LLP
Albuquerque, New Mexico

>     *Attorneys for the Plaintiffs*

Daniel J. Macke
Robles, Rael, & Anaya, P.C.
Albuquerque, New Mexico

>     *Attorneys for the Defendants Board of Commissioners of*
>       *Bernalillo County, Bernalillo County Sheriff Darren*
>       *White, Bernalillo County Sheriff's Detectives Brian Lindley,*
>       *Ralph Gonzales, James Hamsten, Bernalillo County*
>       *Sheriff's Deputies Lawrence Koren, Sean Connors, Aaron*
>       *Wright, Timothy Hix, and Rhonda Moya.*

Stephanie M. Griffin
  Assistant City Attorney
Albuquerque City Attorney's Office
Albuquerque, New Mexico

>     *Attorneys for the Defendants The City of Albuquerque,*
>       *Albuquerque Police Department Officers Drew Baden,*
>       *Matt Thompson, Russell Carter, Robert Johnston,*
>       *James Montoya, and Metropolitan Forensic Science*
>       *Center Firearm and Tool Mark Examiner Mike Haag*