## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JASON KERNS, ARCHIE KERNS, and
MARY ANN KERNS,

      Plaintiffs,

vs.                                    No. CIV 07-0771 JB/ACT

BOARD OF COMMISSIONERS OF
BERNALILLO COUNTY, BERNALILLO COUNTY
SHERIFF DARREN WHITE, in his individual and his
official capacity, BERNALILLO COUNTY SHERIFF'S
DETECTIVES BRIAN LINDLEY, RALPH GONZALES, and
JAMES HAMSTEN, in their individual capacities, BERNALILLO
COUNTY SHERIFF DEPUTIES LAWRENCE KOREN,
SEAN CONNORS, AARON WRIGHT, TIMOTHY HIX, and
RHONDA MOYA, in their individual capacities, THE CITY OF
ALBUQUERQUE, ALBUQUERQUE POLICE DEPARTMENT
OFFICERS DREW BADER, MATT THOMPSON, RUSSELL CARTER,
ROBERT JOHNSTON and JAMES MONTOYA,
in their individual capacities, METROPOLITAN FORENSIC
SCIENCE CENTER FIREARM AND TOOL MARK EXAMINER
MIKE HAAG, in his individual capacity, and JOHN DOES 1-10,
in their individual capacities,

      Defendants.

### MEMORANDUM OPINION[1]

    **THIS MATTER** comes before the Court on: (i) Defendant Mike Haag's Motion for

---

[1] The Court has previously entered an Order: (i) denying  Defendant Mike Haag's Motion for Summary Judgment and Memorandum in Support, Requesting Dismissal of Counts IV, V, VIII, IX, XI, XII, XIII, and XIV of Plaintiffs' First Amended Complaint; (ii) granting in part and denying in part Defendants Board of County Commissioners of Bernalillo County, Darren White, Brian Lindley, Ralph Gonzales, and Laurence Koren's Motion for Summary Judgment on the Basis of Qualified Immunity and on Other Grounds and Memorandum in Support; (iii) granting the Plaintiffs' Motion for Summary Judgment as to Liability on Counts III & VI of the First Amended Complaint; and (iv) denying the Plaintiffs' Motion for Summary Judgment as to Liability on Counts II, IV & V.  See Order, filed March 31, 2010 (Doc. 264).  This opinion is intended to explain more fully the Court's reasoning for its previous Order.

Summary Judgment and Memorandum in Support, Requesting Dismissal of Counts IV, V, VIII, IX, XI, XII, XIII, and XIV of Plaintiffs' First Amended Complaint, filed June 26, 2009 (Doc. 165)("Haag's Motion"); (ii) Defendants Board of County Commissioners of Bernalillo County, Darren White, Brian Lindley, Ralph Gonzales, and Laurence Koren's Motion for Summary Judgment on the Basis of Qualified Immunity and on Other Grounds and Memorandum in Support, filed July 17, 2009 (Doc. 182)("County Defendants' Motion"); (iii) the Plaintiffs' Motion for Summary Judgment as to Liability on Counts III & VI of the First Amended Complaint, filed July 17, 2009 (Doc. 180)("Plaintiffs Motion on Counts III & VI"); and (iv) the Plaintiffs' Motion for Summary Judgment as to Liability on Counts II, IV & V of the First Amended Complaint, filed July 27, 2009 (Doc. 189)("Plaintiffs' Motion on Counts II, IV & V").  The Court held a hearing on August 31, 2009.  The primary issues are: (i) whether probable cause supported Defendant Bernalillo County Sheriff's Detective Brian Lindley's search-warrant affidavit for Plaintiffs Jason Kerns, Archie Kerns, and Mary Ann Kerns' residence; (ii) whether Defendant Bernalillo County Sheriff Darren White's request for J. Kerns' medical records was an unlawful search and seizure, and an unlawful violation of privacy; (iii) whether Lindley's, Defendant Bernalillo County Sheriff's Deputy Lawrence Koren's, and Defendant Metropolitan Forensic Science Center Firearm and Tool Mark Examiner Mike Haag's contributions to the arrest-warrant affidavit were recklessly false, vitiating probable cause of J. Kerns' arrest; (iv) whether Lindley, Koren, and Haag are liable for malicious prosecution; (v) whether Haag is liable for false arrest and malicious prosecution for his ballistics analysis; (vi) whether Lindley, Koren, and Defendant Board of Commissioners of Bernalillo County are liable under the New Mexico Tort Claims Act ("NMTCA"), NMSA 1978, §§ 41-4-1 through 41-4-27, for false arrest and malicious abuse of process; and (vii) whether Lindley and Bernalillo County are liable for trespass and conversion.  The Court finds that probable cause

supported the search warrant of the Plaintiffs' residence and will therefore grant Lindley qualified immunity on Count II. The Court finds that White violated J. Kerns' right of privacy under the Fourth and Fourteenth Amendments and, because there are no genuine issues of fact that necessitate trial, the Court will grant the Plaintiffs' motion for summary judgment as to liability on Counts III and VI. The Court finds that qualified immunity on Counts IV and V is inappropriate because there are genuine issues of material fact as to Haag's, Lindley's and Koren's intent, and thus denies both the Defendants and the Plaintiffs summary judgment as to those counts. Also, because probable cause remains in question, the Court will deny the motion for summary judgment on Counts XIII and IX. Because there is no evidence of trespass or property conversion, the Court will grant summary judgment to Lindley and Bernalillo County on Counts X and XI.

## FACTUAL BACKGROUND

This case involves the investigation into the August 6, 2005 shooting of the Bernalillo County Sheriff's Department's helicopter, Metro One, which crashed into the backyard of a residence near the intersection of Golf Course Road and Paradise Boulevard in Albuquerque, New Mexico. The Bernalillo County Sheriff's Department arrested J. Kerns on August 15, 2005 and a federal grand jury indicted him on federal charges. On May 10, 2006, the United States Attorney dismissed the charges against J. Kerns. The Plaintiffs brought this federal suit against those involved in the investigation, arrest, and prosecution. Many of the material facts are undisputed. The Court notes, however, the factual disputes and whether the dispute is material.

### 1.   **The Crash of Metro One.**

On August 6, 2005, Metro One was conducting a law-enforcement surveillance patrol, circling the intersection of Golf Course Road and Paradise Boulevard in Albuquerque to assist officers on the ground who were attempting to locate a burglary suspect. See Holland's Report to

the National Transportation Safety Board at 3 (dated September 29, 2005), filed July 27, 2009 (Doc. 190-1)("Holland's NTSB Report"). At approximately 12:00 a.m., Ed Sauer, retired Deputy Chief of the Albuquerque Police Department ("APD"), observed Metro One hovering in the area of Paradise Boulevard and Golf Court Road.  See Deposition of Edward Sauer at 5:5-9, filed February 17, 2009 (Doc. 117-2).

On Metro One's fifth pass over the area, the two-person crew heard a load noise originating from inside the aircraft, the aircraft shook, and began to turn right.  See Holland's NTSB Report at 3.  A bullet struck Metro One, entering the bottom front nose of the helicopter, piercing the plexiglass, and sticking into the left rudder pedal.  See Deposition of Lawrence Koren at 22:2-24 (taken December 23, 2008), filed July 27, 2009 (Doc. 190).  Metro One's pilot, Chris Holland, estimated that the left rudder pedal was four inches forward of neutral and eight inches in front of the right rudder pedal when the bullet hit Metro One.  See Deposition of Christopher Holland at 63:11-64:10 (taken October 30, 2008), filed July 27, 2009 (Doc. 190-1).

Holland estimates his altitude at about 400 feet above ground level at the time the bullet struck Metro One.  See Holland's NTSB Report at 3; Holland's Depo. at 38:28.  In Holland's deposition, Holland marked a map indicating the direction that Metro One was facing when Holland heard a pop noise inside the helicopter and the airframe shook violently.  See Holland Depo. at 32:4-17; id. at 35:3-8; id. Exhibit 2.  At that time, Holland indicated that he believed Metro One was pointed in a north-easterly direction.  See Holland Depo. at 32:4-17; id. at 35:3-8; id. Exhibit 2.[2]

_____

[2] Holland's report of the incident stated that Metro One was facing west when he heard the loud noise and the helicopter began to shake, see Holland's NTSB Report at 3, but he marked the map and testified in court that Metro One was pointed to the north-east, see Holland Depo. Exhibit 3.  The Plaintiffs also contend that the GPS data indicated that Metro One was facing in a north-easterly direction, away from the Plaintiffs' residence.  The Court will resolve this disputed fact as appropriate in addressing each party's motions for summary judgment.

Believing the engine had suffered catastrophic engine failure, Holland initiated an emergency landing of Metro One.  <u>See</u> Holland Depo. at 36:14-37:4.  Metro One crashed into the backyard of a residence near the golf course.  <u>See</u> Sauer Depo. at 12:18-13:1.

### 2.      Police Response After the Crash.

Following the crash of Metro One, multiple police units responded to the scene. <u>See</u> Deposition of Brian Lindley at 11:14-25 (taken December 18, 2008), filed July 17, 2009 (Doc. 182-4).  Sauer was one of the first officers to arrive at the scene of the helicopter crash. <u>See</u> Sauer Depo. at 14:18-15:16.  After discovering the helicopter wreckage, he assisted in tearing down a fence.  <u>See</u> Sauer Depo. at 14:23-15:3.  He also saw the observer-passenger and Holland walking away from the helicopter, but did not observe anyone else near the helicopter at that time. <u>See id.</u> at 15:4-16.  Sauer did not recall seeing anyone else at the scene when the fence was torn down.  <u>See id.</u> at 14:21-15:8.  Many individuals in the area, including J. Kerns, witnessed the crash. <u>See id.</u> at 20:14-16.  Sauer testified that several people approached him, as he was coming from the crash, saying: "We think there were shots."  Sauer Depo. at 40:16-19.[3]  Sauer instructed them to move back and stay away from the helicopter.  <u>See</u> Sauer Depo. at 20:14-16.

---

[3] The Plaintiffs contend that the other witnesses heard a gunshot in the immediate area of the crash, "which was no where close to Jason Kerns' home."  Plaintiffs' Response in Opposition to Defendant Board of County Commissioners of Bernalillo County, Darren White, Brian Lindley, Ralph Gonzales, and Lawrence Koren's Motion for Summary Judgment on the Basis of Qualified Immunity and on Other Grounds and Memorandum in Support at 2, filed August 11, 2009 (Doc. 201)("Plaintiffs' Response to County Defendants").   The Plaintiffs point to the affidavit in support of the search warrant for this contention, but misconstrue the factual statement in the affidavit, which states: "Multiple detectives made contact with multiple citizens in the immediate area of the helicopter crash.  During the contacts, multiple citizens reported hearing a gunshot just prior to the helicopter crashing."   Affidavit for Search Warrant at 13, filed July 17, 2009 (Doc. 182-4).  The evidence does not support the contention that the witnesses heard the shot in the immediate area, but rather that the officers made contact with citizens in the immediate area.  The Court, therefore, will not construe the fact as the Plaintiffs have asserted it.

Bernalillo County Sheriff's Deputy Bill Webb was another first responder to the scene. See Affidavit of William Webb ¶¶ 1-2, at 1 (executed June 24, 2009), filed July 17, 2009 (Doc. 182-6)("Webb Aff."). He did not witness any civilians in the area when he arrived, nor did he recall hearing any civilians instructing officers on how to open the door to the helicopter. See Webb Aff. ¶¶ 4-5, at 2. Detectives asked Webb whether any civilians were in the vicinity at the time that he arrived, and he testified that he did not recall seeing anyone there except another officer. See id. ¶ 5, at 2.

### 3.    J. Kerns at the Scene of the Crash.

Before the crash, J. Kerns was working outside the Plaintiffs' residence, located at 9910 Columbus Circle, Albuquerque, rearranging storage in the storage area on the side of the house and the garage. See Deposition of Jason Kerns at 122:1-21 (taken October 22, 2008), filed July 27, 2009 (Doc. 190-2). He watched the helicopter hovering from the edge of his backyard, near the property line and the golf course,. See Statement of Jason Kerns at 5, filed July 27, 2009 (Doc. 190-2)("J. Kerns Statement"); J. Kerns Depo. at 126:13-128:24. As J. Kerns watched the helicopter fly low over the area, he heard a "loud pop sound" to his left, and he observed the helicopter pitch severely and dive to the ground. See J. Kerns Statement at 5. After witnessing the crash, J. Kerns quickly left the house -- leaving the music on and the door cracked open -- and drove to the intersection of Golf Course Road and Paradise Hills Boulevard. See J. Kerns Depo. at 140:6-143:7. J. Kerns attempted to telephone 911 from his cellular telephone while he drove, but the call was dropped, and he never reached 911. See J. Kerns Depo. at 141:18-143:10.

Once J. Kerns got to the scene, which he located based on the activity surrounding the wreck, he went to the backyard where the helicopter had crashed and, according to J. Kerns, he told an officer how to open the door of the helicopter. See J. Kerns Depo. at 144:5-145:13. J. Kerns

approached Sauer and told him: "I watched it go down, I think I heard where the pop noise came from."   J. Kerns Depo. at 49:23-24.[4]   Sauer separated J. Kerns from the other witnesses. See J. Kerns Depo. at 150:4-23; id. at 154:6-17.  Members of the APD Special Weapons and Tactics team ("SWAT") arrived on the scene, including Defendant Officer Drew Bader and Sergeant Robert Johnston.   See Deposition of Robert Johnston at 9:13-24 (taken February 4, 2009), filed July 17, 2009 (Doc. 182-7).  When Johnston arrived, Sauer informed him that there was a witness -- J. Kerns -- who believed he heard a gunshot. See Johnston Depo. at 3:19:4:24. Sauer then instructed Johnston to talk to J. Kerns, find out where the popping noise or gunshot came from, and search that area.  See Johnston Depo. at 9:11-24.  J. Kerns spoke to Johnston and told him about the popping noise, that he knew the direction from which the noise came, and that the noise was loud enough to make J. Kerns' ears ring.  See J. Kerns Depo. at 156:9-25.  J. Kerns also told Johnston that the popping sound came from J. Kerns' left, north of his location, and that, almost immediately thereafter, J. Kerns heard a sound like rocks kicking up or something impacting the ground near where the popping noise originated.  See Sauer Depo. at 62:2-7; 911 Calls and Dispatch on August 6, 2005 at 35:11-17, filed August 11, 2009 (Doc. 201-2); Johnston Depo. at 12:7-13.[5]  While J. Kerns did not know the identity of the officer to whom he spoke, he concedes that he probably said these things to whomever that person was.  See J. Kerns Depo. at 156:12-25.  J. Kerns told Johnston that his observations took place near his residence.  See Johnston Depo. at 11:4-14.  He

---

[4] Sauer had a slightly different recollection of events, testifying that J. Kerns "kept telling [him] the helicopter got shot down" and that J. Kerns stated: "I know where the shot came from." Sauer Depo. at 21:21-22:1.

[5] J. Kerns asserts that he told Johnston that he heard the sound of rocks kicking up, but did not see the rocks moving, as the 911 recording cited indicates.  Johnston testified that J. Kerns told him that J. Kerns had heard and seen the rocks.  See Johnston Depo. at 12:12-13.

also told Johnston that he saw the helicopter flying around and then heard popping noise about fifty feet away.  See Johnston Depo. at 11:14-19.  Upon further inquiry by the officers, J. Kerns conceded that the noise could have been an engine backfire or a rifle report.  See J. Kerns Depo. at 157:12-158:10.[6]

J. Kerns also provided a written statement to the APD officers on an APD witness form, in which he described his perceptions of the helicopter crash.  See J. Kerns Statement at 5.  In the statement, J. Kerns stated the helicopter was hovering approximately three-hundred yards southeast of the Plaintiffs' residence.  See id.  He stated he was standing on the edge of his yard, looking out because his dog -- who is not generally troubled by aircraft -- was upset and barking at something.  See id.  J. Kerns stated that he walked to the edge of his property line and the golf course, watching the helicopter hovering, assuming it was giving air support to some ground units.  See id.  He began wondering why it was staying in the same location for so long.  See id.  His statement described his observation of the helicopter crash as follows:

> I hate to say this, but I was getting annoyed by the sound of the chopper because it was there so long.  It seemed lower and closer than they usually fly around the golf course.  I had been watching it for close to eight minutes.  He looked closer than 1000 ft and I was actually contemplating if I should call someone but then I thought how complicated that would be and if I waited he'd be gone in a few minutes anyway.  Besides I couldn't see the aircraft #'s to report it.  All I could see is the chopper's siloutte [sic] illuminated from below and behind by the cloud cover and street lights.  I also could see the aircraft lights and two red strobes giving me a

---

[6] The parties disagree about this fact.  While the police consistently assert that J. Kerns told them that he heard a gun shot, J. Kerns is equally insistent that he referred to the sound as a popping noise and stated only that it could have been a rifle report when the officers pressed him for more detail.  Compare Johnston Depo. at 11:4-23, 12:12-13, Exhibit 1 with J. Kerns Depo. at 157:12-158:23, 162:6-8.  Johnston asserts that he asked Kerns if he was sure that the sound he heard was a gun shot, and states that J. Kerns told him that "he had been on a gun range enough times and that he was sure it was a gun shot."  Answer to Interrogatory No. 14, filed July 17, 2009 (Doc. 182-8).  Because a reasonable jury could believe either story, the Court will assume the fact that is beneficial to the non-movant in addressing each motion for summary judgment.

better reference of its flight.  It started to rain but I was working outside anyways so I stood fast and continued to watch.  The golf course sprinklers were on, but my dog was still upset, I was trying to calm her down.  I thought it might be another rabbit by the yard.  I was looking up at the helicopter.  There was a loud pop sound directly to my left North of my location right after the pop almost instantly I heard rocks kicking up like something got kicked up or impacted the ground by the same location of the pop noise, immediately after that the helicopter pitched severely the helicopter sound went to a loud winding pitch as it dove.  The pilot had almost no time to autogyro and I watched the helicopter go down.

J. Kerns Statement at 5.

No one other than J. Kerns heard any gun shot in the area of the Plaintiffs' residence. See Affidavit for Search Warrant at 4 (executed August 9, 2005), filed July 27, 2009 (Doc. 190-4); Lindley Depo. at 59:21-25; Deposition of Ralph Gonzales at 40:5-25 (taken December 9, 2008), filed July 27, 2009 (Doc. 190-5).  Other witnesses who informed law-enforcement officers that they heard a gun shot were all in the immediate area of the helicopter crash and not close to the Plaintiffs' home.  See Affidavit for Search Warrant at 2.

### 4. August 6, 2005 Search of the Plaintiffs' Residence.

After speaking with J. Kerns, Johnston sent the APD SWAT team and K-9 units to the area of the Plaintiffs' residence so the officers could look for evidence where a gunshot might have taken place, or contact anybody else in the neighborhood who may have heard or seen something. See Johnston Depo. at 13:10-18; id. at 15:10-15.  When the SWAT team got to the Plaintiffs' residence, they heard music coming from the residence.  See Johnston Depo. at 23:6-8; id. at 23:17-24; J. Kerns Depo. at 124:16-24.  Johnston's report alleges that the garage door was open when Johnston and his SWAT team got to the Plaintiffs' residence.  See Johnston Depo. at 23:6-8; id. at 23:17-24; Lindley Depo. at 59:21-25.  J. Kerns, however, asserts that the garage door was closed when he left his home to go to the crash cite.  See J. Kerns Depo. at 140:19-20.

Officer James Montoya, part of Johnston's SWAT team, reported that the Plaintiffs' garage

door was open and music was coming from the residence.  <u>See</u> Deposition of James Montoya (taken February 9, 2009) at 4:9-5:22, filed July 17, 2009 (Doc. 182-9).  Defendant Matthew Thompson, an APD SWAT officer, was advised that officers from his search team heard loud music coming from the house, and that the other officers "believed that there was a possible party going on inside."  Matthew Thompson's Answer to Interrogatory 7, filed July 17, 2009 (Doc. 182-10).  Sauer also testified that he heard over the radio that there was a "39-2," which is code for a loud-party disturbance.  <u>See</u> Sauer Depo. at 61:9-18.  According to J. Kerns, he was working on rearranging storage outside the Plaintiff's residence before the crash and had been playing music. <u>See</u> J. Kerns Statement at 5; Lindley Depo. at 72:9-15, filed August 11, 2009 (Doc. 201-4).

Montoya reported that there was "stuff" thrown in the driveway and on the side of the home, and also reported observing Marine Corps manuals and other items.  <u>See</u> Montoya Depo. at 5:19-22. Another APD officer reported seeing ammunition canisters either inside the house or in the garage. <u>See</u> Johnston Depo. at 32:16-34:6; Thompson's Answer to Interrogatory No. 7.  Montoya also wrote in his report that the information given by Kerns was "not solid and was misleading," Montoya Depo. at 5:18-19 & Exhibit 1, but he could not recall why he had written that in his report, <u>see</u> Montoya Depo. at 36:9-37:13.  Montoya had never spoken, however, directly with Kerns. <u>See</u> Montoya Depo. at 36:9-37:13.

The officers investigated the outside perimeter of the Plaintiffs' residence and discovered a broken window in the rear of the house.  A. Kerns explains that only the outside pane of the double-paned window had been broken when it was struck by a golf ball.  <u>See</u> Deposition of Archie Kerns at 88:1-6 (taken Oct. 15, 2008), filed May 1, 2009 (Doc. 156-6); <u>id.</u> at 89:14-21; Pl. Response Exhibit 8 at 1, filed May 1, 2009 (Doc. 156-7).  Defendant APD Officer Drew Bader was concerned about the broken window, given the possibility of gunfire in the area; however, he did not closely

inspect the broken glass, and he does not recall seeing a golf ball.  <u>See</u> Deposition of Drew Bader at 38:2-22 (taken February 11, 2009), filed February 17, 2009 (Doc. 117-4); <u>id.</u> at 46:6-10 at 3.

After checking the area around the Plaintiffs' residence for evidence or suspects, Bader and Thompson made several attempts to contact anyone inside the house by knocking and announcing that they were police officers.  No one came to the door in response to their knocking and announcements.  <u>See</u> Johnston Depo. 24:2-9.  The occupants inside the home, A. and M. Kerns -- J. Kerns' parents -- and Michele Zisser -- J. Kerns' girlfriend -- were all asleep, and did not hear the officers' knocks and announcements or any sounds related to the helicopter crash.  <u>See</u> A. Kerns Depo. at 79:2-21;  Deposition of Mary Ann Kerns at 64:20-65:23 (taken Oct. 15, 2008), filed February 17, 2009 (Doc. 117-11).

After the first knock and announce in which the officers were unable to make contact with anyone who might have been inside, Johnston came over to the Plaintiffs' residence and then radioed to the officers at the golf course to get more information from J. Kerns whether it was in fact his residence and where in relation to his residence it was that J. Kerns had heard or seen what he had said he heard or saw.  <u>See</u> Johnston Depo. 24:2-9.  Johnston radioed to the officers at the golf course, who had stayed with J. Kerns,  to get clarification from J. Kerns where he was standing when he heard the popping noise; J. Kerns  relayed that the sound which he heard was directly north. <u>See</u> Johnston Depo. at 24:2-9.  According to Johnston, directly north of the location that J. Kerns gave him is a golf course.  <u>See</u> Johnston Depo. at 24:1-21, 25:11-22.  During this time, the officers at the golf course repeatedly asked J. Kerns to confirm the details of the night.  The officers asked him from what direction he heard the popping noise, what caliber of gun he believed made the noise, and the direction he was standing if one were facing his house.  <u>See</u> J. Kerns Depo. at 158:5-10; <u>id.</u> at 160:25-161:21.  J. Kerns told the officers that the noise came from the north.  <u>See</u> J. Kerns

Depo. at 161:1-162-21.

Johnston did not request permission from J. Kerns to enter the Plaintiffs' residence or inquire whether anyone else was in the residence. See Johnston Depo. at 24:11-21. Johnston stated that, because it was late at night, music was playing, and no one answered the door, the police officers were concerned. See Johnston Depo. at 28:2-6. He also stated that he could not articulate anything that led him to believe that somebody may have been hurt or injured inside the Plaintiffs' residence. See id. at 28:7-10. Thompson stated that, given the circumstances, he "thought that the occupants may be in danger from a possible armed suspect that may have fired at the police helicopter," that "it was possible debris from the [helicopter] could have lodged inside the home," and that "the broken glass could have resulted from a gunshot coming from or into the residence." Thompson Ans. at 2. According to Johnston, at that time there were lights on in the Plaintiffs' residence, and the music coming from the residence played the entire time. See Johnston Depo. at 31:20-25. Bader stated that at the time he had no objective facts or knowledge that made him think that someone had taken refuge inside J. Plaintiffs' residence. See Bader Depo. at 69:4-7. Bader observed that the music that had been coming from the Plaintiffs' residence turned off, which raised concerns, and the officers moved to the rear of the residence. See Bader Depo. at 39:24-40:13. Thompson and Bader knocked on a door at the side of the house and, after no response from within, found the door unlocked and entered the Plaintiffs' residence. See Bader Ans. at 2; Thompson Ans. at 2.

After entering the Plaintiffs' residence, Bader, Thompson, and Defendant APD Officer Russell Carter were met by a female, later identified as Michelle Zisser, J. Kerns' girlfriend at the time. See Thompson Ans. at 2. Thompson identified himself as an APD officer and spoke with Zisser. The officers asked Zisser's consent to look around inside the house. Zisser testified in her deposition that she did not feel she could deny the officers' request, as they had their weapons

displayed.  See Zisser Depo. 46:19-25.  According to Zisser, the officers went quickly around the house with her, and when Zisser informed the officers that J. Kerns' parents were asleep in the master bedroom, they did not enter or investigate in that room.  See id. 47:2-14, 48:24-25:4, at 3-4. The officers were in the Plaintiffs' residence for about five minutes.  See id. 51:8-13, at 3.

       5.      **The Investigation of the Helicopter Crash.**

By the morning of Monday, August 8, 2005, the helicopter had been partially reassembled. See Lindley Depo. at 22:13-21; id. at 23:16-19.  According to Bernalillo County Sheriff Deputy Ralph Gonzales, deputies from Bernalillo County Sheriff's Department had reconstructed the aircraft and found a hole in the plexiglass in the front of the helicopter.  See Gonzales Depo. at 24:10-23.  Bernalillo County and other officials then began to focus their attention on the possibility that the helicopter could have been shot down based on suspected bullet holes in the nose of the helicopter.  See Lindley Depo. at 22:13-21; id. at 23:16-19.  The hole aligned with a shattered left anti-torque pedal in the helicopter.  See Gonzales Depo. at 24:10-23.  During the reconstruction, an agent from the Federal Aviation Administration ("FAA") got into the helicopter.  See Gonzales Depo. at 25:12-15.  When he secured the harness, a piece of a bullet-jacket fragment fell from the harness and into his lap.  See Gonzales Depo. at 25:15-26:1, 26:6-10.  At this time, detectives began pursuing a theory that Metro One had been shot down.  See Gonzales Depo. at 26:3-5.

Bernalillo County Sheriff's Detective Aaron Wright inspected Metro One on August 8, 2005 for evidence relating to the crash.  See Deposition of Aaron Wright at 70:21-23 (taken March 30, 2009), filed June 26, 2009 (Doc. 165-3).  Wright collected several bullet fragments from inside the helicopter.  See Wright Depo. at 20:2-11, 33:1-21; id. at 71:21-23; Wright Depo. Exhibit 1 (Doc. 182-16).  Wright believed the evidence was consistent with the theory that a bullet had made the hole.  See Wright Depo. at 32:23-33:21.  Wright also obtained bullet fragments from

the leg of the pilot, Holland, following Holland's surgery.  See Wright Depo. at 44:21-25; id. at

45:1-12; id. at 71:7-14; Exhibit 10 & Exhibit 11.  Wright then began filling out the forms to request

evaluation by the Forensic Science Center ("FSC").  See Wright Depo. at 45:1-12, Exhibit 10 &

Exhibit 11.  The fragments were tagged and send to Haag at the FSC for processing.  See id.

Koren, the Bernalillo County Sheriff's Department's helicopter mechanic, retrieved the data

from the helicopter's global-positioning-system ("GPS") navigational device, and measured the

distance that the shooter would have been standing from the helicopter when it was shot using a

trajectory angle of sixteen degrees and an altitude of four-hundred-fifty feet.  See Koren Depo. at

67:14-21.[7]  Koren told Lindley that, when the bullet struck the helicopter, it would have been facing

in the direction of a ground tracking measurement of 046 degrees.  See Lindley Depo. at

171:24-172:11.  The Plaintiffs contend that the trajectory angle is wrong, because the pedals were

in neutral when Koren took his measurements.  See Plaintiffs' Motion on Counts II, IV & V at 12.

Koren and Lindley argue that Nelson Welch, the Plaintiffs' expert in accident reconstruction and

firearm examination who reviewed Koren and Lindley's findings, stated that Koren's math was

correct.  See Deposition of Nelson Welch at 183:3-184:6 (taken December 10, 2008), filed August

4, 2009 (Doc. 196-2).  The Plaintiffs counter that the math, given an angle of sixteen degrees is

correct, but that the angle Koren relied on for his calculations is ten degrees off, because the pedals

were placed eight inches from each other at the time the helicopter was shot, and so the correct

trajectory angle should be approximately twenty-five degrees and the correct distance from which

the shooter was located should be closer to one-thousand feet.  See Plaintiffs' Reply to the County

---

[7] Holland estimated the altitude to be about four-hundred feet, see Holland's Report, and the
helicopter GPS indicated four-hundred-eighty feet, so Koren used four-hundred-fifty feet, which was
in the middle.  See Koren Depo. at 58:1-3.

Defendants' Response to the Motion for Summary Judgment as to Liability of Counts II, IV & V of the First Amended Complaint at 5, filed August 24, 2009 (Doc. 215); Declaration of Nelson E. Welch ¶¶ 4-5, at 1 (executed September 3, 2009), filed September 15, 2009 (Doc. 240-9) (finding that the angle is 25.6 degrees and that the shot came from nine-hundred-thirty-nine feet away measured on the horizontal).[8]   The Plaintiffs contend such a measurement indicates the helicopter was facing northeast, see Plaintiffs Motion on Counts II, IV & V at 12, but Lindley and Koren contend such a measurement indicates no specific direction because a helicopter has the ability to fly sideways, see Lindley and Koren's Response at 9.   Koren determined an approximate distance, sixteen-hundred-thirty feet, from which the rifle which shot the helicopter was fired, describing his process as follows:

> The helicopter flies at a relatively level a[l]titude to the earth's horizon during slowly level flight; unfortunately, the downed helicopter was sitting on a flat bed trailer and canted in a nose low position.  Knowing it is impractical to suspend the downed helicopter in the air to level it and take trajectory measurements, I used [the] following steps. 1) I zeroed a protractor on the floor of the rear passenger/cargo area along the longitudinal axis (nose to tail). 2) I pointed a laser beam equipped with a carpenters' level thru the bullet hole to the damaged area of the peddle post. 3) I placed the protractor on top of the carpenters' level and read the measurement (approximately 16 degrees). 4) I repeated these steps about three times with the same results. 5) Using a ruler, yard stick, and protractor, I drew a pictoral sketch depicting the helicopter in level flight at about 450 feet over the ground on a dry erase board. I drew a line at an angle of 16 degrees down from the helicopter[']s longitudinal axis extending from the nose of the helicopter to the ground.  My drawing formed a right triangle.  6) I measured each leg of the triangle and converted inches to feet.  The vertical leg was 4 ½" (conversion to feet: approximately 450 feet). The base leg or horizontal leg was about 15 3/4" (conversion to feet: approximately 1575 feet).  The sloping line/hypotenuse extending from the nose of the helicopter to the ground was measured at about 16 3/8" (conversion to feet: approximately 1630 feet).

---

[8] In a Memorandum Opinion and Order filed March 31, 2010, the Court granted the Plaintiffs leave to supplement their summary judgment record with Welch's Declaration.  See Memorandum Opinion and Order, filed March 31, 2010 (Doc. 263).

Koren Answer to Interrogatory No. 10 at 1, filed July 17, 2009 (Doc. 182-26).[9] On August 12, 2005, Lindley and Koren flew over the crash site in another Bernalillo Sheriff's Department helicopter -- Metro Two -- to measure several locations from the helicopter to the ground.  See Koren Depo. at 78:12-17; Lindley Depo. at 172:23-174:12.  They positioned the helicopter where Koren had calculated Metro One had been, using information from the GPS and from the pilot.  See Lindley Depo. at 180:13-19; Arrest Warrant Affidavit at 14, filed August 11, 2009 (Doc. 201-4).  Officers on the ground used a laser-measuring device to measure the distance from the ground at certain locations and the location of Metro Two, for example measuring that the Plaintiffs' residence was 1670 feet from the position of Metro Two.  See Lindley Depo. at 176:3-6; id. at 182:5-12.

The Bernalillo County Sheriff's Department at no time during the investigation leading up to the arrest-warrant affidavit requested for Haag to ascertain the trajectory angle.  See Defendant Mike Haag's Answers to Plaintiff Jason Kerns' Second Set of Interrogatories to Defendant Mike Haag and Second Request for Production of Documents, Answer No. 26, at 3 (Doc. 240-6).  In early 2006, Haag asked if he could revisit Metro One and use the Metro Forensic Science Center's new Leica Geosystems HDS laser scanner to take a scan of the helicopter.[10]  See id., Answer No. 27. The Bernalillo County Sheriff's Department did not ask Haag to use his scan to complete the trajectory analysis.  See id., Answer No. 28.

---

[9]  The Plaintiffs accept the description of Koren's analysis, but contend that Koren chose an arbitrary pedal position, instead of the pedal position that Holland described at the time of the shooting, which caused Koren to use an angle -- sixteen degrees -- which was less than what would have been appropriate.  See Welch Declaration ¶4, at 1.

[10]  This three-dimensional scanner system uses a combination of a highly accurate aiming device and a laser range finder to build a computer-generated three-dimensional model of the scene. "The potential accuracy as well as the amount of data collected with this method far exceeds other methods."  Michael Haag, The Accuracy and Precision of Trajectory Measurements, AFTE Journal, Vol. 40 No. 2 at 161 (2008), filed September 15, 2009 (Doc. 240-4).

Welch conducted his own analysis and formed a theory on the trajectory of the bullet that hit Metro One.  According to Welch's original assessment, the measured trajectory angle was between thirty degrees and thirty-five degrees, which he stated could not be achieved from the Plaintiffs' residence one-thousand-thirty feet away.  See Letter from Nelson Welch to Marc Lowry at 2 (dated November 6, 2008), filed October 1, 2009 (Doc. 243-1).  He concluded that "[t]he arrest affidavit about the trajectory is therefore also clearly in error."  Letter from Nelson Welch to Marc Lowry at 2.

In Welch's revised findings, based on Dietrich L. Evans' analysis of the data from Haag's laser-scan of Metro One, Welch concluded that the measured angle of the bullet's trajectory was 25.6 degrees.  See Declaration of Nelson E. Welch ¶ 4, at 1 (executed September 3, 2009), filed September 15, 2009 (Doc. 240-9).  Using an entry angle of 25.6 degrees, and assuming the helicopter was four-hundred-fifty feet off the ground, Welch calculated that the shot would have originated from a distance in front of the helicopter of about nine-hundred-thirty-nine feet, measured on the horizontal.  See Welch Declaration ¶ 5, at 1.

**6.      Lindley's August 8, 2005 Interview of J. Kerns.**

On or about August 8, 2005, Lindley interviewed J. Kerns at the Plaintiffs' residence. See Lindley Depo. at 27:12-23;  Affidavit for Search Warrant at 3; J. Kerns Depo. at 164:5-8. During the interview, Lindley questioned J. Kerns about the information he provided the night of the helicopter crash.  See J. Kerns Depo. at 165:3-14 (Doc. 182-2).  At Lindley's request, J. Kerns showed Lindley where he had been standing on the night of the crash -- a couple of feet from the edge of his property.  See J. Kerns Depo. at 165:3-166:3.  Lindley asked J. Kerns about the length of the shot and whether an average person could make the shot.  See J. Kerns Depo. at 166:4-167:3. J. Kerns told Lindley that J. Kerns could make the shot "no problem," and explained that he was a

Marine sniper and that he would easily be able to "take a shot" at over four hundred yards because he routinely trained to take shots of at least four-hundred yards. Affidavit for Search Warrant at 3; J. Kerns Depo. at 166:4-167:21; Lindley Depo. at 54:18-56:6. Kerns further explained that Marine Corps standard for firing for regular Marines -- the minimum Marine Corps standard -- was to be qualified at a five-hundred-yard range. See J. Kerns Depo. at 167:16-21. In response to more general questions about shooting, J. Kerns told Lindley that one could brace themselves against a tree or kneel to take a shot. See J. Kerns Depo. at 168:15-22.

Lindley confirmed with Federal Bureau of Investigation ("FBI") Agent Andrew Matas that J. Kerns had such marksmanship training, and the FBI advised Lindley that J. Kerns had been a helicopter airframe mechanic and range coach/primary marksmanship instructor in the Marine Corps, and such an instructor would "easily be able to hit a man size target out to 700 yards." Affidavit for Search Warrant at 3. Lindley Depo. at 56:3-6. According to Matas, J. Kerns was listed as a Lance Corporal and honorably discharged on November 15, 2001. See Affidavit of Brian Lindley ¶ 3, at 2 (executed July 10, 2009), filed July 17, 2009 (Doc. 182-11).

During Lindley's August 8, 2005 interview with J. Kerns, Lindley also questioned J. Kerns about the visibility of the helicopter on the night of the crash. See Affidavit for Search Warrant at 4. He asked J. Kerns if anyone would have been able to see the helicopter from the area from which J. Kerns heard the popping sound, to which J. Kerns responded: "I was able to see the helicopter fine because I remember the cloud cover was good that night and with the clouds and the lights shining up from the street. The helicopter was a great target." Affidavit for Search Warrant at 4. J. Kerns admits that he probably told Lindley that the helicopter made a great target; it was back-lit, making it appear like a black silhouette on a lighter background, much like the targets used on shooting ranges. See J. Kerns Depo. at 171:9-24. J. Kerns states that he told Lindley that, because he had

-18-

been able to see the helicopter go down, obviously someone in his position could see it.

See J. Kerns Depo. at 169:12-18.  J. Kerns explains he described the night sky as follows:

> I was repeating things that I had written in this written statement about the cloud
> cover being overcast, a pillowy ceiling of cloud layer that covered the entire sky at
> the same level like a blanket, but had a specific altitude above the helicopter
> illuminated from below by the city lights causing the helicopter to look like a black
> dot on a gray orange background creating a silhouette effect, but in different words
> or approximate words.

J. Kerns Depo. at 169:24-170:6.

Lindley also reported that, as he was leaving the Plaintiffs' residence, he spoke with one of

Plaintiffs' neighbors.  Lindley represents that she told him that "if anybody was going to shoot down

the helicopter it would have been my next door neighbor," and that "[h]e's crazy enough to shoot

down the helicopter."  Lindley Depo. at 33:9-34:15 (Doc. 182-5).  J. Kerns contests this fact,

asserting that his next-door neighbor never made such a statement.  See Response ¶ 59, at 5

(citing Affidavit of Gayle Green Gilb at 1-2 (executed July 15, 2009), filed July 27, 2009

(Doc. 190-6)).  J. Kerns cites Gilb's affidavit, which states that an elderly woman named Kathryn

Beauchamp was the neighbor to which Lindley refers, and that Beauchamp denies making the

statements that Lindley attributes to her.  See Gilb Aff. at 1-2.

On August 9, 2005, Detective Danny Joseph conducted surveillance on J. Kerns, following

him in an unmarked vehicle.  See Affidavit of Danny Joseph ¶ 2, at 2 (executed July 6, 2009), filed

July 17, 2009 (Doc. 182-18).  According to Joseph, J. Kerns realized he was being followed, and

began to make erratic turns and drove at a high rate of speed -- over one-hundred miles per hour --

in an apparent attempt to lose his pursuer.  See Joseph Aff. ¶ 2, at 2.  According to J. Kerns, he did

not know who was following him, but it triggered his post-traumatic-stress disorder ("PTSD").

See J. Kerns Depo. at 78:2-80:24.

7.     **August 9, 2005 Interviews of A. Kerns.**

On August 9, 2005, Gonzales, along with other officers, conducted two interviews with A. Kerns, J. Kerns' father.  See Affidavit for Search Warrant at 4; Gonzales Depo. at 48:13-49:5; Gonzales Depo. at 86:14-87:16, filed July 27, 2009 (Doc. 190-6); A. Kerns Depo. at 133:9-20.  The interviews were tape-recorded.  See Gonzales Depo. at 87:2-4.  A. Kerns let the officers into the Plaintiffs' residence on both occasions.  See A. Kerns Depo. at 133:9-20; Gonzales Depo. at 48:13-49:5.  During the first interview, Gonzales and Bernalillo County Sheriff's Deputy Russ Tellez interviewed A. Kerns about a variety of issues, including the firearms A. Kerns and J. Kerns owned.  See Gonzales Depo. at 48:13-49:5.  During the interview, A. Kerns showed Gonzales some photographs of J. Kerns and Zisser.  See Gonzales Depo. at 53:4-23; id. at 87:21-88:16; Transcript of A. Kerns' First Interview at 7 (taken August 9, 2005), filed July 17, 2009 (Doc. 182-13) ("A. Kerns First Interview Tr.").  In the photographs, J. Kerns was cleaning several firearms, and one of the rifles appeared to have a silencer attached.  See Gonzales Depo. at 52:15-25; id. at 53:4-23; id. at 87:21-88:16; A. Kerns First Interview Tr. at 7.  The other photographs depicted several rifles, one of which looked to be an assault rifle.  See Gonzales Depo. at 54:19-55:14; id. at 87:21-88:7.  Gonzales relayed what he saw in the photographs to Lindley.  See Gonzales Depo. at 62:16-63:6.

Gonzales returned to the Plaintiffs' residence on the evening of August 9, 2005 to obtain more information about the firearms and the helicopter crash.  See Gonzales Depo. at 64:14-66-8.  On this second visit, Todd Kalish, an FBI investigator, accompanied Gonzales.  See Gonzales Depo. at 67:23-68:11.  Kalish was shown the photographs that A. Kerns had previously shown to Gonzales.  See Gonzales Depo. at  67:23-68:11.   Kalish noted that J. Kerns seemed familiar with guns and stated "he's got a bunch of them," and A. Kerns replied "Oh yeah."  Transcript of Archie Kerns'

Second Interview at 11-12 (taken August 9, 2005), filed July 17, 2009 (Doc. 182-13)("A. Kerns Second Interview Tr.").[11]

During the second interview, Kalish asked A. Kerns what J. Kerns had told him about the crash.  See Gonzales Depo. at 69:16-70:7; A. Kerns Second Interview Tr. at 10-11. A. Kerns explained that his routine is to get up early -- approximately 3:00 a.m. or 3:30 a.m. -- to make coffee. See A. Kerns Depo. at 79:17-80:5.  He did not recall whether J. Kerns told him about the helicopter crash in the early morning of August 6, 2005, but he recalled J. Kerns told him about the crash the following morning, including the fact that J. Kerns had watched the helicopter crash.  See A. Kerns Depo. at 81:5-19; id. at 95:22-96:3; id. at 109:17:22.  J. Kerns also told A. Kerns that, after seeing the helicopter go down, he helped officers open the door to the helicopter.  See A. Kerns Depo. at 81:20-82:18; id.  at 108:3-8; id.  at 108:24-25; id.  at 109:2-3; id.  at 110:1-9; A. Kerns Second Interview Tr. at 4.  Lindley perceived some inconsistencies in J. Kerns' description of events and what J. Kerns apparently told his father about helping both the pilot and observer, and about where he heard the sound of the rocks.  See Lindley Depo. at 137:8-17; id. at 90:13-25.[12]

_____

[11] The Plaintiffs note that the arrest-warrant affidavit states that A. Kerns told Gonzales during this interview that "Jason has a bunch of rifles somewhere in the house,"  Arrest Warrant Affidavit at 10, and argue that A. Kerns never made such a statement, see Plaintiffs' Motion on Counts II, IV & V at 6; Affidavit of Daniel R. Berg ¶ 2, at 1 (executed July 24, 2009), filed July 27, 2009 (Doc. 190-9)(stating that Berg compared the arrest and search-warrant affidavits with the transcripts of the two A. Kerns' interviews, and was unable to find the alleged statement in the transcripts).  The Plaintiffs contend that the language in the arrest-warrant affidavit is recklessly false.  Lindley and Koren respond that A. Kerns may not have made that statement verbatim, but contend that the language used in the arrest-warrant affidavit was based on the exchange between Kalish and A. Kerns.  The Court will take the dispute into account in its review of the motions for summary judgment.

[12] The Plaintiffs argues that this is not material to the analysis, and that any inconsistency between the various reports about what J. Kerns said can be attributed to a good faith misunderstanding about what J. Kerns believed, rather than any genuine inconsistency. See Lindley Depo. at 127:15-20, 159:15-21 & Exhibit 18 (Doc. 201-4).  The Plaintiffs also attributes any

**8.      August 10, 2005 Search of the Plaintiffs' Residence**.

Lindley drafted a search warrant on August 9, 2005.  See Lindley Depo. at 118:5-10.

Lindley's Affidavit for the Search Warrant requested authority to seize:

> Any and all firearms, to include, but not limited to: automatic pistols or revolvers, long rifles or shotguns; any ammunition, live or spent, any and all boxes and/or containers that may hold said items; any and all gun cleaning equipment and any and all paperwork that may show ownership or possession of said firearms.  Any and all photographs, video, audio, records or writings which may contain information, which may lead investigators to information on the chain of events which lead to the crash of the helicopter in this incident.  Affiant also requests to view or listen to said videos or recordings. Any and all paperwork or documents showing ownership. Possession or occupancy of said property.
>
> Any and all military handbooks, guides, and/or literature.  Any and all news articles/clippings pertaining to the crash of the helicopter being investigated.

Affidavit for Search Warrant at 1.  On August 10, 2005 members of the Bernalillo County Sheriff's Department and several FBI agents executed the search warrant for the Plaintiffs' residence. See Wright Depo. at 72:24-73:11; Deposition of FBI Agent Heather Howard at 25:18-25 (taken March 6, 2009), filed August 10, 2009 (Doc. 199-4).  Lindley did not participate in the search of the Plaintiffs' residence after he dropped off the search warrant.  See Lindley Depo. at 121:9-124:23.   The search warrant inventory records indicate that Wright, Bernalillo County Sheriff's Detective James Hamsten, Bernalillo County Sheriff's Deputy Sean Connors, Bernalillo County Sheriff's Deputy Timothy Hix, Bernalillo County Sheriff's Deputy Rhonda Moya, and FBI agents conducted the search of the Plaintiffs' residence. See Wright Depo. at 53:21-25 and Exhibit 14.  According to Wright, it was Hamsten's, Connors' or Hix' duty to ensure that the items collected were within the scope of the search warrant.  See Wright Depo. at 58:18-25.  During the search of

---

inconsistencies to the inherent unreliability of eyewitness testimony.  See, e.g., Haag Depo. at 9:6-14 (agreeing that eyewitnesses to events are notoriously unreliable).

the Plaintiffs' residence, the officers and agents seized firearms, ammunition, documents --
including J. Kerns' medical records[13] -- A. Kerns' Vietnam helicopter flight manual, and literature.
See Wright Depo. at 72:24-73:11; J. Kerns Aff. ¶ 7, at 1-2.  The officers seized the following
firearms: (i) a 9mm Luger; (ii) a Springfield .45 semi-automatic pistol; (iii) a 9-shot .22 LR revolver;
(iv) a Marlin .22 LR semi-automatic rifle; (v) a Remington 870 shotgun; (vi) a Fabrique Nationale
.30.06 bolt-action rifle ("FN rifle"); (vii) a .357 revolver; (viii) an AR-15 Bushmaster rifle with a
loaded magazine, which was inside a custom guitar case; (ix) an AK-47; (x) a special weapons MP-5
with collapsible stock and oversized flash suppressor; (xi) a .45 semi-automatic pistol with custom
laser-sight grips; and (xii) a suitcase containing a Glock 17 9mm handgun, a custom silencer, and
several high-capacity magazines for the Glock.  See Supplemental Report Form to Wright's Report
at 1-2, filed July 17, 2009 (Doc. 182-16); Wright Depo. at 53:4-11; id. at 56:1-13.

During the search, Joseph and Moya searched the trash left at the roadside at the Plaintiffs'
residence.  See Joseph Aff. ¶ 5; Affidavit of Rhonda Moya ¶ 2, at 2 (executed July 10, 2009), filed
July 17, 2009 (Doc. 182-23).   The officers found a spent casing from a high-powered rifle wrapped
in tape in the Plaintiffs' trash.  See Wright Depo. at 72:15-20; Joseph Aff. ¶ 5; Moya Aff. ¶ 2, at 2;
Electronic Mail Message from Haag to Lindley (dated Aug. 15, 2005), filed June 26, 2009
(Doc. 165-5)("Haag Email").

J. Kerns arrived at the Plaintiffs' residence  during the search.  See J. Kerns Aff. ¶ 6, at 1.
J. Kerns was then voluntarily transported to the Bernalillo County Sheriff's Department's main
office for a formal interview with Lindley and the FBI.  See Lindley Depo. at 125:5-23; J. Kerns
Depo. 63:14-64:9.   J. Kerns told Lindley and Matas that he was being followed earlier.

_____

[13] Lindley and Koren contend that Hix was the only officer associated with seizing
documents.  See Exhibit 14 to Wright Depo.

See Interview with Jason Kerns at 18, filed July 17, 2009 (Doc. 182-4).  J. Kerns told Lindley and Matas that he did not know who was following him, but it triggered his PTSD.  See J. Kerns Depo. at 78:2-80:24.  When asked more questions about his PTSD, Kerns told Lindley and Matas: "I guess I can't explain what PTSD is, if you need to know you can speak to my doctor and he'll explain it." Interview with Jason Kerns at 18.

### 9.    J. Kerns' Medical Records.

At the time of the Metro One investigation, White was the elected sheriff of Bernalillo County, and therefore in charge of the Bernalillo County Sheriff's Department's policies and procedures.  See Deposition of Sheriff Darren White at 24:11-16 (taken March 5, 2009), filed July 17, 2009 (Doc. 180-2).  After leaving the Marines in 2001, J. Kerns received medical and behavioral healthcare at the Veterans Hospital in Albuquerque.  See Affidavit of Jason Kerns ¶ 2, at 1 (executed July 16, 2009), filed July 17, 2009 (Doc. 180-1).  On August 11, 2005, as part of the investigation of J. Kerns, White signed a written request for the Veterans Hospital to disclose J. Kerns' medical and behavior health information.  See White Depo. at 58:23-59-20; id. at 67:1-12. An FBI report indicates that the request was made pursuant the Bureau of Alcohol, Tobacco and Firearms' ("BATF") investigation, which it was conducting with the assistance of the FBI and the Bernalillo County Sheriff's Department.  See FBI Report, Exhibit 3 to Klein Depo. at 1, filed July 17, 2009 (Doc. 182-33).  Because of J. Kerns' admission that he suffers from PTSD, the BATF was interested whether J. Kerns made false statements when purchasing his firearms, because he would have had to indicate that he had not been diagnosed with a mental disorders.  See FBI Report, Exhibit 3 to Klein Depo. at 1.  On August 16, 2005, the Veterans Hospital received a request, signed by White, from the Bernalillo County Sheriff's Department for the release of information from the medical chart of J. Kerns, which the Release of Information unit of the Health Information

Management Section for the Veterans Hospital processed.  See Declaration of Rebecca W. Martinez ¶ 4, at 2 (executed July 17, 2009), filed July 17, 2009 (Doc. 180-3).  The Release of Information unit granted the request on or about August 17, 2005 by releasing 1000 pages of computer records and clipped pages from J. Kerns' chart.  See Martinez Declaration ¶ 4, at 2.  J. Kerns did not consent to the release of his medical records.  See J. Kerns Aff. ¶¶ 3-5, at 1.  Assistant United States Attorney Barth testified that the Bernalillo County Sheriff's Department retrieved the records, then passed to the FBI, and then to the United States Attorney's Office.  See Deposition of Assistant United States Attorney Charles L. Barth at 34:1-16 (taken May 18, 2009), filed August 4, 2009 (Doc. 196-3).

> **10.    Haag's Involvement in the Investigation.**

Haag is a civilian employee of the City of Albuquerque, serving as a forensic scientist with the APD Crime Lab in the Firearms and Toolmark Unit.  See Deposition of Michael G. Haag at 4:12-14 (taken December 15, 2008), filed June 26, 2009 (Doc. 165-1).  Haag is not a law-enforcement officer and therefore does not have the authority to apprehend, arrest, or bring before the court violators within the state.  See Haag Depo. 5:23-24; Affidavit of Michael G. Haag ¶ 2, at 1 (executed February 18, 2009), filed June 26, 2009 (Doc. 165-2).  Haag is a distinguished member of the Association of Firearms and Toolmark Examiners ("AFTE"), which sets the standards and guidelines for all firearm and toolmark examiners.  See Welch Depo. at 30:11-13; id. at 60:4-10.  The field of firearm and toolmark examination is based in science, and thus an examiner uses his or her training in the field to inform and support his or her subjective opinions.  See Theory of Identification as it Relates to Toolmarks at 3, filed August 23, 2009 (Doc. 212-2)("Currently the interpretation of individualization/identification is subjective in nature, founded on scientific principles and based on the examiner's training and experience.").

On August 9, 2005, Wright requested Haag examine the Metro One helicopter, and Haag noted "[s]everal suspicious perforations" of the Plexiglass window, which were consistent with a bullet hole.  Report of Analysis at 12 (dated December 30, 2005), filed June 26, 2009 (Doc. 165-2). On August 11, 2005, Wright gave Haag two work orders requesting Haag examine the evidence the officers collected, including metal fragments, ammunition, firearms, and clothing, see APD Forensic and Technical Services Request for Service Forms at 3-5 (dated Aug. 11, 2005), filed June 26, 2009 (Doc. 165-2); Haag Depo. at 59:4-17; Haag Aff. ¶ 3, at 1, and an additional request, dated September 14, 2005, to examine the copper fragments from Holland's leg, see APD Forensic and Technical Services Request for Service Form at 6 (dated Sept. 14, 2005), filed June 26, 2009 (Doc. 165-2).  Part of Haag's task was to compare the fragments recovered from the helicopter and from Holland's leg, and compare them to test-shots from the firearms seized from the Plaintiffs' residence, including the FN rifle.  See Wright Depo. at 46:1-6.  As part of his examination of the evidence, Haag wrote a Report of Analysis.  See Report of Analysis at 8-17.[14]  He took lead lifts with sodium rhodizonate[15] from the helicopter, which tested positive for vaporous lead[16] and from that result, determined that only a high-velocity projectile, such as a rifle bullet, would have generated, on impact with the helicopter, the amount of vaporous lead he found.  See Report of

---

[14] The Report of Analysis was provided to the United States Attorney's Office and J. Kerns' counsel during his criminal case.  See Barth Depo. at 37:9-19.

[15] A lead lift with sodium rhodizonate is a chemical test for the presence of lead in any form. A positive result around a suspected bullet hole is consistent with the passage of a bullet. See National Institute of Justice, Firearm Examiner Training Manual, available at http://www.ojp.usdoj.gov/nij/training/firearms-training/ ("Firearm Examiner Training Manual").

[16] Vaporous lead residue, also known as lead smoke, is projected from the muzzle of a firearm to a particular maximum distance, and testing for vaporous lead residue may help establish muzzle-to-target distance.  See  Firearm Examiner Training Manual.

Analysis at 12-17; Haag Depo. at 58:17-21. Haag, in his Report of Analysis, does not mention J. Kerns' name, or any allegations about or alleged conduct of J. Kerns. See Report of Analysis at 8-17.

Haag was first given access to the weapons, ammunition, and other evidence seized from the Plaintiffs' residence pursuant to the August 10, 2005 search warrant on August 12, 2005. See Haag Depo. at 58:10-14. Haag examined three rifles -- an AR-15 clone, an AK clone, and a FN bolt-action rifle -- from the collection of weapons seized from the Plaintiffs' residence. See Haag Depo. at 60:22-25. Haag chose to examine these firearms because they were the only high-powered rifles among the weapons seized. See Haag Depo. at 58:19-22. Haag determined that the barrel of the FN rifle was manufactured with a pattern of four lands and four grooves.[17] See Haag Depo. at 66:18-22; Haag Depo. Exhibit 22. Haag measured the average land width on the FN rifle as 0.041 inches. See Haag Depo. at 69:20-22. The literature value[18] for a four land and groove weapon -- a weapon shooting 30-caliber bullets -- is 0.236. See Haag Depo. at 116:5-14; Haag Depo. Exhibit 22.

Haag also examined all of the fragments collected from inside the Metro One helicopter and from the pilot's leg. See Report of Analysis at 7-17. The bullet fragments Haag examined were damaged. See Defendant Mike Haag's Answers to Plaintiff Jason Kerns' First Set of Interrogatories

---

[17] Land and groove impressions are striations -- a series of parallel ridges -- found on the bearing surface of a bullet caused by the rifling in the barrel from which it was fired. See Firearm Examiner Training Manual. Rifling is the process of making the spiral groove impressions in the barrel of a firearm, which imparts a spin to the bullet that improves its aerodynamic stability and accuracy. See id.

[18] A majority of firearm manufacturers provide information in their published literature which contains bore and groove diameter measurements of the barrel of each firearm. See T. Warlow, Firearms, The Law, and Forensic Ballistics at 130 (2d ed. 2005). The "literature value" refers to those published values.

("Haag's Answers to Interrogatories"), Answer No. 3 at 4, filed June 26, 2009 (Doc. 165-4); Report of Analysis at 13-15.  Because of the damage to the fragments, Haag had to unfurl or unbend the fragments recovered to conduct his analysis.  See Haag Depo. at 71:11-14; id. at 109:17-21; id. at 140:20-22; Welch Depo. at 116:17-24.  According to Haag's work notes for the fragment labeled p-1, he made land width measurements of 0.036, 0.037, and 0.035, and noted the average land width measurement as 0.036.  See Haag Depo. at 92:10-16; Haag Depo. Exhibit 22.  Because of the amount of damage to the p-1 fragment, Haag, in his notes, did not write down his measurement for the groove impression width because of his lack of confidence that his measurement would be accurate.  See Haag Depo. at 94:11-20.[19]  The Plaintiffs state that it was "self-evident" that the forensic measurements for the land width and the groove width of the bullet fragment recovered from Holland's leg -- fragment p-1 measured a land width of approximately 0.036 inches and a groove width of less than 0.12 inches -- were considerably smaller than the land and groove widths on the FN rifle, which had a land width of 0.041 inches and a groove width of 0.195 inches. See Plaintiffs' Motion on Counts II, IV & V at 9.  Haag repeatedly states that, because of the significant amount of damage the fragments suffered because of the initial impact of the bullet into the helicopter, fragmentation and bending of the bullet, as well as subsequent deformation, he was not willing to simply take a number down, plug it into a formula, and exclude a weapon with confidence.  See Haag Depo. at 94:15-20; id. at 98:6-16; id. at 102:6-22 ("I wanted to give myself as much breathing room on this as possible, again because of my lack of confidence in the observed measurements, so pause, no, not necessarily.  The bigger the list, the better, because again, I didn't feel comfortable in excluding based on what I saw.").

---

[19] The Plaintiffs contend that the groove impressions were clearly present and visible on the p-1 fragment, and measured less than 0.12 in width.  See Welch Depo. Exhibit 15.

Haag concluded from his analysis that the AR-15 clone and the AK clone rifles did not fire the bullet fragments recovered from the helicopter.  <u>See</u> Haag Depo. at 61:24-62:13.  Haag initially opined that the bullet fragments could not be identified with or excluded from having been fired from the FN rifle.  <u>See</u> Report of Analysis at 13-15; Haag's Answers to Interrogatories, Answer Nos. 5, 7, and 18.  Haag determined that the cartridge casing wrapped in tape recovered from the Plaintiffs' residence had been fired from the FN rifle.  <u>See</u> Report of Analysis at 13.  Further, Haag was not willing to definitively state that the bullet fragments recovered from the Metro One shooting came from a 30-caliber bullet.  <u>See</u> Haag Depo. at 98:3-16.  In his Report of Analysis, in his conclusions about each of the seven fragments recovered from the helicopter and from the pilot's leg, Haag concluded: "This fragment cannot be identified or excluded from having been fired from the FN rifle." Report of Analysis at 13 & 14.  The FN rifle fired 30-caliber bullets.  <u>See</u> Haag Depo. at 98:21-24.  The Plaintiffs contend that Haag "lacked confidence in his original ballistics conclusion that the FN rifle could not be excluded as the suspect weapon."  Plaintiffs' Sealed Response in Opposition to Defendant Mike Haag's Motion for Summary Judgment and Memorandum, in Support, Requesting Dismissal of Counts IV, V, VIII, IX, XI, XIII, and XIV of Plaintiffs' First Amended Complaint at 5, filed August 7, 2009 (Doc. 197)("Plaintiffs' Response to Haag").  The Court has reviewed Haag's deposition testimony, which the Plaintiffs contend makes this factual assertion, and finds that the Plaintiffs have reversed what Haag asserted.  Haag's deposition states:

> Q.     Okay. And you said even though what appears to be a gross discrepancy between the land impression, you weren't comfortable excluding the FN rifle from having fired the bullet fragment?
>
> A.     Correct, because of the amount of unfurling that I had to do, my confidence in the amount of deformation that could have taken place, my confidence in the representation was very low.

Haag Depo. at 79:11-18.  Haag answers that he was not comfortable excluding the FN rifle, not, as the Plaintiffs contend, that he was not comfortable with his conclusion that he could not exclude the FN rifle.  According to Haag, he could not ascertain if the 0.03 land width he measured on fragment f-7 was the result of deformation to the fragment, and thus he was not comfortable excluding the FN rifle, which has a land width of 0.041.  See Haag Depo. at 114:11-115:10.  Additionally, the proportion of the ratios between the land grooves of the fragments and the FN rifle, in Haag's opinion, were different, but were not sufficient for him to feel comfortable excluding the FN rifle in his initial conclusions.  See Haag Depo. at 108:23-109:3.  These comparisons Haag made are standard analytical tools used to match a bullet fragment to a weapon, as reflected by Haag's bench notes, which have entries for these values.  See Haag's Bench Notes (taken August 12, 2005), filed August 7, 2009 (Doc. 197-1).   Haag was also not willing to make a definitive conclusion whether the fragments found in the pilot's leg were compressed.  See Haag Depo. at 119:12-122:22.  Haag acknowledged that the ability to detect the possibility of damage and compression in the fragments is based on past experience, and not methods set forth in scientific literature.  See Haag Depo. at 131:24-132:6 ("I describe it as healthy skepticism over for the observation of physical evidence.").  The AFTE does not have a standard margin of error that is acceptable or unacceptable.  See Welch Depo. at 58:4-10

On August 15, 2005, Haag wrote an electronic-mail message to Lindley.  See Haag Email at 1.  The electronic-mail message informed Lindley of Haag's preliminary results, including that the cartridge wrapped in tape found in the trash matched the FN rifle collected, the ammunition found in the house was all copper-based bullets, that all of the fragments were "mangled very badly," and that the fragments from the helicopter indicated it could have been fired from a "relatively big list of rifles."  Haag Email at 1.  The electronic-mail message did not mention

J. Kerns name, or any allegations or alleged conduct.  See Haag Email at 1.  Haag's electronic-mail message did not give the measurement values he took, nor the literature values for the FN rifle. See Haag Email at 1.

**11.      J. Kerns' Arrest and Indictment.**

On August 15, 2005, Lindley drafted and signed an arrest-warrant affidavit, which was reviewed by a supervisor and an assistant District Attorney prior to submission to the State District Court Judge.  See Lindley Aff. ¶ 4, at 2.  That same day, Lindley obtained a warrant for the arrest of J. Kerns, and J. Kerns was arrested on August 15, 2005.  See  Arrest Warrant Affidavit at 21-27 (executed Aug. 15, 2005), filed July 17, 2009 (Doc. 182-4).  The arrest warrant served as the impetus for criminal charges under state law, but the charges were dropped on August 22, 2005. See Plaintiffs' Request for Admission No. 4 at 1, filed July 17, 2009 (Doc. 182-28).

In the arrest-warrant affidavit, as well as in the state criminal complaint, Lindley used some of the information he received from Haag's electronic mail message, but used his own phrasing and interpretation of the content of the message when writing the arrest-warrant affidavit.  See Arrest Warrant Affidavit and Criminal Complaint at 1-7 (dated Aug. 15, 2005), filed June 26, 2009 (Doc. 165-6); Haag Depo. at 154:2-156:22.[20]   Haag first saw the arrest-warrant affidavit on

_____

[20] The Plaintiffs contest that Lindley used his own phrasing and interpretation of Haag's electronic-mail message, because they contend that Lindley drafted his arrest-warrant affidavit in part based on information Haag provided him.  See Plaintiffs' Response to Haag at 2.  They contend that Haag never informed Lindley, any other law-enforcement officer, or any prosecutor involved in the criminal case that (i) he lacked confidence in the ballistics analysis; (ii) that he believed his forensic measurements of the land and groove widths were not credible because the bullet fragments had shrunk; and (iii) that he was unwilling to state that the bullet fragments recovered from Holland's leg were attributable to a 30-caliber bullet.  The Court has reviewed the electronic-mail message, see Haag Email, and the arrest-warrant affidavit, see Doc. 165-6.  Viewing these documents in the light most favorable to the Plaintiffs, as the non-moving party, the additional facts the Plaintiffs assert do not disprove what is plain from the reading of Lindley's arrest-warrant affidavit -- that he rephrased the language in Haag's electronic-mail message.  Haag's

May 2, 2006, which was after state district judge reviewed and approved it.  See Haag Depo. at

153:20-23.  The United States Attorney's Office either issued a subpoena or requested Haag to

testify as a witness before the grand jury.  See Haag Aff. ¶ 5, at 2.  On August 17, 2005, Haag

testified before the grand jury, during which he described his experience and his examination of the

Metro One helicopter, the bullet fragments, and the FN rifle.  See Grand Jury Transcript of Haag's

Testimony  (taken August 17, 2005), filed June 26, 2009 (Doc. 165-8).  Haag stated during his

testimony that:

> these fragments are highly damaged, I cannot identify them as having been fired
> from that particular rifle.  So I can't say it's that rifle amongst all others, but the
> widths, the general size of them, cants or twists of them, is in agreement with those
> produced by that rifle, as well as many others that are out there on the market.

Grand Jury Transcript of Haag's Testimony at 32:7-13.[21]  During his testimony, Haag never

---

electronic-mail message states: "All live ammo from house is Winchester brand, 30-06 caliber, 180 grain Silver Tip.  These (like almost all HP and SP rifle bullets) do have copper based bullets." Haag Email at 1.  He also states: "One frag from the chopper is the mangled copper base of a bullet. This rules out an FMJ bullet.  It is too badly deformed to tell what caliber."  Haag Email at 1. Lindley's arrest-warrant affidavit states: "The enclosed copper base of a soft point or hollow point bullet was recovered from the helicopter (left seat belt of pilot) and the remaining, unfired Winchester cartridges collected from 9910 Columbus are soft point bullets with enclosed copper bases."  Arrest Warrant Affidavit at 6.  It also states "The copper bullet base from the helicopter is badly damaged, but is consistent in approximate caliber with bullets such as those loaded in 30-06 cartridges."  Arrest Warrant Affidavit at 6.  The Court finds that the difference in phrasing is clear and, for the purposes of this motion, the Court will accept that Lindley rephrased the language in Haag's electronic-mail message when discussing Haag's findings in the arrest-warrant affidavit.

[21] The Plaintiffs concede that these statements were part of Haag's testimony, but contest the accuracy of the testimony

> insofar as Defendant Mike Haag failed (1) to inform the grand jury that the forensic
> measurements of the bullet fragments were in fact much smaller than the widths for
> the FN rifle . . . or (2) to alert the grand jury to his lack of confidence in his analysis
> that the land and groove widths of the bullet fragments were in "agreement with
> those produced by" the FN rifle.

Plaintiffs' Response to Haag at 3.  In reply, Haag concedes that he did not explain the science behind

mentioned J. Kerns by name.  See Grand Jury Transcript of Haag's Testimony.  Agent Doug Klein

of the FBI also testified before the Grand Jury.  See Grand Jury Transcript of [Redacted] Testimony

(taken August 17, 2005), filed June 26, 2009 (Doc. 165-8).

On August 17, 2005, the federal grand jury indicted J. Kerns.  See Indictment, filed

June 26, 2009 (Doc. 165-9).  The only witnesses to testify before the grand jury were Haag and FBI

agent Klein.  Lindley turned his files over to the FBI prior to the grand jury proceeding.  See Lindley

Answer to Interrogatory No. 24 at 1, filed July 17, 2009 (Doc. 182-35).[22]  According to Klein, all

of the information he testified to before the grand jury came from the Bernalillo County Sheriff's

Department and the APD.  See Klein Depo. at 36:15-16.

### 12.    J. Kerns' Waiver of Detention Hearing.

On August 25, 2005, J. Kerns filed a Waiver of Detention Hearing.  See Waiver of

Detention Hearing (dated Aug. 25, 2005), filed June 26, 2009 (Doc. 165-10).  The Honorable

Alan C. Torgerson, United States Magistrate Judge for the District of New Mexico, issued an Order

of Detention Pending Trial, which states: "The Court makes the necessary probable cause finding

based on the waiver," Order of Detention Pending Trial (dated Aug. 25, 2005), filed June 26, 2009

his conclusions, nor does he contend he was required to do so.  See Defendant Mike Haag's Reply
to Plaintiffs' Response to Defendant Haag's Motion for Summary Judgment and Memorandum, in
Support, Requesting Dismissal of Counts IV, V, VII, IX, XII, XIII, and XIV of Plaintiffs' First
Amended Complaint at 3, filed August 17, 2009 (Doc. 207)("Haag's Reply").  Because the Plaintiffs
do not contest the quotation from Haag's testimony, the Court will accept the fact as Haag has stated
it.  To the extent that Haag did not state the information which the Plaintiffs argue he failed to state,
the Court notes the omission from the testimony.

[22] The Plaintiffs contest this fact, because they contend that not all files were turned over.
For example, Klein does not recall seeing the GPS data.  See Deposition of Doug Klein at 21:1-15
(taken March 6, 2009), filed August 11, 2009 (Doc. 201-18).  According to FBI Agent Heather
Howard, she did not know there was GPS data to request, so it was never requested.  See Howard
Depo. at 23:1-6.  The Court will consider this discrepancy in its analysis.

(Doc. 165-11).[23]  J. Kerns was thereby remanded into the custody of the United States Marshals pending final disposition of his case.  See Order of Detention Pending Trial.  J. Kerns filed a Motion to Reconsider Detention Order on December 1, 2005, see United States v. Jason Kerns, No. CR 05-01776 JC (D.N.M.), Motion to Reconsider Detention Order (Doc. 20), and Judge Torgerson held a hearing on December 21, 2005.  In an Order issued that same day, Judge Torgerson denied J. Kerns' motion for reconsideration, finding that J. Kerns did not overcome the rebuttable presumption under 18 U.S.C. § 3142(e) that J. Kerns was a danger to the community and a flight risk.  Judge Torgerson independently found that, based on past failures to appear and J. Kerns' attempt to avoid the Bernalillo County Sheriff's Department's detectives, he was a flight risk. See United States v. Jason Kerns, 05-01776 JC, Order at 1 (Doc. 28).  Judge Torgerson also found that, based on J. Kerns' mental history, testimony about his acts of road rage and history with his mother, he was a danger to the community.  See id. at 1.  J. Kerns remained incarcerated for nine months.

### 13.   Welch's Analysis and Dismissal of Charges Against J. Kerns.

On April 27, 2006, the Plaintiffs' expert, Welch, contacted Haag to inform him that Welch had concluded that the FN rifle seized from the Plaintiffs' residence possessed differing rifling

---

[23] The Plaintiffs' contest this fact.  They argue that the statement in Judge Torgerson's subsequent Order of Detention Pending Trial, which states that the Court had made the necessary probable-cause finding based on the waiver, is dicta, because J. Kerns did not concede or speak to the issue of probable cause in his waiver.  See Plaintiffs' Response to Haag at 3.  The Court, however, does not believe that this argument is sufficient evidence to contest Judge Torgerson's statement in the Order of Detention Pending Trial and therefore accepts that he made that statement. The Plaintiffs also argue that J. Kerns' waiver of the detention hearing reserved his right to bring a detention hearing in the future.  The Court notes that the waiver J. Kerns signed states: "[I] do hereby waive (give up) my right to a detention hearing and agree to be detained.  However, I reserve the right to petition the court to review my detention and set reasonable conditions of release." Waiver of Detention Hearing.  J. Kerns did not reserve his right to a detention hearing in the future, as he contends; rather, he reserved his right for the Court to review his detention.

characteristics[24] than the rifle used to fire the bullet that fragmented within the Metro One helicopter.

See Report of Analysis at 17; Haag's Answers to Interrogatories, Answer No. 4.  According to

Welch, he eliminated the FN rifle as the suspect rifle in less than five seconds after comparing a

bullet fragment to the test-fire from the FN rifle under a forensic microscope.  See Haag Depo. at

135:9-14.  Welch found that the groove-width comparison of the bullet fragment from the helicopter

was not in agreement with the bullets test-fired from the FN rifle.  See Declaration of

Nelson E. Welch ¶¶ 5-7, at 1 (executed August 7, 2009), filed August 7, 2009 (Doc. 197-7).  Haag

reviewed Welch's notes, in particular, his methodology in determining general rifling characteristics

using the knurled cannelure[25] present on fragment p-1.  See Report of Analysis at 17.[26]  According

to Haag, the use of knurls to evaluate the spacing of lands and grooves is not standard practice in

---

[24] Rifling characteristics are the number, width, and direction of twist of the rifling grooves in a barrel of a given caliber firearm.  See Firearm Examiner Training Manual.

[25] A cannelure is a groove impression in a ring around the bullet.  A cannelure can be smooth or knurled -- having small ridges, like serrations.  See Firearm Examiner Training Manual.

[26] The Plaintiffs contest this fact.  They argue:

Mike Haag knew that Nelson Welch based his exclusion of the FN rifle on the gross discrepancy between the land and groove widths of the bullet fragments (like P-1 and P-7) as compared to the land and groove widths produced by the FN rifle, forensic measurements taken on the bullet fragment that formed the base of the bullet (radial measurements), in addition to using the knurled cannelures between the land impression on the bullet fragment P-1 to gauge the number of lands and grooves on a 30 caliber bullet.  See December 10, 2008 Deposition of Ne[ls]on Welch, [85:]4-18; [155:]3-14; [156:]1-5.  Mr. Welch's use of the knurled cannelures to estimate the number of lands and grooves on a 30 caliber bullet merely served as redundant proof for his traditional ballistics analysis, an analysis that had already eliminated the FN rifle as the suspect rifle.

Plaintiffs' Response to Haag at 4.  The Court does not believe that this argument shows a factual dispute whether Haag reviewed Welch's notes.  The Court accepts that Haag reviewed Welch's findings and also accepts the Plaintiffs additional description of Welch's technique.

the field of Firearm Examination, nor is it published or accepted as a method of analysis. See Haag's Answers to Interrogatories, Answer No. 4.  Haag reviewed and evaluated Welch's use of the "knurled cannelure method" and found no flaws in its use or accuracy, and Haag, therefore, concluded from the novel methodology that the FN rifle had different class characteristics from the knurled cannelure present on the p-1 bullet fragment and thus could be excluded from having fired the bullet into the Metro One helicopter.  See Haag's Answers to Interrogatories, Answer No. 4; Report of Analysis at 17.  Haag apprised the United States Attorney's Office of his revised findings. See Haag's Answers to Interrogatories, Answer No. 18.  Haag maintains that he is still not confident that the fragments were from a 30-caliber bullet, but states that he is not willing to second-guess his initial observations and conclusion to not exclude the FN rifle.  See Haag Depo. at 107:7-13.  Welch stated that it is common for forensic analysts in the field of firearms and toolmarks to have inconclusive findings.  See Welch Depo. at 20-23.  He also stated, however: "I cannot comprehend from the work notes why it was an inconclusive.  I just -- it boggles my mind."  Welch Depo. at 30:1-5.

According to Welch, Haag is responsible, conscientious, and detail-oriented.  See Welch Depo. at 29:19-30:4.  Welch also stated that Haag is truthful, well-published, and well-respected in the field.  See Welch Depo. at 30:5-13.  This case is the first and only time that Welch has disagreed with one of Haag's findings.  See Welch Depo. at 30:21-23.  Welch believes that the failure to account for the discrepancy between the groove width on the bullet fragments from the helicopter and the bullet test-fired from the FN rifle constituted reckless disregard of the facts.  See Welch Declaration ¶ 11, at 2.

On May 10, 2006, the federal criminal charges against J. Kerns were dismissed by the United States Attorney because he determined, after review of the ballistics evidence, that there was

insufficient evidence to proceed.  See United States v. Jason Kerns, 05-cr-1776 (D.N.M.) (Docs. 54 & 55).  The Plaintiffs gave notice of potential New Mexico Tort Claims Act claims on July 7, 2006.  See Notice of Claims Pursuant to New Mexico Tort Claims Act (dated July 7, 2006), filed July 1, 2009 (Doc. 168-16).

## PROCEDURAL BACKGROUND

The Plaintiffs filed their First Amended Complaint for Damages Caused by the Deprivation of Civil Rights and Other Tortious Conduct on November 26, 2007.  See Doc. 5.  The Plaintiffs asserted fifteen claims, each against some or all of the seventeen named Defendants and against ten unidentified John Does, stemming from the arrest and incarceration of J. Kerns.  Since the filing of the Amended Complaint, the Plaintiffs have stipulated to the dismissal of all claims asserted against certain Defendants[27] and have stipulated to the dismissal of some claims against other remaining Defendants.[28]  The remaining Counts and Defendants are: (i) Count I -- illegal entry without a

---

[27] On February 24, 2009, the Plaintiffs dismissed with prejudice all claims asserted against Hamsten, Connors, Hix, and Moya.  See Stipulation of Dismissal of Defendants James Hamsten, Sean Connors, Timothy Hix, and Rhonda Moya with Prejudice, filed February 24, 2009 (Doc. 121). On March 20, 2009, the Plaintiffs dismissed with prejudice all claims asserted against Montoya and Johnston.  See Stipulated Dismissal of Defendants James Montoya and Robert Johnston with Prejudice, filed March 20, 2009 (Doc. 137).  The parties have agreed to dismiss with prejudice all claims against Wright.  See Stipulated Order of Dismissal of Aaron Wright with Prejudice, filed July 6, 2009 (Doc. 170).  The Plaintiffs have also stipulated to dismiss with prejudice of all claims against Gonzales.  See Notice of Stipulated Dismissal of Defendant Ralph Gonzales, filed July 17, 2009 (Doc. 183).

[28] The Plaintiffs dismissed with prejudice Count XV as against Bernalillo County and White. See Notice of Stipulated Dismissal of Defendant Darren White and of the Board of Commissioners of Bernalillo County Under Count XV, filed August 20, 2009 (Doc. 209).  The Plaintiffs dismissed with prejudice the claims against the City of Albuquerque asserted in Counts VII, VIII, IX, X, XI, XII, XIII, XIV, and XV.  See Notice of Stipulated Dismissal of City of Albuquerque, filed August 20, 2009 (Doc. 210).  The Plaintiffs dismissed the claims against Haag asserted in Counts VIII, IX, X, XI, XII, XIII, XIV, and XV of the First Amended Complaint.  See Notice of Stipulated Dismissal of Mike Haag, filed August 20, 2009 (Doc. 211).  The Plaintiffs dismissed with prejudice Count XII of the First Amended Complaint asserted against Bernalillo County, Lindley, and Koren.  See Notice

warrant -- asserted against Bader, Carter, and Thompson; (ii) Count II -- unlawful search and seizure -- asserted against Lindley; (iii) Count III -- unlawful search and seizure of medical information and deprivation of medical privacy contrary to the Fourth Amendment, the Fourteenth Amendment, and the Federal Privacy Act, 5 U.S.C. § 552A(b)(7) --  asserted against White; (iv) Count IV -- false arrest/false imprisonment of J. Kerns under the Fourth Amendment -- asserted against Lindley, Koren, and Haag; (v) Count V -- malicious prosecution under the Fourth Amendment -- asserted against Lindley, Koren, and Haag; (vi) Count VI -- municipal liability for the violations asserted in Count III -- asserted against White; (vii) Count VIII -- false detention/arrest/imprisonment of J. Kerns under the NMTCA -- asserted against Lindley, Koren, and the County; (viii) Count IX -- malicious abuse of process under the NMTCA -- asserted against Lindley, Koren, and Bernalillo County; (ix) Count X -- deprivation of property rights and trespass under the NMTCA -- asserted against Lindley, Bader, Thompson, Carter, and Bernalillo County; and (x) Count XI -- deprivation of property rights and conversion under the NMTCA -- asserted against Lindley and Bernalillo County.  On February 17, 2009, Bader, Thompson, and Carter moved for summary judgment on the basis of qualified immunity on Counts I, X, and XIII, see Defendants Drew Bader, Matthew Thompson, and Russell Carter's Motion for Summary Judgment and Memorandum in Support,

---

of Stipulated Dismissal of Bernalillo County, Brian Lindley, and Larry Koren Under Count II, filed September 4, 2009 (Doc. 229).  The Plaintiffs dismissed with prejudice Count XIII of the First Amended Complaint asserted against Bernalillo County, Lindley, Bader, Thompson, and Carter. See Notice of Stipulated Dismissal of Bernalillo County, Brian Lindley, Drew Bader, Matt Thompson, and Russell Carter, filed September 4, 2009 (Doc. 230).  The Plaintiffs dismissed with prejudice Count XIV of the First Amended Complaint asserted against Bernalillo County, Lindley, and Koren.  See Notice of Stipulated Dismissal of Bernalillo County, Brian Lindley, and Larry Koren, filed September 4, 2009 (Doc. 231).  The Plaintiffs also dismissed with prejudice Bernalillo County and White as to Count VI of the First Amended Complaint, with the exception of liability concerning Count III.  See Stipulated Dismissal of Defendants Bernalillo County Board of Commissioners as to Count VI, with Prejudice, with the Exception of Municipal Liability as it Related to Count III, filed July 14, 2009 (Doc. 176).

Requesting Dismissal of Counts I, X, and XIII of Plaintiffs' First Amended Complaint [Doc. 5], filed February 17, 2009 (Doc. 117), which the Court denied.  See Order, filed September 30, 2009 (Doc. 242); Memorandum Opinion, filed October 5, 2009 (Doc. 246).  The City of Albuquerque appealed that decision to the United States Court of Appeals for the Tenth Circuit on October 29, 2009.  See Notice of Appeal, filed October 29, 2009 (Doc. 248).[29]

Now before the Court are four summary judgment motions -- two motions for summary judgment from the Plaintiffs, Haag's motion for summary judgment on the basis of qualified immunity, and Bernalillo County, White, Lindley, and Koren's ("County Defendants")[30] motion for summary judgment on the basis of qualified immunity.  The parties have expressed to the Court that they wish for the Court to decide these four motions "in one global order to facilitate the appellate process."  Letter to the Court from Stephanie Griffin and Marc Lowry re: Pending Matters at 1, filed February 18, 2010 (Doc. 259).

---

[29] Although there is a pending interlocutory appeal, the transfer of jurisdiction to the Tenth Circuit is limited to the aspects of the case involved in the appeal -- here, whether Bader, Thompson, and Carter are entitled to qualified immunity on Counts I and X of the First Amended Complaint.  See Howard v. Mail-Well Envelope Co., 150 F.3d 1227, 1229 (10th Cir. 1998)(stating "the transfer [of jurisdiction by appeal] affects only those aspects of the case involved in the appeal.").  The Court has continuing jurisdiction to decide the remaining summary judgment motions.  See id. at 1229 ("Thus, when an appeal is taken from a limited interlocutory ruling, as opposed to one that affects the litigation as a whole, the district court may proceed with the case."); Stewart v. Donges, 915 F.2d 572, 575-76 (10th Cir. 1990)(stating that, insofar as there are "discrete orders that can be carved out and isolated from the remainder of the case," the district court is permitted to proceed in substantive matters).  The parties agree that the Court has jurisdiction to decide these four motions, and, moreover, have asked the Court to decide these motions, stating that resolution would facilitate appeal of the issues.  See Letter to the Court from Stephanie Griffin and Marc Lowry re: Pending Matters at 1.

[30] The motion also included Gonzales, whom the Plaintiffs dismissed after the motion was filed but before the Court held its hearing.

-39-

1.      **Haag's Motion for Summary Judgment on the Basis of Qualified Immunity on Counts IV and V.**

The Plaintiffs have two outstanding claims against Haag: (i) a claim under 42 U.S.C. § 1983 for false arrest/false imprisonment in violation of the Fourth Amendment and Fourteenth Amendment; and (ii) a § 1983 claim for malicious prosecution in violation of the Fourth Amendment and Fourteenth Amendment.  In his motion for summary judgment, Haag asserts that he is entitled to qualified immunity against the false arrest/imprisonment claim.  He also asserts he is entitled to absolute immunity or, in the alternative, to qualified immunity against the malicious-prosecution claim.

a.      **Arguments in the Briefs on Haag's Motion for Summary Judgment.**

Haag contends that he did not personally participate in the authorship of J. Kerns' arrest-warrant affidavit and that he never reviewed the arrest-warrant affidavit, in which Lindley included information from the electronic-mail message he received from Haag, before it was presented to a judge for approval.  See Haag Motion at 9-10.  Haag argues that he did not see the arrest-warrant affidavit until nine months after it had been submitted to a judge.  Haag further argues that he is not a police officer and has no authority to arrest J. Kerns, nor was he the affiant of the arrest-warrant affidavit.  See Haag Motion at 11-12.  Haag argues that, because he is not a law-enforcement officer and not the affiant, he cannot be held liable for the false arrest/false imprisonment claim alleged in Count IV.  Haag also argues that he is entitled to absolute immunity protection from the Plaintiffs' malicious-prosecution claim because he testified as a witness in the grand-jury proceeding and was not a complaining witness -- he did not accuse J. Kerns of criminal conduct -- and therefore he should be immune from civil damages based upon his testimony. See Haag's Motion at 12-13.  In the alternative, Haag argues he should be entitled to qualified

immunity protection because he did not cause J. Kerns' continued confinement or prosecution. See Haag's Motion at 15.

The Plaintiffs contend that Haag contributed material misinformation and omitted exculpatory facts that created a false impression that probable cause existed to arrest J. Kerns. See Plaintiffs' Sealed Response in Opposition to Defendant Mike Haag's Motion for Summary Judgment and Memorandum, in Support, Requesting Dismissal of Counts IV, V, VIII, IX, XI, XIII, and XIV of Plaintiffs' First Amended Complaint at 1, filed August 7, 2009 (Doc. 197). The Plaintiffs contend that Haag's asserted lack of personal participation in charging, arresting, detaining, or prosecuting J. Kerns is insufficient to warrant dismissal of the Plaintiffs' federal civil rights claims. See Response to Haag's Motion at 8. The Plaintiffs also argue that Haag had no credible rationale for failing to exclude the FN rifle as the suspect rifle. See Response to Haag's Motion at 8. The Plaintiffs contend that Haag's theory that the bullet fragments may have been compressed, which he states he believes is a possibility based upon experience, and not based on published scientific literature, shows a knowing or reckless disregard for the truth that the groove measurements of the fragments did not match the grooves in the test-fire bullet from the FN rifle, for which the Plaintiffs contend Haag is liable under the Fourth and Fourteenth Amendments. See Response to Haag's Motion at 9. The Plaintiffs also argue that Haag is not entitled to absolute immunity from their malicious-prosecution claim because they contend that Haag was a complaining witness. The Plaintiffs contend that Haag's failure to immediately exclude the FN rifle was instrumental in causing J. Kerns' arrest and prosecution. The Plaintiffs also contend that their malicious-prosecution claim accrued well before Haag testified before the grand jury. See Response to Haag's Motion at 11.

The Plaintiffs argue that Haag is liable under the Tenth Circuit's holding in Pierce v.

Gilchrist, 359 F.3d 1279 (10th Cir. 2004), in which the Tenth Circuit denied a forensic analyst's motion to dismiss a claim against her for malicious prosecution, based on her finding that hair could have been from a suspect that was later exculpated, because the Tenth Circuit could "not say the false information supplied by [the forensic analyst] and the accurate exculpatory information disregarded by [the forensic analyst] were not significant enough to prejudice [the defendant's] constitutional rights[.]" 359 F.3d at 1287. The Plaintiffs contend that Haag's statement to the grand jury that the bullet fragments recovered from the shooting were "in agreement with those produced by" the FN rifle is the functional equivalent of saying that the FN rifle could have fired the bullet which hit the helicopter. See Response to Haag's Motion at 12.

In reply, Haag argues that the Plaintiffs have offered no argument establishing that a non-affiant who was not afforded the opportunity to review an arrest-warrant affidavit should be liable under § 1983 for an unlawful arrest claim. See Haag's Reply at 5. Haag argues that the law establishes that only an affiant and/or a person in the same position as the affiant can be held liable under § 1983. See Haag's Reply at 6 (citing Malley v. Briggs, 475 U.S. 335, 345 (1986)). Haag contends that he is not a complaining witness and thus entitled to absolute immunity from the malicious-prosecution claim because he did not investigate J. Kerns. See Haag's Reply at 7. Haag contends that his role was solely as a firearm and tool mark examiner evaluating physical evidence to offer opinions of identification, elimination, or inconclusive. See Haag's Reply at 7. Haag further argues that his calculations are not materially exculpatory information because he had concerns about their accuracy because of the deformation of the bullet fragments. See Haag's Reply at 9. Further, Haag contends that there is no clearly established law stating that a non-officer may be liable for withholding allegedly exculpatory information from law-enforcement officials. See Haag's Reply at 10. Finally, Haag argues that, even if his testimony were excluded from the

grand jury's probable-cause determination, Klein's testimony -- which Haag contends the Plaintiffs

have not challenged -- would still provide the requisite probable cause.  See Haag's Reply at 10-11.

> **b.    Arguments at the Hearing Regarding Haag's Motion for Summary Judgment.**

At the hearing, Stephanie Griffin, Haag's attorney, argued that the Tenth Circuit's holding

in Pierce v. Gilchrist did not address false arrest or false imprisonment, and indeed the Tenth Circuit

found that there was probable cause for the warrant for arrest in that case.  See Transcript of Hearing

at 39:23-40:9 (taken August 31, 2009)(Griffin)("Tr.").[31]  Ms. Griffin contended that the false-arrest

claim and false-imprisonment claims should fail because Haag lacks personal participation.

See Tr. at 40:10-12 (Griffin).  Ms. Griffin conceded that the holding in Pierce v. Gilchrist would

allow the Plaintiffs to bring a claim against Haag for malicious prosecution, even though he did not

personally participate as an affiant; however, she argued that Haag has raised a number of defenses,

including absolute immunity, which were not raised in  Pierce v. Gilchrist.  See Tr. at 40:20-25

(Griffin).  Ms. Griffin argued that Haag did not actively instigate or encourage prosecution of

J. Kerns.  See Tr. at 41:17-20 (Griffin).  She distinguished Pierce v. Gilchrist, arguing that, even if

Haag determined that the FN rifle was responsible for the fragments, he would not have determined

that J. Kerns was responsible for firing that weapon, and thus he should not be viewed as a

complaining witness.  See Tr. at 42:6-19 (Griffin).  Ms. Griffin stressed that Welch was asked if

Haag withheld any data from him, and he strenuously denied that any data was withheld.

See Tr. at 45:9-20 (Griffin).  Ms. Griffin further argued that, even if Haag's testimony before the

grand jury were set aside and not considered, Klein's evidence alone established probable cause.

---

[31] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

See Tr. at 48:22-49:2 (Griffin).

Marc Lowry, the Kerns' attorney, argued that Haag's actions in not immediately excluding the FN rifle amounted to more than negligence; it amounted to reckless disregard for the truth. See Tr. at 54:7-12 (Lowry). Lowry argued that the land and groove impression on the fragment from Holland's leg and the test-fire from the FN do not match, and Haag's inability to make that determination was reckless. See Tr. at 56:16-21 (Lowry). Mr. Lowry argued that, based on the notes Haag made in his raw data, there is room for an inference that Haag used a larger margin of error to include the FN rifle. See Tr. at 62:1-5 (Lowry). Mr. Lowry believes the interpretation of the work notes is a question of fact that the jury should decide, and that it is up to the jury to decide whether Haag's actions amounted to recklessness or if he intentionally ignored data. See Tr. at 63:13-15 (Lowry); id. at 81:6-14 (Lowry). Mr. Lowry stated that he believes that Haag's actions were in such gross error that the Court is in a position to say as a matter of law that he is liable. See Tr. at 81:17-22 (Lowry). Mr. Lowry maintained that the errors should have been obvious to Haag. See Tr. at 72:12-24 (Lowry). Mr. Lowry also stressed that Haag is a complaining witness, not entitled to qualified immunity. See Tr. at 72:24-73:7 (Lowry).

Ms. Griffin responded to Mr. Lowry's assertion that the exclusion of the FN rifle should have been obvious to Haag, arguing that Haag was conservative, given the damage to the fragments recovered from Holland's leg and from Metro One. See Tr. at 86:21-25 (Lowry). Ms. Griffin also argued that Haag eliminated some of the firearms found in the Plaintiffs' residence. See Tr. at 88:18-25 (Griffin). Ms. Griffin stated that she does not believe that Haag's conduct rises to the standard in Pierce v. Gilchrist, because he was dealing with a lot of variables, given the size of the fragments and the damage to the fragments. See Tr. at 89:8-15 (Griffin). Mr. Lowry further argued that it is his contention that Haag was under institutional pressure to find some commonality

between the FN rifle and the fragments.  See Tr. at 97:20-24 (Lowry).  Mr. Lowry conceded that the

shell-cartridge wrapped in tape found in the Kerns' trash can was definitely from the FN rifle.

See Tr. at 99:15-20 (Court, Lowry).

**2.  The Plaintiffs' Motion for Summary Judgment as to Liability on Counts II, IV and V of the First Amended Complaint.**

The Plaintiffs, in their motion for summary judgment on Counts II, IV & V, move the Court

to enter declaratory judgment.  First, in Count II, the Plaintiffs ask the Court to declare Lindley

liable for the illegal search of the Plaintiffs' residence.  Second, in Count IV, they ask the Court to

declare Lindley, Koren, and Haag liable for J. Kerns' false arrest and false imprisonment.  Third,

in Count V, the Plaintiffs ask the Court to declare Lindley, Koren, and Haag liable for the failure

to disclose exculpatory information.  See Plaintiffs' Motion on Counts II, IV & V at 1.

The Plaintiffs contend that Lindley's search-warrant affidavit lacked probable cause to

support the search of the Plaintiffs' residence because it failed to tie J. Kerns to the shooting of

Metro One in a meaningful way.  See Plaintiffs' Motion on Counts II, IV & V at 13.  The Plaintiffs

contend that Lindley should have known that J. Kerns' statements to officers that he heard a popping

sound from his backyard was "an innocent mistake."  Plaintiffs' Motion on Counts II, IV & V at 14.

The Plaintiffs also argue that Lindley should have realized there was no nexus between J. Kerns or

the Plaintiffs' residence, and the shooting of Metro One, other than Lindley's suspicion that J. Kerns

was involved.  Plaintiffs' Motion on Counts II, IV & V at 14.  The Plaintiffs contend that Lindley's

affidavit in support of the search warrant is an unsubstantiated hunch that J. Kerns was involved in

the shooting.  The Plaintiffs also argue that the Court should exclude information from the affidavit

in support of the search warrant which they contend was recklessly false, including: (i) information

regarding a concerned citizen who made statements that, if anyone in the neighborhood would have

-45-

shot down a helicopter, it would be the male living at 9910 Columbus Circle -- the Plaintiffs'
address; (ii) statements Lindley attributed to A. Kerns that J. Kerns told him shortly after 12:30 a.m.
on August 6, 2005, that someone had shot down the helicopter; (iii) the statement attributed to
A. Kerns that J. Kerns had "a bunch of rifles somewhere in the house"; and (iv) that A. Kerns stated
that J. Kerns had told him that he had helped the pilot and observer out of the helicopter after the
crash.  See Plaintiffs' Motion on Counts II, IV & V at 17.  The Plaintiffs also contend that the
warrant affidavit failed to include the following: (i) that another witness, George Smith, was
standing at the clubhouse to the golf course, not far from the Plaintiffs' residence, and also drove
to the scene of the crash, but did not report hearing anything like gunshots; and (ii) that the
helicopter had been struck by a bullet directly through the front of the aircraft while, according to
Smith, the aircraft was facing away from the Plaintiffs' residence.  See Plaintiffs' Motion on Counts
II, IV & V at 17.  The Plaintiffs also argue that the execution of the August 9, 2005 search warrant
caused much of the Plaintiffs' property to be illegally seized because the warrant was insufficiently
particularized.  See Plaintiffs' Motion on Counts II, IV & V at 18.

With regards to Count IV -- false arrest and false imprisonment -- the Plaintiffs contend that
Lindley's arrest-warrant affidavit contained recklessly false information, and omitted both
information about the positioning of the helicopter and ballistics information that Haag provided.
See Plaintiffs' Motion on Counts II, IV & V at 21-23.  The Plaintiffs contend that, when the
information regarding the shooting distance and GPS information, as well as the ballistics
information, is purged from the affidavit, there is no probable cause left to support the proposition
that J. Kerns was responsible for the Metro One shooting.  See  Plaintiffs' Motion on Counts II, IV
& V at 25.

The Plaintiffs also argue that the suppression of favorable evidence violates the due-process

clause and that a police officer or forensic analyst may be liable under the Fourteenth Amendment for withholding exculpatory evidence.  See  Plaintiffs' Motion on Counts II, IV & V at 26.  The Plaintiffs contend that Lindley, Koren, and Haag knowingly and recklessly withheld material exculpatory information from the Court, the prosecution, and the defense team, and contend that if such evidence had been disclosed in a timely manner, J. Kerns would have been exonerated. See Plaintiffs' Motion on Counts II, IV & V at 26.  The Plaintiffs contend that Koren and Lindley fabricated their trajectory analysis to place a gunshot within forty feet of the Plaintiffs' residence. See Plaintiffs' Motion on Counts II, IV & V at 26-27.  The Plaintiffs state that the GPS data from the helicopter constitutes Brady v. Maryland[32] material because it was demonstrably exculpatory, as they contend it showed that the helicopter was facing away from the Plaintiffs' home and demonstrated that the officers' analysis was misleading.  See  Plaintiffs' Motion on Counts II, IV & V at 27.  The Plaintiffs further contend that Haag failed to disclose the true nature of his forensic tests and that he should have informed the Court that he was not confident in his analysis, and that in not doing do, he suppressed material evidence in violation of the Fourteenth Amendment. See Plaintiffs' Motion on Counts II, IV & V at 27-28.

The County Defendants respond that Lindley and Koren are entitled to qualified immunity. They contend that the search warrant established a sufficient nexus because J. Kerns' recount to multiple officers that he heard a popping noise or a gunshot established a link between him and the shooting.  See Defendants Brian Lindley and Lawrence Koren's Response to Plaintiffs' Motion for Summary Judgment as to Liability on Counts II, IV & V of the First Amended Complaint at 12, filed August 10, 2009 (Doc. 199)("County Defendants' Response").  The County Defendants also argue

---

[32] 373 U.S. 83 (1963).

that there is no evidence that any material facts in the affidavit for the search warrant were recklessly false.  See County Defendants' Response at 13.  The County Defendants contend that the facts which the Plaintiffs contend were false, if excluded, do not vitiate probable cause.  See County Defendants' Response at 13.  They argue that, to the extent that the quotes are not correct, the warrant affidavit's language was innocent or negligent, which is insufficient for constitutional liability.  For example, that there were weapons in the Plaintiffs' residence is all that was needed to establish probable cause, regardless whether A. Kerns made statements regarding the quantity of guns.  See County Defendants' Response at 14.  The County Defendants also argue that, to the extent that the Plaintiffs contest the timing when J. Kerns talked to his father about helping the pilot and observer out of the helicopter, such issue is not relevant, because it is undisputed that A. Kerns told officers that J. Kerns stated he helped -- even though other officers have provided contrary information.  See County Defendants' Response at 15.  The County Defendants further contend that the purported exculpatory material is not exculpatory.  First, regarding statements Smith made, the County Defendants argue that they contradict the statements Holland made about the direction of the helicopter, and further, Smith never made statements about directionality to the officers at the time of the crash.  Lindley, thus, could not recklessly exclude information he did not have.  See  County Defendants' Response at 16.  The County Defendants further argue that the Plaintiffs' argument regarding the insufficient particularity of the search warrant is a new claim raised for the first time at the summary judgment stage, and is not contained within the First Amended Complaint, and should therefore not be permitted now.  See County Defendants' Response at 17.  Alternatively, they contend that there is no evidence that either Lindley or Koren participated in, supervised, or ordered the search of the Plaintiffs' residence.  See County Defendants' Response at 17.

      With regard to the arrest-warrant affidavit, the County Defendants argue that Koren's

calculations were not false, and moreover, the two facts asserted in the arrest-warrant affidavit -- (i) 1630 feet is within the range of a 30-caliber rifle and (ii) J. Kerns could shoot a man-sized target from 1670 feet -- are not disputed.  As to the ballistics information, the County Defendants contends that Lindley is constitutionally permitted to rely on the analysis other officers conducted.  See County Defendants' Response at 21.  Finally, the County Defendants argue the Plaintiffs have no Fourteenth-Amendment claim that exists separate and apart from their Fourth-Amendment claim.  See County Defendants' Response at 25.

The Plaintiffs reply that the law-enforcement officers should have discredited J. Kerns' testimony the night of the crash that he heard a popping noise because no one but J. Kerns made a similar claim.  See Plaintiffs' Reply to the County Defendants' Response to the Motion for Summary Judgment as to Liability on Counts II, IV & V of the First Amended Complaint at 5, filed August 24, 2009 (Doc. 215)("Plaintiffs' Reply to County Defendants").  They also argue that falsifying statements in the affidavit for the search warrant is evidence of malice.  See Plaintiffs' Reply to County Defendants at 6-7.  The Plaintiffs' further contend that establishing that J. Kerns had the means and the ability to shoot Metro One is not enough to establish probable cause.  See Plaintiffs' Reply to County Defendants at 7-8.  Regarding the particularity argument, the Plaintiffs contend that a Fourth-Amendment search-and-seizure violation was set forth in the First Amended Complaint, which is sufficient to incorporate the particularity claim.  See Plaintiffs' Reply to County Defendants at 8.  The Plaintiffs further contend that Lindley instigated the search by obtaining the search warrant without probable cause and thus is liable for the damages that flowed from the illegal search.  See Plaintiffs' Reply to County Defendants at 9.

Haag filed a separate response, arguing that he was not obligated to explain his math to prosecutors or law enforcement, but rather has an obligation to offer opinions of identification,

elimination, or inconclusive, with regard to rifling characteristics. <u>See</u> Defendant Mike Haag's Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment as to Liability on Counts II, IV & V of the First Amended Complaint at 16-17, filed August 4, 2009 (Doc. 196) ("Haag's Response"). Haag's opinion was "inconclusive," which means he came to a conclusion that the FN rifle could or could not be excluded, which Haag contends distinguishes this case from the forensic analyst in <u>Pierce v. Gilchrist</u>, who reported that evidence she examined could have come from the plaintiff, but withheld information that the evidence also could not have come from the plaintiff. <u>See</u> Haag's Response at 17 (citing <u>Pierce v. Gilchrist</u>, 359 F.3d at 1293). Here, Haag contends he was explicit that the bullet fragments could not be identified or excluded as having been fired from the FN rifle and there were many other rifles on the market from which the bullet fragment could have come. <u>See</u> Haag's Response at 17. Moreover, Haag contends that, when Welch demonstrated his novel knurled cannelure methodology, Haag tested the method and found that it produced an accurate measurement allowing him to confidently exclude the FN rifle. <u>See</u> Haag's Response at 18-19. Finally, Haag argues that the Plaintiffs did not suffer a due-process violation because of Haag's alleged exclusion of <u>Brady v. Maryland</u> material because J. Kerns' criminal case never went to trial. <u>See</u> Haag's Response at 20.

In reply to Haag, the Plaintiffs argue that Haag effectively declared that J. Kerns could have shot down Metro One by stating that the bullet fragments could not be excluded from having been fired from the FN rifle. <u>See</u> Plaintiffs' Reply in Support of their Motion for Summary Judgment as to Liability on Counts II, IV & V of the First Amended Complaint at 13, filed August 23, 2009 (Doc. 212)("Plaintiffs' Reply to Haag"). The Plaintiffs argue that, if Haag concluded that the fragments were too damaged for a conclusion, his result should have been "unsuitable for microscopic examination," and concluding otherwise evidences malice and bias. Plaintiffs' Reply

to Haag at 13.  The Plaintiffs maintain that Haag purposefully distorted his analysis.  See Plaintiffs'

Reply to Haag at 14.  The Plaintiffs concede, however, Haag's argument that their procedural

due-process claim fails as a matter of law under Tenth Circuit precedent, because a plaintiff can

assert only a 42 U.S.C. § 1983 claim based on failure to provide Brady v. Maryland material after

a criminal defendant has been convicted and a judgment entered against him.  See Plaintiffs' Reply

to Haag at 15 (citing Becker v. Kroll, 494 F.3d 904, 920-21 (10th Cir. 2007); Morgan v. Gertz,

166 F.3d 1307, 1310 (10th Cir. 1999).[33]

### 3.    The Plaintiffs' Motion for Summary Judgment as to Liability of Counts III & VI of the First Amended Complaint.

The Plaintiffs move the Court to enter an order declaring that White, in his individual and

official capacity, is liable for obtaining J. Kerns' medical and behavioral health records in violation

of J. Kerns' right to privacy under the Fourth and Fourteenth Amendments.  See Plaintiffs' Motion

on Counts III & VI at 1.  The Plaintiffs argue that, because J. Kerns was not provided with any

notice or an opportunity to prevent the disclosure of his medical records, the seizure of those records

violated his clearly established federal procedural due-process rights.  See Plaintiffs' Motion on

Counts III & VI at 10.  The Plaintiffs also argue that the Fourth-Amendment protections attach to

J. Kerns' individual claim of privacy.  Finally, the Plaintiffs contend that the seizure of J. Kerns'

medical records triggers municipal liability, because White is the policymaker for Bernalillo County

and there is no written policy addressing how a law enforcement officer would secure medical

records, and, therefore, by signing a request for records, White created policy.  See Plaintiffs'

Motion on Counts III & VI at 14.

_____

[33] The Plaintiffs also argue that they wish to preserve the issue for appellate purposes, as they believe the Tenth Circuit's holdings are incorrectly decided.  See Plaintiffs' Reply to Haag at 15.

In response, the County Defendants argues that there is no clearly established law which put White on notice that a request to a third-party medical provider for medical records violated the Fourth or Fourteenth Amendments.  <u>See</u> Defendants Board of County Commissioners of Bernalillo County, Darren White, Brian Lindley, and Lawrence Koren's Response to Plaintiffs' Motion for Summary Judgment as to Liability on Counts III & VI of the First Amendment Complaint at 5, filed July 29, 2009 (Doc. 193)("White's Response").[34]  The County Defendants argue that there is no evidence that the Veterans Hospital was compelled to release the records; rather, as stated in Martinez's affidavit, the request was processed through the procedure the hospital has in place to protect patient files.  <u>See</u> White's Response at 7.  The County Defendants further argue that, under the Plaintiffs' theory, any law-enforcement officer who requests medical records commits an unconstitutional search.  <u>See</u> White's Response at 7.  They also contend that no clearly established law put White on notice that such a request would violate the Fourth Amendment.  The County Defendants further note that the Plaintiffs have not challenged whether White had probable cause to search or seize the medical records.  <u>See</u> White's Response at 8. They additionally argue that the Federal Privacy Act permits disclosure of information to another agency for a criminal law-enforcement activity if the head of the agency has made a written request.  <u>See</u> White's Response at 8 (citing 5 U.S.C. §552a(b)(7)).  The County Defendants further contend that the Plaintiffs' theory of liability under the Fourteenth Amendment relies upon cases involving either the compelled disclosure of information or the dissemination of information to others, but that White engaged in neither.  <u>See</u> White's Response at 8.  Finally, the County Defendants argue that, because White committed no clearly established constitutional violation, there can be no municipal liability.

---

[34] White is the only Defendant against whom claims under Counts III & VI remain.

<u>See</u> White's Response at 12.

In reply, the Plaintiffs argue that the request submitted to the hospital is no different from consent from a maid to search a hotel room, which the Supreme Court has held violates the Fourth Amendment. <u>See</u> Plaintiffs' Reply in Support of their Motion for Summary Judgment as to Liability on Counts III & VI of the First Amended Complaint at 5, filed August 12, 2009 (Doc. 203)("Plaintiffs' Reply to White")(citing <u>Stoner v. California</u>, 376 U.S. 483, 489 (1964)). The Plaintiffs argue that the County Defendants' argument that the Federal Privacy Act applies is unavailing, because the request can only be made if the activity is authorized by law, and obtaining private medical records without consent is not authorized by law. <u>See</u> Plaintiffs' Reply to White at 6. The Plaintiffs further argue that White's actions constituted more than a mere request -- rather, his agent, another officer with the Bernalillo County Sheriff's Department acting under White's signed request, reviewed all computer records and clipped pages and copied records containing protected and irrelevant medical material. <u>See</u> Plaintiffs' Reply to White at 7. The Plaintiffs stress that J. Kerns did not provide consent or implied consent for such a search. <u>See</u> Plaintiffs' Reply to White at 7. The Plaintiffs maintain their argument that any constitutional violation by White establishes municipal liability because he created policy when he authorized the search and seizure of J. Kerns' medical records. <u>See</u> Plaintiffs' Reply to White at 9.

### 4.  **The County Defendants' Motion for Summary Judgment on the Basis of Qualified Immunity and Other Grounds on Counts II, III, IV, V, VI, VIII, IX, X and XI.**

The County Defendants move for summary judgment on the basis of qualified immunity on all remaining claims asserted against them. <u>See</u> County Defendants' Motion at 1. The remaining Counts against the County Defendants are: (i) Count II -- unlawful search and seizure; (ii) Count III -- unlawful search and seizure of medical information and deprivation of medical privacy;

(iii) Count IV -- false arrest/false imprisonment of J. Kerns; (iv) Count V -- malicious prosecution; (v) Count VI -- municipal liability for violation of Count III; (vi) Count VIII -- false detention/arrest/imprisonment under the NMTCA; (vii) Count IX -- malicious abuse of process; (viii) Count X -- deprivation of property rights and trespass under the NMTCA; and (ix) Count XI -- deprivation of property rights and conversion under the NMTCA.  The Court will address the arguments on each claim in turn.

a.      **<u>Arguments on Count II.</u>**

Count II is asserted against Lindley.  The County Defendants argue that the Plaintiffs cannot meet their burden of establishing that Lindley knowingly or recklessly made false statements in the affidavit in support of the search warrant for the Plaintiffs' residence.  <u>See</u> County Defendants' Motion at 26.  Moreover, the County Defendants argue that Lindley's search-warrant affidavit, viewed in light of the totality of the circumstances, establishes probable cause.  <u>See</u> County Defendants' Motion at 27.  In the alternative, the County Defendants argue that probable cause existed to search the Plaintiffs' residence based upon the weapons-related charges under investigation by the BATF, with the assistance of the Bernalillo County Sheriff's Department.  <u>See</u> County Defendants' Motion at 27.  They argues that probable cause existed based upon J. Kerns' admission to Lindley and Matas that he has PTSD, and based on the photograph A. Kerns showed Gonzales and others of J. Kerns cleaning his firearms.  <u>See</u> County Defendants' Motion at 27.

In response, the Plaintiffs argue that the affidavit in support of the search warrant fails to establish probable cause.  The Plaintiffs stress that no one else around the Plaintiffs' residence, except J. Kerns, heard a gunshot.  <u>See</u> Plaintiffs' Response in Opposition to Defendant Board of County Commissioners of Bernalillo County, Darren White, Brian Lindley, Ralph Gonzales, and

-54-

Lawrence Koren's Motion for Summary Judgment on the Basis of Qualified Immunity and on Other Grounds and Memorandum in Support at 12, filed August 11, 2009 (Doc. 201)("Plaintiffs' Response to County Defendants"). The Plaintiffs argue that the affidavit contains recklessly false statements, such as A. Kerns speaking to J. Kerns shortly after the crash and alleged statements of the Plaintiffs' neighbor. See Plaintiffs' Response to County Defendants at 13. The Plaintiffs contend that Lindley's facts were untrustworthy, incompetent, or deliberately misleading. See Plaintiffs' Response to County Defendants at 16.

In reply, the County Defendants argue that, if the Plaintiffs are facially challenging the affidavit, Lindley is entitled to qualified immunity, because an officer who acts with objective good faith and obtains a search warrant cannot be expected to question the magistrate judge's probable-cause determination. See County Defendants' Reply to Motion for Summary Judgment, filed August 17, 2009 (Doc. 205)("County Defendants' Reply"). Moreover, the County Defendants argue that, even if the Court strikes the statements attributed to A. Kerns and Beauchamp, the search-warrant affidavit still establishes probable cause. See County Defendants' Reply at 8.

At the hearing, Daniel Macke, the County Defendants' attorney, argued that neither Lindley nor Koren personally participated in the search. See Tr. at 109:20-110:4 (Macke). Mr. Macke also challenged the standard that the Plaintiffs are trying to impose on the affidavit for the search warrant, contending that the Plaintiffs are attempting to impose a beyond-a-reasonable-doubt standard on the probable-cause determination. See Tr. at 110:25-111:6 (Macke). He argued that the facts in the search-warrant affidavit that the Plaintiffs contest are (i) not material to the probable-cause determination and (ii) not recklessly submitted. See Tr. at 111:7-13 (Macke). Mr. Macke argued that, if the Court excluded the statement from the neighbor, who was expressing an opinion and had no personal knowledge of the shooting, there would still be probable cause.

-55-

See Tr. at 111:21-24 (Macke).  He put forth the same argument regarding whether J. Kerns told A. Kerns about the shooting in the early morning shortly after Metro One went down.  See Tr. at 114:19-115:1 (Macke).  Mr. Macke also argued that it is undisputed that J. Kerns told officers on numerous occasions that he heard a popping noise, and Mr. Macke contended that the logical inference, given the rest of the evidence, is that J. Kerns was referring to a gunshot.  See Tr. at 113:2-18 (Macke).  Mr. Macke also pointed out that J. Kerns' entire written statement is included in the search-warrant affidavit, which cannot be viewed as a reckless disregard of the facts.  See Tr. at 114:4-8 (Macke).  Mr. Macke further argued that there are no facts that have been submitted which show that the officers had any information, at the time the search warrant was drafted, regarding which way the helicopter was facing when it was shot down.   See Tr. at 116:2-11 (Macke).  Mr. Macke stressed that there was no duty to follow up on all potentially exculpatory leads, and thus he does not believe that the lack of information in the warrant about the direction of the helicopter gives rise to a genuine issue of material fact.  See Tr. at 116:9-12.  Mr. Macke argued that there was plenty of information to support a reasonable officer's belief that there was probable cause for the search warrant: J. Kerns' attempt to evade police, what he heard and saw the night of the shooting, his descriptions of what he saw, his admissions about how the helicopter made a great target, and his admission that he could make the shot no problem.  See Tr. at 116:25-117:13 (Macke).

Mr. Lowry argued that there is no nexus between J. Kerns and his involvement in the actual helicopter shooting, and that the search warrant was premised on a hunch.  See Tr. at 150:20-151:1 (Lowry).  Mr. Lowry argued that he thinks there was a duty upon Lindley to determine more of the fundamental facts of the case before he wrote the affidavit for the search warrant for the Plaintiffs' residence.  See Tr. at 155:6-10 (Lowry).

### b.    <u>Arguments on Count III</u>.

Count III is asserted against White for unlawful search and seizure of medical records, and deprivation of medical privacy, contrary to the Fourth and Fourteenth Amendments and the Federal Privacy Act.  The County Defendants first argue that any claim brought against White under the Federal Privacy Act is both barred by a two-year statute of limitations and not actionable against local officials or a municipality. They further argue that White is entitled to qualified immunity, because he had probable cause to make the request for J. Kerns' medical records, and there is no evidence that, once disclosed, White made unlawful use of the medical records.  <u>See</u> County Defendants' Motion at 29.  The County Defendants also contend that there is no clearly established law that would have put White on notice that a request for medical records would violate J. Kerns' constitutional rights.

In response, the Plaintiffs stipulate to a dismissal of the Privacy Act claim.  <u>See</u> Plaintiffs' Response to County Defendants at 17.  The Court, therefore, will not review that aspect of Count III. They also reassert the arguments they made in their stand-alone motion for summary judgment on Count III and VI.  <u>See</u> Plaintiffs' Response to County Defendants at 17.

At the hearing, Mr. Macke argued that the testimony is clear that White has no recollection beyond signing the request.  <u>See</u> Tr. at 118:17-21 (Macke).  Mr. Macke argues that there is not clearly established law which put White on notice that his request would violate the Constitution. <u>See</u> Tr. at 118:23-119:1 (Macke).  Mr. Lowry clarified that Count III is alleging breach of privacy under both the Fourth and Fourteenth Amendments.  <u>See</u> Tr. at 131:20-25 (Lowry).  Mr. Lowry distinguished White's request for medical records from a police knock-and-talk, because asking for medical records touches upon an area which the Supreme Court and the Tenth Circuit have held constitutes private intimate information.  <u>See</u> Tr. at 133:24-134:25 (Lowry).

-57-

Mr. Lowry urged the Court to follow the clearly established precedent of the Supreme Court and the Tenth Circuit, which provide that requesting medical or behavioral records violates the Fourth Amendment.  <u>See</u> Tr. at 135:6-25 (Lowry).  Mr. Lowry further argued that there is no implied waiver in this case, like there was in the Court's decision in <u>Chavez v. Martinez</u>, No. CIV 07-1250, 2008 U.S. Dist. LEXIS 108932 (D.N.M. Oct. 20, 2008)(Browning, J.).  <u>See</u> Tr. at 140:23-25 (Lowry).

**c.**      <u>**Arguments on Count IV**</u>**.**

Count IV, brought under § 1983 for false arrest or false imprisonment, is asserted against Lindley, Koren, and Haag.  Lindley and Koren as well as Haag have asserted a qualified immunity defense.  Haag's arguments are contained within his motion for summary judgment, already discussed.  The County Defendants argue that they believe the Plaintiffs' claim should be for malicious prosecution, and not for false arrest or false imprisonment.  <u>See</u> County Defendants' Motion at 30.  They also argue that the Plaintiffs should be estopped from asserting that there was no probable cause for J. Kerns' arrest and imprisonment, because J. Kerns waived his detention hearing on August 25, 2005.  Moreover, they argue probable cause supported the arrest.  <u>See</u> County Defendants' Motion at 32.  Even if probable cause did not exist, they argue Lindley and Koren are still entitled to qualified immunity because they could have mistakenly, but reasonably, concluded that they had probable cause.  <u>See</u> County Defendants' Motion at 32.  Finally, they assert there was no malice.  <u>See</u> <u>id.</u>

In response, the Plaintiffs argue that the Lindley and Koren cannot hide behind the fact that they did not file the federal charges, because the charges were filed based on their distorted view of the evidence.  <u>See</u> Plaintiffs' Response to County Defendants at 18. The Plaintiffs further argue that Lindley and Koren cannot assert a probable-cause defense because the information in the

warrant is not trustworthy.  See Plaintiffs' Response to County Defendants at 19.

At the hearing, Mr. Macke argued that there is no evidence that anything submitted in the arrest-warrant affidavit was false or recklessly submitted.  See Tr. at 124:10-13.  Mr. Macke also underscored that there is nothing in the warrant regarding where the shooter was relative to Metro One.  Rather, the warrant contains information that the helicopter was within a distance from the Plaintiffs' residence which J. Kerns told officers he could shoot and hit a man-sized target.  See Tr. at 125:1-10 (Macke).

Mr. Lowry argued that the trajectory analysis from Koren in the arrest-warrant affidavit was recklessly false, because the pedal position he used was incorrect.  See Tr. at 160:22-25 (Lowry).  He also argued that the description of the Metro Two test is recklessly false, because the officers did not use the data from the GPS.  See Tr. at 163:11-164:6 (Lowry).  Mr. Macke contends, even striking the trajectory evidence, there is still probable cause for the arrest warrant.  See Tr. at 174:12-19 (Macke).

### d.     Arguments on Count V.

Count V, brought under § 1983 for malicious prosecution, is asserted against Lindley, Koren, and Haag.  Lindley and Koren as well as Haag have asserted qualified immunity.  Haag's arguments are contained within his motion for summary judgment, already discussed.  The County Defendants argue that Lindley and Koren did not cause J. Kerns' continued prosecution or imprisonment; Lindley filed a state criminal complaint, which was dismissed on August 22, 2005, and thus, the County Defendants argue, the claim should cut off at that time.  See County Defendants' Motion at 30.  They argue that neither Lindley nor Koren testified before the grand jury, which secured the federal indictment against J. Kerns, nor were they involved in what evidence to bring before the grand jury.  See County Defendants' Motion at 31.  They further contend that the chain of causation

was broken by the intervening acts of the AUSA and grand jury.  See County Defendants' Motion at 31.  Finally, they assert there was no malice.  See id.  Mr. Macke, at the hearing, argued that the Plaintiffs do not meet the elements of malicious prosecution, because Lindley cannot initiate federal charges.  See Tr. at 126:18-127:3 (Macke).

### e.    Arguments on Count VIII.

Count VIII asserts claims of false detention, arrest, and imprisonment under the NMTCA asserted against Bernalillo County, Lindley, and Koren.  The County Defendants argue that the Court should dismiss this claim for failure to provide timely notice, as the NMTCA requires. See County Defendants' Motion at 33.  In the alternative, they argue that they are entitled to summary judgment because Lindley's and Koren's actions were lawful and based on probable cause. See County Defendants' Motion at 33.  In response, the Plaintiffs argue that their claim is not untimely, because notice that the Plaintiffs preserved their right to potentially file suit was filed within ninety days of the dismissal of J. Kerns' federal charges.  See Plaintiffs' Response to County Defendants at 20.  The Plaintiffs further argue that, under New Mexico state law, the County Defendants are liable, because Lindley and Koren are required to complete a reasonable pre-filing investigation, and they did not.  See Plaintiffs' Response to County Defendants at 20.  In reply, the County Defendants contend that the NMTCA claims accrued when the state charges, not the federal charges, were dismissed, and thus the Plaintiffs' notice was untimely.  See County Defendants' Reply at 12.

### f.    Arguments on Count IX.

Count IX of the First Amended Complaint asserts a claim for "abuse of process - malicious prosecution" under the NMTCA against Bernalillo County, Lindley and Koren.  In New Mexico, the torts of malicious prosecution and abuse of process have been combined into a single tort of

malicious abuse of process.  See DeVaney v. Thriftway Mktg. Corp., 124 N.M. 512, 518, 953 P.2d

277, 283 (1997).  The County Defendants argue that the Plaintiffs have not presented any evidence

of the County Defendants' improper use of process, and argue that Lindley and Koren had probable

cause to believe that J. Kerns had committed the crimes charged in the arrest warrant.  See County

Defendants' Motion at 34.  The Plaintiffs argue that the County Defendants lacked both probable

cause and purposefully withheld exculpatory information from the courts, which was an abuse of

process.  See Plaintiffs' Response to County Defendants at 20.

### g.        Arguments on Count X and Count XI.

Count X asserts a claim for deprivation of property rights and trespass under the NMTCA

against Lindley and Bernalillo County.[35]  The County Defendants argue that there is no waiver of

sovereign immunity for the claim, that Lindley did not participate in the search, and that, therefore,

neither Lindley nor Bernalillo County could have committed trespass.  See County Defendants'

Motion at 34.  They further contend that, because there was probable cause, there was a lawful

reason for the Bernalillo County Sheriff's Department to be on the Plaintiffs' property.  See County

Defendants' Motion at 34.  Count XI asserts a claim for deprivation of property rights and

conversion under the NMTCA against Lindley and Bernalillo County.  The County Defendants

assert the same arguments that they put forth for why the Court should grant summary judgment on

Count X.  See County Defendants' Motion at 34.

The Plaintiffs respond that a law enforcement officer is liable for property damage resulting

from false imprisonment, false arrest, malicious prosecution, abuse of process, or violation of

---

[35] Count X is also asserted against Bader, Thompson, and Carter.  The Court previously addressed the claim as to those Defendants and the decision is currently on appeal to the Tenth Circuit.

property rights.  See Plaintiffs' Response to County Defendants at 21.  The County Defendants reply that the Plaintiffs have not brought forth any evidence of property damage, much less property damage that Lindley caused.

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case."  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotes omitted).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  It is

not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'"). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at * 1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and Argo v. Blue Cross and Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

   Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. See Vitkus v. Beatrice Co., 11 F.3d at 1539. Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill and Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson

v. Liberty Lobby, Inc., 477 U.S. at 249 (internal citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the Court should keep in mind three principles.  First, the Court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the Court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Third, the Court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. at 807.  Qualified immunity "protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. Civ. 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."  Pearson v. Callahan, 129 S. Ct. 808, 815 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 129 S. Ct. at 815 (quoting Harlow v. Fitzgerald, 457 U.S. 800,

818 (1982)).  When a defendant asserts qualified immunity at summary judgment, the responsibility

shifts to the plaintiff to meet a "heavy two-part burden."  Medina v. Cram, 252 F.3d 1124, 1128

(10th Cir. 2001).  The plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions

violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at

the time of the alleged unlawful activity.  See Riggins v. Goodman, 572 F.3d 1101, 1107

(10th Cir. 2009); Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).

In assessing whether the right was clearly established, the court asks whether the right was

sufficiently clear that a reasonable officer in the defendant's shoes would understand that what he

or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d at 1327.  In

Saucier v. Katz, 533 U.S. 194 (2001), overruled in part by Pearson v. Callahan, the Supreme Court

of the United States held that the court must decide whether there was a constitutional violation first,

before it decides whether the law is clearly established.  See 533 U.S. at 200-01.  The Supreme

Court no longer requires the courts to analyze the issues in that order.  See Pearson v. Callahan,

129 S. Ct. at 818.

### 1.   Factual Disputes in the Qualified-Immunity Analysis.

In determining whether the plaintiff has met his or her burden of establishing a constitutional

violation that was clearly established, the court construes the facts in the light most favorable to the

plaintiff as the non-moving party.  See Scott v. Harris, 550 U.S. 372, 378-80 (2007); Riggins v.

Goodman, 572 F.3d at 1107 (noting that the Tenth Circuit "accept[s] the facts as the plaintiff alleges

them").   In Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), the Tenth Circuit

explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation,
> a plaintiff's version of the facts must find support in the record: more specifically,
> "[a]s with any motion for summary judgment, when opposing parties tell two

different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake County, 584 F.3d at 1312.   The Tenth Circuit, in Rhoads v. Miller, No. 08-8093, 2009 U.S. App. LEXIS 24312 (10th Cir. Nov. 5, 2009), recently explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony:

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380.   In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events.  550 U.S. at 379.  Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony.  There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury.  And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . .  Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistence or provocation.  If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 2009 U.S. App. LEXIS 24312, **6-8 (internal citations and quotations omitted).

In a concurring opinion in Thomson v. Salt Lake County, Judge Holmes stated that the court must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court," before inquiring into whether there are genuine issues of material fact for resolution by the jury. 584 F.3d at 1326-27 (Holmes, J. concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting)(observing that, even if factual disputes exist, "these

disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts.")).

>       2.      **Clearly Established Rights.**

A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned." Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983), cert. denied, 469 U.S. 880 (1984). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Strepka v. Miller, 2001 WL 1475058, at * 5 (10th Cir. 2001)(citing Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)). See Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. at 640.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified-immunity defense.  In Pearson v. Callahan, the Supreme Court held that, "while the sequence set forth [in Saucier v. Katz] is often appropriate, it should no longer be regarded as mandatory."  129 S. Ct. at 818.  Rather, lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be

-67-

addressed first in light of the circumstances of the particular case at hand."  Id.  The Supreme Court

also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz would often be

beneficial.  See Pearson v. Callahan, 129 S. Ct. at 819.  Once the plaintiff has established the

inference that the defendant's conduct violated a clearly established constitutional right, a

qualified-immunity defense generally fails.  See Cannon v. City and County of Denver, 998 F.2d

867, 870-71 (10th Cir. 1993).

## LAW REGARDING ABSOLUTE IMMUNITY

"Absolute immunity is recognized as it existed in common law, but only so far as necessary

to protect the judicial process."  Zamora v. City of Belen, 383 F. Supp. 2d 1315, 1324

(D.N.M. 2005)(Browning, J.).  An official who asserts absolute immunity from § 1983 liability

shoulders the burden of establishing the existence of immunity for the function in question.

See Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 432 (1993).

Because qualified immunity is presumed to be sufficient to protect public officials in the

exercise of their discretionary duties, see Burns v. Reed, 500 U.S. 478, 486-87 (1991), absolute

immunity extends only so far as necessary to protect the judicial process, see id. at 485-87.  As the

Tenth Circuit has explained:

> The Supreme Court has endorsed a "functional" approach to questions concerning
> the application of common-law tort immunities to individuals in § 1983 actions:
> "Immunity is justified and defined by the *functions* it protects and serves, not by the
> person to whom it attaches."  Forrester v. White, 484 U.S. 219 (1988)(emphasis in
> original).  The extent of government officials' immunity depends upon the likely
> effect their exposure to liability will have on the operation of effective government
> in a particular context, balanced against the potential for a deprivation of individual
> rights in that context.

Valdez v. City and County of Denver, 878 F.2d 1285, 1287 (10th Cir. 1989).  The Tenth Circuit has

held that the grand-jury proceeding is integral to the judicial phase of the criminal process.

See Anthony v. Baker, 955 F.2d 1395, 1399 (10th Cir. 1992).

In Briscoe v. LaHue, 460 U.S. 325 (1983), the Supreme Court held that, "in litigation brought under 42 U. S. C. § 1983, all witnesses -- police officers as well as lay witnesses -- are absolutely immune from civil liability based on their testimony in judicial proceedings." 460 U.S. at 328.  The Supreme Court explained that  "[s]ubjecting government officials, such as police officers, to damages liability under § 1983 for their testimony might undermine not only their contribution to the judicial process but also the effective performance of their other public duties." Id. at 343.  The Tenth Circuit has found that "the grand jury provides enough of the protections of a trial that grand jury witnesses should be absolutely immune." Anthony v. Baker, 955 F.2d at 1399.

Complaining witnesses, on the other hand, are not entitled to absolute immunity. See Malley v. Briggs, 475 U.S. 335, 341 (1986); Anthony v. Baker, 955 F.2d at 1399.  A complaining witness is a person who actively instigated or encouraged the prosecution of the plaintiff.  See Anthony v. Baker, 955 F.2d at 1399 n.2 (citing W. Keeton, Prosser & Keeton on the Law of Torts § 119 (5th ed. 1984); Lounder v. Jacobs, 119 Colo. 511, 205 P.2d 236 (1949)).  In Malley v. Briggs, the Supreme Court denied absolute immunity to a police officer who wrongfully initiated a criminal proceeding by applying for an arrest warrant.  See 475 U.S. at 341.  The plaintiff in Anthony v. Baker brought a § 1983 malicious-prosecution claim against the deputy sheriff  who investigated the alleged criminal conduct and who served as the special investigator in the grand-jury investigation.  See 955 F.2d at 1396.  In his complaint, the plaintiff challenged the deputy's "motivation for his actions prior to the grand jury proceeding and [the deputy's] conduct during the grand jury proceeding," including that, before the grand-jury proceeding, the deputy allegedly "deliberately created false evidence and distorted reports and failed to make a full and fair disclosure of his investigation for the purpose of misleading and misinforming the prosecutor and the grand

jury." Anthony v. Baker, 955 F.2d at 1399 & n.3.  The Tenth Circuit held that the deputy, "as a

defendant in a § 1983 suit for malicious prosecution, should be denied absolute immunity for his

grand jury testimony only if he is found to be a complaining witness and only if the testimony is

relevant to the manner in which he initiated or perpetuated the prosecution of the plaintiff."  955

F.2d at 1401.

> The Tenth Circuit, in Pierce v. Gilchrist, stated that:
>
> A prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's
> decision not to drop charges but to proceed to trial -- none of these decisions will
> shield a police officer who deliberately supplied misleading information that
> influenced the decision . . . .  If police officers have been instrumental in the
> plaintiff's continued confinement or prosecution, they cannot escape liability by
> pointing to the decisions of prosecutors or grand jurors, or magistrates to confine or
> prosecute him.  They cannot hide behind the officials whom they have defrauded.

359 F.3d at 1292 (quoting Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir. 1988)(emphasis

omitted)).  See Robinson v. Maruffi, 895 F.2d 649, 656 (10th Cir. 1990).  In Robinson v. Maruffi,

police officers, who purposefully concealed and misrepresented material facts to the district

attorney, appealed a jury conviction for conspiracy for malicious prosecution.  The Tenth Circuit

rejected as "disingenuous" police officers' "argument that their misconduct is shielded by the acts

of the prosecutor, the grand jury, and the trial and appellate courts . . . ." 895 F.2d at 655-56.

## RELEVANT FOURTH AMENDMENT LAW

> The Fourth Amendment states:
>
> The right of the people to be secure in their persons, houses, papers, and effects,
> against unreasonable searches and seizures, shall not be violated, and no Warrants
> shall issue, but upon probable cause, supported by Oath or affirmation, and
> particularly describing the place to be searched, and the persons or things to be
> seized.

U.S. Const. amend. IV.  The Fourth Amendment generally requires a warrant for there to be a valid

search and seizure.  The Supreme Court has previously stated that the home is entitled to the greatest

Fourth-Amendment protection.  See Kyllo v. United States, 533 U.S. 27, 31 (2001)("At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion.").  "[P]olice officers need either a warrant or probable cause plus exigent circumstances, in order to make lawful entry into a home."  Kirk v. Louisiana, 536 U.S. 635, 638 (2002).

### 1.    Legal Standard for Probable Cause in an Affidavit in Support of a Warrant.

A search warrant must be supported by probable cause, requiring "more than mere suspicion but less evidence than is necessary to convict."  United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980).  To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity."  United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000).  "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched."  United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990).  The task of the magistrate judge issuing the search warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  United States v. Reed, 195 Fed. Appx. 815, 821 (10th Cir. 2006)(quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  See United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997) (finding that, in determining whether an affidavit supports a finding of probable cause, the court must review the affidavit as a whole and look  to the totality of the information contained therein). In making his or her determination, the magistrate judge "may draw reasonable inferences from the material provided in the warrant application."  United States v. Rowland, 145 F.3d 1194, 1205

-71-

(10th Cir. 1998).

"A reviewing court should accord great deference to a magistrate's determination of probable cause." United States v. Reed, 195 Fed. Appx. at 822. The court's duty is "simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed." Illinois v. Gates, 462 U.S. at 236, 238-39. This deference is appropriate to further the Fourth Amendment's strong preference for warrants. See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); United States v. Ventresca, 380 U.S. 102, 105-06 (1965)("An evaluation of the constitutionality of a search warrant should begin with the rule that the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of office[r]s . . . ."). Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." United States v. Ventresca, 380 U.S. at 106.

The deference accorded a magistrate judge's probable cause determination, however, is not boundless. See United States v. Leon, 468 U.S. 897, 914 (1984). The court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause. See United States v. Danhauer, 229 F.3d at 1006. Specifically, the court should not defer to a magistrate judge's probable-cause determination if it "is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances." United States v. Reed, 195 Fed. Appx. at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. 727, 734 (1984); Illinois v. Gates, 462 U.S. at 239).

## 2.   The Particularity Requirement for Search Warrants.

The Supreme Court has stated that "those searches deemed necessary should be as limited

as possible." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). The Tenth Circuit has explained that "the Fourth Amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized." Cassady v. Goering, 567 F.3d 628, 635 (10th Cir. 2009)(quoting United States v. Leary, 846 F.2d 592, 600 (10th Cir. 1988)). The particularity requirement prevents general searches and strictly limits the discretion of the officer executing the warrant. See Voss v. Bergsgaard, 774 F.2d 402, 404 (10th Cir. 1985)("The particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause."); United States v. Janus Indus., 48 F.3d 1548, 1553 (10th Cir. 1995)("As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.")(quoting Stanford v. Texas, 379 U.S. 476, 485 (1965))). "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." United States v. Janus Indus., 48 F.3d at 1553 ("The test applied to the description of the items to be seized is a practical one.").

In Cassady v. Goering, the search warrant authorized the search of the plaintiff's entire farm, including his house, and the seizure of "[a]ny & all narcotics," "[a]ny and all illegal contraband," and various specific items mostly related to a narcotics operation, as well as the search and seizure of "all other evidence of criminal activity" and all personal property that was stolen, embezzled, or otherwise illegal. 567 F.3d at 635. The Tenth Circuit found that the warrant violated the plaintiff's Fourth Amendment rights because "[t]he warrant[] allowed precisely the kind of rummaging through a person's belongings, in search of evidence of even previously unsuspected crimes or of no crime at all, that the Fourth Amendment proscribes." 567 F.3d at 635 (quoting Voss v. Bergsgaard, 774

F.2d at 405).

The Tenth Circuit has previously applied a blanket suppression where officers conducted a general search for evidence of crimes not specifically listed in the warrant. See Cassady v. Goering, 567 F.3d at 643; United States v. Foster, 100 F.3d 846, 851-52 (10th Cir. 1996); United States v. Medlin, 842 F.2d 1194, 1199-1200 (10th Cir. 1988).

### 3.      Arrest Warrants and the Franks v. Delaware Standard.

"[A]n arrest is valid and does not violate the Fourth Amendment if the warrant underlying it was supported by probable cause at the time of its issuance; this holds true even if later events establish that the target of the warrant should not have been arrested." Beard v. City of Northglenn, Colo., 24 F.3d 110, 114 (10th Cir. 1994). "Probable cause for an arrest warrant is established by demonstrating a substantial probability that a crime has been committed and that a specific individual committed the crime." Wolford v. Lasater, 78 F.3d 484, 489 (10th Cir. 1996)(citing Wong Sun v. United States, 371 U.S. 471, 481 n.9 (1963)).

An arrest-warrant affiant violates the Fourth Amendment when he or she "knowingly . . . , or with reckless disregard for the truth," includes false statements in the affidavit, Franks v. Delaware, 438 U.S. 154, 155-56 (1978), or "knowingly or recklessly omit[s] from an arrest affidavit information which, if included, would have vitiated probable cause," Stewart v. Donges, 915 F.2d 572, 582-83 (10th Cir. 1990). See Bruner v. Baker, 506 F.3d 1021, 1026 (10th Cir. 2007). In a case involving information omitted from an affidavit, the existence of probable cause is determined "by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant." Wolford v. Lasater, 78 F.3d at 489 (quoting Stewart v. Donges, 915 F.2d at 582, n.13). In some cases, "[r]ecklessness may be inferred from omission of facts which are clearly critical to a finding of probable cause." DeLoach v.

-74-

Bevers, 922 F.2d 618, 622 (10th Cir. 1990).  "Allegations of negligence or innocent mistake are

insufficient."  Franks v. Delaware, 438 U.S. at 171.

In Beard v. City of Northglenn, 24 F.3d 110 (10th Cir. 1994), Justice White, sitting by

designation, stated:

> [W]hile in hindsight it is beyond cavil that [the investigating officer] made a mistake
> in his representations to [the expert witness], and while the mistake may have had
> an impact in the outcome of [the expert witness'] analysis and the warrant
> application hearing,  neither of these points bears much relevance to our inquiry.
> Under the Fourth Amendment our inquiry is focused neither on the existence nor the
> consequence of [the investigating officer's] error but on the intention behind it.

24 F.3d at 116.

### 4.   Law Regarding Illegal Search and Seizure of Medical Records.

In Ferguson v. City of Charleston, the Supreme Court considered whether the special-needs

exception[36] to the Fourth Amendment permitted a hospital policy designed to obtain evidence of

drug use through urine tests that would be turned over to the police and admissible in subsequent

criminal prosecutions.  The Supreme Court found the special-needs exception did not apply and

remanded the case.  In the decision, the Supreme Court stated: "'[T]he gravity of the threat alone

cannot be dispositive of questions concerning what means law enforcement officers may employ

to pursue a given purpose.'  The Fourth Amendment's general prohibition against nonconsensual,

warrantless, and suspicionless searches necessarily applies to such a policy."   532 U.S. at 86

(quoting Indianapolis v. Edmond, 531 U.S. at 32, 42-43 (2000)).

---

[36] "The 'special needs' doctrine, which has been used to uphold certain suspicionless
searches performed for reasons unrelated to law enforcement, is an exception to the general rule that
a search must be based on individualized suspicion of wrongdoing." Ferguson v. City of Charleston,
532 U.S. at 79 n.15 (quoting Indianapolis v. Edmond, 531 U.S. 32, 54 (2000)(Rehnquist, C.J.,
dissenting)).  See Griffin v. Wisconsin, 483 U.S. 868, 873 (1987)(concluding that, in limited
circumstances, a search unsupported by either warrant or probable cause can be constitutional when
"special needs" other than the normal need for law enforcement provide sufficient justification).

Regarding the warrantless seizure of medical records, the Tenth Circuit has stated that a Fourth-Amendment violation might occur when a government employer seizes an employee's medical records without a warrant.  See Lankford v. City of Hobart, 27 F.3d 477, 480 n. 2 (10th Cir. 1994).  The Tenth Circuit in Lankford v. City of Hobart seemed to suggest that such a finding is possible without deciding the issue.  See id. ("It is possible that a Fourth Amendment violation occurred when . . . [the defendant] 'seized' [the plaintiff's] medical files without a warrant. . . . [The plaintiff] has failed adequately to address the Fourth Amendment implications of [the defendant's] actions on appeal. Therefore, we do not address this issue.").  Instead of resting on Fourth-Amendment grounds, the Lankford v. City of Hobart holding is rooted in the right to privacy. In Lankford v. City of Hobart, female former-dispatchers brought an action against a police chief under 42 U.S.C. § 1983.  See 27 F.3d at 478.  Among other things, the plaintiffs alleged that the police chief sexually harassed them and used his authority as police chief to obtain the private medical records of one of the plaintiffs to prove that she was a lesbian.  See 27 F.3d at 478.  The Tenth Circuit held that, if true, the police chief's actions amounted to a clear privacy violation. See id. at 479.  In reaching its holding, the Tenth Circuit relied on Eastwood v. Department of Corrections of Oklahoma, 846 F.2d 627 (10th Cir. 1988).  See Lankford v. City of Hobart, 27 F.3d at 479.  Eastwood v. Department of Corrections of Oklahoma involved a state employee who coerced a subordinate to reveal private information about her sexual history.  See 846 F.2d at 629. The Tenth Circuit held that the state employee did not enjoy qualified immunity from suit for violation of privacy arising out of those facts.  See id. at 630.

The Supreme Court has said that, generally, "[a] 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.  A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that

property." United States v. Jacobsen, 466 U.S. 109, 113 (1984).  See United States v. Lyons, 510 F.3d 1225, 1240 n.9 (10 Cir. 2007).  Determining whether a legitimate expectation of privacy exists involves two inquiries: (i) defendant must show a subjective expectation of privacy in the area searched, and (ii) that expectation must be one that society is prepared to recognize as reasonable. See United States v. Angevine, 281 F.3d 1130, 1134 (10th Cir. 2002)(citation omitted).

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979)(citations omitted).  Nonetheless, "the precedent of the Supreme Court and [the Tenth Circuit] is quite clear that a warrantless search is reasonable only when it falls within one of the clearly defined exceptions to the warrant requirement." United States v. Bute, 43 F.3d 531, 534-535 (10th Cir. 1994)(citing Florida v. Jimeno, 500 U.S. 248, 250 (1991)); Cady v. Dombrowski, 413 U.S. 433, 439 (1973)).  A warrantless search is per se unreasonable unless it falls within one of the exceptions to the warrant requirement.

In Chavez v. Marinez, the Court considered whether the defendant, an officer, violated the plaintiff's Fourth - and Fourteenth-Amendment rights when the defendant went to the plaintiff's doctor's office to verify the dates on the plaintiff's doctor's note.  See 2008 U.S. Dist. LEXIS 108932, at **1-2.  In that case, the defendant suspected that the plaintiff had altered his doctor's note, so the defendant followed up with the doctor's office.  The defendant did not request or receive the plaintiff's medical records; he only received verbal information from the receptionist.  See 2008 U.S. Dist. LEXIS 108932, at *6. The United States Department of Health and Human Services also performed an investigation and found that the disclosure of the plaintiff's medical information to the defendant "could reflect a violation of the general uses and disclosures provision at 45 C.F.R.

§ 164.502(a)."  2008 U.S. Dist. LEXIS 108932, at *7.  In <u>Chavez v. Marinez</u>, the Court stated:

> The Court does not believe that a police officer asking a third-party questions and receiving voluntary answers is a search under the Fourth Amendment.  To hold otherwise would make almost all routine police work and investigation subject to the Fourth Amendment's limitations.  The Court does not believe that police questioning and voluntary responses constitute a search to which the Fourth Amendment applies.
>
> [The defendant's] questions and receipt of answers in this specific context do not constitute a search.  To constitute a search, [the defendant's] actions must have at least invaded upon [the plaintiff's] reasonable expectations of privacy.  See <u>United States v. Jacobsen</u>, 466 U.S. at 113.  The information that [the defendant] sought and obtained was information that [the plaintiff] purported to supply in his request for sick leave.  Specifically, [the plaintiff] provided a doctor's note containing the information that [the defendant] attempted to verify at [the doctor's] office. Thus, [the plaintiff] cannot, on good ground, argue that he had a reasonable expectation of privacy in the fact that he was undergoing a medical procedure and in the dates upon which he was taking days off work to visit the doctor.

2008 U.S. Dist. LEXIS 108932, at **28-29.

In <u>Jaffee v. Redmond</u>, 518 U.S. 1 (1996), the Supreme Court held "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence." 518 U.S. at 15.  While announcing the privilege in the context of that § 1983 action, the Supreme Court found it "neither necessary nor feasible to delineate its full contours in a way that would 'govern all conceivable future questions in this area.'"  518 U.S. at 18 (quoting <u>Upjohn Co. v. United States</u>, 449 U.S. 383, 386 (1981)).  In <u>United States v. Glass</u>, 133 F.3d 1356 (10th Cir. 1998), the Tenth Circuit upheld the psychotherapist privilege in criminal cases to protect the defendant's statements from compelled disclosure.  See 133 F.3d at 1360.

## THE UNITED STATES CONSTITUTION'S RIGHT TO PRIVACY

The Due-Process Clause of the Fourteenth Amendment protects the right of privacy. See <u>Flanagan v. Munger</u>, 890 F.2d 1557, 1570 n.15 (10th Cir. 1989); <u>Mangels v. Pena</u>, 789 F.2d

836, 839 (10th Cir. 1986). The Tenth Circuit has recognized that the right to privacy extends to when government employers improperly attempt to obtain the private medical history or records of their employees. See Lankford v. City of Hobart, 27 F.3d at 479. Although the Tenth Circuit in Lankford v. City of Hobart found a violation of the right of privacy under the facts in that case, it did not discuss the manner in which a court should determine generally when a violation of the privacy right occurs. Flanagan v. Munger provides some instruction on this point. In Flanagan v. Munger, the Tenth Circuit employed a balancing test to determine when disclosure by the government of private information amounts to violation of the right to privacy. See Flanagan v. Munger, 890 F.2d at 1570. Specifically, a court must inquire: "(1) if the party asserting the right has a legitimate expectation of privacy; (2) if disclosure serves a compelling state interest; and (3) if disclosure can be made in the least intrusive manner." 890 F.2d at 1570. The Tenth Circuit held that the plaintiffs, police officers who owned an adult video store, did not suffer a violation of their privacy rights when their ownership was disclosed, noting that "only highly personalized information is protected." 890 F.2d at 1570. See Mangels v. Pena, 789 F.2d at 839 ("The legitimacy of an individual's expectations depends, at least in part, upon the intimate or otherwise personal nature of the material . . . ."). In Ortlieb v. Howery, 74 Fed. Appx. 853, 854 (10th Cir. 2003), the Tenth Circuit applied the balancing test set forth in Flanagan v. Munger and held that the plaintiff did not have a reasonable expectation of confidentiality in her X-ray. See 74 Fed. Appx. at 857. In reaching its conclusion, the Tenth Circuit in Ortlieb v. Howery noted that the plaintiff's broken leg was not confidential information because the plaintiff had contacted her employer seeking extended medical leave because of the severity of her injury, and the injury was "well-known and publicized with no intrusion into her personal affairs." Id. The Tenth Circuit also observed that, because the plaintiff had "supported her request for an indefinite extension of medical

benefits with her doctor's report stating that his opinion of continuing disability was corroborated with her x-rays, she had no reasonable expectation that the x-rays themselves would be confidential or protected from her supervisor's reach or purview."  74 Fed. Appx. at 857.  Finally, the Tenth Circuit noted that "the x-rays, unlike written medical records, contained no facts or information of an intimate or personal nature about which Ms. Ortlieb could form a legitimate or reasonable expectation of confidentiality notwithstanding her claim for benefits." Id. at 857.

## LAW REGARDING MALICIOUS PROSECUTION

A claim for a constitutional violation based on malicious prosecution requires that five elements be met.  As the Tenth Circuit has stated:

> Under our cases, a § 1983 malicious-prosecution claim includes the following elements: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages.

Wilkins v. DeReyes, 528 F.3d 790, 799 (10th Cir. 2008).  Probable cause is a requirement for a malicious-prosecution claim, but "false information" that was submitted to the finder of probable cause cannot be considered when ascertaining whether probable cause existed at the time of the probable-cause determination.  Id. at 801 (stating "if we set aside, as we must, the false information, nothing is left in the affidavits to support probable cause for [p]laintiffs' arrests.")(internal citation omitted).

## LAW REGARDING THE NMTCA

The NMTCA is the "exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act . . . ." NMSA 1978, § 41-4-17(A).  A governmental entity of New Mexico may not be sued unless the plaintiff's cause of action fits within one of the exceptions to governmental entities' and public employees' immunity

in the NMTCA.  See Begay v. State, 104 N.M. 483, 486, 723 P.2d 252, 255 (Ct. App. 1985), rev'd

on other grounds by Smialek v. Begay, 104 N.M. 375, 721 P.2d 1306 (1986).  "Consent to be sued

may not be implied, but must come within one of the exceptions to immunity under the Tort Claims

Act."  Begay v. State, 104 N.M. at 487, 723 P.2d at 256 (internal quotation marks omitted).  Thus,

if the court cannot find a specific waiver in the NMTCA, the court must dismiss the plaintiff's claim.

See Begay v. State, 104 N.M. at 487, 723 P.2d at 256.

      The NMTCA was enacted in recognition of "the inherent unfair and inequitable results which

occur in the strict application of the doctrine of sovereign immunity."  NMSA 1978, § 41-4-2(A).

The New Mexico Legislature also recognized

      that while a private party may readily be held liable for his torts within the chosen
      ambit of his activity, the area within which the government has the power to act for
      the public good is almost without limit, and therefore government should not have
      the duty to do everything that might be done.

NMSA 1978, § 41-4-2(A).  As a result, it was "declared to be the public policy of New Mexico that

governmental entities and public employees shall only be liable within the limitations of the Tort

Claims Act and in accordance with the principles established in that act."  NMSA 1978 § 41-4-2(A).

The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent

person's standard of care in the performance of that duty."  NMSA 1978, § 41-4-2(C).

      The NMTCA provides a general grant of immunity from tort claims against government

entities and public employees, unless a particular exception to the waiver applies.  See NMSA 1978,

§ 41-4-4(A).  The NMTCA provides

      the exclusive remedy against a governmental entity or public employee for any tort
      for which immunity has been waived under the Tort Claims Act and no other claim,
      civil action or proceeding for damages, by reason of the same occurrence, may be
      brought against a governmental entity or against the public employee or his estate
      whose act or omission gave rise to the suit or claim.

NMSA 1978, § 41-4-17.   A governmental entity of New Mexico may not be sued unless the plaintiff's cause of action fits within one of the exceptions to the immunity granted to governmental entities and public employees in the NMTCA.   See Begay v. State, 104 N.M. at 486, 723 P.2d at 255.   The right to sue and to recover against a governmental entity is limited to the rights, procedures, limitations, and conditions that the NMTCA prescribes.   See Methola v. County of Eddy, 95 N.M. 329, 333-34, 622 P.2d 234, 238-39 (1980).

## 1.   **NMTCA's Notice Requirement.**

Under the NMTCA:

A.   Every person who claims damages from the state or any local public body under the Tort Claims Act shall cause to be presented to the risk management division for claims against the state, the mayor of the municipality for claims against the municipality, the superintendent of the school district for claims against the school district, the county clerk of a county for claims against the county, or to the administrative head of any other local public body for claims against such local public body, within ninety days after an occurrence giving rise to a claim for which immunity has been waived under the Tort Claims Act, a written notice stating the time, place and circumstances of the loss or injury.

B.   No suit or action for which immunity has been waived under the Tort Claims Act shall be maintained and no court shall have jurisdiction to consider any suit or action against the state or any local public body unless notice has been given as required by this section, or unless the governmental entity had actual notice of the occurrence. The time for giving notice does not include the time, not exceeding ninety days, during which the injured person is incapacitated from giving the notice by reason of injury.

NMSA 1978, § 41-4-16A, B.  The New Mexico Court of Appeals has explained:

[T]he purpose of a notice requirement is to enable the person or entity to whom notice must be given, or its insurance company, to investigate the matter while the facts are accessible, to question witnesses, to protect against simulated or aggravated claims, and to consider whether to pay the claim or refuse it.

Martinez v. City of Clovis, 95 N.M. 654, 657, 625 P.2d 583, 586 (Ct. App. 1980).

The plain language of NMSA 1978, § 41-4-16A and 16B does not require a notice when the

suit is against a public employee, and the New Mexico Court of Appeals has so held.  See Dutton v. McKinley City Bd. of Comm'rs., 113 N.M. 51, 54, 822 P.2d 1134, 1137 (Ct. App. 1991)("The written notice requirements of Section 41-4-16A do not apply to claims against public employees.") (citing Martinez v. City of Clovis, 95 N.M. at 656, 625 P.2d at 585).

> [T]here is nothing within the notice provisions of § 41-4-16 requiring such notice from one who claims damages against a public employee; and merely because § 41-4-4C imposes upon the governmental entity for which the employee works the obligation to provide a defense to its employee and pay any settlement or judgment reached, it does not convert a public employee, without immunity under § 41-4-6, into a "local public body," a "governmental entity," or the "state or state agency," as those terms are defined in § 41-4-3.

Martinez v. City of Clovis, 95 N.M. at 656, 625 P.2d at 585.

### 2.    Waiver of Immunity.

A plaintiff may not sue a governmental entity or its employees for a damage claim arising out of violations of rights under the New Mexico Constitution unless the NMTCA contains a waiver of immunity.  "In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits for damages to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act."   Barreras v. N.M. Corr. Dep't, 133 N.M. 313, 319, 62 P.3d 770, 776 (Ct. App. 2002).  See Chavez v. City of Albuquerque, 124 N.M. 479, 482, 952 P.2d 474, 477 (Ct. App. 1997)(noting that a plaintiff cannot seek damages for violations of rights under the New Mexico Constitution unless immunity is waived under the NMTCA); Rubio v. Carlsbad Mun. Sch. Dist., 106 N.M. 446,449, 744 P.2d 919, 922 (Ct. App. 1987)(holding that no waiver of immunity exists for damages arising out of alleged educational malpractice claim against a school board); Begay v. State, 104 N.M. at 488, 723 P.2d at 257 (finding that no waiver existed in NMTCA for suits for damages under Article II, § 11 of the New Mexico Constitution).

Those waivers are, however, relatively broad:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978
> [granting immunity from liability for torts committed within the scope of duty] does
> not apply to liability for personal injury, bodily injury, wrongful death or property
> damage resulting from assault, battery, false imprisonment, false arrest, malicious
> prosecution, abuse of process, libel, slander, defamation of character, violation of
> property rights or deprivation of any rights, privileges or immunities secured by the
> constitution and laws of the United States or New Mexico when caused by law
> enforcement officers while acting within the scope of their duties.

NMSA 1978, § 41-4-12 (1976)(emphasis added).  See Sisneros v. Fisher, No. CIV 09-0213,

2010 U.S. Dist. LEXIS 9256, at *80 (D.N.M. Jan. 13, 2010) (Browning, J.)("The NMTCA waives

immunity from suit for law-enforcement officers who commit certain intentional torts, including

assault, battery, false imprisonment, false arrest, and malicious prosecution -- almost all of which

[the plaintiff] asserts [against a Bernalillo County Sheriff's Department officer and Bernalillo

County].").  Thus, an officer can be held liable for most intentional torts committed while in the

course and scope of the officer's duties.

A law-enforcement officer is a "full-time salaried public employee of a governmental entity

whose principal duties under law are to hold in custody any person accused of a criminal offense,

to maintain public order or to make arrests for crimes, or members of the national guard when called

to active duty by the governor." NMSA 1978, § 41-4-3.  New Mexico courts have construed this

definition strictly.  They have held that the Director of the New Mexico Motor Vehicle Department,

who has statutory power to make arrests, was not a law-enforcement officer because the "vast

majority of [his] time and effort are involved in administrative matters." Dunn v. State ex rel.

Taxation & Revenue Dep't Motor Vehicle Div., 116 N.M. 1, 4, 859 P.2d 469, 473 (Ct. App. 1993).

Similarly, various other persons associated with the criminal-justice system been held to not be

law-enforcement officers.  See, e.g., Coyazo v. State, 120 N.M. 47, 49-51, 897 P.2d 234, 236-38

(Ct. App. 1995)(district attorneys and staff); Silva v. State, 106 N.M. 472, 478 745 P.2d 380, 386 (1987)(Secretary of Corrections).

### 3.     New Mexico Tort Claims of False Arrest and False Imprisonment.

The tort of false imprisonment occurs when a person intentionally confines or restrains another person without consent, and with knowledge that he has no lawful authority to do so.  See Santillo v. N.M. Dep't of Pub. Safety, 143 N.M. 84, 88, 173 P.3d 6, 12 (Ct. App. 2007); Diaz v. Lockheed Elecs., 95 N.M. 28, 31-32, 618 P.2d 372, 375-76 (Ct. App. 1980).  A false arrest is merely one way of committing false imprisonment.  See Santillo v. N.M. Dep't of Pub. Safety, 143 N.M. at 88, 173 P.3d at 12 (citing 32 Am. Jur. 2d False Imprisonment § 3 (2007)); Butler ex rel. Butler v. Rio Rancho Pub. Sch. Bd. of Educ., 245 F. Supp. 2d 1203, 1211 (D.N.M. 2002)("The torts of false arrest and false imprisonment are similar.").  "An officer who has probable cause to arrest a person cannot be held liable for false arrest or imprisonment, since probable cause provides him with the necessary authority to carry out the arrest."  Santillo v. N.M. Dep't of Pub. Safety, 143 N.M. at 88, 173 P.3d at 12.  See State v. Johnson, 122 N.M. 696, 701, 930 P.2d 1148, 1153 (1996)(noting that "a common-law defense to a civil . . . false imprisonment suit . . . requires . . . that the officer prove that he or she acted in good faith and with probable cause and therefore lawfully under the circumstances").  If an officer had probable cause to obtain the warrant for a plaintiff's arrest, then he acted with authority when he arrested her, and he cannot be held liable for false imprisonment, false arrest, or for malicious abuse of process based on a lack of probable cause.  See Santillo v. N.M. Dep't of Pub. Safety, 143 N.M. at 88-89, 173 P.3d at 14.

### 4.     New Mexico Tort Claim of Malicious Abuse of Process.

New Mexico has combined the torts of abuse of process and malicious prosecution into a single tort: malicious abuse of process.  See Devaney v. Thriftway Marketing Corp., 124 N.M.512,

518, 953 P.2d 277, 283 (1997), abrogated on other grounds by Fleetwood Retail Corp. of N.M. v.

LeDoux, 142 N.M. 150, 164 P.3d 31 (2007).  "One who uses a legal process, whether criminal or

civil, against another primarily to accomplish a purpose for which it is not designed, is subject to

liability to the other for harm caused by the abuse of process."  Richardson v. Rutherford, 109 N.M.

495, 501, 787 P.2d 414, 420 (1990)  The Supreme Court of New Mexico has held:

> an abuse of process arises when there has been a perversion of the court processes
> to accomplish some end which the process was not intended by law to accomplish,
> or which compels the party against whom it has been used to perform some collateral
> act which he legally and regularly would not be compelled to do.

Richardson v. Rutherford, 109 N.M. at 500, 787 P.2d at 419.

The Supreme Court of New Mexico recently revised the necessary elements of the tort of

malicious abuse of process.  In Durham v. Guest, 145 N.M. 694, 204 P.3d 19 (2009), the Supreme

Court of New Mexico held that: (i) an arbitration proceeding is a judicial proceeding for the

purposes of a claim for malicious abuse of process, see id. at 703, 204 P.3d at 28; and (ii) that the

requirement that the defendant initiate judicial proceedings against the plaintiff -- which had

previously been an essential element to a malicious-abuse-of-process claim -- was no longer an

element, see id. at 701, 204 P.3d at 26.  The tort of malicious abuse of process under New Mexico

law now has only three elements: (i) "the use of process in a judicial proceeding that would be

improper in the regular prosecution or defense of a claim or charge;" (ii) "a primary motive in the

use of process to accomplish an illegitimate end;" and (iii) damages.  Durham v. Guest, 145 N.M.

at 701, 204 P.3d at 26.

In elaborating upon the first element, the Supreme Court of New Mexico commented:

> An improper use of process may be shown by (1) filing a complaint without probable
> cause, or (2) an irregularity or impropriety suggesting extortion, delay, or
> harassment, or other conduct formerly actionable under the tort of abuse of process.
> A use of process is deemed to be irregular or improper if it (1) involves a procedural

> irregularity or a misuse of procedural devices such as discovery, subpoenas, and attachments, or (2) indicates the wrongful use of proceedings, such as an extortion attempt. Finally, we emphasize that the tort of malicious abuse of process should be construed narrowly in order to protect the right of access to the courts.

Id. at 701, 204 P.3d at 26. About the general policies underlying the malicious-abuse-of-process tort, the Supreme Court said:

> When the judicial process is used for an illegitimate purpose such as harassment, extortion, or delay, the party that is subject to the abuse suffers harm, as does the judicial system in general. Thus, the malicious abuse of process tort makes the process abuser liable to the other party for the harm caused by the abuse of process.

Id. at 702, 204 P.3d at 27. The tort of malicious abuse of process is construed narrowly to protect the right of access to the courts. See Devaney v. Thriftway Marketing Corp., 124 N.M. at 519, 953 P.2d at 284. "[T]he filing of a proper complaint with probable cause, and without any overt misuse of process, will not subject a litigant to liability for malicious abuse of process, even if it is the result of a malicious motive." Richardson v. Rutherford, 109 N.M. at 502, 787 P.2d at 421 ("There is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions . . . .")(citation omitted). "[A] malicious-abuse-of-process plaintiff attempting to show a lack of probable cause must demonstrate, by the applicable standard of proof, that the opponent did not hold a reasonable belief in the validity of the allegations of fact or law of the underlying claim." Devaney v. Thriftway Marketing Corp., 124 N.M. at 522, 953 P.2d at 287. If an officer had probable cause to obtain the warrant for the plaintiff's arrest, then he acted with authority when he arrested her, and he cannot be held liable for malicious abuse of process based on a lack of probable cause. See Santillo v. N.M. Dep't of Pub. Safety, 143 N.M. at 88-89, 173 P.3d at 14.

**5.      New Mexico Tort Claim for Trespass.**

Trespass is defined as a direct infringement of another's right of possession.

See Schwartzman, Inc. v. Atchison, T. & S.F. Ry. Co., 857 F. Supp. 838, 844 (D.N.M. 1994)

(Burciaga, J.)(citing Pacheco v. Martinez, 97 N.M. 37, 41, 636 P.2d 308 (Ct. App. 1981) and

Restatement (Second) of Torts § 158 ("One is subject to liability to another for trespass, irrespective

of whether he thereby causes harm . . . , if he intentionally (a) enters land [of another or] causes a

thing or third person to do so . . . .")); North v. Pub. Serv. Co., 94 N.M. 246, 247, 608 P.2d 1128,

1129 (1980)(defining trespass as a deprivation of property rights which consists of an unauthorized

entry upon the land of another).   In Montes v. Gallegos, 812 F. Supp. 1165 (D.N.M. 1992)

(Parker, J.), the court found that an officer who had entered the plaintiffs' home using an invalid

search warrant was liable to the plaintiffs for trespass and was liable under NMSA 1978, § 41-4-12

of the NMTCA.  See Montes v. Gallegos, 812 F. Supp. at 1170.

## ANALYSIS

 The Court has before it four motions for summary judgment: two from the Plaintiffs, one

from Haag, and one from the County Defendants.  The County Defendants and Haag ask the Court

to grant them qualified immunity, and Haag, in the alternative asks that the Court grant him absolute

immunity, from the Plaintiffs' claims under 42 U.S.C. § 1983.  The County Defendants also request

that the Court grant them summary judgment on the Plaintiffs' NMTCA claims.  The Plaintiffs

request the Court to grant them summary judgment on Counts II, III, IV, V, and VI.  For each Count,

the Court will proceed under the analysis of Saucier v. Katz and Pearson v. Callahan, construing the

facts in the light most favorable to the Plaintiffs, and then analyzing whether the Plaintiffs have met

their burden to show some evidence that the Defendants violated their rights, then analyze whether

the right at issue was clearly established.  Because the Court is entertaining motions for summary

judgment from both the Plaintiffs and the Defendants, the Court will also decide whether any

violation has been established as a matter of law, such that the Plaintiffs are entitled to summary

judgment on Counts II, III, IV, V, and VI.

**I.      LINDLEY IS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS'
         CLAIM OF UNLAWFUL SEARCH AND SEIZURE, AND OF DEPRIVATION OF
         <u>PROPERTY WITHOUT DUE PROCESS OF LAW.</u>**

Count II of the First Amended Complaint alleges that Lindley is liable under § 1983 for

unlawful search and seizure of evidence, and of deprivation of property without due process of law,

arising from his drafting of the affidavit for the search warrant of the Plaintiffs' residence on August

9, 2005.  The Plaintiffs argue that Lindley knew the officers could not legally search the Plaintiffs'

residence or seize the Plaintiffs' property in the absence of probable cause, and that the affidavit

lacked probable cause because it contains facts recklessly misrepresenting the truth or deliberate

falsehoods.  Both the Plaintiffs and the County Defendants have moved for summary judgment on

Count II.  The County Defendants assert that Lindley is entitled to qualified immunity.

Because the County Defendants have asserted that Lindley is entitled to qualified immunity,

the burden shifts to the Plaintiffs to meet the Tenth Circuit's "heavy two-part burden" to defeat the

qualified-immunity defense.  <u>Medina v. Cram</u>, 252 F.3d at 1128.  The Plaintiffs must demonstrate

that the facts show: (i) that Lindley's search-warrant affidavit and subsequent search violated the

Plaintiffs' Fourth-Amendment right to be free from unreasonable searches and seizures, and the

Plaintiffs' Fourteenth-Amendment right against the unlawful deprivation of property without due

process; and (ii) that the Plaintiffs' constitutional rights allegedly infringed were clearly established

at the time of the search.  <u>See</u> <u>Riggins v. Goodman</u>, 572 F.3d at 1107.  The County Defendants argue

that the Plaintiffs cannot meet this burden because the search-warrant affidavit established probable

cause, and because Lindley did not knowingly or recklessly include false statements in the affidavit.

In determining whether the Plaintiffs have shown sufficient evidence to meet their burden

of demonstrating that Lindley violated their clearly established constitutional rights, the Court must

accept the well-pleaded facts in the light most favorable to the Plaintiffs as the non-moving party. See Riggins v. Goodman, 572 F.3d at 1107 (noting that the Tenth Circuit "accept[s] the facts as the plaintiff alleges them."). The Plaintiffs must first demonstrate that Lindley violated their constitutional rights. The Plaintiffs argue that Lindley violated their constitutional rights when he drafted an affidavit for a search warrant which failed to provide probable cause to justify a search. The Plaintiffs contend that there was not a sufficient nexus between J. Kerns and the shooting of Metro One to justify the search. They argue that the affidavit for the search warrant is nothing more than an unsubstantiated hunch. They point to the following evidence to prove their argument: (i) no one but J. Kerns heard a popping sound or gunshot near the Plaintiffs' residence; (ii) the warrant affidavit states that "one concerned citizen . . . reported that if anybody in the neighborhood was going to shoot down a helicopter it would be the male subject that lives at [the Plaintiffs' address]. The citizen reported that the male subject was an ex-military member and seems crazy enough to shoot down a helicopter," which was attributed in depositions to the Plaintiffs' neighbor, and which, in hearsay statements to the Plaintiffs' counsel, she denied; (iii) A. Kerns denies that J. Kerns told him shortly after the shooting that someone shot down the helicopter; and (iv) the transcripts of the interviews with A. Kerns do not show that he said "Jason has a bunch of rifles somewhere in the house." The Plaintiffs also point out that information was omitted from the search-warrant affidavit: (i) Smith's eye-witness statement that he witnessed the helicopter crash but did not report hearing gunshots; and (ii) Smith's statement that the helicopter had been struck through the front of the aircraft, while he was facing away from the aircraft.

Accepting the facts as the Plaintiffs have stated them, see Riggins v. Goodman, 572 F.3d at 1107, and having carefully reviewed the record, the Court believes that some of the evidence to which the Plaintiffs point should be struck from the search-warrant affidavit as false or misleading.

The Court accepts that Gonzales' interviews with A. Kerns do not support the search-warrant affidavit's statement that J. Kerns told his father shortly after the crash "Someone just shot down the helicopter," nor does the record support the statement attributed to A. Kerns that "Jason has a bunch of rifles somewhere in this house."  Rather, A. Kerns stated that he did not speak with J. Kerns shortly after the crash --   he spoke with him later in the morning.  The transcripts of the interviews with A. Kerns also do not contain a statement from A. Kerns that "Jason has a bunch of rifles somewhere in this house."  Viewing the evidence in the light most favorable to the Plaintiffs, as the Court must when considering qualified immunity, the Court will assume for the purpose of this analysis only, that Lindley included this information in reckless disregard for the truth, and in its determination of probable cause, the Court will not consider these statements in the search-warrant affidavit.[37]  The Court must also accept as true the evidence on the record that the Plaintiffs' neighbor did not make the statement that if anyone in the neighborhood would have shot down a helicopter, it would be the male living at the Plaintiffs' address.  The Court will also not consider this statement in its review of the state district court's probable-cause determination.

The Court, however, will not accept as true that Lindley recklessly omitted information from Smith, an eye-witness to the crash, in the search-warrant affidavit.  At summary judgment, the Plaintiffs' version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott [v. Harris], 550 U.S. at 380).  The Plaintiffs assert that Lindley recklessly omitted the

---

[37] The Court will also not consider them when assessing whether probable cause supported the arrest-warrant affidavit.

information in Smith's statement and that Smith's testimony would have proved that the helicopter was facing away from the Plaintiffs' residence. The Court notes, however, that Smith did not give information about where he saw the bullet strike Metro One or what direction Metro One was facing in his 2005 statement. The information on which the Plaintiffs rely is contained within an affidavit Smith gave in 2009, four years after the search warrant was drafted, in which he states that Metro One was facing south and that the bullet entered through the front of Metro One. There is no evidence that Smith told Lindley about Metro One's position and where the bullet entered in 2005 in some way other than the 2005 statement. Because the Plaintiffs' contention that Lindley recklessly omitted Smith's eye-witness account is blatantly contradicted by the record -- because no reasonable jury could believe that it was reckless to not include information that Lindley had no reason to know, as it was not in Smith's 2005 statement -- the Court will not accept that Lindley recklessly omitted directional information learned from Smith's eyewitness account.

If the warrant affidavit, modified to exclude false information, still establishes probable cause, then the search was lawful, and Lindley has not violated the Plaintiffs' constitutional right. See United States v. Ford, 184 Fed. Appx. 693, 695 (10th Cir. 2006). Most of the information in the search warrant affidavit is not disputed. The affidavit contains the entirety of J. Kerns' written statement from August 6, 2005, as well as information he gave verbally to the officers that night, including that: (i) the popping noise he heard from his backyard, which no one else to whom the police spoke immediately around his residence heard, and which was loud enough to make his ears ring; (ii) that J. Kerns could see the helicopter, and its lights, could track its reference of flight; and (iii) that the helicopter was annoying him. The affidavit also includes Lindley's interview with J. Kerns on August 8, 2005, in which he detailed his military sniper training, told Lindley he could make the shot "no problem" and stated that he would easily be able to "take a shot" at over

four-hundred yards because he routinely trained to take shots of at least four-hundred yards. See Affidavit for Search Warrant at 3; J. Kerns Depo. at 166:4-167:21; Lindley Depo. at 54:18-56:6. J. Kerns further explained that the Marine Corps firing standard for regular Marines -- the minimum Marine Corps standard -- was to be qualified at a five-hundred-yard range. See J. Kerns Depo. at 167:16-21. In response to more general questions about shooting, J. Kerns told Lindley that one could brace themselves against a tree or kneel to take a shot. See J. Kerns Depo. at 168:15-22. The affidavit also includes J. Kerns' statement that the helicopter was a "great target." Affidavit for Search Warrant at 3. J. Kerns admits that he probably told Lindley that the helicopter made a great target; it was back-lit, making it appear like a black silhouette on a lighter background, much like the targets used on shooting ranges. See J. Kerns Depo. at 171:9-24. The affidavit also contains the undisputed evidence that J. Kerns began traveling at over one-hundred miles per hour in an attempt to lose detectives assigned to conduct surveillance of J. Kerns. Additionally, the affidavit contains valid information from Gonzales' interviews with A. Kerns, including A. Kerns showing the photograph of J. Kerns with several firearms. Finally, the search-warrant affidavit addresses the inconsistencies between what J. Kerns told officers -- such as hearing the popping sound near the Plaintiffs' residence loud enough to make his ears ring and hearing rocks kick up -- and what the officers observed and what other witnesses told the officers.

The Court believes that, viewing the totality of the unstruck evidence made known to the reviewing state district judge, the affidavit established a substantial basis for concluding that probable cause existed to search the Plaintiffs' residence. See Massachusetts v. Upton, 466 U.S. 727, 728 (1984)(stating that "the Fourth Amendment's requirement of probable cause for the issuance of a warrant is to be applied, not according to a fixed and rigid formula, but rather in the light of the "totality of the circumstances" made known to the magistrate"). The Supreme Court has

rejected after-the-fact de novo scrutiny of an warrant-issuing judge's probable-cause determination. See Massachusetts v. Upton, 466 U.S. at 728 (finding that the reviewing court erred when it conducted a de novo probable-cause determination and emphasizing that "[a] deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant."); Illinois v. Gates, 462 U.S. at 238-39 (stating that the court's duty is "simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed."); United States v. Reed, 195 Fed. Appx. at 822 (stating that "[a] reviewing court should accord great deference to a magistrate's determination of probable cause."). The Supreme Court has advised: "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." Massachusetts v. Upton, 466 U.S. at 734.

The Court believes that Lindley's search-warrant affidavit, excluding the facts the Court has stated it will not consider to construe the affidavit in the light most favorable to the Plaintiffs, still provides a substantial basis for the issuance of the warrant. Although no single piece of evidence in it is conclusive, the Court believes that the totality of the facts support the state district judge's determination that there was a fair probability that J. Kerns was linked to the shooting of Metro One and a fair probability that evidence of the crime would be found in the Plaintiffs' residence. See United States v. Reed, 195 Fed. Appx. at 821 ("The task of the magistrate judge issuing the search warrant is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."). The Court believes the combination of J. Kerns' extensive account

of the details of the helicopter crash, the details of which he told repeatedly but which the officers were unable to corroborate themselves or through other witnesses, J. Kerns' evasive response to the officers' surveillance, and what the Court believes can be construed as J. Kerns' bragging about his ability to hypothetically make the shot that brought down Metro One, collectively created enough of a picture that the state district judge could make a fair inference that J. Kerns was linked to the shooting of Metro One, and that "there [was] a fair probability that contraband or evidence of a crime [would] be found" in the Plaintiffs' residence. Id.

Recklessness may be inferred where the omitted information was "clearly critical" to the probable-cause determination. DeLoach v. Bevers, 922 F.2d 618, 622 (10th Cir. 1990); Pierce v. Gilchrist, 359 F.3d at 1295 (stating that the plaintiffs bear a "heavy burden" of showing that defendants' inaccuracies were "necessary to the finding of probable cause."). Mere negligence or innocent mistake is insufficient to void a warrant. See Franks v. Delaware, 438 U.S. at 171. The Court has determined that probable cause was established in the search-warrant affidavit without considering the facts the Plaintiffs contested as false or misleading. The facts the Court excluded were not essential to the Court's determination. At most, the evidence suggest that Lindley negligently included information learned from other officers. Because the omitted facts were not clearly critical to the probable-cause determination, the Court does not believe that Lindley's inclusion of the false or misleading facts rose to the level of recklessness. The Court finds, therefore, that the Plaintiffs have failed to establish that Lindley was reckless in his drafting of the search-warrant affidavit.

The Court also believes that the Plaintiffs' particularity argument is unavailing. The Plaintiffs argue that the search warrant was insufficiently particularized. The Tenth Circuit has held that "the Fourth Amendment requires that the government describe the items to be seized with as

much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized." Cassady v. Goering, 567 F.3d at 635.  This is not a case in which the search warrant does not describe items to be seized. See, e.g., Groh v. Ramirez, 540 U.S. 551, 558 (2004)(finding that, because a search warrant's sole description of the place to be searched was "single dwelling residence . . . blue in color," it "did not describe the items to be seized at all . . . . [T]he warrant was so obviously deficient that we must regard the search as 'warrantless' within the meaning of our case law."); Cassady v. Goering, 567 F.3d at 635 (rejecting the search warrant, which permitted the search and seizure of "all other evidence of criminal activity" because it did not confine the scope of the search to any particular crime).  The search warrant in this case states that the officers are seeking firearms and paperwork related to those firearms, military-related literature and guides, and photographs, audio recordings, or video recordings linked to the chain of events leading up to the crash of Metro One.  The items are narrow in scope and are linked to a particular criminal activity -- the shooting of Metro One.  The Court believes that the state district judge's determination that the request is adequately particularized to enable the officers to reasonably ascertain and identify the things authorized to be seized was proper. See United States v. Janis Indus., 48 F.3d at 1553 (stating that "[a] description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized.").  The search warrant is not, therefore, facially invalid.

The Court finds that Lindley's affidavit established probable cause and that the search warrant was not facially invalid.  The Court, therefore, finds that the Plaintiffs have failed to meet the first-prong of their burden to defeat Lindley's qualified-immunity defense and will grant Lindley qualified immunity on Count II.  The Court, therefore, will grant Lindley's motion for summary

judgment as to Count II and deny the Plaintiffs' motion on Count II.

## II.   THE PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNTS III AND VI.

Count III of the First Amended Complaint alleges that White violated J. Kerns' Fourth- and Fourteenth-Amendment rights when he requested J. Kerns' private medical records from the Veterans Hospital, and Count VI alleges that, because White is the Bernalillo County Sheriff, and thus the policymaker for the department, if liable for Count III, there is also municipal liability under Count VI.  White has asserted qualified immunity in his summary-judgment motion.  The Plaintiffs have also moved for summary judgment as to liability on these counts.

### A.   WHITE IS NOT ENTITLED TO QUALIFIED IMMUNITY FOR VIOLATING J. KERNS' FOURTEENTH-AMENDMENT RIGHT OF PRIVACY.

Because White has asserted that he is entitled to qualified immunity, the burden shifts to the Plaintiffs to meet the Tenth Circuit's "heavy two-part burden" to defeat the qualified immunity defense.  Medina v. Cram, 252 F.3d at 1128.  The Plaintiffs must demonstrate: (i) that White's request for J. Kerns' private medical files from the Veterans Hospital violated the J. Kerns' Fourteenth-Amendment right to privacy; and (ii) that his constitutional right was clearly established at the time of White's request.  See Riggins v. Goodman, 572 F.3d at 1107.  White argues that the Plaintiffs cannot meet this burden because his mere request for medical records did not violate the Constitution.  In determining whether the Plaintiffs have shown sufficient evidence to meet their burden of demonstrating that White violated J. Kerns' clearly established constitutional rights, the Court must accept the facts in the light most favorable to the Plaintiffs as the non-moving party.

### 1.   White's Request Violated J. Kerns' Constitutional Right to Privacy.

The Plaintiffs must first demonstrate that White violated their constitutional rights.  The

Tenth Circuit has held that "there is a constitutional right to privacy that protects an individual from the disclosure of information concerning a person's health." Herring v. Keenan, 218 F.3d 1171, 1173 (10th Cir. 2000). In Lankford v. City of Hobart, the Tenth Circuit found that the chief of police violated the plaintiff's privacy rights under § 1983 when he obtained the plaintiff's private medical records without the plaintiff's consent, leaving open the possibility that such action could also violate the Fourth Amendment. See 27 F.3d at 480 n.1 (stating "it is possible that a Fourth Amendment violation occurred when, as Ms. Calvary alleges, Mr. Medrano 'seized' her protected medical files without a warrant."). The Tenth Circuit found that the police chief was liable under § 1983 for obtaining the plaintiff's medical records without her consent.

In this case, the Plaintiffs contend that White violated J. Kerns' constitutional right to privacy in personal medical information and violated the Fourth Amendment's prohibition on unreasonable search and seizure. Although there is no explicit reference in the Constitution to a right of privacy, the Supreme Court has found such a right to be implicit in the Constitution, and in Ferguson v. City of Charleston, 532 U.S. 67 (2001), the Supreme Court found: "The reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent." 532 U.S. at 78.

The Tenth Circuit did not discuss the manner in which a court generally should determine when a violation of the privacy right occurs in Lankford v. City of Hobart. In Flanagan v. Munger, the Tenth Circuit adopted a balancing test, under which the Court must consider: (i) whether J. Kerns had a legitimate expectation of privacy in his medical and psychiatric records; (ii) whether disclosure of this information served a compelling state interest; and (iii) whether the state could have achieved its objectives in a less intrusive manner. See 890 F.2d at 1570. The Court used this

test in <u>Chavez v. Martinez</u> to evaluate whether the defendant violated the plaintiff's right to privacy when he went to the plaintiff's doctor's office to verify dates in the plaintiff's possibly altered doctor's note.  <u>See</u> 2008 U.S. Dist. LEXIS 108932, at *32.  The Court is aware that the test in <u>Flanagan v. Munger</u> is directed more toward situations where government actors reveal or publicize information that a plaintiff considers private or confidential.  Even so, the Tenth Circuit has applied the test where a plaintiff asserted a violation of her right to privacy when her employer accessed her medical information without permission.  <u>See</u> <u>Ortlieb v. Howery</u>, 74 Fed. Appx. at 857.

The Plaintiffs have presented evidence that White authorized a request directed to the Veterans Hospital which stated: "Please provide any and all records possessed by the VA pertaining to Jason KEARN'S [sic] psychiatric condition as it would apply to 18 U.S.C. § 922(g)(4)."  Letter from Sheriff Darren White to United States Department of Veterans Affairs Release of Information Office at 4, filed July 17, 2009 (Doc. 182-20).  The request was sent by facsimile transmission to the Release of Information Office of the United States Department of Veterans Affairs.  <u>See</u> <u>id.</u> There is a factual dispute over who went to the hospital to receive the records, but viewing the evidence in the light most favorable to the Plaintiffs, the Court accepts that another Bernalillo County Sheriff's Department officer went to the VA hospital and was given access to "1000 pages all computer records and clipped pages from chart as clipped by officer" of J. Kerns' medical records.  <u>See</u> Electronic Accounting of Disclosure for J. Kerns at 3, filed July 21, 2009 (Doc. 185). The Plaintiffs argue that the 1000 pages documented all of J. Kerns' medical, pharmacy, and behavioral health records, none of which were relevant to establishing a criminal charge under 18 U.S.C. § 922(g)(4).  Although White did not personally retrieve the medical records, he was both the supervising authority, and one who exercised control over the request and the officer who retrieved the documents resulting from the request.  <u>See</u> <u>Poolaw v. Marcantel</u>, 565 F.3d 721, 732-33

(10th Cir. 2009)(stating that, when "an affirmative link exists between the constitutional deprivation and either the officer's personal participation, his exercise of control or discretion, or his failure to supervise," the officer is liable for that constitutional deprivation)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997)).

J. Kerns, in his affidavit, states that he believes that his medical and mental-health records, including the information he conveyed to the doctors and mental-health professionals at the Veterans Hospital, was confidential and private.  See J. Kerns Aff. ¶ 3, at 1.  J. Kerns also states that he believed that his medical and mental-health records would not be disclosed to anyone other than those professionals involved in providing medical and mental-health services to him.  See J. Kerns Aff. ¶ 4, at 1.  The County Defendants do not put forth any evidence to dispute J. Kerns' assertion that he believed his medical and mental-health records, in the Veterans Hospital's possession, were private and confidential.  There is no indication in the record that J. Kerns shared his medical records with the Bernalillo County Sheriff's Department or gave permission for them to request his records.  He made a statement to Lindley that, if Lindley wanted more information about PTSD generally, he could speak to J. Kerns' doctor, but he gave no indication that he expected or consented to the officers procuring all of his medical records.  See Interview with Jason Kerns at 18 ("You know, it, I guess I can't explain what PTSD is, if you need to know you can speak to my doctor and he'll explain it.").[38]  Moreover, the Court believes that it was legitimate for J. Kerns to

_____

[38] The County Defendants do not argue that this exchange between Lindley and J. Kerns constituted consent to request and seize his medical records.  The determination whether a defendant freely and voluntarily consents to a search, however, is a question of fact and is derived from the totality of the circumstances.  See United States v. Pena-Sarabia, 297 F.3d 983, 986 (10th Cir. 2002).  To show that a consent to search is valid, there must be "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given."  United States v. Pena-Sarabia, 297 F.3d at 986 (citation omitted).  J. Kerns' statement to Lindley that Lindley could ask J. Kerns' doctor about PTSD generally does not constitute unequivocal, specific, freely and intelligently given

expect that his medical records would be private.  See J. Glover & E. Toll, The Right to Privacy of Medical Records, 79 Denv. U. L. Rev. 540, 541 (2002)("Over the last thirty years, the federal courts have uniformly accepted the principle that medical records are private and entitled to protection.")(citing Whalen v. Roe, 429 U.S. 589 (1977)).  The first factor to balance in the Flanagan v. Munger test is whether J. Kerns had a legitimate expectation of privacy in his medical and psychiatric records, and the Court believes that, viewing the record in the light most favorable to J. Kerns, that factor weighs in his favor.

The second factor to balance is whether the Bernalillo County Sheriff's Department had a compelling state interest in J. Kerns' medical records.  The request which White sent to the Veterans Hospital explained that they were investigating whether J. Kerns had been "adjudicated a mental defect," because, under 18 U.S.C. § 922(g)(4), it is unlawful for a person "who has been adjudicated as a mental defective or who has been committed to a mental institution" to possess firearms.  18 U.S.C. § 922(g)(4).  Congress intended to keep firearms away from persons considered potentially dangerous, which included prohibiting the possession of firearms by individuals who have been committed to mental institutions or adjudicated mentally incompetent.  See Huddleston v. United States, 415 U.S. 814, 826 (1974)("There also can be no doubt of Congress' intention to deprive the juvenile, the mentally incompetent, the criminal, and the fugitive of the use of firearms.").  The Court believes that White asserted a compelling state interest in determining whether J. Kerns has been adjudicated to have a mental defect or has been committed to a mental institution.  The Plaintiffs have not provided any evidence to contest this compelling state interest, and therefore the Court weighs this factor in White's favor.

―――――――――――――

consent for the Bernalillo County Sheriff's Department to search and seize his medical records.

The third factor that the Court should balance to determine whether White committed a constitutional violation of J. Kerns' privacy is whether the state could have achieved its objectives in a less intrusive manner.  See 890 F.2d at 1570.  In his letter, White requests "any and all records possessed by the VA" pertaining to J. Kerns' psychiatric condition.  The record of the Veterans Hospital indicates under request comments "Review all records" and under released information states "1000 pages all computer records and clipped pages from chart as clipped by officer."  Martinez Declaration, Exhibit 1.  The Plaintiffs argue that White could have asked the Veterans Hospital whether J. Kerns has been committed to a mental institution or adjudicated to have a mental defect.  Instead, White's request yielded all of J. Kerns medical records.[39]  The Court believes that White could have achieved his objective of determining J. Kerns' status under 18 U.S.C. § 922(g)(4) in a far less intrusive manner than a blanket request for any and all records that the Veterans Hospital possessed pertaining to psychiatric condition.  White could have requested the Veterans Hospital's Release of Information Unit to look into the records and determine whether J. Kerns' was ever committed to a mental institution or adjudicated to have a mental defect, rather than seizing 1000 pages of his medical records.  The Court finds that the third factor also weighs in the Plaintiffs favor.  Weighing the three factors, and viewing the evidence in the light most favorable to the Plaintiffs, as the Court must when conducted a qualified-immunity analysis, the Court believes that the Plaintiffs have met their burden of demonstrating that White violated J. Kerns' constitutionally protected right to privacy.

The Court notes that this case is more analogous to Lankford v. City of Hobart than Chavez

---

[39] Mr. Lowry brought the seized records to the hearing and demonstrated for the Court that they included J. Kerns' physical ailments, his sexual history, and his medication history, and showed no evidence of a particularized request.  See Tr. at 142:14-19 (Lowry).

v. Martinez.  In Chavez v. Martinez, the Court found that there was no violation of the plaintiff's privacy right when the defendant asked the plaintiff's doctor's office to verify dates for the plaintiff's sick leave.  The Court found that the information the defendant sought -- dates of a doctor's visit -- was not highly personal, particularly when the plaintiff had told the defendant that he had been at the doctor's office as an excuse to take leave from work.  Here, White requested information of a more personal nature regarding J. Kerns' psychiatric condition, and in a manner far more intrusive that asking a question of a receptionist -- White's request yielded a "review of all records."  Martinez Declaration, Exhibit 1.  The Court believes that the precedent in Lankford v. City of Hobart, which found a clearly established violation of constitutional rights when an employer obtained a plaintiff's medical records without permission, is controlling in this situation. The Tenth Circuit has consistently found that a constitutional right of privacy attaches to such personal information.  See Douglas v. Dobbs, 419 F.3d 1097, 1102 (10th Cir. 2005)(stating that the court had "no difficulty" concluding that the right of medical privacy includes the right to keep pharmacy records confidential); Herring v. Keenan, 218 F.3d 1171, 1173 (10th Cir. 2000)("This circuit, however, has repeatedly interpreted the Supreme Court's decision in Whalen v. Roe . . . as creating a right to privacy in the non-disclosure of personal information.").

To the extent that White argues his request was proper under the Federal Privacy Act, and thus was not a constitutional violation, the Court does not find that argument persuasive.  The Federal Privacy Act states:

> (b)      Conditions of disclosure. No [federal] agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be--

* * * *

(7)    to another [federal] agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought.

5 U.S.C. § 552a(b)(7).  The Federal Privacy Act creates an independent cause of action for the illegal disclosure of private information.  The provision of the Federal Privacy Act that the County Defendants argue gives White legal authority was promulgated as a defense to Privacy Act violations.  It was not Congress' intent to erode constitutional privacy protections.  Moreover, although the Veterans Hospital, as part of the United States Department of Veterans Affairs, is considered an agency, the Bernalillo County Sheriff's Department is not a federal agency.  The Privacy Act, § 552a(a)(1), defines the term "agency" by reference to 5 U.S.C. § 552(e), which provides: "'agency' as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency."  5 U.S.C. § 552(f).  While the phrase "any executive department" could be read to include state and local executive departments, the structure of the act strongly suggests that agency refers only to agencies of the federal government.  Courts have consistently so held that the provisions of the Privacy Act are specifically limited to agencies of the United States Government.  See United States v. Streich, 560 F.3d 926, 935 (9th Cir. 2009) ("The Federal Privacy Act does not apply to state agencies."); Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 124 (2d Cir. 2008)("This Court, joining many of its sister Circuits, has accordingly held that the private right of civil action created by the Privacy Act is specifically limited to actions against agencies of the United States government."); Spurlock v. Ashley County,

281 Fed. Appx. 628, 629 (8th Cir. 2008); Schmitt v. City of Detroit, 395 F.3d 327, 331

(6th Cir. 2005)(holding that "the Privacy Act applies exclusively to federal agencies"); Polchowski

v. Gorris, 714 F.2d 749, 752 (7th Cir. 1983)("This act, however, applies only to agencies of the

United States Government.").   See also United States v. Miller, 643 F.2d 713, 715 (10th Cir.

1981)(holding that "agency" under the Federal Privacy Act does not include national banks because

the definition of agency is "restrictive"); Unt v. Aerospace Corp., 765 F.2d 1440, 1447 (9th Cir.

1985)(rejecting the argument that a federally funded non-profit corporation constitutes an agency

under the Federal Privacy Act). Congress, when enacting the Privacy Act, specifically limited its

scope to federal agencies.  See S. Rep. No. 93-1183, 93d Cong., 2d Sess., reprinted in 1974 U.S.

Code Cong. & Adm. News 6916, 6932 ("The Committee has cut back on the bill's original coverage

and ordered the Privacy Commission to make a study of State, local and private data banks and

recommend precise application of the Act where needed.").[40]  The County Defendants, moreover,

argue in their motion for summary judgment that the Federal Privacy Act does not apply to the

Bernalillo County Sheriff's Department, because it is local government and not an agency of the

federal government.  See County Defendants' Motion at 28.  The Court agrees that the Bernalillo

County Sheriff's Department is a part of the Bernalillo County local government and is not a federal

agency within the "restrictive language" of § 552a(a)(1).  See United States v. Miller, 643 F.2d at

715 n.1.  The Court, thus, will not now allow the County Defendants to assert the Federal Privacy

Act, which is inapplicable to the Bernalillo County Sheriff's Department, as lawful authorization

for White's constitutional violation.

---

[40] The bill, as originally introduced, contained a remedy for improper disclosures by state authorities; these provisions were deleted, however, because of the uncertain effect of such a provision and because Congress felt that it lacked the necessary information for devising a remedial scheme in this context. See 1974 U.S. Code Cong. & Adm. News at 6933-34.

The Court also notes that Mr. Barth testified in his deposition that he assumed that White had asserted the law-enforcement exception to the Health Insurance Portability and Accountability Act, Pub. L. 104-191 ("HIPAA").  The Court finds no indication in the record that White sought the information pursuant to the law-enforcement exception in HIPAA, which allows HIPAA-covered entities, like the Veteran's Hospital, to disclose protected healthcare information in six circumstances: (i) as required by law -- court orders, subpoenas, warrants; (ii) to identify or locate a suspect, fugitive, material witness, or missing person; (iii) in response to a law-enforcement official's request for information about a victim or suspected victim of a crime; (iv) to alert law enforcement of a person's death, if the covered entity suspects that criminal activity caused the death; (v) when a covered entity believes that protected health information is evidence of a crime that occurred on its premises; and (vi) by a covered health-care provider in a medical emergency not occurring on its premises, when necessary to inform law enforcement about the commission and nature of a crime, the location of the crime or crime victims, and the perpetrator of the crime.  See 45 C.F.R. 164.512.  The County Defendants put forth no argument that White's request was relying upon one of HIPAA's law-enforcement exceptions.  While White did not appear to be relying upon HIPAA's law-enforcement exception, it is not clear he needed to cite to HIPAA or otherwise have it in mind when he made his request, as HIPAA restrains the "health plan, health care clearinghouse, or health care provider" from disclosing protected medical information, and does not restrain law-enforcement directly.  45 C.F.R. § 164.104.  See United States v. Prentice, No. 09-343, 2010 U.S. Dist. LEXIS 9701, at *23 (D. Minn. Jan. 15, 2010)(stating "a law enforcement agency is not a covered entity, subject to the restraints on the use or receipt of protected medical information"); United States v. Elliott, No. 08-4160M, 2009 U.S. Dist. LEXIS 122041, at *8 (D. Md. Dec. 23, 2009)("Law enforcement agencies, including the office of the prosecuting attorney, are not

covered entities under [HIPAA]"); United States v. Abdallah, No. H-07-155, 2009 U.S. Dist. LEXIS 57233, at *6 (S.D. Tex. July 1, 2009); United States v. Mathis, 377 F. Supp.2d 640, 645 (M.D. Tenn. 2005)(recognizing that the FBI is not a covered entity under HIPAA). More importantly, White's request does not fall into any of the six categories for the law-enforcement exception to HIPAA. There was no court order or subpoena for J. Kerns' records. The information was not sought to locate J. Kerns or to discover his identity. No medical emergency was involved, no victims, and no deaths. White's justification -- to determine whether J. Kerns' unlawfully owned his firearms -- is not within the scope of any of the six exceptions.

### 2.     The Right to Privacy in Medical Records Is Clearly Established.

To defeat qualified immunity, the Plaintiffs must also demonstrate that requesting medical records without the patient's consent violates a clearly established right. A plaintiff "cannot simply identify a clearly established right in the abstract and allege that the defendant has violated it." Hilliard v. City and County of Denver, 930 F.2d 1516, 1518 (10th Cir. 1991). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Because knowledge that an action violates a clearly established statutory or constitutional right is required to defeat qualified immunity, the "essential inquiry is: would an objectively reasonable official have known that his conduct was unlawful?" Lawrence v. Reed, 406 F.3d 1224, 1230 (10th Cir. 2005). "If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." Brosseau v. Haugen, 543 U.S. at 198.

A plaintiff may satisfy his or her burden by showing that there is a Supreme Court or Tenth Circuit opinion on point, or that his or her proposition is supported by the weight of authority from

other courts.  See Anaya v. Crossroads Managed Care Systems, Inc., 195 F.3d 584, 594 (10th Cir. 1999).  White contends that the Plaintiffs cannot rely merely upon identifying an abstract right to privacy protected by the Fourth Amendment and then allege that White has violated it.  See Herring v. Keenan, 218 F.3d 1171,1176 (10th Cir. 2000)("A plaintiff cannot simply identify a clearly established right in the abstract and allege that the defendant has violated it.").  The cases that the Plaintiffs cite clearly establish that there is a privacy right in medical and behavioral records. See Douglas v. Dobbs, 419 F.3d at 1102 (stating that the court had "no difficulty" concluding that the right of medical privacy includes the right to keep pharmacy records confidential); Herring v. Keenan, 218 F.3d at 1173 ("This circuit, however, has repeatedly interpreted the Supreme Court's decision in Whalen v. Roe . . . as creating a right to privacy in the non-disclosure of personal information."); Lankford v. City of Hobart, 27 F.3d at 479 (holding that the police chief's request for medical records without the plaintiff's consent amounted to a clear privacy violation); Eastwood v. Dep't of Corr. of Okla., 846 F.2d at 629; A.L.A. v. W. Valley City, 26 F.3d 989, 990 (10th Cir. 1994)("there is no dispute that confidential medical information is entitled to constitutional privacy protection").  The Supreme Court, in 2001, held in Ferguson v. City of Charleston that individuals enjoyed a reasonable expectation of privacy in medical test results and that "the results of those tests will not be shared with nonmedical personnel without [the patient's] consent."  532 U.S. at 78.

The Court has also found support by the weight of authority from other courts.  See Norman-Bloodsaw v. Lawrence Berkeley Lab., 135 F.3d 1260, 1269 (9th Cir. 1998)("The constitutionally protected privacy interest in avoiding disclosure of personal matters clearly encompasses medical information and its confidentiality."); Yin v. California, 95 F.3d 864, 870 (9th Cir. 1996)(noting that "individuals have a right protected under the Due Process Clause of the Fifth

or Fourteenth Amendments in the privacy of personal medical information and records."). Congress has also recognized the importance of privacy in medical records in a variety of contexts, most prominently in HIPAA.

Moreover, there is a Tenth Circuit case closely on point which gives White notice that requesting private medical records violates the patient's right of privacy.  See Lankford v. City of Hobart, 27 F.3d at 479-80 (affirming the district court's denial of the defendant's motion for summary judgment because the plaintiff had established a prima facie case that a "clearly established privacy violation occurred.").  The Tenth Circuit found that there was no question that the plaintiff's medical records, "which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection."  27 F.3d at 479.  Given the Tenth Circuit's precedent, the Court finds that J. Kerns' right to not have White request and view his medical records without legal authorization, such as pursuant to a subpoena, or to J. Kerns' consent, was a violation of privacy that an objectively reasonable officer would have understood.  See Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 ("In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.").  Because the Plaintiffs have established that White violated a clearly established right, they have met their two-part burden, and the Court will deny White qualified immunity as to the violation of privacy claim and deny him summary judgment.

## B.  WHITE IS NOT ENTITLED TO QUALIFIED IMMUNITY ON THE PLAINTIFF'S FOURTH-AMENDMENT CLAIM.

The Plaintiffs have asserted their right to privacy in J. Kerns' medical rights under both the

Fourteenth and the Fourth Amendments.  The Court has found that they have met their burden of demonstrating that White's actions violated J. Kerns' clearly established right to privacy under the Fourteenth Amendment.  The Court must now assess whether the Plaintiffs have demonstrated that: (i) White's request for J. Kerns' private medical files from the Veterans Hospital violated the J. Kerns' Fourth-Amendment right to be free from unreasonable searches and seizures; and (ii) his constitutional rights were clearly established at the time of White's request.  See Riggins v. Goodman, 572 F.3d at 1107.  White argues that the Plaintiffs cannot meet this burden because it is not clearly established that requesting medical records from a third-party possessing the records violates the Fourth Amendment.  In determining whether the Plaintiffs have shown sufficient evidence to meet their burden of demonstrating that White violated J. Kerns' clearly established Fourth Amendment privacy  rights, the Court must accept the facts in the light most favorable to the Plaintiffs -- the non-moving party.

### 1.    White's Request Violated J. Kerns' Fourth-Amendment Right to be Free from Unreasonable Search and Seizure.

The Plaintiffs must first demonstrate that White violated J. Kerns' constitutional rights.  The Tenth Circuit has held that "there is a constitutional right to privacy that protects an individual from the disclosure of information concerning a person's health."  Herring v. Keenan, 218 F.3d 1171, 1173 (10th Cir. 2000).  The Supreme Court has stated: "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'"  Pennsylvania v. Mimms, 434 U.S. 106, 108-09 (1977)(quoting  Terry v. Ohio, 392 U.S. 1, 19 (1968)).  In Lankford v. City of Hobart, the Tenth Circuit, found that the chief of police violated the plaintiff's privacy rights under § 1983 when he obtained the plaintiff's private medical records without the plaintiff's consent, but also left open

the possibility that such action could also violate the Fourth Amendment.  See 27 F.3d at 480 n.1

(stating "it is possible that a Fourth Amendment violation occurred when, as Ms. Calvary alleges,

Mr. Medrano 'seized' her protected medical files without a warrant.").  In Ferguson v. City of

Charleston, the plaintiff sued under the Fourth Amendment to protect her private medical data, and

the Supreme Court found that the infringement occasioned by the hospital's sharing private medical

data with law enforcement constituted an intrusion into patients' privacy rights.  See 532 U.S. at

71-73 ("The reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic

tests in a hospital is that the results of those tests will not be shared with non-medical personnel

without her consent.").

In this case, the Plaintiffs contend that White violated J. Kerns' Fourth-Amendment right

when he requested that his officers be allowed to seize J. Kerns' personal medical records without

his consent.  There is no evidence that White sought a warrant or even a subpoena for the

information.  Nor is there any evidence that White contemplated seeking J. Kerns' consent.  White

states in his deposition: "I sign letters like this pretty routinely."  White Depo. at 59:18-20.   The

Fourth Amendment protects "expectations of privacy."  Winston v. Lee, 470 U.S. 753, 758

(1985)(citing Katz  v. United States, 389 U.S. 347 (1967)).  The Supreme Court has stressed that

"[the] overriding function of the Fourth Amendment is to protect personal privacy and dignity

against unwarranted intrusion by the State."  Schmerber v. California, 384 U.S. 757, 767 (1966).

The Plaintiffs have brought forth evidence that J. Kerns had a reasonable expectation of privacy in

his medical records the Veterans Hospital held, and has shown that White neither sought consent,

nor used proper legal means -- a warrant or subpoena -- to request his medical records.  White

signed a letter to the Veterans Hospital stating "please provide any and all records possessed by the

VA," and the Veterans Hospital turned over a thousand pages of J. Kerns' medical records, which,

taking the facts in the light most favorable to the Plaintiffs, went from the Bernalillo County Sheriff's Office to the FBI, and then to the United States Attorney's Office. The Court finds that the Plaintiffs have established that White unreasonably infringed upon J. Kerns' protected right of privacy in his medical records and thus violated his Fourth Amendment rights.

The Court notes that this situation is distinguishable from the Court's findings in Chavez v. Martinez. In that case, the Court also expressed concern about the Fourth-Amendment liability implications of police questioning:

> The Court does not believe that a police officer asking a third-party questions and receiving voluntary answers is a search under the Fourth Amendment. To hold otherwise would make almost all routine police work and investigation subject to the Fourth Amendment's limitations. The Court does not believe that police questioning and voluntary responses constitute a search to which the Fourth Amendment applies.

Chavez v. Martinez, 2008 U.S. Dist. LEXIS 108932, at **28-29. In that case, however, the Court found that there was not an expectation of privacy in the limited information that the police officer sought -- dates of doctor visits -- because the plaintiff had already given the dates to the police officer in his doctor's note. In contrast, White's request to the Veterans Hospital to "please provide any and all records," yielding one-thousand pages of J. Kerns' medical records without his consent, is not the same as a police officer asking a doctor's office receptionist to verify dates on a doctor's note. Had this case been a situation in which White asked the Veterans Hospital to look at their records and answer his questions regarding whether J. Kerns had ever been adjudicated mentally incompetent or committed to a mental institution, the Court might be more persuaded that White had acted lawfully. Instead, White signed off on a broad sweeping request to obtain J. Kerns' private medical information, received that information, and passed it on to the FBI.

The indirect encouragement of another to conduct an unlawful search has been held to violate the Fourth Amendment. See United States v. Leffall, 82 F.3d 343, 348 (10th Cir. 1996)

(stating that "law enforcement officers may not circumvent the Fourth Amendment by acting through private citizens"); United States v. Reed, 15 F.3d 928, 933 (9th Cir. 1994)(holding that "police cannot acquiesce to or indirectly encourage a private person's search for incriminating evidence without implicating the Fourth Amendment")(citing United States v. Walther, 652 F.2d 788, 793 (9th Cir. 1981)).  In United States v. Sims, No. CR 00-193, 2001 U.S. Dist. LEXIS 25819 (D.N.M. Apr. 19, 2001)(Vázquez, J.), the Honorable Martha A. Vázquez, United States District Judge, and now Chief Judge of the District of New Mexico, found that it was unlawful for law-enforcement officers to instigate and direct an employer to conduct a warrantless search of an employee's computer, e-mail and Internet usage.  See 2001 U.S. Dist. LEXIS 25819, at *23 (stating that "law enforcement [cannot] get around the Fourth Amendment by directing an employer to do an illegal search for them. The Fourth Amendment is not so easily circumvented.").  Judge Vázquez also found that the employer's consent was insufficient to permit a lawful search of the employee's computer files because the employer did not have authority to consent to a search for law enforcement.  See 2001 U.S. Dist. LEXIS 25819, at *36.  Taking the facts in the light most favorable to J. Kerns, the circumstances are similar here.  White directed the Veterans Hospital to turn over J. Kerns' medical records, in which J. Kerns had a reasonable expectation of privacy, and the Veterans Hospital complied with White's directive.  Moreover, there is no evidence that the Veterans Hospital had authority to consent to a law-enforcement search or seizure of J. Kerns' medical records.  See United States v. Sims, 2001 U.S. Dist. LEXIS 25819, at *36.  The Court finds, viewing the facts in the light most favorable to J. Kerns, the invasive nature of his action crossed the line from proper police investigation into constitutional violation.  The Plaintiffs have sufficiently demonstrated that, without a warrant and without lawful consent, White's request for J. Kerns' medical records violated J. Kerns' right to be free from an unlawful search and seizure.

2.      **The Plaintiff's Reasonable Right to Privacy of His Medical Records Is Clearly Established.**

To assess whether White is entitled to qualified immunity on the Plaintiffs' claim that the request for his private medical records violated his Fourth Amendment rights, the Court must address whether the right is clearly established. The County Defendants argue that there is no clearly established law that requesting medical records violates the Fourth Amendment. To be established clearly, however, there is no need that "the very action in question [have] previously been held unlawful." Wilson v. Layne, 526 U.S. 603, 615 (1999). "The unconstitutionality of outrageous conduct obviously will be unconstitutional, this being the reason, as Judge Posner has said, that '[t]he easiest cases don't even arise.'" Safford Unified Sch. Dist. #1 v. Redding, 129 S. Ct. 2633, 2643 (2009)(quoting K. H. v. Morgan, 914 F.2d 846, 851 (7th Cir. 1990)). The Supreme Court notes, however, that even as to actions less than outrageous, "officials can still be on notice that their conduct violates established law . . . in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

The Court has not located a reported case affirmatively deciding that there are Fourth-Amendment consequences for requesting private medical records without consent. The Court gives considerable weight, however, to the Tenth Circuit's statement in Lankford v. City of Hobart, that "it is possible that a Fourth Amendment violation occurred when, as [the plaintiff] alleges, [the defendant] 'seized' her protected medical files without a warrant." 27 F.3d at 480 n.2. The Tenth Circuit did not reach that question because the plaintiff did not raise it on appeal. Nevertheless, the Court notes that the Tenth Circuit's statement provides notice to officers taking medical records that, not only will it subject him or her to liability for a constitutional privacy violation, but possibly to liability for violating the Fourth Amendment.

-114-

The Supreme Court has stressed that the "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. at 202 (emphasis added). To be established clearly, however, there is no need that "the very action in question [have] previously been held unlawful." Wilson v. Layne, 526 U.S. 603, 615 (1999). See Harlow v. Fitzgerald, 457 U.S. at 818-19 (1982)("If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct"). The Court has found that, because there is established precedent in the Tenth Circuit that an officer using his authority to procure medical records without the consent of the patient is a violation of a constitutional right of privacy, White knew that his conduct was unlawful. The County Defendants argue that, because there are no cases holding that requesting medical records violates a person's Fourth Amendment right, that White is entitled to qualified immunity. The Court does not, however, believe that "clearly established" must be construed so narrowly as to foreclose liability on one ground and not another, simply because there is not case law on point for one of the constitutional grounds of the violation. In other words, if the defendant knows what he or she is doing is wrong, it does not appear that all the law related to the cause of action -- statute of limitations, exhaustion -- has to be clearly established. What has to be clearly established is that what the defendant is doing is wrong. Qualified immunity is designed to protect an officers from being sued without notice that his or her conduct was unlawful. The grounds upon which the officer can be sued for the unlawful conduct -- i.e. all the procedural aspects of the claim -- does not have to be clearly established. The defendants are rarely lawyers, and it does not help them do their jobs if they know whether a lawsuit would be successful. What they need to be on notice of is whether the conduct is unlawful. Thus, the Court does not believe that White needs to know what section

of the Constitution his actions violate; he need only know that what he did was unlawful.

In Robbins v. Wilkie, 433 F.3d 755 (10th Cir. 2006), the defendants argued they were entitled to qualified immunity because there was no authority specifically recognizing the right to be free from retaliation for the exercise of Fifth Amendment rights. See 433 F.3d at 766-767. They argued that, even if the right to exclude is clearly established, they were still entitled to qualified immunity because the right to be free from retaliation in the private property context is not clearly established. See id. The Tenth Circuit rejected this argument, stating:

> While this assertion is true, it does not follow that the right is not clearly established such that a reasonable official would understand that his actions violate the law. Although alleged rights violations must be analyzed at the proper level of generality, "the more obvious egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004). No objectively reasonable government official would think he can retaliate against a citizen for that citizen's exercise of a clearly established constitutional right.

433 F.3d at 767. The Tenth Circuit relied on its prior precedent in DeLoach v. Bevers, 922 F.2d 618 (10th Cir. 1990), which found that retaliation for the exercise of First Amendment rights was clearly established because the court needed to find the right retaliated against to be clearly established, and thus held in Robbins v. Wilkie that the plaintiff had a clearly established Fifth-Amendment right to exclude others from his property, so qualified immunity was inappropriate for retaliation for the exercise of that clearly established right. See 433 F.3d at 767. The Supreme Court in Wilkie v. Robbins, 551 U.S. 537 (2007), reversed the Tenth Circuit's finding that the plaintiff could go forward with his claim for Fifth-Amendment retaliation, stating that as a matter of policy:

> A judicial standard to identify illegitimate pressure going beyond legitimately hard bargaining would be endlessly knotty to work out, and a general provision for tortlike liability when Government employees are unduly zealous in pressing a governmental interest affecting property would invite an onslaught of Bivens [v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388] actions.

551 U.S. at 562.  Justice Souter's majority opinion, however, did not address the Tenth Circuit's

reasoning as to the second-prong of the qualified-immunity analysis.  Justice Ginsburg, in her

dissenting opinion, addressed the Tenth Circuit's analysis whether a right is clearly established.

First, she found that the plaintiff, viewing the facts in the light most favorable to him, had

established that the defendants -- Bureau of Land Management agents -- had violated his

Fifth-Amendment right to be free from the government coercively taking property cost-free.   She

stated:

> The closest question in this case is whether the officials are nevertheless entitled to
> immunity because it is not clearly established that retaliation for the exercise of Fifth
> Amendment rights runs afoul of the Constitution.   The "dispositive inquiry in
> determining whether a right is clearly established is whether it would be clear to a
> reasonable officer that his conduct was unlawful in the situation he confronted."
> Saucier [v. Katz], 533 U.S. at 202.  As noted, all concede that there are no reported
> cases recognizing a Fifth Amendment right to be free from retaliation.  However, it
> is inconceivable that any reasonable official could have believed to be lawful the
> pernicious harassment Robbins alleges.  In the egregious circumstances of this case,
> the text of the Takings Clause and our retaliation jurisprudence provided the officers
> fair warning that their behavior impermissibly burdened a constitutional right.
> See Hope  v. Pelzer, 536 U.S. 730, 739-741 (2002).

Wilkie v. Robbins, 551 U.S. at 585 (Ginsburg, J., dissenting).  Justice Ginsburg disagreed with the

majority's holding that it was for Congress to step in, stating that, "[u]nless and until Congress acts,

however, the Court should not shy away from the effort to ensure that bedrock constitutional rights

do not become merely precatory," and stating that she would affirm the Tenth Circuit's holding.

Wilkie v. Robbins, 551 U.S. at 585 (Ginsburg, J., dissenting)( internal quotation omitted).

Although the Supreme Court reversed the Tenth Circuit's decision on policy grounds, the

Court finds the Tenth Circuit's analysis of finding a clearly established right instructive in this case,

where there is not a case on point that establishes that White is not immune from suit under the

Fourth Amendment.  The Tenth Circuit reasoned that, because it was established that there is

liability under the First Amendment for retaliatory actions, it was clearly established that there could be liability under the Fifth Amendment for retaliatory actions.  The Court has found that White was on notice that no reasonable officer could believe that requesting medical records without authorization is not a violation of the constitutional right to privacy -- a clearly established constitutional right.  The Court finds it is a logical extension that there being notice to reasonable officers that taking medical records without consent is committing a wrong under the Fourteenth Amendment also provides notice that the wrong may expose the reasonable officer to liability under the Fourth Amendment.

The Court also finds it instructive to look to other circumstances where privacy violations have been found under the Fourth Amendment to determine whether White would have been on notice that requesting medical records, without consent and without a warrant or subpoena, was violating the Fourth Amendment.  The Supreme Court considers the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity, see Winston v. Lee, 470 U.S. at 761, and has previously found that intruding into an individual's living room, see Payton v. New York, 445 U.S. 573 (1980), eavesdropping upon an individual's telephone conversations, see Katz v. United States, 389 U.S. at 361, or forcing an individual to accompany police officers to the police station, see Dunaway v. New York, 442 U.S. 200 (1979), damage the individual's sense of personal privacy and security, and are thus subject to the Fourth Amendment's dictates.

The Court also finds it helpful to consider the clearly established law regarding third-party consent to searches.  J. Kerns has brought forth sufficient evidence that he did not give consent to White or anyone else to request his medical records.  It is clearly established that an officer must have consent to search and seize property from a person authorized to give consent.  See Stoner v. California, 376 U.S. 483, 489 (1964)("Our decisions make clear that the rights protected by the

Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority.'"); Illinois v. Rodriguez, 497 U.S. 177, 189 (1990)(stating that unless an officer has an objective reasonable belief that a consenting party has authority over the premises, "warrantless entry without further inquiry is unlawful unless authority actually exists."); United States v. McAlpine, 919 F.2d 1461, 1464 (10th Cir. 1990)(stating that when courts analyze the validity of third-party consent, they "deem a third party situated to give effective consent only if the subject of the search authorized that party, either expressly or impliedly, to waive the subject's Fourth Amendment right.")(citation omitted).   In Stoner v. California, the Supreme Court held that the police violated the plaintiff's Fourth-Amendment rights when they searched his hotel room with the consent of the hotel's night clerk.  The Supreme Court stated:

> It is important to bear in mind that it was the petitioner's constitutional right which was at stake here, and not the night clerk's nor the hotel's.  It was a right, therefore, which only the petitioner could waive by word or deed, either directly or through an agent.  It is true that the night clerk clearly and unambiguously consented to the search.  But there is nothing in the record to indicate that the police had any basis whatsoever to believe that the night clerk had been authorized by the petitioner to permit the police to search the petitioner's room.

376 U.S. at 489.  The officer has the burden of proving the effectiveness of a third party's consent. See Illinois v. Rodriguez, 497 U.S. 177, 181 (1990); United States v. Salinas-Cano, 959 F.2d 861, 864 (10th Cir. 1992)(stating that "[t]he burden of proving effectiveness of consent cannot be met if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry.")(citation omitted).  The Court finds compelling the line of cases clearly establishing that officers must demonstrate authority to consent to searches of closed containers, because of the high expectation of privacy that attaches -- similar to the high expectation of privacy that attaches to a person's private medical records.  The Tenth Circuit has found that "certain types of containers historically command a high degree of privacy," and adopted the reasoning of the United States

Court of Appeals for the Fourth Circuit, which has stated:

> Common experience of life, clearly a factor in assessing the existence and the reasonableness of privacy expectations, surely teaches all of us that the law's "enclosed spaces" -- mankind's valises, suitcases, footlockers, strong boxes, etc. -- are frequently the objects of his highest privacy expectations, and that the expectations may well be at their most intense when such effects are deposited temporarily . . . in places under the general control of another.

United States v. Salinas-Cano, 959 F.2d at 864 (quoting United States v. Block, 590 F.2d 535, 541 (4th Cir. 1978)).  In United States v. Salinas-Cano, the Tenth Circuit held: "It is not enough for the officer to testify, as he did here, that he thought the consenting party had joint access and control. The 'apparent authority' doctrine does not empower the police to legitimize a search merely by the incantation of the phrase."  959 F.2d at 865.  "Apparent authority exists when officers reasonably, even if erroneously, believe that the person consenting to the search has the authority to do so." United States v. Thompson, 524 F.3d 1126, 1133 (10th Cir. 2008).  The Tenth Circuit in United States v. Salinas-Cano stressed that "the Fourth Amendment does not invalidate warrantless searches based on a reasonable mistake of fact, as distinguished from a mistake of law," and found that the officer's search violated the Fourth Amendment because of a mistake of law -- the information known to the officer was insufficient to support a reasonable belief in the third-party's authority to give consent to search the plaintiff's suitcase.  959 F.2d at 865-66.  The Court believes that the clearly established law regarding third-party consent adds additional weight to the Court's finding that White had notice that his request to a third-party for J. Kerns' medical records -- to which he did not have a right without consent or a warrant, and that the Veterans Hospital did not have a right to give up in these circumstances -- was unreasonable and unlawful.

The Court finds that it is clearly established that requesting private medical records, without consent from the patient, when the health-care provider has no other right to disclose the

information, is a constitutional wrong and subject to Fourth Amendment liability.  The Court, therefore, finds that the Plaintiffs have satisfied both prongs necessary to defeat qualified immunity. The Court will therefore deny White qualified immunity on the Fourth Amendment claim in Count III.

### C.   THERE ARE NO GENUINE ISSUES OF MATERIAL FACT, AND THE PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.

In Thomson v. Salt Lake County, Judge Holmes explained that the Court must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court," before inquiring into whether there are genuine issues of material fact for resolution by the jury.  584 F.3d at 1326-27 (Holmes, J. concurring).  The Plaintiffs have successfully established violations of J. Kerns' clearly established right to privacy in his medical records and therefore qualified immunity is not appropriate.  If the Court were solely considering White's motion for summary judgment, the burden would shift back to him to prove that there are no genuine issues of material fact.  Because, however, the Plaintiffs have also asserted that they are entitled to summary judgment as to liability on Count III, the Court will assess whether any genuine issues of material fact remain.  The Court recognizes that a factual dispute remains over who physically went to retrieve the documents from the Veterans Hospital.  White has offered no evidence of who retrieved the records.  The Plaintiffs have offered both the Electronic Accounting Disclosure of the hospital which states "as clipped by officer" and the testimony of Mr. Barth, who testified that White requested the records, White received the records, and the Bernalillo County Sheriff's Department then passed them to the FBI. The Court notes that, although this is a fact in dispute, it is not a material fact in the determination

of whether White's request, as written, violated J. Kerns' privacy rights.  White does not contest the content of the letter that he authorized.  He does not contest what it was requesting.  Because the facts necessary to conduct the balancing test the Tenth Circuit has set forth are not in dispute, the Court can make a determination on Count III as a matter of law.  Viewing the facts in the light most favorable to White -- the non-movant with respect to the Plaintiffs' motion -- the Court still finds that the balancing test for whether there was a privacy violation falls in favor of the Plaintiffs.  The Court, therefore, will deny summary judgment to White and grant summary judgment to the Plaintiffs.

### D.    MUNICIPAL LIABILITY ATTACHES TO WHITE'S VIOLATION OF J. KERNS' RIGHT TO PRIVACY.

Municipal liability under 42 U.S.C. § 1983 is limited to deprivations of federally protected rights caused by actions taken pursuant to official municipal policy.  See Monell v. New York City Dep't. of Soc. Servs., 436 U.S. 658, 691 (1978); Leatherman v. Tarrant County Narcotics Intell. & Coordination, 507 U.S. 163, 166 (1993)(stating that "a municipality can be sued under § 1983, but it cannot be held liable unless a municipal policy or custom caused the constitutional injury"); Seamons v. Snow, 206 F.3d 1021, 1029 (10th Cir. 2000)(stating that, to establish municipal liability, a plaintiff must show "that the unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution or were carried out by an official with final policy making authority with respect to the challenged action").  Municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.  See Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986).  In Pembaur v. City of Cincinnati, the Supreme Court held that the search of a doctor's office without a warrant gave rise to municipal liability because the County Prosecutor was acting as a "final decisionmaker" when he ordered the illegal search.

See 475 U.S. at 484-85.   Justice Brennan explained that, if an official, who possesses final policymaking authority in a certain area, makes a decision -- even if it is specific to a particular situation -- that decision constitutes municipal policy for § 1983 purposes.   See 474 U.S. at 481. Hence, such an act can be understood as an act "of the municipality" which the municipality "officially sanctioned or ordered." 474 U.S. at  480. The Supreme Court held that "municipal liability under § 1983 attaches where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  475 U.S. at 481.  See Bd. of County Comm'rs v. Brown, 520 U.S. 397, 404 (1997)(stating that "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."); Oklahoma City v. Tuttle, 471 at 823 (stating that "'policy' generally implies a course of action consciously chosen from among various alternatives").   Proving moving force requires showing a "direct causal link between the action and deprivation of federal rights."  Lopez v. LeMaster, 172 F.3d 756, 763 (10th Cir. 1999).

Here, White was the moving force behind the request without consent of J. Kerns' private medical records.  White concedes that, as Sheriff of Bernalillo County, he is the official policymaker for law-enforcement policies for the Bernalillo County Sheriff's Department.  See White Depo. at 24:5-16.   See also Myers v. Okla. County Bd. of County Comm'rs, 151 F.3d 1313, 1319 (10th Cir. 1998)("The defendants do not deny that Sheriff Sharp, as the supervising law enforcement officer, was a final policymaker with respect to the decision to enter the apartment. Thus, there is no dispute in this case that the County, through Sheriff Sharp, was the 'moving force' behind the decision to enter the apartment. If that decision -- the decision to enter the apartment -- resulted in

a constitutional violation, the County would be liable.")(citation omitted)).   White does not

specifically recall signing the letter authorizing the request for J. Kerns' medical records, but he

states: "It's clearly something of a nature that I would sign as part of an investigation asking for

records," White Depo. at 59:4-5, and also explains: "But, again, it is my signature.  I did sign it.

And it is not uncommon.  I sign letters like this pretty routinely,"  White Depo. at 59:18-20.  As the

Supreme Court has held, if an official, who possesses final policymaking authority in a certain area,

makes a decision -- even if it is specific to a particular situation -- that decision constitutes municipal

policy for 1983 purposes.  See Pembaur v. City of Cincinnati, 474 U.S. at 481.  The Court finds,

therefore, that the Plaintiffs are entitled to summary judgment on Count VI of their First Amended

Complaint as it relates to Count III.

## III.   LINDLEY AND KOREN ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON COUNT IV, AND GENUINE ISSUES OF FACT NECESSITATE A TRIAL.

Count IV of the First Amended Complaint alleges that Lindley, Koren, and Haag are liable

under § 1983 for false arrest and false imprisonment of J. Kerns.  The Court will address Count IV

as to Haag separately.  As this claim pertains to Lindley and Koren, the Plaintiffs argue that Lindley

and Koren manipulated the information in the arrest-warrant affidavit and the evidence presented

to the grand jury, which caused J. Kerns' incarceration.   Both the Plaintiffs and the County

Defendants have moved for summary judgment on Count II.  Lindley and Koren have asserted a

qualified immunity defense.

### A.   THE DEFENDANTS CANNOT LIMIT LIABILITY TO THE STATE COURT PROCEEDINGS.

As an initial matter, the Court finds the County Defendants' argument that the federal

government's initiation of federal criminal proceedings cut off Lindley and Koren's liability

unpersuasive.  They argue that, because none of the County Defendants participated in the grand

jury proceeding, they cannot be held liable for J. Kerns' arrest, imprisonment, or prosecution past

the dismissal of the state court case.   The Tenth Circuit, in Pierce v. Gilchrist, adopted the United

States Court of Appeals for the Seventh Circuit's holding: "If police officers have been instrumental

in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to

the decisions of prosecutors or grand jurors, or magistrates to confine or prosecute him.   They cannot

hide behind the officials whom they have defrauded."   Pierce v. Gilchrist, 359 F.3d at 1292 (quoting

Jones v. City of Chicago, 856 F.2d 985 (7th Cir. 1988)).   The evidence Klein used in the grand jury

proceeding came entirely from the Bernalillo County Sheriff Department's investigation.   Lindley

accompanied Klein to the proceeding, to assist him before he testified before the grand jury.   See

Klein Depo. at 21:23-22:4.   The Tenth Circuit, in Pierce v. Gilchrist stated:

> [Section] 1983, by its terms, applies not only to a person who "subjects," but also to
> any person who "causes to be subjected . . . any citizen of the United States . . . to the
> deprivation of any rights, privileges, or immunities secured by the Constitution and
> laws." This suggests that Congress was concerned not just with the officer who
> formally initiates the process that leads to an unconstitutional seizure, but to all those
> who were the "cause" of deprivations of constitutional rights.   This Court has
> previously held that officers who conceal and misrepresent material facts to the
> district attorney are not insulated from a § 1983 claim for malicious prosecution
> simply because the prosecutor, grand jury, trial court, and appellate court all act
> independently to facilitate erroneous convictions.

359 F.3d at 1292.   To the extent that the jury could find that Lindley and Koren manipulated or

distorted the evidence used to justify the arrest and prosecution of J. Kerns, which Klein used as his

basis for testimony before the grand jury and which Lindley used in his arrest-warrant affidavit, the

acts of the federal grand jury and the United States Attorney's Office do not shield Lindley and

Koren from liability.   Viewing the evidence in the light most favorable to the Plaintiffs, a reasonable

jury could find Lindley and Koren's findings were recklessly false and that they intentionally or

recklessly excluded information which could have exculpated J. Kerns.   Lindley and Koren, thus,

would be the cause of the deprivation of J. Kerns' constitutional rights.  See 359 F.3d at 1292.  The Court finds, therefore, that the end of the state court proceedings against J. Kerns did not cut off Lindley and Koren's liability.

> **B.   THE PLAINTIFFS HAVE MET THEIR BURDEN THAT LINDLEY AND KOREN VIOLATED J. KERNS' FOURTH-AMENDMENT RIGHT TO BE FREE FROM UNLAWFUL ARREST.**

Because Lindley and Koren have asserted qualified immunity, the burden shifts to the Plaintiffs to defeat the qualified-immunity defense.  The Plaintiffs must demonstrate: (i) that Lindley and Koren violated J. Kerns' right to be free from arrest in the absence of probable cause; and (ii) the right was clearly established at the time of J. Kerns' arrest.  In determining whether the Plaintiffs have shown sufficient evidence to meet their burden of demonstrating that Lindley and Koren violated their clearly established constitutional right, the Court must accept the facts in the light most favorable to the Plaintiffs as the non-moving party.

The Plaintiffs must first demonstrate that Lindley and Koren violated their constitutional rights.  The Plaintiffs argue that Lindley violated J. Kerns' constitutional rights when Lindley drafted the arrest-warrant affidavit which failed to provide probable cause to arrest and that Koren violated J. Kerns rights when he produced recklessly false trajectory results, which Lindley put into the arrest-warrant affidavit.  There is a presumption of validity with respect to an affidavit supporting a warrant.  See Franks v. Delaware, 438 U.S. at 171.  An attack on a warrant must be accompanied by an offer of proof, and allegations of negligence or innocent mistake are insufficient. "To impeach an otherwise valid warrant on the ground that it was issued on false information critical to the finding of probable cause requires proof that the affiant seeking the warrant knew that the challenged information was false or that he had a reckless disregard for its truthfulness." Beard v. City of Northglenn, Colorado, 24 F.3d 110, 114 (10th Cir. 1994)(citing Franks v. Delaware, 438

U.S. at 155-56). "This standard applies to an officer's decision to omit from his warrant affidavit information in his possession that is also critical to the showing of probable cause." 24 F.3d at 114.

The arrest-warrant affidavit contains information identical to the search-warrant affidavit, plus details such as the firearms and casing wrapped in tape that were recovered at the Plaintiffs' residence, Haag's ballistics analysis, and Koren's trajectory analysis. The Plaintiffs assert that the following facts in the arrest-warrant affidavit were recklessly false: (i) that Koren used the GPS data, combined with the statements of the pilot and observer, as well as an analysis of the bullet's trajectory through the helicopter's cockpit, to obtain an approximate distance at which the rifle that shot down Metro One was fired; (ii) the distance was 1630 feet; (iii) on August 12, 2005, Koren and Lindley flew over the crash site and positioned Metro Two at the location of the GPS coordinates obtained from Metro One recorded at the time it was shot down; (iv) the distance from the Plaintiffs' residence to the same location that the helicopter was hovering at the time it was shot down was approximately 1670 feet, within the distance that the Marine Corps stated that J. Kerns was trained to shoot man-sized targets; (v) Haag's representation that the bullet fragments from the helicopter and Holland's leg are consistent with the .30-06 ammunition[41] located in the Plaintiffs' residence; (vi) the copper bullet base from the helicopter was badly damaged but consistent in approximate caliber with bullets such as those loaded in .30-06 cartridges; and (vii) although the fragments were damaged, the overall widths of the land impressions are also in approximate agreement with those the FN rifle produced. According to the Plaintiffs, none of the facts regarding the GPS should be considered in the affidavit, because Lindley and Koren ignored the GPS altitude and used an

---

[41] .30-06 ammunition is a popular 30-caliber rifle ammunition, which can be loaded into many rifles, such as the 308 Winchester, 300 Savage, or the FN rifle, like the one found in the Plaintiffs' residence. See Haag Email at 1.

-127-

average[42] instead and ignored the GPS track heading[43] of forty-six degrees.  The Plaintiffs also contend that none of Koren's trajectory analysis should be included because he did not place the pedals apart, as they were at the time of the crash, which caused his finding of a trajectory of sixteen degrees to be less steep than it should have been.  The Plaintiffs also contend that the arrest-warrant affidavit failed to state the following: (i) the GPS data showed a track heading of forty-six degrees; (ii) if the helicopter was facing in the direction of ground tracking forty-six degrees, it would have been facing away from the Plaintiffs' residence; (iii) the rudder-pedal position is essential to determining the trajectory angle; (iv) Koren approximated the altitude of the helicopter as four-hundred-fifty feet; (v) Haag was not willing to state that the bullet fragments recovered from the helicopter were fragments of a .30-06 bullet; (vi) the comparison of the width of the land impressions on the fragment from Holland's leg was not consistent with the test-fire from the FN rifle; (vii) the comparison of the groove width of the recovered bullet fragment from Holland's leg was not consistent with the test-fire from the FN rifle; (viii) the measurements of both the lands and grooves on the fragment from Holland's leg were smaller than the literature values for the FN rifle; (ix) they were also smaller than the measured values from the test-shot from the FN rifle; (x) the land and groove widths on the bullet fragment from Holland's leg indicated that it was more likely that a six land and groove weapon fired the bullet, rather than a four land and groove weapon; and (xi) the FN rifle is a four land and groove weapon.  The Plaintiffs also provide evidence that, using

---

[42] Holland estimated the altitude at about 400 feet, see Holland's Report, and the helicopter GPS indicated 480 feet, so Koren used 450 feet, which was in the middle, see Koren Depo. at 58:1-3.

[43] The heading is the compass direction where the helicopter was pointing, compared to north.  See gps.about.com/od/glossary/g/Heading.htm.  The track heading is the direction the helicopter is moving over the ground.

a laser-scan of Metro One, which Haag took, but which he was not asked to analyze, the Plaintiffs' expert conducted an analysis using a trajectory rod[44] aligned with the helicopter's pedals in the correct positions when the shot occurred, and determined that the entry angle was over twenty-five degrees.  See Welch Declaration ¶ 4, at 1.

In the qualified-immunity analysis, the Court must take the facts as the Plaintiffs assert them as true, unless blatantly contradicted by the record.  The Plaintiffs have brought forth contradictory calculations of both ballistics and trajectory analysis from Welch.  Taking Welch's evidence in the light most favorable to the Plaintiffs, it suggests that the conclusions made and used in the arrest-warrant affidavit were false, and unreasonably so.  The Plaintiffs evidence shows that the trajectory angle Koren calculated was incorrect by ten degrees, because he did not use the proper pedal-positioning.  This conclusion is further supported with Welch's opinion that the accurate trajectory angle was 25.6 degrees, which Welch determined would have required the shooter of Metro One to have been approximately nine-hundred-thirty-nine feet from the helicopter -- closer than the Plaintiffs' residence, which was one-thousand-seventy feet away.  Moreover, accepting the facts as the Plaintiffs have stated them, the Plaintiffs also brought forth evidence that the County Defendants never asked Haag to do a trajectory analysis.  Welch also used the knurled cannelure method to determine that the fragments from Holland's leg and from Metro One could not have come from the FN rifle -- a conclusion with which Haag, upon reviewing Welch's methods, agreed.  Welch has submitted that it was unreasonable for Haag to have not excluded the FN rifle earlier, based on the fragments he analyzed.  Lindley, however, took selectively from Haag's preliminary

---

[44] A trajectory rod is a metal pole inserted through a bullet hole to help establish the approximate shooter position and also to assist in determining the points of a bullet's impact.  See E. Hueske, Practical Analysis and Reconstructing of Shooting Incidents at 69 (2006).

analysis, and asserted in the arrest-warrant affidavit that the fragments matched the ammunition found in the Plaintiffs' residence, and that the "overall widths of the land impressions [of the bullet fragments] are also in approximate agreement with those produced by the FN rifle." Search-Warrant Affidavit at 6.  The Court believes that these facts, which the Court must accept as true for the purpose of the qualified immunity analysis, could be enough for a jury to find that Lindley and Koren were reckless in the trajectory analysis, and that Lindley was reckless in his adoption of the most favorable of Haag's conclusions,[45] which best suited a finding of probable-cause against J. Kerns.

If the Court takes the Plaintiffs' facts as true, as it must when analyzing qualified immunity, it must treat the trajectory calculations from Koren as recklessly false, as well as the ballistics information that states that the fragments are consistent with an FN rifle.  The Court also accepts as true the Plaintiffs' contention that there were exculpatory facts recklessly omitted.  The Court will review whether there would have been probable cause if the affidavit had included the track heading information for Metro One, a calculation of the distance that used a proper trajectory angle, and had included Haag's observations that the bullet fragments were much smaller than the FN test fire and suggested they originated from a six land-and-groove weapon, rather than a four land-and-groove weapon, like the FN rifle.   The Court does not consider the recklessly false facts in the arrest-warrant affidavit, and considers the omitted information in making a determination whether there was probable cause for J. Kerns' arrest.  See Stewart v. Donges, 915 F.2d at 582 n.13 (stating that, in a case involving information omitted from an affidavit, the existence of probable cause is

_____

[45] The evidence shows that Lindley rephrased Haag's conclusions, which he sent in an electronic-mail message.  The Court believes that a reasonable jury could find that the manner in which Lindley included facts favorable to linking J. Kerns to the Metro One shooting, and omitted facts that indicated the ballistics matched many other rifles, constituted reckless disregard.

determined "by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant."). Omitting the ballistics evidence that Haag cannot exclude the FN rifle and the trajectory analysis based on a sixteen degree angle, and including omitted information that, according to Welch, the officers should have known, which excludes the FN rifle, and using the twenty-five degree trajectory, the Court believes that there is not a substantial basis to conclude that J. Kerns was responsible for the Metro One shooting. Rather, the omitted information would have vitiated probable cause, as it would have eliminated the suspect weapon -- the FN rifle -- and it would have placed the shooter much closer to the helicopter -- less than one-thousand feet -- than where J. Kerns was -- at his residence, over sixteen-hundred feet away. What is left is the information which was in the search warrant, and although the Court believes that the information was enough to justify the search of the Plaintiffs' residence for more evidence, because there was a probability that J. Kerns was linked to the shooting, it is not enough to support a finding that J. Kerns was the shooter, and thus arrest him. Without probable cause to arrest, the officers committed a constitutional violation, and the Plaintiffs, therefore, have met the first prong of their two-part burden to defeat qualified immunity.

## C. IT IS CLEARLY ESTABLISHED THAT LINDLEY'S AND KOREN'S RECKLESS DISREGARD VITIATES PROBABLE CAUSE.

The Tenth Circuit law is clearly established that for an officer to arrest an individual pursuant to an arrest warrant, the warrant must be supported by probable cause. See Kalina v. Fletcher, 522 U.S. 118, (1997)(stating that "the Fourth Amendment requires that arrest warrants be based upon probable cause, supported by oath or affirmation")(internal quotation omitted); Cortez v. McCauley, 478 F.3d 1108, 1117 (10th Cir. 2007)("The law was and is unambiguous: a government official must have probable cause to arrest an individual."). It is also clearly established in the Tenth Circuit that,

"if the [plaintiff] is able to prove the necessary deliberate falsehood or reckless disregard to impeach a facially valid warrant, the reasonableness inquiry has to be resolved against the defendant since no reasonably competent officer could believe an arrest legal where it was his deliberate or reckless deception that led the magistrate into issuing the warrant." See Beard v. City of Northglenn, 24 F.3d at 115. Taking the evidence in the light most favorable to the Plaintiffs, the Court finds that a reasonable jury could find that Koren's trajectory analysis, and Lindley's use of that analysis, was reckless deception, and the right not to be arrested based on such deception is clearly established. The Court, therefore, will deny Koren and Lindley qualified immunity on Count IV.

### D.     GENUINE ISSUES OF FACT AS TO LINDLEY'S AND KOREN'S INTENT NECESSITATE A TRIAL.

Under the Fourth Amendment, the Court's inquiry whether Lindley and Koren acted with reckless disregard for the truth in their efforts to show probable cause focuses neither on the existence nor the consequence of Lindley and Koren's errors, but on the intention behind them. Once the Court has taken the facts as the Plaintiffs have stated them to analyze whether qualified immunity is appropriate, the Court must look at the landscape of the facts as they are. See Thomson v. Sale Lake County, 584 F.3d at 13256 ("Based upon that true factual landscape, courts should determine whether defendant can carry the traditional summary judgment burden of establishing that there are no genuine issues of material fact for jury resolution and that defendant is entitled to judgment as a matter of law."); Medina v. Cram, 252 F.3d at 1128 ("If the plaintiff successfully establishes the violation of a clearly established right, the burden shifts to the defendant, who must prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law."). There are cross-motions for summary judgment on Count IV as to Lindley and Koren, so the Court must look at the facts as they weigh in favor of each party.

If the facts are as the Plaintiffs have stated them, the Court believes that there is sufficient evidence that a reasonable jury could look at the analysis and opinions Lindley and Koren gave, as incorporated into the arrest-warrant affidavit, as compared to the analysis and opinions that Welch gave when considering the same facts, and determine that it was unreasonable for Lindley and Koren to reach the conclusions that they did. The Court also believes that a reasonable jury could find that Lindley's and Koren's findings were in reckless disregard for the truth and resulted in the exclusion of evidence that had exculpatory value, and could have vitiated the state district judge's finding of probable cause. According to the Plaintiffs, the GPS data showed the helicopter had a forty-six degree track heading at the time of the shooting, which, according to the Plaintiffs, would have positioned the helicopter facing northeast, away from the Plaintiffs' residence, a fact with which Holland's deposition agrees. The arrest-warrant affidavit does not state the GPS heading degree, nor the direction the helicopter was facing, but if it had, the Court believes the helicopter facing away from the Plaintiffs' residence weighs against finding probable cause that J. Kerns was the shooter. Also, the Court believes that the jury could give greater weight to the Plaintiffs' contention that Lindley and Koren gave a recklessly false estimate of the distance a shooter would have been standing away from the helicopter when it was shot, based on the Plaintiffs' evidence that Koren guessed at the position of the rudder pedals, which distorted the angle he used to calculate the distance of the shooter. The Court also believes that the jury could give weight to Lindley's and Koren's decision to not ask Haag to measure the trajectory angle, which the Court believes could potentially lead a jury to find that Lindley and Koren acted in reckless indifference to the facts.

If the facts are viewed in the light most favorable to Koren and Lindley, the Court believes a reasonable jury could find that there was no reckless intent in their use of the data they collected and which Lindley reported in the arrest-warrant affidavit. The jury could find that it was

reasonable for Koren to use an average of the information the pilot provided and the GPS reflected, and that it was reasonable for him to conduct his calculations in the manner that he did. The jury could also find that it was reasonable for Lindley to rely upon the information he received from both Koren and Haag, and to use that information to construct his arrest-warrant affidavit.

The reasonableness of Koren and Lindley's actions and their intent, to the extent that facts were misrepresented or false, is a question for the jury. See Robinson v. Maruffi, 895 F.2d at 657 (finding that it was proper for the district court to allow the jury to find if the defendant's conduct defiled a criminal investigation, grand-jury proceeding, and trial, and whether it was "so outrageous as to deny [the plaintiff] his constitutional right to a proper probable cause determination."); Walker v. City of Wilmington, No. 08-4218, 2010 U.S. App. LEXIS 853, at **17-18 (3d Cir. Jan. 4, 2010) (reversing the district court's determination that probable cause supported a warrant and remanding to the district court for a jury to determine whether the search warrant was invalid); Burke v. Town of Walpole, 405 F.3d 66, 70 (1st Cir. 2005)(vacating the district court's grant of summary judgment to the defendant on the plaintiff's § 1983 claim alleging a Fourth-Amendment violation, concluding that "the record contains evidence, sufficient to create a jury question, that he intentionally or recklessly withheld exculpatory DNA evidence from the magistrate who issued the warrant to arrest Burke, and a reasonable officer would know that such conduct violated a clearly established Fourth Amendment right."); Fletcher v. Burkholter, 07-338, 2009 U.S. Dist. LEXIS 1918, at 25 (E.D. Okla. Jan. 12, 2009)(finding that there was a genuine issue of material fact as to recklessness of the affiant officer and finding that the reasonableness of an officer's actions in attesting to an affidavit is a question of fact to be resolved by a jury). Because the Court believes that there are genuine issues of material fact regarding the reasonableness of Koren and Lindley's investigation, the Court will deny both the Plaintiffs' and Lindley and Koren's motions for summary judgment.

**IV.    THE SAME GENUINE ISSUES OF MATERIAL FACT EXIST AS TO THE
PLAINTIFFS' MALICIOUS-PROSECUTION CLAIM.**

Count V of the First Amended Complaint asserts a malicious-prosecution claim against
Lindley, Koren, and Haag.  The Tenth Circuit has previously held that officers who conceal and
misrepresent material facts are not insulated from a § 1983 claim for malicious prosecution simply
because the prosecutor, grand jury, trial court, and appellate court all act independently to facilitate
erroneous convictions.  See Robinson v. Maruffi, 895 F.2d at 655-56.  Under Tenth Circuit case law,
a § 1983 malicious-prosecution claim includes the following elements: (i) the defendant caused the
plaintiff's continued confinement or prosecution; (ii) the original action terminated in favor of the
plaintiff; (iii) no probable cause supported the original arrest, continued confinement, or
prosecution; (iv) the defendant acted with malice; and (v) the plaintiff sustained damages.  See
Wilkins v. DeReyes, 528 F.3d at 799.  It is clearly established law in the Tenth Circuit that Koren
and Lindley could be held liable for malicious prosecution if the jury finds that their actions
constituted reckless disregard of facts which could have vitiated probable cause.  See Pierce v.
Gilchrist, 359 F.3d at 1298-99.  Because the issue of probable cause is determinate of this claim in
the same way that it is with Count IV, the Court will deny qualified immunity and deny both
motions for summary judgment for the same reasons as the Court stated for Count IV.

**V.    WHETHER HAAG'S BALLISTICS ANALYSIS CONSTITUTED RECKLESS
INDIFFERENCE IS A QUESTION FOR THE JURY.**

The Plaintiffs have also brought claims of false imprisonment and arrest and malicious
prosecution under § 1983 against Haag, because they contend that Haag's failure to account for
discrepancies between the test-shot from the FN rifle and the bullet fragments recovered from Metro
One and Holland's leg constituted a reckless disregard for the fact that the FN rifle could not have
fired the bullet fragments recovered from the shooting.  Haag has asserted both absolute immunity

and qualified immunity as defenses.  Because the Court finds that Haag is a complaining witness, and finds that the Plaintiffs have met their two-part burden to defeat qualified immunity, the Court will deny Haag absolute and qualified immunity and determine that there are genuine issues of material fact that necessitate a trial.

### A.      JUDICIAL ESTOPPEL DOES NOT APPLY.

As an initial matter, Haag argues that J. Kerns conceded probable cause when he waived his detention hearing and thus that judicial estoppel applies.  In New Hampshire v. Maine, the Supreme Court set forth a three-part test as a guide for when judicial estoppel may be invoked: (i) a party's later position must be clearly inconsistent with its earlier position; (ii) the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (iii) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose unfair detriment on the opposing party if not estopped.  See 532 U.S. 742, 750-51 (2001).

Haag argues that J. Kerns' initial waiver of a detention hearing, which Judge Torgerson interpreted as a basis for finding probable cause, constituted taking a position that probable cause existed.  The Court disagrees.  The Court does not believe that J. Kerns' initial waiver of a detention hearing precludes the Court from addressing whether there was probable cause for J. Kerns' arrest.  The Tenth Circuit cautions that judicial estoppel must be applied "narrowly and cautiously."  Bradford v. Wiggins, 516 F.3d 1189, 1194 n.3 (10th Cir. 2008)(stating "we do not hold it to be dispositive that the [plaintiffs] simply entered a no contest plea.").  The Tenth Circuit notes that "[s]ometimes a civil action following a plea is justified, most commonly when a party's previous position was based on a mistake."  Bradford v. Wiggins, 516 F.3d at 1193 n.3 (citing Thore v. Howe,

466 F.3d 173, 185 (1st Cir. 2006)).

Here, J. Kerns did not assert any facts in his waiver, or otherwise take a position on probable cause when he signed a waiver of detention hearing; he simply did not contest probable cause. Compare Bradford v. Wiggins, 516 F.3d at 1193 (holding that judicial estoppel barred the plaintiffs' false arrest and malicious-prosecution claims because their claims were "clearly inconsistent with testimony at their plea hearing."); Johnson v. Lindon City Corp., 405 F.3d 1065, 1069 (10th Cir. 2005)(holding that judicial estoppel applied where the plaintiffs admitted responsibility in their pleas for abeyance and later argued that their arrests were illegal) . The waiver that J. Kerns signed is a boilerplate form, which makes no assertions of fact.  Judge Torgerson made an independent determination that there was probable cause, because J. Kerns signed the waiver of a detention hearing.  See Order of Detention Pending Trial at 1 (Doc. 165-12).  The Order states: "Defendant waives the detention hearing.  Defendant stipulates to detention at this time.  The Court finds defendant waived this hearings [sic] with a full understanding of its meaning and effect.  The Court makes the necessary probable cause finding based on the waiver."  Order of Detention Pending Trial at 1.  Almost four months later, after J. Kerns retained counsel to replace his court-appointed counsel, he exercised his right to petition the court to review his detention, filing a motion to reconsider, see United States v. Jason Kerns, 05-01776 JC, Motion to Reconsider Detention Order, filed December 1, 2005 (Doc. 20), and on December 21, 2005, Judge Torgerson held a detention hearing.  J. Kerns subpoenaed Haag to testify at the hearing to demonstrate the lack of probable cause, but the United States objected, and Judge Torgerson did not permit the testimony. In an Order issued that same day, Judge Torgerson denied J. Kerns' motion for reconsideration, finding that J. Kerns did not overcome the rebuttable presumption under 18 U.S.C. § 3142(e) that J. Kerns was a danger to the community and a flight risk.  See United States v. Jason Kerns,

05-01776 JC, Order at 1 (Doc. 28).  J. Kerns remained in the custody until May 10, 2006, when the United States Attorney dismissed the charges against him.

Because the Court must apply judicial estoppel "narrowly and cautiously," Bradford v. Wiggins, 516 F.3d at 1194 n.3, and because the Court does not believe it appropriate to construe a waiver of a detention hearing as an affirmative assertion that there was probable cause, the Court does not believe the first element of judicial estoppel has been met.  The Court finds, therefore, that J. Kerns' position that there was no probable cause to arrest or prosecute him is not inconsistent with an earlier position that he took.  Accordingly, the Court finds that he is not judicially estopped from now asserting the position that the Defendants lacked probable cause.

### B.    HAAG IS NOT ENTITLED TO ABSOLUTE IMMUNITY.

Haag argues that he is entitled to absolute immunity from the Plaintiffs' malicious-prosecution charge.  Absolute immunity protections may extend to a grand-jury witness, provided the witness does not function as a complaining witness.  See Anthony v. Baker, 955 F.2d at 1399.  A complaining witness is a person "who actively instigated or encouraged the prosecution of the plaintiff."  Id. at 1399 n.2.  The Court must determine whether Haag's conduct before the grand-jury proceeding and his testimony at the grand-jury proceeding qualifies him as a complaining witness.  See id. at 1399.  The Court believes that Haag's ballistics analysis, in which he was unwilling to eliminate the suspect FN rifle as the firearm responsible for the fragments recovered from Holland's leg and Metro One, as well as his testimony before the grand jury maintaining that the fragments' widths, the general size of them, cants or twists[46] of them, were in agreement with those produced by the FN rifle demonstrated Haag's role in instigating the prosecution of J. Kerns.

_____

[46] The cant or twist is the direction the lands and grooves spin in the rifle barrel.  See Rifling, http://en.wikipedia.org/wiki/Rifling.

The Court believes two things illustrate why Haag played an instrumental role in the prosecution of J. Kerns: (i) of all of the people with first-hand knowledge of the investigation[47] -- the officers who spoke with J. Kerns, the officers who conducted the trajectory analysis, and Lindley, who led the investigation -- only Haag testified; and (ii) Haag's findings were so important to the United States' Attorney's case that the charges against J. Kerns were dropped as soon as Haag, after reviewing Welch's findings, changed his opinion.   The Court believes the evidence is clear that Haag's findings were a driving force behind the prosecution of J. Kerns and accordingly, finds that Haag was a complaining witness -- one who "actively instigated or encouraged the prosecution" -- because his testimony was relevant to the manner in which he "perpetuated the prosecution" of J. Kerns.  Anthony v. Baker, 955 F.2d at 1399 n.2, 1401.  Because Haag's ballistics findings actively "encouraged the prosecution" of J. Kerns, the Court finds that Haag is a complaining witness, and therefore he is not entitled to absolute immunity.  Anthony v. Baker, 955 F.2d at 1399 n.2.

### C.    HAAG IS NOT ENTITLED TO QUALIFIED IMMUNITY.

Because Haag has asserted qualified immunity, the burden shifts to the Plaintiffs to defeat the qualified-immunity defense.  The Plaintiffs must demonstrate that the facts show: (i) that Haag violated J. Kerns' constitutional rights; and (ii) that those rights were clearly established at the time of J. Kerns' arrest and prosecution. In determining whether the Plaintiffs have shown sufficient evidence to meet their burden of demonstrating that Haag violated their clearly established constitutional rights, the Court must accept the facts in the light most favorable to the Plaintiffs as the non-moving party.

---

[47] The only other witness to testify was FBI Agent Klein, who stated during his deposition that nearly all of his testimony came from information the Bernalillo County Sheriff's Department obtained and from Lindley's arrest-warrant affidavit, which also relied on Haag's findings.  See Klein Depo. at 19:1-22:15.

The Plaintiffs must first demonstrate that Haag violated their constitutional rights. The Plaintiffs do not contest Haag's conclusions that the AR-15 clone and the AK clone rifles should be excluded, and do not contest that the casing found in the Kerns' trash came from the FN rifle. The sole dispute is whether Haag recklessly disregarded or intentionally ignored measurements and observations of the fragments from Metro One and Holland's leg, which they contend should have led Haag to exclude the FN rifle. The Plaintiffs argue that Haag knew that the groove width from the FN rifle could be easily determined by subtracting the land width from the literature value for the land plus groove measurement for a 30-caliber rifle. See Plaintiffs' Motion on Counts II, IV & V at 9. They contend that Haag knew that the average groove width manufactured on the FN rifle would have to be 0.195 inches -- 0.236 literature value minus 0.041 measured value for the FN rifle -- and that he did not record any measurement for the groove width "that was clearly present and visible" on the p-1 fragment, which, according to the Plaintiffs' expert Welch, measured less than 0.12 inches in width. See Plaintiffs' Motion on Counts II, IV & V at 9 (citing Welch Depo. Exhibit 15). The Plaintiffs also contend that Haag should have known that the FN rifle could not have been responsible for firing the bullet fragment recovered from Holland's leg -- fragment f-1 -- because the 30-caliber HN rifle had a pattern of four lands and four grooves and, according to the Plaintiffs' calculations, the bore circumference equaled, at most, 0.62 inches, compared to the bore circumference of a .30-06 bullet, which is 0.9425 inches. See Plaintiffs' Motion on Counts II, IV & V at 10 (citing Haag Depo. Exhibit 22 and Welch Depo. Exhibit 15). The Plaintiffs argue that the measurements indicate that the bullet was fired from a six land-and-groove rifle, rather than a four land-and-groove rifle. See id. Construing Haag's process and conclusions in the light most favorable to the Plaintiffs, the Court believes that a reasonable jury could find that Haag's use of a conservative range of error and his decision to not take down certain groove impression

measurements, as well as his decision that the disparate ratios between the test-shot from the FN rifle, and the fragments was not enough to exclude the FN rifle rose to the level of reckless disregard. The Court also believes a reasonable jury could give more credit to Welch's findings that the fragments provided readily obtainable measurements that would have conclusively excluded the FN rifle.

Finally, the facts the Plaintiffs have presented are sufficient that a reasonable jury could find intent -- perhaps institutional pressure to avoid excluding the suspect weapon. Haag states that he did not distort test results. See Haag Response at 7. Welch agreed that there is no evidence that Haag knowingly distorted test results. See Welch Depo. at 159:18-20. It is Welch's opinion, however, that the bullet fragments were not damaged to the point where reliable measurements were impossible to obtain, and that Haag, as a trained forensic scientist specializing in fireaarm and tool mark examination, was reckless to ignore these fragments in his work. See Welch Depo. at 100:17-102:1.

Haag argues that he did not personally participate in the arrest or prosecution of J. Kerns. This argument is unavailing. Section 1983 claims may be brought against any person who "causes to be subjected. . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The Tenth Circuit has interpreted this statutory language to mean that Congress was concerned not only with the officer who formally initiates the process that leads to an unconstitutional seizure, but to all those who were the "cause" of deprivations of constitutional rights. See Pierce v. Gilchrist, 359 F.3d at 1292. Taking the facts in the light most favorable to the Plaintiffs, both the arrest-warrant affidavit and the grand jury, to whom Haag testified, relied upon Haag's finding that the FN rifle could not be excluded. The fact that, once Haag altered his findings, after accepting Welch's conclusions, the

charges against J. Kerns were dropped lends further weight to the fact that his analysis was the lynchpin of the case against J. Kerns.  The Court finds that the Plaintiffs have presented sufficient evidence that a reasonable jury could find that Haag's actions constituted reckless disregard and he omitted a fact -- the exclusion of the FN rifle -- which would have vitiated probable cause.  The Court finds that the Plaintiffs have satisfied the first-prong to defeat the qualified-immunity defense.

The Court also finds that the Plaintiffs have sufficiently shown that it is clearly established that Haag could be liable for his actions.  The Plaintiffs correctly rely upon the Tenth Circuit's holding in Pierce v. Gilchrist, which provides clearly established law that a forensic analyst cannot "hide behind the fact that she [or he] neither initiated nor filed the charges against [the plaintiff]." 354 F.3d at 1293 (internal quotation omitted).  In Pierce v. Gilchrist, a forensic analyst conducted an analysis of scalp and pubic hair samples from a rape crime scene and concluded that the hairs could have come from the suspect.  See 354 F.3d at 1282. The plaintiff was charged with rape, but was later exonerated on the basis of DNA evidence.  The plaintiff brought suit, alleging that the forensic analyst concealed the fact that his hair did not match the hairs found at the crime scene, did not deliver the hair samples in a timely manner to the plaintiff's expert, and disregarded her findings that the plaintiff's blood contained a particular enzyme that was not present in the sperm found on the victim, and the forensic analyst moved to dismiss the plaintiff's amended complaint.  See id. The forensic analyst argued that she could not be held liable under § 1983 because she was not involved in the plaintiff's arrest, nor was she responsible for filing the charges.  See 354 F.3d at 1291.  The Tenth Circuit disagreed and held:

> The actions of a police forensic analyst who prevaricates and distorts evidence to convince the prosecuting authorities to press charges is no less reprehensible than an officer who, through false statements, prevails upon a magistrate to issue a warrant. In each case the government official maliciously abuses a position of trust to induce the criminal justice system to confine and then to prosecute an innocent defendant.

We view both types of conduct as equally repugnant to the Constitution.

354 F.3d at 1293.  The Tenth Circuit relied on the Restatement, which states: "A private person who takes an active part in continuing or procuring the continuation of criminal proceedings initiated by himself or by another is subject to the same liability for malicious prosecution as if he had then initiated the proceedings."  Restatement (Second) Torts § 655.  The comments to this section state that it "applies . . . when the proceedings are initiated by a third person, and the defendant, knowing that there is no probable cause for them, thereafter takes an active part in procuring their continuation."  Restatement (Second) Torts § 655, cmt. b.  The Court found that the allegations in the plaintiff's amended complaint met that standard.  The Tenth Circuit has also held those who conceal and misrepresent material facts are not insulated from a § 1983 claim for malicious prosecution simply because the prosecutor, grand jury, trial court, and appellate court all act independently to facilitate erroneous convictions.  See Robinson v. Maruffi, 895 F.2d at 655-56.  The Court finds, therefore, that Haag was on sufficient notice that providing recklessly false information, upon which others relied to arrest and prosecute J. Kerns, could subject him to § 1983 liability.

### D.    GENUINE ISSUES OF FACT AS TO HAAG'S INTENT NECESSITATE A TRIAL.

There are cross-motions for summary judgment on Counts IV and V as to Haag, so the Court must look at the facts as they weigh in favor of each party.  If the facts are as the Plaintiffs have stated them: (i) the fragments from Holland's leg and the helicopter provided sufficient indicators for Haag to exclude the FN rifle; (ii) Haag ignore those indicators; and (iii) he used overly broad ranges of error to ensure the FN rifle was not excluded.  The Court believes that a reasonable jury could find, based upon the evidence the Plaintiffs presented as to the means Haag could have

employed to eliminate the rifle, and the findings of Welch, who eliminated the rifle "in five seconds," that the actions of Haag constituted reckless indifference.

If the facts are viewed in the light most favorable to Haag, however, the Court believes a reasonable jury could find that the was no reckless intent in Haag's conservative findings.  The jury could find that it was reasonable, based on the damage to the fragments Haag observed, to not trust the accuracy of the measurements which the Plaintiffs argue were plainly visible.  The jury could also find that Haag's use of a broader range of error was appropriate and not reckless.  The jury could further find that Welch's approach was novel,[48] and was not a foreseeable method for Haag to use before he submitted his results to Lindley for inclusion in the arrest-warrant affidavit and gave his testimony to the grand jury.

The reasonableness of Haag's analysis and his intent, to the extent that he ignored facts which would have exculpated J. Kerns, is a question for the jury.  See Robinson v. Maruffi, 895 F.2d at 657; Walker v. City of Wilmington, 2010 U.S. App. LEXIS 853, at **17-18; Burke v. Town of Walpole, 405 F.3d at 70; Fletcher v. Burkholter, 2009 U.S. Dist. LEXIS 1918, at *25.  Because the Court believes that there are genuine issues of material fact regarding the reasonableness of Haag's analysis, the Court will deny both the Plaintiffs' and Haag's motions for summary judgment on Counts IV and V.

## VI.   LINDLEY, KOREN, AND BERNALILLO COUNTY ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE NMTCA CLAIMS FOR FALSE ARREST AND MALICIOUS ABUSE OF PROCESS.

Count VIII asserts claims of false detention, arrest, and imprisonment under the NMTCA

---

[48] At the hearing, Ms. Griffin and Mr. Lowry explained to the Court that the method Welch used was initially proposed by Mr. Lowry's wife.  See Tr. at 46:6-13 (Griffin); id. at 75:19-77:23 (Lowry).

asserted against Bernalillo County, Lindley, and Koren.  Count IX asserts a claim for abuse of process/malicious prosecution under the NMTCA against Bernalillo County, Lindley and Koren.  In New Mexico, the Supreme Court has combined the torts of malicious prosecution and abuse of process into a single tort of malicious abuse of process,  see DeVaney v. Thriftway Mktg. Corp., 124 N.M. at 518, 953 P.2d at 283, so the Court will construe the Plaintiffs' First Amended Complaint as asserting that cause of action.

The County Defendants argue that the Court should dismiss the NMTCA claims because notice was untimely.  In response, the Plaintiffs argue that their claim is not untimely, because notice that the Plaintiffs preserved their right to potentially file suit was filed within ninety days of the dismissal of J. Kerns' federal charges.  The Plaintiffs gave notice of potential NMTCA claims on July 7, 2006.  See Notice of Claims Pursuant to New Mexico Tort Claims Act (dated July 7, 2006), filed July 1, 2009 (Doc. 168-17).  On May 10, 2006, the federal criminal charges against J. Kerns were dismissed.

Notice is not required for the NMTCA claims asserted against Lindley or Koren.  The plain language of NMSA 1978, § 41-4-16A and 16B does not require a notice when the suit is against a public employee, and the New Mexico Court of Appeals has so held.  "The written notice requirements of Section 41-4-16A do not apply to claims against public employees."  Dutton v. McKinley City Bd. of Comm'rs., 113 N.M. at 54, 822 P.2d at 1137 (citing Martinez v. City of Clovis, 95 N.M. at 656, 625 P.2d at 585).

> [T]here is nothing within the notice provisions of § 41-4-16 requiring such notice from one who claims damages against a public employee; and merely because § 41-4-4C imposes upon the governmental entity for which the employee works the obligation to provide a defense to its employee and pay any settlement or judgment reached, it does not convert a public employee, without immunity under § 41-4-6, into a "local public body," a "governmental entity," or the "state or state agency," as those terms are defined in § 41-4-3.

Martinez v. City of Clovis, 95 N.M. at 656, 625 P.2d at 585.   See Mata v. Anderson, No. CIV 08-0046, 2010 U.S. Dist. LEXIS 9257, at *142 (D.N.M. January 13, 2010) (Browning, J.) (holding that a plaintiff's claims against a police officer were not barred for failure to provide notice pursuant to the NMTCA because he was not a "local public body," a "governmental entity," or a "state or state agency.").  As to Bernalillo County, the Plaintiffs' claims arise from the false and reckless information from Lindley, Koren, and Haag which was relied upon in the federal prosecution, and they have brought suit based upon injuries arising from the federal case.  Moreover, even if the Court were to find that notice to Bernalillo Country were untimely, which it does not, Section 41-4-16B of the NMTCA provides an exception to the written notice requirement where the governmental entity at issue had actual notice of the tort.  See NMSA 1978, § 41-4-16B.  See Lopez v. State, 122 N.M. 611, 615, 930 P.2d 146, 150 (1996)("New Mexico courts consistently have applied the 'likelihood that litigation may ensue' standard, looking at whether, from the totality of the circumstances known to the governmental entity charged with fault in the occurrence, a reasonable person would have concluded that the victim may claim compensation.").  In Lopez v. State, the Supreme Court of New Mexico explained when an inference of actual notice may be found, stating: "When the governmental entity allegedly at fault has knowledge of the facts and circumstances of the occurrence, it may also have knowledge of its own potential liability. A reasonable inference of the likelihood of suit may arise from such knowledge."  122 N.M. at 616, 930 P.2d at 151.  The Court believes the facts of this case permit an inference of Bernalillo County's knowledge of its own potential liability -- given that this case arose out of an event intimately connected with Bernalillo County and the Bernalillo County Sheriff's Department -- to find that Bernalillo County was on actual notice that litigation would likely ensue once the federal charges against J. Kerns were dropped.  The Court finds, therefore, that notice of the Plaintiffs' NMTCA

claims was timely.

In the alternative, the County Defendants argue that Bernalillo County, Lindley, and Koren are entitled to summary judgment because their actions were lawful and based on probable cause. The County Defendants are correct that a finding of probable cause would defeat the Plaintiffs' claims of false arrest and malicious abuse of process. The Court, however, has determined that there exist genuine issues of material fact whether probable cause supported the arrest warrant. The Court, therefore, will not grant the County Defendants summary judgment, but rather will send their NMTCA claims for false arrest and malicious abuse of process to the jury along with the Plaintiffs' § 1983 claims.

## VII.  THE PLAINTIFFS HAVE PRESENTED NO EVIDENCE THAT LINDLEY OR BERNALILLO COUNTY COMMITTED TRESPASS OR CONVERSION.

Count X asserts a claim for deprivation of property rights and trespass under the NMTCA against Lindley and Bernalillo County.[49] Count XI asserts a claim for deprivation of property rights and conversion under the NMTCA against Lindley and Bernalillo County. The Plaintiffs, in response to the County Defendants' motion for summary judgment, put forth no facts asserting any property damage or conversion. The Plaintiffs merely argue that a law enforcement officer is liable for property damage resulting from a violation of property rights. The Court has found that probable cause supported Lindley's search-warrant affidavit, and thus the search of the Plaintiffs' residence was lawful. Without any evidence of property damage, and because the officers of the Bernalillo County Sheriffs' Office, which conducted the search pursuant to the warrant, were lawfully authorized to be on the Plaintiffs' property, the Court finds that there are no genuine issues of

---

[49] Count X is also asserted against Bader, Thompson, and Carter. The Court addressed the claim as to those Defendants in its October 5, 2009 Opinion, currently on appeal to the Tenth Circuit, and therefore cannot re-address them in this Opinion.

material fact and that the County and Lindley are entitled to judgment as a matter of law on Counts

X and XI.  The Court, therefore, grants the County and Lindley summary judgment on those counts.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Marc M. Lowry
Carolyn M. Nichols
Rothstein, Donatelli, Hughes, Dahlstrom,
  Schoenburg & Bienvenu, LLP
Albuquerque, New Mexico

> *Attorneys for the Plaintiffs*

Daniel J. Macke
Robles, Rael, & Anaya, P.C.
Albuquerque, New Mexico

> *Attorneys for the Defendants Board of Commissioners of*
> *Bernalillo County, Bernalillo County Sheriff Darren*
> *White, Bernalillo County Sheriff's Detectives Brian Lindley,*
> *and Bernalillo County Sheriff's Deputy Lawrence Koren*

Stephanie M. Griffin
  Assistant City Attorney
Albuquerque City Attorney's Office
Albuquerque, New Mexico

> *Attorneys for the Defendants Albuquerque Police*
> *Department Officers Drew Baden, Matt Thompson,*
> *Russell Carter, and Metropolitan Forensic Science*
> *Center Firearm and Tool Mark Examiner Mike Haag.*