# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JASON KERNS, ARCHIE KERNS, and
MARY ANN KERNS,

       Plaintiffs,

vs.                                                                      No. CIV 07-0771 JB/ACT

BOARD OF COMMISSIONERS OF
BERNALILLO COUNTY, BERNALILLO COUNTY
SHERIFF DARREN WHITE, in his individual and his
official capacity, BERNALILLO COUNTY SHERIFF'S
DETECTIVES BRIAN LINDLEY, RALPH GONZALES, and
JAMES HAMSTEN, in their individual capacities, BERNALILLO
COUNTY SHERIFF DEPUTIES LAWRENCE KOREN,
SEAN CONNORS, AARON WRIGHT, TIMOTHY HIX, and
RHONDA MOYA, in their individual capacities, THE CITY OF
ALBUQUERQUE, ALBUQUERQUE POLICE DEPARTMENT
OFFICERS DREW BADER, MATT THOMPSON, RUSSELL CARTER,
ROBERT JOHNSTON and JAMES MONTOYA,
in their individual capacities, METROPOLITAN FORENSIC
SCIENCE CENTER FIREARM AND TOOL MARK EXAMINER
MIKE HAAG, in his individual capacity, and JOHN DOES 1-10,
in their individual capacities,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the United States Court of Appeals for the

Tenth Circuit's Judgment, filed January 19, 2012 (Doc. 286-2)("Tenth Circuit Judgment");

(ii) United States Court of Appeals for the Tenth Circuit's Opinion, filed January 19, 2012 (Doc.

286-1);[1] and (iii) Defendants Drew Bader, Matthew Thompson, and Russell Carter's Motion for

Summary Judgment and Memorandum in Support, Requesting Dismissal of Counts I, X, and XIII

of Plaintiffs' First Amended Complaint [Doc. 5], filed February 17, 2009 (Doc. 117)("MSJ"). The

---

[1]The opinion is published as <u>Kerns v. Bader</u>, 663 F.3d 1173, 1177 (10th Cir. 2011).

Court held a hearing on April 10, 2012.  The primary issue is whether Defendants Drew Bader, Matthew Thompson, and Russell Carter[2] are entitled to qualified immunity protection from the Plaintiffs' claims for relief, because they did not violate clearly established law regarding a warrantless search pursuant to the exigent circumstances exception.[3]  The Court will grant the MSJ with respect to the Fourth-Amendment claim asserted in Count I.  The Court finds that the City Defendants did not violate clearly established law, because, analyzing the case law at a low level of generality, it was not clearly established that exigent circumstances did not exist.

## FACTUAL BACKGROUND

This case involves the investigation into the August 6, 2005, shooting of the Bernalillo County Sheriff's Department's helicopter, Metro One, which crashed into the backyard of a residence near the intersection of Golf Course Road and Paradise Boulevard in Albuquerque, New Mexico.  The Bernalillo County Sheriff's Department arrested Plaintiff Jason Kerns on August 15, 2005 and a federal grand jury indicted him on federal charges.  On May 10, 2006, the United States Attorney dismissed the charges against J. Kerns.  Plaintiffs J. Kerns, Archie Kerns, and Mary Ann Kerns brought this federal suit against those involved in the investigation, arrest, and prosecution.

On or about August 6, 2005, at approximately 12:00 a.m., retired Deputy Chief Ed Sauer

---

[2]The Court will refer to Bader, Thompson, and Carter collectively as the "City Defendants."

[3]The Tenth Circuit instructed the Court to conduct further proceedings with respect to the second prong of the qualified immunity analysis -- whether the law was clearly established.  See Kerns v. Bader, 663 F.3d at 1182.  The Tenth Circuit made no decision with respect to the first qualified-immunity question -- whether there was a constitutional violation -- and found that the "answer to that question isn't so clear in this case."  Kerns v. Bader, 663 F.3d at 1181.  Because the Tenth Circuit did not make a decision with respect to whether there was a constitutional violation, the Court will not reconsider its analysis on that point.  Moreover, neither party has asked the Court to reconsider its opinion with respect to the constitutional violation.  Accordingly, this memorandum opinion and order addresses only whether the law was clearly established.

observed the Bernalillo County Sheriff's Department Metro One helicopter hovering in the area of Paradise Boulevard and Golf Course Road in Bernalillo County, New Mexico, after he pulled into his driveway and exited his vehicle. <u>See</u> Deposition of Edward Sauer 5:5-9 (October 22, 2008), filed February 17, 2009 (Doc. 117-2); MSJ ¶ 1, at 2 (setting forth this fact); Plaintiffs' Response to City Defendants Drew Bader, Matthew Thompson, and Russell Carter's Motion for Summary Judgment Requesting Dismissal of Counts I, X, and XIII of Plaintiffs' First Amended Complaint ¶ 1, at 2, filed May 1, 2009 (Doc. 156)("MSJ Response")(not disputing this fact). As Sauer entered his residence, he heard a loud crack that sounded like a rifle shot. <u>See</u> Sauer Depo. at 5:17-7:8; MSJ ¶ 2, at 2 (setting forth this fact); MSJ Response ¶ 2, at 2 (not disputing this fact). Sauer observed the Metro One helicopter go straight down to the ground after he heard the shot. <u>See</u> Sauer Depo. at 10:14-19; MSJ ¶ 3, at 2 (setting forth this fact); MSJ Response ¶ 3, at 2 (not disputing this fact).

Sauer drove to the intersection where he believed the helicopter went down to look for it; however, he was unable to immediately locate the helicopter. <u>See</u> Sauer Depo. 10:24-11:5; MSJ ¶ 4, at 2 (setting forth this fact); MSJ Response ¶ 4, at 2 (not disputing this fact). Once Sauer walked to the golf course area, he saw that the helicopter had crashed in a residence's backyard, where he saw the observer and the pilot emerging from the wreckage. <u>See</u> Sauer Depo. at 12:18-13:1, 14:18-15:11; MSJ ¶ 5 at 2 (setting forth this fact); MSJ Response ¶ 5, at 2 (not disputing this fact). Sauer observed two or three civilians approaching the crash, and Sauer instructed them to move back and stay away from the helicopter. <u>See</u> Sauer Depo. at 20:14-16; MSJ ¶ 6, at 2 (setting forth this fact); MSJ Response ¶ 6, at 3 (not disputing this fact). Several civilians told Sauer that they had heard shots fired before the helicopter crashed. <u>See</u> Sauer Depo. at 40:16-19; MSJ Response ¶ 33, at 5

(setting forth this fact).[4]  Sauer radioed the Special Weapons and Tactics ("SWAT") supervisor to

come to his location, because he had "three witnesses [that say] they know where the shots fired

came from."  Deposition of Edward Sauer at 44:9-15 (January 12, 2009), filed May 1, 2009 (Doc.

156-2); Response MSJ ¶ 34, at 5 (setting forth this fact); MSJ Reply at 3 (not disputing this fact).

One man kept telling Sauer that the helicopter had been shot down.  See Sauer Depo. at 20:16-23;

MSJ ¶ 6, at 3 (setting forth this fact).[5]

     J. Kerns was one of the witnesses who approached Sauer and J. Kerns stated that he

overheard other people saying that the helicopter had been shot down.  See Deposition of Jason

Kerns at 148:11-17, filed May 1, 2009 (Doc. 156-1); Transcript of Videotaped Interview of Jason

Kerns at 18:22-25, 19:1-4 (not dated), filed May 1, 2009 (Doc. 156-1)("J. Kerns Videotaped Tr.");

MSJ Response ¶ 35, at 6 (setting forth this fact).[6]  Sauer recalls J. Kerns saying: "I know where the

_____

[4]The City Defendants admit that Sauer testified that "there were several people around saying, 'We think there were shots,'" but point out that, in the next line, Sauer testified that J. Kerns said: "Hey, I know where the shots came from."  Sauer Depo. at 40:16-19.  This information does not specifically controvert the asserted fact and, in fact, supports the asserted fact that several people told Sauer they heard shots.  Accordingly, the Court will deem the asserted fact admitted.

[5]The Kerns dispute this fact and state that the City Defendants' next asserted fact, in paragraph 7 of the MSJ, "clearly indicated that Jason Kerns never stated to law enforcement that the helicopter had been 'shot down.'"  MSJ Response ¶ 6, at 3.  In paragraph 7, the City Defendants note that "Plaintiff claims that he recalls saying 'I watched it go down, I think I heard where the pop noise came from.'"  MSJ ¶ 7, at 3 (citing Deposition of Jason Kerns 49:23-24 at 2 (taken Oct. 22, 2008), filed Feb. 17, 2009 (Doc. 117-3)).  J. Kerns does not, however, deny that he indicated to Sauer that he knew where the "shot" came from.  In fact, J. Kerns indicates that he "can't remember exactly what [he] said."  J. Kerns Depo. at 149:22-23.  Accordingly, the Court will deem admitted the asserted fact that a man, later identified as J. Kerns, kept telling Sauer that the helicopter had been shot down.

[6]The City Defendants do not object to the substance of the asserted fact, and the Court will therefore deem the asserted fact admitted, see D.N.M.LR-Civ. 56.1(b), but clarifies that the search, to which the MSJ Response refers in a footnote, took place three days after the helicopter was shot down on a warrant the Bernalillo County Sheriff's Department executed, see MSJ Reply ¶ 35, at 3.

shot came from." Sauer Depo. at 21:21-22:1, 40:6-19; MSJ ¶ 7, at 3 (setting forth this fact).[7] J.

Kerns told Sauer: "I watched it go down, I think I heard where the pop noise came from."

Deposition of Jason Kerns 49:23-24 at 2 (taken Oct. 22, 2008), filed Feb. 17, 2009 (Doc. 117-3);

MSJ ¶ 7, at 3 (setting forth this fact); MSJ Response ¶ 7, at 3 (not disputing this portion of the fact);

MSJ Response ¶ 36, at 6 (setting forth this fact). Sauer instructed J. Kerns to "[s]tay right here," and

Sauer had another officer speak with J. Kerns. Sauer Depo. 22:9023:2 at 6; MSJ ¶ 8 (setting forth

this fact); MSJ Response ¶ 8, at 3 (not disputing this fact). After hearing that the Metro One

helicopter had been shot down, members of the Albuquerque Police Department ("APD") Tactical

Unit arrived on the scene. See Deposition of Sergeant Robert Johnston at 4:18-24 (February 4,

2009), filed February 17, 2009 (Doc. 117-4); MSJ ¶ 9, at 3 (setting forth this fact); MSJ Response

¶ 9, at 3 (not disputing this fact). Officer Drew Bader and Sergeant Robert Johnston spoke to J.

Kerns about what he witnessed. See Johnston Depo. at 9:13-24, 11:5-19; Deposition of Drew Bader

at 22:2-12 (taken Feb. 11, 2009), filed February 17, 2009 (Doc. 117-5); MSJ ¶ 10 (setting forth this

fact); Response MSJ ¶ 10, at 3 (not disputing this fact).

     J. Kerns told the police that he heard a pop noise that was so loud it made his ears ring. See

J. Kerns Depo. at 156:15-25; MSJ ¶ 11, at 3 (setting forth this fact); MSJ Response ¶ 11, at 3 (not

disputing this fact). He explained that the pop noise sounded "like an engine back low or maybe a

rifle report, like the sound of a gun going off." J. Kerns Depo. at 157:19-25; MSJ ¶ 11, at 3 (setting

forth this fact); MSJ Response ¶ 11, at 3 (not disputing this fact). He also reported that he heard the

---

[7]The Kerns again disputes that J. Kerns told Sauer he witnessed the helicopter get shot down, based on J. Kerns' testimony that "I watched it go down, I think I heard where the pop noise came from." J. Kerns Depo. at 149:23-24, 154:14-17. As the Court stated earlier, J. Kerns' deposition testimony does not specifically controvert the asserted fact that J. Kerns told Sauer he knew from where the shot came. See note 5, supra. Accordingly, the Court will deem the asserted fact admitted.

sound of rocks kick up from the direction in which he believed he heard the pop noise originated. See J. Kerns Depo. at 162:6-8; MSJ ¶ 11, at 3 (setting forth this fact); MSJ Response ¶ 11, at 3 (not disputing this fact). J. Kerns also provided the police with a written statement wherein he stated that he was "standing on the edge of the property line and the golf course watching the helicopter hovering." Written Statement of Jason Kerns at 1, filed February 17, 2009 (Doc. 117-6); MSJ ¶ 12, at 4 (setting forth this fact); MSJ Response ¶ 12, at 3 (not disputing this fact).

J. Kerns gave Johnston directions to his home, which is located at 9910 Columbus Circle N.W., on the golf course. See Johnston Depo. at 15:15-19; MSJ ¶ 13, at 4 (setting forth this fact); MSJ Response ¶ 13, at 3 (not disputing this fact). In response to J. Kerns' report, Johnston sent members of the SWAT and K-9 units to the area of J. Kerns' residence so the officers could look for evidence where a gunshot might have taken place, or contact anybody else in the neighborhood who may have heard or seen something. See Johnston Depo. at 15:12-15, 16:13-17:7; MSJ ¶ 14, at 4 (setting forth this fact); MSJ Response ¶ 14, at 3 (not disputing this fact); MSJ Response ¶ 37, at 6 (setting forth this fact); City Defendants' Reply to Plaintiffs' Response to Their Motion for Summary Judgment Requesting Dismissal of Counts I, X, and XIII of Plaintiff' First Amended Complaint at 3, filed June 18, 2009 (Doc. 161)("MSJ Reply")(not disputing this fact). Bader, Carter, and Thompson were among the tactical officers who went to the area. See Defendant Drew Bader's Answers to Plaintiff Jason Kerns' First Set of Interrogatories and Request for Production of Documents to Defendant Drew Bader at 2, filed February 2, 2009 (Doc. 117-7)("Bader Ans."); Defendant Russell Carter's Answers to Plaintiff Jason Kerns' First Set of Interrogatories and Request for Production of Documents to Defendant Russell Carter at 2, filed February 2, 2009 (Doc. 117-8)("Carter Ans."); Defendant Matthew Thompson's Answers to Plaintiff Jason Kerns' First Set of Interrogatories and Request for Production of Documents to Defendant Matthew Thompson at

2, filed February 17, 2009 (Doc. 117-9)("Thompson Ans."); MSJ ¶ 15, at 4 (setting forth this fact);

MSJ Response ¶ 15, at 3 (not disputing this fact).  Johnston instructed the officers to go through

every yard around the circle area, and if they could see lights in the house or hear noise or movement

inside, to knock on the door and ask if anyone saw or heard anything.  See Johnston Depo. 16:11-25;

MSJ Response ¶ 38, at 6 (setting forth this fact); MSJ Reply at 3 (not disputing this fact).  The

officers split into two groups to canvas the neighborhood.  See Johnston Depo. at 15:16-18, 34:16-

25, 35:1-13; MSJ Response ¶ 39, at 6 (setting forth this fact); MSJ Reply at 3 (not disputing this

fact).  Johnston led one group and Defendant Officer James Montoya led the other.  See Deposition

of Sergeant Robert Johnston at 15:19-25; Deposition of Officer James Montoya at 12:12-19 (dated

February 11, 2009), filed May 1, 2009 (Doc. 156-5); MSJ Response ¶ 40, at 6 (setting forth this

fact); MSJ Reply at 3 (not disputing this fact).

       Johnston spoke to people at approximately four houses, but nobody at any of the houses had

heard any gunshot or heard the helicopter crash.  See Johnston Depo. at 18:6-25, filed May 1, 2009

(Doc. 156-4); MSJ Response ¶ 41, at 7 (setting forth this fact); MSJ Reply at 3 (not disputing this

fact).  Montoya's team made contact with people at one or two houses, but no one reported hearing

shots fired or knew anything about the helicopter crash.  See Montoya Depo. at 14:3-25, 15:7-10;

MSJ Response ¶ 42, at 7 (setting forth this fact); MSJ Reply at 3 (not disputing this fact).  It is

possible that the noises J. Kerns heard could have been acoustical reverberations from the buildings

along the golf course.  See MSJ Response ¶¶ 43, 44, at 7 (setting forth this fact).[8]

_____

       [8]The Kerns assert that "Officer Montoya acknowledged that the noises that Jason Kerns
heard could have been acoustical reverberations off of the buildings along the golf course" and
"Officer Bader recognized the same."  MSJ Response ¶¶ 43-44, at 7 (citing Montoya Depo. at 38:1-
5; Bader Depo. at 18:20-19:22).  The City Defendants assert, with respect to paragraph 43:

       The deposition testimony cited by Plaintiffs is taken out of context as this testimony

Johnston directed Bader, Thompson, and Carter to investigate the area surrounding J. Kerns'

residence.  See Bader Ans. at 2; Carter Ans. at 2; Thompson Ans. at 2; MSJ ¶¶ 16, 18, at 4-5 (setting

forth this fact); MSJ Response ¶¶ 16, 18, at 3 (not disputing this portion of the fact).  Thompson was

searching the neighborhood and contacting neighbors, but within fifteen minutes another search

team requested the SWAT team, advising that the officers could hear loud rap music and suspected

a party, and Thompson went to the residence to assist.  See Thompson Ans. at 2; MSJ ¶¶ 17, 18, at

4-5 (setting forth this fact).[9]  There was loud music coming from J. Kerns' residence, multiple cars

_____

is in response to Plaintiffs' counsel follow-up questions to the testimony offered by
Officer Montoya on page 37 of his deposition.  Officer Montoya testified ". . . I am
going off of what I was told, that shots came from that direction and that there was
some type of impact either near or around [Jason Kerns] in that area."  When asked
if it was also likely that maybe the sound would have reverberated or ricocheted off
of something else back to him [Jason Kerns], Officer Montoya responded "That
could always be a possibility."

MSJ Reply ¶ 43, at 4 (citing Montoya Depo. at 37:18-21, 38:1-5)(emphasis added).  With respect
to paragraph 44, the City Defendants assert that

Officer Bader's testimony is taken out of context as his testimony clearly illustrates
that he is giving general examples of what happens when witnesses report hearing
gun fire.  The testimony cited by Plaintiff also shows that Officer Bader said that he
is incapable of testifying about the possibility of hearing reverberations or echoes,
but Officer Bader pointed out that with respect to the subject incident, officers did
not have any good information "until we learned what the information was that Jason
Kerns had."

MSJ Reply ¶ 44, at 4 (citing Bader Depo. at 19:5-14).  In their depositions, Montoya and Bader both
acknowledge that it is possible that J. Kerns heard the echo of the shot.  See Montoya Depo. at 38:5
("That could always be a possibility."); Bader Depo. at 18:25-19:4 ("That's fairly normal.
Especially people that don't have a good background in firearms.  If they have the reverberation or
the echoes off the houses, they think that the shot cam from somewhere else . . . .").  The City
Defendants have not specifically controverted the asserted fact, that Montoya and Bader
acknowledge J. Kerns could have heard an echo or reverberation, and the Court will deem that fact
admitted.  See D.N.M.LR-Civ. 56.1(b).

[9]The Kerns do not dispute paragraph 18 of the MSJ, which states in full: "Officer Thompson
was advised that the officers who were at 9910 Columbus Circle could hear loud rap music coming

were at the residence, and miscellaneous items were along the side of the house.  See Bader Ans.

at 2; Carter Ans. at 2; Thompson Ans. at 2; J. Kerns Depo. 124:16-24; MSJ ¶¶ 16, 19, at 4-5 (setting

forth this fact).[10]  These circumstances seemed odd to Thompson and the officers discussed the

---

from inside this home and that they believed that there was a possible party going on inside so
Officer Thompson went over to this residence to assist." MSJ ¶ 18, at 4-5.  See MSJ Response ¶ 18,
at 3 (not disputing this fact).  The Kerns dispute paragraph 17 of the MSJ, which states in full:

> Meanwhile, SWAT Officer Thompson was searching around the neighborhood near
> the 9910 Columbus Circle residence and made contact with several people to see if
> they had any pertinent information relating to the crash.  Within fifteen minutes of
> starting his search, another search team requested the SWAT team's assistance at the
> 9910 Columbus Circle residence.

MSJ ¶ 17, at 4.  The Kerns assert: "It is not contested that APD Officer Thompson was on the scene
at 9910 Columbus Circle to investigate the helicopter shooting, genuine dispute exists as to how
Officer Thompson was called to the Kerns' residence." MSJ Response ¶ 17, at 3.  The Kerns do not,
however, cite any evidence to support a genuine dispute, and, having admitted paragraph 18, the
Court is unsure what dispute there could be.  The local rules provide that "[a]ll material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted" and that the
response "must refer with particularity to those portions of the record upon which the non-movant
relies." D.N.M.LR-Civ. 56.1(b).  Accordingly, the Court will deem paragraph 18 admitted.

      [10]The City Defendants' asserted facts are:

  16.   K-9 Officers Bader and Carter went to the 9910 Columbus Circle residence
        where they heard loud music coming from the house and noticed that the
        garage door was open.

  . . . .

  19.   When Officer Thompson arrived at the 9910 Columbus Circle residence, he
        saw approximately five vehicles parked at this residence and lots of furniture
        and other miscellaneous items out in the yard.  He also saw that the garage
        door was open, but noticed that all the lights were off inside of the home.

MSJ ¶¶ 16, 19, at 4-5.  The Kerns dispute that the music was loud, that the garage door was open,
and that the lights were off.  See MSJ Response ¶¶ 16, 19, at 3-4 (citing J. Kerns Depo. at 124:16-20,
140:19-25.  In the MSJ Reply, the City Defendants assert that there is no genuine dispute, because
the facts describe Bader's and Carter's perceptions.  See MSJ Reply ¶ 16, at 2.  They argue that J.
Kerns' testimony establishes that his music was playing at "level eight" and, although the garage
was closed when he left his residence, he admits that the garage door was open when he returned

possibility of an armed suspect inside the home.  See Thompson Ans. at 2; MSJ ¶ 20, at 5 (setting

forth this fact).[11]

_____

home at 2:45 a.m.  MSJ Reply ¶ 16, at 2.  Whether the music was loud is a matter of perception and, in paragraph 62 of the Kerns' asserted facts, the Kerns assert that Johnston heard the music playing inside the home, before the officers entered.  See MSJ Response ¶ 62, at 10.  The Court does not believe that the Kerns have specifically controverted the asserted fact, that the music was loud, with J. Kerns' testimony that the music was at level eight, given that the officers could hear the music playing while outside.  Because the Kerns have not specifically controverted the asserted fact, the Court will deem the fact that the music was loud admitted.  See D.N.M.LR-Civ. 56.1(b).  With respect to whether the garage door was open, J. Kerns stated that "the door to the garage was completely shut."  J. Kerns Depo. at 140:20.  The City Defendants assert that J. Kerns conceded that the garage door was open when he returned at 2:45 a.m.  See MSJ Reply ¶ 16, at 2 (citing J. Kerns Depo. at 252:6-10).  The City Defendants did not, however, provide the Court with the cited portion of the deposition.  Accordingly, there is dispute whether the garage door was open or closed.  Because the Court must resolve all disputes in favor of the non-moving party, the Court will not include Thompson's observation that the garage door was open.  See Hunt v. Cromartie, 526 U.S. 541, 551 (1999)(stating that the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party).  With respect to whether the lights were on or off, there is conflicting testimony between the officers.  See Thompson Ans. at 2 ("The garage door was open, but all the lights were out inside of the home."); Johnston Depo. at 23:1-5 ("[B]ut I could see lights on at the house . . . .").  Furthermore, the City Defendants did not dispute the Kerns' paragraph 62, in which the Kerns assert that Johnston observed that the lights were on inside the house.  See MSJ Reply at 3-7.  Accordingly, because the Court must construe the evidence in the light most favorable, the Court will not include Thompson's observation that the lights were turned off.  See Hunt v. Cromartie, 526 U.S. at 551.

     [11]The City Defendants assert: "This seemed odd to Officer Thompson because it was late at night so he and other members of the tactical team discussed the possibility of an armed suspect possibly being inside the home.  During their discussion, the loud music that had been playing suddenly stopped."  MSJ ¶ 20, at 5.  The Kerns point to Johnston's testimony, which states that the music was playing when he arrived until the officers entered the house.  See Johnston Depo. at 31:20-25.  The City Defendants respond that "the record cited by the Plaintiffs does not support their contention that Fact No. 20 is disputed," but do not explain why Johnston's deposition testimony is insufficient.  There is a dispute between Thompson's Answer and Johnston's deposition testimony, and the City Defendants do not contest paragraph 62, in which the Kerns rely on Johnston's testimony that the music was on the entire time.  Because the Court must construe the evidence in the light most favorable to the Kerns, the Court finds that the music was on continuously.  See Hunt v. Cromartie, 526 U.S. at 551 (stating that the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party).  In the Letter from Stephanie Griffin to the Court (dated April 11, 2012), filed April 11, 2012 (Doc. 300)("April 11, 2012 Griffin Letter"), the City

The officers did not report seeing any movement inside the Kerns' home.  See Bader Depo. at 70:21-71:4; MSJ Response ¶ 58, at 9 (setting forth this fact); MSJ Reply at 3 (not disputing this fact).  The many officers at the Kerns' home were searching for "shell casings, guns, [and] people," but no such evidence was ever found there.  Johnston Depo. at 26:6-10, 31:2-7, 42:4-12; MSJ Response ¶ 49, at 7 (setting forth this fact); MSJ Reply at 3 (not disputing this fact).  Bader is a trained human tracker.  See Bader Depo. at 29:5-10; MSJ Response ¶ 46, at 7 (setting forth this fact); MSJ Reply at 3 (not disputing this fact).  Johnston communicated with J. Kerns over the police radio to confirm that 9910 Columbus Circle was his home and to inquire where J. Kerns was standing when he heard the popping noise.  See Johnston Depo. at 24:2-10; MSJ Response ¶ 52, at 8 (setting forth this fact), MSJ Reply at 3 (not disputing this fact).  Johnston did not speak directly with J. Kerns, but spoke through other law enforcement officers, and, using this technique, Johnston clarified J. Kerns' perceptions concerning the directionality of the noise J. Kerns heard. See Johnston Depo. at 24:11-25; MSJ Response ¶¶ 53-54, at 8 (setting forth this fact); MSJ Reply at 3 (not disputing this fact).  Johnston did not ask who was in J. Kerns' residence or about any of the officer's observations.  See Johnston Depo. at 24:11-21; MSJ Response ¶ 54, at 8 (setting forth this fact); MSJ Reply at 3 (not disputing this fact).  The officers investigated the outside perimeter of the J. Kerns' residence and discovered a broken window in the rear of the house.  See Bader Depo. at 39:4-10, 62:8-10; Defendants' Photograph of Broken Window, filed February 17, 2009 (Doc. 117-12); MSJ ¶ 23, at 5 (setting forth this fact); MSJ Response ¶ 23, at 4 (not disputing this

Defendants assert that Bader knew that there people were in the house.  See April 11, 2012 Griffin Letter ¶ 7, at 2 (citing Bader Depo. at 61:21-62:7).  The cited portion of the deposition also relies on the fact that the music was suddenly cut off.  Because the Court has found, for the purposes of this MSJ, that the music played continually, the Court will not include the related fact, that Bader knew there were people inside because the music cut off.  The Court must construe this related fact in favor of the non-moving party.

fact). Other than the broken window, Bader did not find any evidence revealing where a shooter may have been standing or to where the shooter may have departed. See Bader Depo. at 54:21-55:10, 86:20-23; MSJ Response ¶ 47, at 7 (setting forth this fact).[12] A. Kerns explains that only the outside pane of the double-paned window had been broken when it was struck by a golf ball, which the officers did not observe on the ground. See J. Kerns Depo. at 254:8-25; Deposition of Michelle Zisser at 50:1-9 (October 17, 2008), filed May 1, 2009 (Doc. 156-10); Deposition of Archie Kerns 88:1-6; 89:14-21, at 1 (October 15, 2008), filed May 1, 2009 (Doc. 156-6); Plaintiffs' Photograph of Broken Window, filed May 1, 2009 (Doc. 156-6); MSJ Response ¶ 56, at 8-9 (setting forth this fact).[13] Bader was concerned about the broken window, given the possibility of gunfire in the area;

---

[12]The Kerns assert that "Officer Bader looked for evidence revealing where a shooter may have been standing or where a shooter may have departed to, and found none." MSJ Response ¶ 47, at 7. The City Defendants assert:

> Officer Bader's testimony is taken out of context. The testimony cited by Plaintiffs reflects Officer Bader's answer to the question of whether tactical officers ever left the Kerns property. Officer Bader testified that one of the first things that he observed at the Kerns home that indicated gunfire, or something unusual was the broken window at the back of the home.

MSJ Reply ¶ 47, at 5 (citing Bader Depo. at 38:3-22, 54:18-20). The portions of Bader's deposition to which the City Defendants cite do not specifically controvert the asserted fact. Accordingly, the Court will deem the asserted fact, that Bader could not locate evidence about where the shooter was standing or went, admitted. See D.N.M.LR-Civ. 56.1(b). To more accurately reflect Bader's testimony, however, the Court will modify this fact to assert that Bader found no evidence of a shooter -- other than the broken window.

[13]The City Defendants dispute the asserted fact that only the exterior pane was broken and that it was broken by a golf ball, and argue:

> Plaintiff fails to cite any evidence in the record that officers knew for a fact that a golf ball and not a gun shot or debris from the helicopter crash or something else caused the damage to the broken window. Officer Bader testified that he does not recall seeing a golf ball on the ground and that he could not see whether the broken glass went all the way through the interior.

however, he did not closely inspect the broken glass, and he does not recall seeing a golf ball.  See

Bader Depo. at 38:2-22; 46:6-10; MSJ Response ¶ 55, at 8 (setting forth this fact); Reply at 3 (not

disputing this fact). Bader knows that, in his line of work, a broken window is usually not a good

sign, especially when gunfire is reported in the area.  See Bader Depo. at 62:20-23; April 11, 2012

Griffin Letter ¶ 7, at 2 (setting forth this fact).[14]  A golf ball striking the Kerns' window would not

have been out of the ordinary, because the Kern's backyard borders the eighteenth hole of the

Paradise Hills golf course.  See A. Kerns Depo. at 87:6-88:6, 89:14-23; Deposition of Mary Ann

Kerns at 74:7-75:25 (October 15, 2009), filed May 1, 2009 (Doc. 156-8); Champion Window Co.

of Albuquerque, LLC Service Order, filed May 1, 2009 (Doc. 156-9); MSJ Response ¶ 57, at 9

---

MSJ Reply ¶¶ 56-57, at 5 (citing Bader Depo. at 46:8-14).  This information and the cited portion of Bader's deposition do not controvert the asserted fact that the damage was because of a golf ball, which was on the ground next to the window.  See D.N.M.LR-Civ. 56.1(b).  Moreover, the Kerns do not assert, in this paragraph, that the officers' knew a golf ball caused the damage, they only assert that a golf ball caused the damage.  Accordingly, the Court will deem this fact admitted.  The Court will also include the information from Bader's deposition, that he did not closely inspect the window, in a separate fact.

[14]The Kerns dispute this fact and assert:

> While Bader found the broken window to play a factor in his desire to search the Kerns' home, Sgt. Johnson, who actually authorized the entry into the Kerns' house, never mentioned the broken window as playing a role in his decision to enter the Kerns' home.  In any event, as discussed above, the City Defendants have conceded that the cause of the broken window is a factual issue to be resolved by a jury. Unlike Bader, Sgt. Johnson did not think the shooter was inside the Kerns' home, but wanted to make sure the home had not been burglarized after Jason Kerns had departed the house.

Plaintiffs' Supplemental Factual Support in Opposition to the City Defendants' Motion for Summary Judgment ¶ 7, at 4, filed April 25, 2012 (Doc. 301).  While the Kerns attack whether this fact was important to Johnston's decision-making, they do not specifically controvert the asserted fact that, in Bader's experience, a broken window is a bad sign.  See D.N.M.LR-Civ. 56.1(b).  Accordingly, the Court will deem the asserted fact admitted.

(setting forth this fact).[15]

After checking the area around J. Kerns' residence for evidence or suspects, Bader and Thompson made several attempts to contact anyone inside the house by knocking and announcing that they were police officers.  See Bader Depo. at 61:21-65:15; MSJ ¶ 21, at 5 (setting forth this fact).[16]  No one came to the door in response to their knocking and announcements.  See Bader

---

[15]Paragraph 57 asserts: "The fact that a golf ball had struck the Kerns' window should not have been out of the ordinary to the law enforcement officers, as the Kerns' back yard borders the eighteenth (18th) hole of the golf course at Paradise Hills."  MSJ Response ¶ 57, at 9.  The City Defendants reiterate:

> Plaintiff fails to cite any evidence in the record that officers knew for a fact that a golf ball and not a gun shot or debris from the helicopter crash or something else caused the damage to the broken window.  Officer Bader testified that he does not recall seeing a golf ball on the ground and that he could not see whether the broken glass went all the way through the interior.

MSJ Reply ¶¶ 56-57, at 5 (citing Bader Depo. at 46:8-14).  The City Defendants correctly point out that the portions of the record to which the Kerns cite do not establish that the officers knew that a golf ball had damaged the window.  In his deposition, Bader testified that he "didn't closely inspect" the window and that he did not recall seeing the golf ball on the ground.  Bader Depo. at 46:6-10.  Each fact asserted in a response must "refer with particularity to those portions of the record upon which the non-movant relies."  D.N.M.LR-Civ. 56.1(b).  Because there is no evidence that the officers knew that a golf ball caused the damages that they observed, the Court will modify the asserted fact.  The City Defendants do not, however, specifically controvert the remaining portion of the asserted fact, that it is not unusual for a golf ball to strike the Kerns' home because it is located on the eighteenth hole.  See D.N.M.LR-56.1(b).  Accordingly, the Court will deem the remaining portion of the asserted fact admitted.

[16]The Kerns assert: "It is not contested that nobody inside the Kerns' home came to the door or that entry to the Kerns' home took place after a thorough search of the area for evidence or suspects; the rest, however is contested."  MSJ Response ¶ 21, at 4 (citing Zisser Depo. at 40:10-41:22).  Zisser testified that she did not hear any knocks at the door or the doorbell and that "I would have heard a knock or anything, because this window, you can hear."  Zisser Depo. at 40:10-21.  Zisser also testified that she was asleep before waking up when she heard the police radio.  See Zisser Depo. at 40:1-7.  The cited portions of Zisser's deposition testimony do not establish that the police did not knock on the door; they establish only that Zisser did not hear any noises from outside.  Because the Kerns have not specifically controverted the asserted fact, that the police knocked and announced themselves, the Court will deem this fact admitted.  See D.N.M.LR-Civ. 56.1(b).

Depo. at 61:21-65:15; MSJ ¶ 21, at 5 (setting forth this fact).  The occupants inside the home, A. and

M. Kerns (J. Kerns' parents) and Michele Zisser (J. Kerns' girlfriend), were all asleep, and did not

hear the officers' knocks and announcements, or any sounds related to the helicopter crash.  See

Deposition of Michelle Zisser at 39:5-15 (October 17, 2008), filed February 17, 2009 (Doc. 117-9);

Deposition of Archie Kerns 79:2-21, at 2 (October 15, 2008), filed February 17, 2009 (Doc. 117-10);

Deposition of Mary Ann Kerns 64:20-65:23, at 2 (October 15, 2008), filed February 17, 2009 (Doc.

117-11); MSJ ¶ 22, at 5 (setting forth this fact); MSJ Response ¶ 22, at 4 (not disputing this portion

of the fact).  Sometime after the officers had knocked on the front door, Johnston was called over

to the Kerns' residence.  See Johnston Depo. at 21:9-22, 23:17-24:10; MSJ Response ¶¶ 50-51, at

8 (setting forth this fact); MSJ Reply at 3 (not disputing this fact).

Thompson stated that, given the circumstances, he "thought that the occupants may be in

danger from a possible armed suspect that may have fired at the police helicopter," that "it was

possible debris from the [helicopter] could have lodged inside the home," and that "the broken glass

could have resulted from a gunshot coming from or into the residence."  Thompson Ans. at 2; MSJ

¶ 24, at 6 (setting forth this fact).[17]  Johnston did not think that the shooter would be found at the

scene, because of the time lag between the helicopter crash and his arrival at the Kerns' home.  See

---

[17]The Kerns dispute this fact and assert that "[g]enuine disputes exist as to what Officer
Thompson may have thought" and point the Court to "Plaintiffs facts 41 through 69 below."  MSJ
Response ¶ 24, at 4.  None of the facts asserted in paragraphs 41 through 69, however, mention
Thompson by name or address his state of mind.  The local rules require that the non-moving party
"specifically controvert" an asserted fact.  D.N.M.LR-Civ. 56.1(b).  Because the facts to which the
Kerns point do not specifically controvert the asserted fact, that Thompson thought that the
occupants of J. Kerns' could be in danger, the Court will deem this fact admitted.  See D.N.M.LR-
Civ. 56.1(b).

Johnston Depo. at 42:4-12; MSJ Response ¶ 61, at 9 (setting forth this fact).[18]   According to

Johnston, at that time there were lights on in J. Kerns' residence, and the music coming from the

residence played the entire time.  See Johnston Depo. 31:20-25; MSJ Response ¶ 62, at 10 (setting

forth this fact).[19]  The officers became concerned for the safety of the individuals inside the

residence; Thompson and Bader knocked on a door at the side of the house, found the door

unlocked, opened it, and instructed any occupants to come outside.[20]  See Bader Depo. at 70:5-20,

_____

[18]The City Defendants assert that, "[n]otwithstanding this fact, Sergeant Johnston also testified that his concern was for the safety of the resident occupants in the aftermath of the shooting."  MSJ Reply ¶ 61, at 6 (citing Johnston Depo. at 42:13-20).  The City Defendants do not appear to contest the asserted fact and the portion of Johnston's deposition to which they cite does not address whether Johnston believed he would find the suspect.  Because the City Defendants have not specifically controverted the asserted fact the Court will deem this fact admitted.  See D.N.M.LR-Civ. 56.1(b).

[19]Paragraph 62 of the MSJ Response is not listed as one of the paragraphs with which the City Defendants "do not take issue"; however, the City Defendants do not otherwise discuss paragraph 62.  MSJ Reply at 3-7.  Because the local rules require that a reply "specifically controvert" any material facts included in the response and because the MSJ Reply does not specifically address paragraph 62, the Court will deem this fact admitted.  D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[20]The Kerns assert two additional facts, which the City Defendants have specifically controverted.  The Kerns assert that: (i) "Sgt. Johnston could not articulate any fact that led him to believe that somebody was hurt or injured inside the Kerns' home"; and (ii) Officer Bader could not articulate any objective fact that made him "think anyone, even the shooter, had sought refuge inside the Kerns' home."  MSJ Response ¶¶ 59-60, at 9 (citing Johnston Depo. at 28:7-10); Bader Depo. at 69:4-7).  The City Defendants point out that Johnston and Bader both articulated facts that led officers to be concerned for the welfare of those individuals inside the home.  See MSJ Reply ¶¶ 59-60, at 5-6 (citing Johnston Depo. at 42:3-20; Bader Depo. at 65:4-15).  The Kerns point to Johnston's statement, in response to a question whether he could articulate what led him to believe that someone may have been hurt inside the house, that, "[a]t this point in time, no, sir."  Johnston Depo. at 28:7-10.  Later in his deposition, however, Johnston states:

When we got to the Kerns residents [sic] and the door was open, the lights were on, the music was playing loud, it was late at night, early in the morning, nobody was answering the door, for whatever reason, and the fact that a shooting had taken place of a helicopter, unknown if anybody else had been shot in the interim prior to, after,

72:24-73:10; MSJ ¶ 25, at 6 (setting forth this fact).[21]   After several minutes with no response, Thompson, Bader, and Carter entered the home, because they were concerned for the safety of any individuals inside given the unsecured door, broken window, unresponsiveness, and J. Kerns' report

---

> whatever that yes, I felt at that time we needed to get in that house to make sure there was nobody injured inside that house.

Johnston Depo. at 42:13-20.  Accordingly, the City Defendants have specifically controverted the asserted fact that Johnston could articulate no facts concerning why he believed a person might be in need of assistance.  See D.N.M.LR-Civ. 56.1(b).  In response to a question whether he could articulate any objective facts that made him think someone had taken refuge inside of the house, Bader said "no."  Bader Depo. at 69:4-7.  Earlier in his deposition, however, Bader had stated:

> So now we are thinking well, the door is unlocked, we haven't found the offender, now nobody is coming to the door.  There may be somebody hurt or maybe somebody being held hostage.  We really don't know what's going on yet and that's not good.  I mean, this is as far as we know, and we don't have the information to tell us otherwise, this is basically the scene of a crime.  This is where somebody shot down a helicopter.  That's a big deal, and to have these people now not able to come to the door to contact us is extremely troubling.

Bader Depo. at 65:4-15.  Thus, although perhaps confused as to what objective facts might be, Bader gave reasons why he believed an injured person or the shooter could have taken refuge in the house.  The City Defendants have therefore specifically controverted the asserted fact that Bader could not articulate a reason someone might have sought refuge inside the house, and the Court will not include that fact.  See D.N.M.LR-Civ. 56.1(b).

[21]The Kerns dispute this fact and assert that "[g]enuine disputes exist as to what the City Defendants were concerned about, or whether they announced themselves as they entered."  MSJ Response ¶ 25, at 4.  The City Defendants respond that the Kerns' "claims that a genuine issue of fact exists as to these facts; however, the Plaintiffs only cite argument of their counsel, not actual contested facts to support their position."  MSJ Reply ¶¶ 24-26, at 3 (citing Fritzscke v. Albuquerque Mun. Sch. Dist., 194 F.Supp.2d 1194, 1206 (D.N.M. 2002)(Black, J.)).  The Court has already determined that the Kerns' evidence that they did not hear any knocking or announcing does not specifically controvert the City Defendants' asserted facts that they announced themselves.  See supra note 16.  The Kerns have also pointed to no evidence which specifically contradicts the fact that the officers were concerned about the individuals in J. Kerns' residence, but generally argue that the facts they assert in paragraphs 41 through 69 create a genuine issue of material fact regarding with what the police officers were concerned.  None of those facts, however, directly address the asserted fact.  Accordingly, the Court will deem the asserted fact admitted.  See D.N.M.LR-Civ. 56.1(b).

of a popping noise.  See Bader Depo. at 61:21-65:15; MSJ ¶ 26, at 6 (setting forth this fact).[22]  The

officers did not seek permission from J. Kerns before entering, even though Johnston had been in

radio contact with him.  See Johnston Depo. at 32:9-15; MSJ Response ¶ 65, at 10 (setting forth this

fact).[23]  Given the circumstances with which the officers were presented, Bader stated that, as far

as the officer's knew, J. Kerns' home was "basically the scene of a crime" and that the officers did

not "have the information to tell us otherwise."  Bader Depo. at 65:11-12; MSJ Response ¶ 63, at

10 (setting forth this fact).[24]

---

[22]The Kerns argue that: "It is not contested that the APD Officers entered the Kerns' home without permission.  A genuine dispute exists, however, as to whether APD Officers had lawful authority to do so, and to the remaining statements."  MSJ Response ¶ 26, at 4.  The Kerns cite generally to the facts which they assert in paragraphs 41 through 69 of the MSJ Response.  See MSJ Response ¶ 26, at 4.  Whether the officers had lawful authority to enter the Kerns' home is a legal question, which the Court will address in its analysis section.  See Wilson v. Jara, No. 10-0797, 2011 WL 5822729, at *2 (D.N.M. Oct. 17, 2011)(Browning, J.)("Whether this fact is relevant is a legal argument, and the Court will not address United States v. Abendi at this time, but will consider it in its legal analysis."); Ruiz v. City of Brush, No. 05-897, 2006 WL 1816454, at *4 (D. Colo. June 30, 2006)("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute[;][l]egal argument should be reserved for separate portions of the brief.'").  With respect to the portions of the asserted fact addressing why the officers entered the residence, the portions of the record to which the Kerns do not specifically controvert those reasons.  See supra note 20.

[23]The City Defendants assert that this fact is misleading "as it is uncontested [See fact 29] that Ms. Zisser was asked by the officers if they could look around inside the house, and she said 'sure,' and took them around the house real quick."  MSJ Reply ¶ 65, at 6.  The Court agrees that, once the officers were inside the house, Ms. Zisser agreed to let the officers tour the residence.  The asserted fact, however, states that the officers failed to ask permission before entering the home.  The City Defendants' facts, however, also establish that the officers were already in the home when they encountered Ms. Zisser; therefore, she could not have granted them permission to enter.  See MSJ ¶ 27, at 6 ("The officers entered the residence through a side door where they were met by a female, who was later identified as Plaintiff Jason Kerns' girlfriend, Michelle Zisser.").  Accordingly, the City Defendants have not specifically controverted the asserted fact, that the officers entered the home without permission, and the Court will deem that fact admitted.  See D.N.M.LR-Civ. 56.1(b).

[24]The City Defendants assert:

After entering J. Kerns' residence, Bader, Thompson, and Carter were met by a female, later identified as Michelle Zisser. See Thompson Ans. at 2; MSJ ¶ 27, at 6 (setting forth this fact); MSJ Response ¶ 27, at 5 (not disputing this fact). Zisser had been sleeping in a room near the door and did not hear anything until the officers were inside the home with their radios transmitting. See Zisser Depo. at 40:10-25, 41:1-22; MSJ Response ¶ 67, at 10 (setting forth this fact).[25] Thompson identified himself as an officer with the Albuquerque Police Department ("APD") and spoke with Zisser. See Thompson Ans. at 2; MSJ ¶ 28, at 6 (setting forth this fact); MSJ Response

---

> This fact is misleading as Plaintiffs fail to represent Officer Bader's testimony as a whole in their recitation of the facts. The complete testimony reveals that Officer Bader was asked how the decision was made to enter the Kerns property and Officer Bader responds by describing the exigency of the situation under the totality of the circumstances.

MSJ Reply ¶ 63, at 6. The City Defendants do not dispute the asserted fact, that Bader believed the Kerns' residence could be the scene of the crime, and the Court will deem that fact admitted. See D.N.M.LR-Civ. 56.1(b). The Court will, however, modify that fact to more accurately reflect the totality of Bader's testimony and the context in which that statement was made.

[25]The Kerns assert that "Michelle Zisser, who was staying at the Kerns' home and was sleeping in a location where she could have heard a knock on the door or anything else did not hear anything until the City Defendants were inside the home with their radios on." MSJ Response ¶ 67, at 10 (citing Zisser Depo. at 40:10-41:22; Map of Residence, filed May 1, 2009 (Doc. 156-10)). The City Defendants assert that

> This fact is misleading as Ms. Zisser was asleep and did not hear any noises whatsoever while she was asleep until she was awakened by the sounds of a police radio. Consequently Ms. Zisser did not hear any sounds before hearing the police radio, including the music playing, the sound of the helicopter before or after it crashed, any knocks at the door, or the pop noise that Plaintiff Jason Kerns claims he heard.

MSJ Reply ¶ 67, at 6-7 (citing Zisser Depo. at 39:5-21). The City Defendants' MSJ Reply does not specifically controvert the asserted fact. The Kerns and the City Defendants appear to agree that Zisser was asleep and that she did not hear anything before she woke up to the noises on the police radio. The City Defendants also do not provide any evidence which addresses where Zisser was sleeping. Accordingly, the Court will deem the asserted fact admitted.

-19-

¶ 28, at 5 (not disputing this portion of the fact).  The officers asked Zisser's consent to look around inside the house.  <u>See</u> Zisser Depo. at 46:8-22; MSJ ¶ 29, at 7 (setting forth this fact); MSJ Response ¶ 29, at 5 (not disputing this fact).  Zisser stated that she did not feel she could deny the officers' request, as they had their weapons displayed.  <u>See</u> Zisser Depo. 46:19-25; MSJ ¶ 69, at 11 (setting forth this fact).[26]  According to Zisser, the officers went quickly around the house with her, and when Zisser informed Bader, Thompson, and Carter that J. Kerns' parents were asleep in the master bedroom, they did not enter or investigate in that room.  <u>See</u> Zisser Depo. at 47:2-14, 48:24-25:4; MSJ ¶ 30, at 7 (setting forth this fact); MSJ Response ¶ 30, at 5 (not disputing this fact).  The officers left the residence without seizing or damaging any property.  <u>See</u> M. Kerns Depo. at 74:3-4, 76:1-6; MSJ ¶ 31, at 7 (setting forth this fact).[27]  After the search of the Kerns' home, Montoya

_____

[26]The City Defendants assert that the asserted fact, that Zisser felt that she could not deny the officers consent to search the home, "is misleading as Ms. Zisser testified that she was initially startled by the officers' presence, but she concedes that the officers did not threaten her with their firearms" and note that Zisser does not "claim that any of the officers yelled at her or were mean to her."  MSJ Reply ¶ 69, at 7.  In the cited portion of Zisser's deposition, in response to a question regarding what was meant when she said that she took the officers around the home "real quick," Zisser stated:

> A:   Well, you know, I'm not going to tell them no, that they can't look around the house, when they have guns.  So they said we can just quickly go around, and so that's what I did.  I quickly showed them.  As I'm taking them through, they -- it was -- they weren't really -- they just kind of went through, almost like they had already seen it.

Zisser Depo. at 46:19-47:6.  The City Defendants point to other portions of Zisser's testimony in which she states that the officers did not threaten her, were not mean to her, and did not yell at her.  <u>See</u> Zisser Depo. at 47:15-17, 51:17-25.  This testimony does not, however, specifically controvert the asserted fact that Zisser testified that she did not feel that she could deny consent or that the officers had their weapons displayed.  Accordingly, the Court will deem the asserted fact admitted.  <u>See</u> D.N.M.LR-Civ.56.1(b).

[27]The Kerns assert that "[g]enuine disputes exist as to the damage that may have been caused."  MSJ Response ¶ 31, at 5.  The Kerns do not cite to any portion of the record to support their argument.  The local rules require that a response "refer with particularity to those portions of

stated that he thought J. Kerns' acoustic perception of events was, at best, "not solid," and at worst,

"misleading," because law enforcement officers did not "find or see anything" that verified his

statements.   Montoya Depo. at 58:17-25; MSJ Response ¶ 64, at 10 (setting forth this fact).[28]

Montoya also acknowledged that, after searching the Kerns' residence and talking to his fellow

officers, he had not come across any clue that made law enforcement believe that a shot was fired

from the Columbus Circle neighborhood or J. Kerns' home.  See Montoya Depo. at 49:19-50:7; MSJ

Response ¶ 45, at 7 (setting forth this fact).[29]

## PROCEDURAL BACKGROUND

The Kerns filed their First Amended Complaint for Damages Caused by the Deprivation of

Civil Rights and Other Tortious Conduct on November 26, 2007.  See Doc. 5.  The Kerns asserted

_____

the record upon which the non-movant relies."  D.N.M.LR-Civ. 56.1(b).  The Kerns have not cited
any portion of the record, and the Court will therefore deem the fact that there was no damage
admitted.

[28]The City Defendants assert that, "by stating the officers did not 'find or see anything',
Officer Montoya obviously came to this conclusion after officers had already gone to the Kerns
residence."  MSJ Reply ¶ 64, at 6 (emphasis in original).  The City Defendants do not dispute the
asserted fact, that Montoya believed the J. Kerns' statements were misleading or mistaken, and the
Court will deem that fact admitted.  See D.N.M.LR-Civ. 56.1(b).  The Court will, however, modify
that fact to more accurately reflect when Montoya reached that conclusion.

[29]The City Defendants assert:

Officer Montoya's testimony is taken out of context and is misleading.  The portion
of the testimony cited by Plaintiffs reflects that Officer Montoya is discussing what
occurred after the SWAT team left the Columbus Circle area and returned to
Paradise and Golf Course.  Had Plaintiffs included the preceding page of Officer
Montoya's testimony, their Fact No. 45 would not be as misleading.

MSJ Reply ¶ 45, at 4-5 (citing Montoya Depo. at 48:19-49:6).  The City Defendants do not dispute
that Montoya did not come across a clue indicating that the shot had come from Columbus Circle
and the Court will deem that fact admitted.  See D.N.M.LR-Civ. 56.1(b).  The Court will, however,
to more accurately reflect his testimony, indicate that Montoya reached this conclusion after the
search and after talking with the other officers.

fifteen claims, each against some or all of the seventeen named Defendants and against ten unidentified John Does, stemming from the arrest and incarceration of J. Kerns. Since the filing of the Amended Complaint, the Plaintiffs have stipulated to the dismissal of all claims asserted against certain Defendants[30] and have stipulated to the dismissal of some claims against other remaining Defendants.[31]   On October 5, 2009, before the Court decided the City Defendants' MSJ, the remaining Counts and Defendants were: (i) Count I -- illegal entry without a warrant -- asserted

_____

[30]On February 24, 2009, the Kerns dismissed with prejudice all claims asserted against Defendants James Hamsten, Sean Connors, Timothy Hix, and Rhonda Moya. See Stipulation of Dismissal of Defendants James Hamsten, Sean Connors, Timothy Hix, and Rhonda Moya with Prejudice, filed February 24, 2009 (Doc. 121). On March 20, 2009, the Kerns dismissed with prejudice all claims asserted against Montoya and Johnston. See Stipulated Dismissal of Defendants James Montoya and Robert Johnston with Prejudice, filed March 20, 2009 (Doc. 137). The parties agreed to dismiss with prejudice all claims against Defendant Aaron Wright. See Stipulated Order of Dismissal of Aaron Wright with Prejudice, filed July 6, 2009 (Doc. 170). The Kerns also stipulated to dismiss with prejudice of all claims against Defendant Ralph Gonzales. See Notice of Stipulated Dismissal of Defendant Ralph Gonzales, filed July 17, 2009 (Doc. 183).

[31]The Kerns dismissed with prejudice Count XV as against Bernalillo County and White. See Notice of Stipulated Dismissal of Defendant Darren White and of the Board of Commissioners of Bernalillo County Under Count XV, filed August 20, 2009 (Doc. 209). The Kerns dismissed with prejudice the claims against the City of Albuquerque asserted in Counts VII, VIII, IX, X, XI, XII, XIII, XIV, and XV. See Notice of Stipulated Dismissal of City of Albuquerque, filed August 20, 2009 (Doc. 210). The Kerns dismissed the claims against Defendant Mike Haag asserted in Counts VIII, IX, X, XI, XII, XIII, XIV, and XV of the First Amended Complaint. See Notice of Stipulated Dismissal of Mike Haag, filed August 20, 2009 (Doc. 211). The Kerns dismissed with prejudice Count XII of the First Amended Complaint asserted against Defendants Bernalillo County, Brian Lindley, and Larry Koren. See Notice of Stipulated Dismissal of Bernalillo County, Brian Lindley, and Larry Koren Under Count II, filed September 4, 2009 (Doc. 229). The Kerns dismissed with prejudice Count XIII of the First Amended Complaint asserted against Bernalillo County, Lindley, Bader, Thompson, and Carter. See Notice of Stipulated Dismissal of Bernalillo County, Brian Lindley, Drew Bader, Matt Thompson, and Russell Carter, filed September 4, 2009 (Doc. 230). The Kerns dismissed with prejudice Count XIV of the First Amended Complaint asserted against Bernalillo County, Lindley, and Koren. See Notice of Stipulated Dismissal of Bernalillo County, Brian Lindley, and Larry Koren, filed September 4, 2009 (Doc. 231). The Plaintiffs also dismissed with prejudice Bernalillo County and White as to Count VI of the First Amended Complaint, with the exception of liability concerning Count III. See Stipulated Dismissal of Defendants Bernalillo County Board of Commissioners as to Count VI, with Prejudice, with the Exception of Municipal Liability as it Related to Count III, filed July 14, 2009 (Doc. 176).

against Bader, Carter, and Thompson; (ii) Count II -- unlawful search and seizure -- asserted against Lindley; (iii) Count III -- unlawful search and seizure of medical information and deprivation of medical privacy contrary to the Fourth Amendment, the Fourteenth Amendment, and the Federal Privacy Act, 5 U.S.C. § 552A(b)(7) --  asserted against Defendant Darren White; (iv) Count IV -- false arrest/false imprisonment of J. Kerns under the Fourth Amendment -- asserted against Defendants Brian Lindley, Lawrence Koren, and Mike Haag; (v) Count V -- malicious prosecution under the Fourth Amendment -- asserted against Lindley, Koren, and Haag; (vi) Count VI -- municipal liability against the Board of Commissioners of Bernalillo County for the violations White was alleged to have committed in Count III; (vii) Count VIII -- false detention/arrest/imprisonment of J. Kerns under the New Mexico Tort Claims Act, N.M.S.A. 1978, §§ 41-4-1 to -30 ("NMTCA") -- asserted against Lindley, Koren, and the County; (viii) Count IX -- malicious abuse of process under the NMTCA -- asserted against Lindley, Koren, and Bernalillo County; (ix) Count X -- deprivation of property rights and trespass under the NMTCA -- asserted against Lindley, Bader, Thompson, Carter, and Bernalillo County; and (x) Count XI -- deprivation of property rights and conversion under the NMTCA -- asserted against Lindley and Bernalillo County.

### 1.   **Bader, Thompson, and Carter's MSJ.**

On February 17, 2009, Bader, Thompson, and Carter moved for summary judgment on the basis of qualified immunity on Counts I, X, and XIII.  See Doc. 117.  The City Defendants argued that the Kerns cannot show a clearly established constitutional violation from the City Defendants' entry into their residence.  See MSJ at 9.  They noted that the Fourth Amendment does not mandate that police officers possess a warrant before entering a home.  See MSJ at 9 (citing United States v. Najar, 451 F.3d 710, 714 (10th Cir. 2006)).  The City Defendants asserted that they went to 9910

Columbus Circle "to search for a possible shooting suspect and/or evidence that a shooting occurred in the vicinity of the Kerns' residence." MSJ at 9-10.  They contended that the scene that confronted them at the residence was unusual, because "[t]hey saw an open garage door, approximately five vehicles parked at this residence, furniture and other miscellaneous items out in the yard all the while they heard loud music coming from this residence." MSJ at 10.  They further asserted that the officers knocked and announced their presence, viewed a broken window, and discussed the possibility of a burglary at the residence.  See MSJ at 10.  They emphasized that these circumstances arose around midnight at the same residence where J. Kerns heard a sound consistent with rifle fire. See MSJ at 10.  The City Defendants argued that exigency justified their entry, because the officers were concerned that someone was in need of assistance "given the scene they observed." MSJ at 11.  They contended that "the business of policemen and firemen is to act, not to speculate or meditate on whether the report is correct." MSJ at 11-12 (citing United States v. Najar, 451 F.3d at 714).  They asserted that, once they entered the home, Zisser gave them permission to look around and escorted them around the house.  See MSJ at 12.  The City Defendants also argued that they have not waived immunity under the NMTCA and that the Court should dismiss the state claims against them.  See MSJ at 12-13.

On May 1, 2009, the Kerns filed their MSJ Response.  See Doc. 156.  The Kerns argued that the boundaries of the exigent-circumstances exception to the Fourth Amendment were clearly established on August 6, 2009.  See MSJ Response at 11.  They asserted that the City Defendants "can seek no safe harbor in any exigent circumstances exception to the Fourth Amendment, as they can point to no objective facts that would lead a reasonable police officer to have concluded that somebody inside the Kerns' home was in need of immediate assistance." MSJ Response at 11. They contended that "the exception has never been applied to the search of a home where the

officers could not identify a specific threat known to have originated from or that had a direct tie to

the dwelling that was searched." MSJ Response at 12. The Kerns pointed to the United States Court

of Appeals for the Tenth Circuit's decision in United States v. Bute, 43 F.3d 531 (10th Cir. 1994),

in which the Tenth Circuit found that a police officer violated the Fourth Amendment when he

entered a commercial building after observing an open garage door and suspecting a burglary.

See MSJ Response at 12-13. They argued that, in that case, "the mere possibility that a burglary or

vandalism may have been committed did not reasonably justify the officer's search in a commercial

building." MSJ Response at 13. The Kerns also pointed to United States v. Davis, 290 F.3d 1239,

1242 (10th Cir. 2002), and argued that it demonstrates that, "when the police enter a home based on

the belief that a threat to safety exists, the police must be able to . . . point to specific facts detailing

a known threat." MSJ Response at 13.

The Kerns argued that the Court's assessment of reasonableness turns on "whether the record

provides a clear showing of an immediate need to protect the safety of others." MSJ Response at

14. They contended that the officers "attach a great deal of intrigue to their claim that . . . the music

stopped," even though Johnston stated that the music remained on and that the officers "cast the

most sinister interpretation possible about a single pane of a two pane window being broken." MSJ

Response at 16. The Kerns asserted that a reasonable officer would have confirmed that the broken

glass was the result of a bullet before entering the home. See MSJ Response at 17. They further

asserted that, although the officers focus on the fact that no one came to the door, "for all they knew,

nobody was home to answer the door." MSJ Response at 17. The Kerns pointed out that a prudent

officer would not have entered the home without obtaining information regarding the occupants of

the home from J. Kerns. See MSJ Response at 17. They emphasized that the record indicates that

the police teams' search of the area had already yielded "the conclusion that there existed no

evidence indicating that a shooter was in the area." MSJ Response at 18. The Kerns asserted that the best evidence that the City Defendants did not enter the home to check for an injured person is the concession that the officers did not go to A. and M. Kerns' bedroom to check on their welfare. See MSJ Response at 18. They argued that the officers considered the Kerns' home to be a crime scene and that the officers entered the home to investigate the helicopter shooting. See MSJ Response at 19. The Kerns also contended they have pled valid claims against the City Defendants under state law. See MSJ Response at 19-22

On June 18, 2009, the City Defendants filed the MSJ Reply. See Doc. 161. The City Defendants emphasized that the Tenth Circuit established the exigent circumstances test in United States v. Najar and that it requires: (i) that the officers had reasonable grounds to believe that there is an immediate need to protect the lives or safety of themselves or others; and (ii) the manner and scope of the search is reasonable. See MSJ Reply at 7. They pointed out that the Kerns failed to cite any authority for the proposition that the officers must identify a specific threat directly tied to the dwelling that was searched. See MSJ Reply at 7. They argued that such a holding would unduly restrict law enforcement and contradict United States v. Najar. See MSJ Reply at 8. The City Defendants contended that there was no known threat in United States v. Najar and that they have set forth facts which establish their objectively reasonable belief that someone inside 9910 Columbus Circle could have been injured or in harms way. See MSJ Reply at 8. They asserted that undisputed facts demonstrate that a prudent officer would be reasonable in believing "that the shooter was in or that the shooting took place in the area of the Kerns' residence." MSJ Reply at 9. They emphasized that the officer "observed unusual activity at the home given the circumstances of the evening." MSJ Reply at 9. They pointed out that the Kerns do not contest that music was playing at the home and that the back window was broken, and that the Kerns argue that the lights

were on, indicating that someone was home.  See MSJ Reply at 10.  The City Defendants argued

that a reasonable belief does not require an absolute certainty and that it "is well settled that officers

can reasonably search for victims upon reports of gun fire."  MSJ Reply at 10 (citing United States

v. Gambino-Zavala, 539 F.3d 1221, 1226 (10th Cir. 2008); United States v. Najar, 451 F.3d at 718).

### 2.      The Court's October 5, 2009 Opinion.

On October 5, 2009, the Court filed its Memorandum Opinion and Order deciding the MSJ.

See Doc. 246 ("Oct. 5, 2009 MOO").  The Court held that there were genuine issues of material fact

"whether exigent circumstances exist to make the warrantless entry into Plaintiffs[] Jason Kerns,

Archie Kerns, and Mary Ann Kerns' home lawful," and found that "Bader, Thompson, and Carter

are not entitled to qualified immunity."  Oct. 5, 2009 MOO at 2.  In its legal section the Court recited

the following with respect to qualified immunity:

> Qualified immunity recognizes the "need to protect officials who are required
> to exercise their discretion and the related public interest in encouraging the vigorous
> exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).
> Qualified immunity "protects federal and state officials from liability for
> discretionary functions, and from 'the unwarranted demands customarily imposed
> upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque,
> No. Civ. 08-0181, 2009 U.S. Dist. LEXIS 45670, at *29 (D.N.M. Apr. 28,
> 2009)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). Issues of qualified
> immunity are best resolved at the "earliest possible stage in litigation."  Pearson v.
> Callahan, 129 S.Ct. 808, 815 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227
> (1991)).
>
> Qualified immunity shields government officials from liability where "their
> conduct does not violate clearly established statutory or constitutional rights of
> which a reasonable person would have known."  Pearson v. Callahan, 129 S.Ct. at
> 815 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  The United States Court of
> Appeals for the Tenth Circuit has stated:
>
>> When a defendant asserts qualified immunity at summary judgment,
>> the responsibility shifts to the plaintiff to meet a "heavy two-part
>> burden," [Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001)]
>> (internal quotation marks omitted), demonstrating, first, that the
>> defendant's actions violated a constitutional or statutory right and,

second, that the right at issue was clearly established at the time of the defendant's allegedly unlawful conduct.  In assessing whether the right was clearly established, we ask whether the right was sufficiently clear that a reasonable government officer in the defendant's shows would understand that what he or she did violated that right.  If the plaintiff fails to satisfy either part of the two-part inquiry, we must grant the defendant qualified immunity.

Casey v. W. Law Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).

A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned."  Zweibon v. Mitchell, 720 F.2d 162, 172-173 (D.C. Cir. 1983), cert. denied, 469 U.S. 880 (1984).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Strepka v. Miller, 28 Fed. Appx. 823, 830 (10th Cir. 2001)(citing Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).  See Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether the 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

As the Supreme Court of the United States has observed, it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. at 640.  However, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Id. at 635.

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court required that the courts decide whether the defendant's actions violated a constitutional right before determining whether the right was clearly established at the time of the defendant's allegedly unlawful conduct.  See id. at 201.  In Pearson v. Callahan, the Supreme Court revisited the proper procedure for lower courts to evaluate a qualified-immunity defense, holding that, "while the sequence set forth [in Saucier v. Katz,] is often appropriate, it should no longer be regarded as mandatory."  129 S.Ct. at 818.  Rather, lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  Id.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz would often be beneficial.  See Pearson v. Callahan, 129 S.Ct. at 819.

-28-

Oct. 5, 2009 MOO at 9-10 (alterations in original).  In its legal section on the Fourth Amendment,

the Court stated:

> The Fourth Amendment states:
>
> > The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
>
> U.S. Const. [a]mend. IV. The Fourth Amendment generally requires a warrant for there to be a valid search and seizure. For the warrantless search to be valid and legal, the search must fall within a recognized exception to the Fourth Amendment's warrant requirement.  See United States v. Aquino, 836 F.3d 1268, 1271 n.3 (1988)(stating "[p]olice violate the Fourth Amendment when they engage in a warrantless search and no exception to the warrant requirement applies.")(citation omitted).
>
> "Searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980).  The Supreme Court of the United States has previously stated that the home is entitled to the greatest Fourth-Amendment protection.  See Kyllo v. United States, 533 U.S. 27, 31 (2001)("At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion. With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no."); Payton v. New York, 445 U.S. at 585 (stating that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."). The Fourth Amendment does not prevent a government search of one's home in the absence of a warrant, but it protects against unreasonable searches.  See United States v. Najar, 451 F.3d 710, 713-14 (10th Cir. 2006)(citing Illinois v. Rodriguez, 497 U.S. 177, 183 (1990)).
>
> To enter a home, "police officers need either a warrant or probable cause plus exigent circumstances, in order to make lawful entry into a home."  Kirk v. Louisiana, 536 U.S. 635, 638 (2002).  The government bears the burden of proving the exigency exception to the warrant requirement applies.  See United States v. Najar, 451 F.3d at 717 (citing United States v. Wicks, 995 F.2d 964, 970 (10th Cir. 1993)).  "That burden is especially heavy when the exception must justify the warrantless entry of a home." United States v. Najar, 451 F.3d at 717 (citing United States v. Anderson, 981 F.2d 1560, 1567 (10th Cir. 1992)).
>
> In Mincey v. Arizona, 437 U.S. 385 (1978), the Supreme Court instructed: "[T]he Fourth Amendment does not bar police officers from making warrantless

entries and searches when they reasonably believe that a person within is in need of immediate aid." Mincey v. Arizona, 437 U.S. at 392. The United States Court of Appeals for the Tenth Circuit, in United States v. Najar, set forth a two-part test for determining whether there are exigent circumstances present: "[O]ur test is now two-fold, whether (1) the officers have an objectively reasonable basis to believe that there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable (a modification of our former third prong)." 451 F.3d at 718. In the limited circumstances where the risk of danger to the officers or others gives rise to the exigent circumstance, the court does not require a separate showing of probable cause. See id.

Oct. 5, 2009 MOO at 11-12.

The Court found that, "because Bader, Thompson, and Carter have not met the burden of showing that there were exigent circumstances present when the[y] entered the Kerns' home, there is a factual issue whether they violated the Kerns' Fourth Amendment right to be free from unlawful searches." Oct. 5, 2009 MOO at 13. In its analysis, the Court noted that the "Kerns have a Fourth Amendment expectation of privacy in their own home that is well-established," and that the City Defendants bear the burden of proving that an exigency existed. See Oct. 5, 2009 MOO at 13 (citing Payton v. New York, 445 U.S. at 585). The Court held that the City Defendants had not established, as a matter of law, that "the observations that Bader, Thompson, and Carter made would lead a reasonable officer to the conclusion that there was an immediate need to protect the lives or safety of themselves or others." Oct. 5, 2009 MOO at 14. The Court found that, in previous cases, the Tenth Circuit had found exigent circumstances were not present "when a possible threat was based on no more than speculation." Oct. 5, 2009 MOO at 14 (citing United States v. Bute, 43 F.3d at 539). The Court stated:

> [A] reasonable fact finder could find that Bader, Thompson, and Carter acted on little more than speculation. In the canvassing of the neighborhood, Bader, Thompson, and Carter, and the other police officers dispatched to the area, had some information that might lead them to believe that the offender was in the area. After they arrived, however, their initial investigation did not produce much information that supported the lead from J. Kerns. The citizens in the neighboring homes with whom the

-30-

officers spoke did not hear a gunshot, nor did they realize that a helicopter had crashed nearby. They did not discover a gun, shell casings, or signs of a shoot. A reasonable fact finder might also conclude that the presence of music playing from the Kerns' home, miscellaneous items in the yard, and a possible open garage door, did not suggest danger. A reasonable fact finder might not find these circumstances to be particularly suggestive, given that Bader, Thompson, and Carter knew that the residence belonged to one of the witnesses back at the golf course, with whom Johnston was in contact via the police radio. A reasonable fact finder might conclude that these circumstances could be more readily and reasonably explained as attributable to a person who had left his home in a hurry after witnessing a helicopter crash. Bader, Thompson, and Carter contend that they grew concerned when the music coming from J. Kerns' home stopped playing and that this factored into the decision to enter. Johnston contends, however, that the music was playing continuously. See Johnston Depo. 31:20-24, at 3. Given the discrepancy in the facts, a reasonable fact finder might find that the music turning off is not a persuasive factor in the determination that persons inside J. Kerns' home were in danger. The Court finds that a reasonable fact finder might conclude that it was conjecture for Bader, Thompson, and Carter to make the leap that these were sign of an intruder into the Kerns' home.

Oct. 5, 2009 MOO at 14-15. The Court lent weight to the Kerns' argument that, "if there was concern for the safety of people possibly inside the Kerns' home, Bader, Thompson, and Carter could have learned if there were people in the Kerns' home directly from J. Kerns, with whom Johnston was in radio contact," and noted that the officers' actions once inside the home undercut their explanation for preceding without a warrant or consent. Oct. 5, 2009 MOO at 16. The Court concluded:

> The evidence that the Kerns have presented and Bader, Thompson, and Carter['s] inability to adequately demonstrate, as a matter of law, the first-prong of the exigent-circumstances test, leads the Court to find that there is sufficient evidence to deny Bader, Thompson, and Carter's motion for summary judgment. The Court, therefore, will not grant Bader, Thompson, and Carter qualified immunity on the Kerns' first claim.

Oct. 5, 2009 MOO at 16. With respect to the state law claims, the Court held that there is evidence that Bader, Thompson, and Carter "entered the Kern's home without a warrant and without an exception to the warrant requirement, and, in doing so, they may not say they have immunity from

tort liability." Oct. 5, 2009 MOO at 18.

### 3.   April 12, 2010 Opinion.

On March 31, 2010, the Court denied: (i) Defendant Mike Haag's motion for summary judgment; (ii) Defendants Board of County Commissioners of Bernalillo County, White, Lindley, Ralph Gonzales, and Koren's motion for summary judgment on the basis of qualified immunity; and (iii) the Kerns' motion for summary judgment as to Counts II, IV, and V of the First Amended Complaint. See Order at 4, filed March 31, 2010 (Doc. 264)("March 31, 2010 Order"). The Court also granted the Kerns' motion for summary judgment as to Counts III and IV of the First Amended Complaint. See March 31, 2010 Order at 4.

On April 12, 2010, the Court issued its Memorandum Opinion more fully explaining the reasons behind its March 31, 2010 Order. See Memorandum Opinion, filed April 12, 2010 (Doc. 265)("April 12, 2010 MO"). The Court first decided that Lindley was entitled to qualified immunity as to Count II -- unlawful search and seizure and deprivation of property without due process of law -- because his search warrant affidavit established probable cause and because Lindley did not knowingly or recklessly include false statements in the affidavit. See April 12, 2010 MO at 96. The Court next determined that the Kerns were entitled to summary judgment: (i) Count III -- unlawful search and seizure of medical information and deprivation of medical privacy contrary to the Fourth Amendment, the Fourteenth Amendment, and the Federal Privacy Act, 5 U.S.C. § 552A(b)(7) -- asserted against White; and (ii) Count IV -- false arrest/false imprisonment of J. Kerns under the Fourth Amendment -- asserted against Lindley, Koren, and Haag. See April 12, 2010 MO at 97. The Court found that White's request for J. Kerns' medical files violated J. Kerns' right to privacy, because J. Kerns had a legitimate expectation of privacy in his medical records and because White could have achieved his objectives in a less obtrusive manner. See April 12, 2010 MO at 98-107.

The Court held that the right to privacy in medical records was clearly established, because the weight of authority established such a right and because a Tenth Circuit case closely on point, Lankford v. City of Hobart, 27 F.3d 477 (10th Cir. 1994), gave "White notice that requesting private medical records violates the patient's right of privacy."  April 12, 2010 MO at 107-09.  It found that White violated J. Kerns' right to be free from an unlawful search and seizure when White requested J. Kerns' medical records from the veteran's hospital.  See April 12, 2010 MO at 113.  The Court then held that there "is established precedent in the Tenth Circuit that an officer using his authority to procure medical records without the consent of the patient is a violation of a constitutional privacy right" and that the clearly established prong did not need to be "construed so narrowly as to foreclose liability on one ground and not another, simply because there is not case law on point for one of the constitutional grounds of the violation."  April 12, 2010 MO at 115.  The Court found that Lindley and Koren were not entitled to qualified immunity on Count IV, for false arrest and false imprisonment, because there were genuine issues of material fact regarding their intent.  See April 12, 2010 MO at 132-34.  The Court found that those same issues of material fact precluded summary judgment on Count V, J. Kerns' malicious prosecution claim against Lindley, Koren, and Haag.  See April 12, 2010 MO at 135.  With respect to Haag, the Court held that whether his ballistics analysis constituted reckless indifference was a question of fact for a jury.  See April 12, 2010 MO at 135-44.

### 4.     Appeal to the Tenth Circuit, and the Tenth Circuit's Opinion and Holding.

On October 29, 2009, Bader, Carter, Thompson filed their Notice of Appeal.  See Doc. 248. On January 19, 2012, the Tenth Circuit reversed the Court's decision with respect to its denial of qualified immunity, and remanded the case for further proceedings "in accordance with the opinion of this court."  Tenth Circuit Judgment at 4.  The Oct. 5, 2009 MOO was vacated.  See Tenth Circuit

Judgment at 4.  With respect to White, Lindley, Koren, and Haag, the Tenth Circuit directed the Court to grant dismissal to those defendants on the basis of qualified immunity.  See Tenth Circuit Judgment at 4-5.

In its opinion, issued December 20, 2011, the Tenth Circuit stated it would address the following questions: (i) "Do we have to decide a qualified immunity appeal involving close questions of law that the district court hasn't yet addressed?"; (ii) "Do the police violate a suspect's clearly established rights by requesting his hospital records?"; and (iii) "[D]o authorities have probable cause to arrest a trained marksman who makes suspicious statements in the wake of a shooting, who leads officers on a high speed chase, and who has a recently concealed rifle shell casing lying at the bottom of his trash can?"  Kerns v. Bader, 663 F.3d 1173, 1177 (10th Cir. 2011). The Tenth Circuit answered "no to the first two questions and yes to the last."  Kerns v. Bader, 663 F.3d at 1177.

The Tenth Circuit began its analysis with Bader, Thompson, and Carter.  The Tenth Circuit noted the "heavy burden" a plaintiff bears to overcome the presumption of qualified immunity and that the Supreme Court of the United States had recently suggested that federal courts should "think hard, and then think hard again, before turning small cases into large ones."  Kerns v. Bader, 663 F.3d at 1180-81.  It held that, despite both aspects being "in play" before the Court, "the district court did not analyze the clearly established law element" and that the Court "held only that the defendants had actually violated Mr. Kerns's Fourth Amendment rights."  Kerns v. Bader, 663 F.3d at 1181 (emphasis in original).  It found that the Oct. 5, 2009 MOO "addressed only the first part of the two part test for qualified immunity."  Kerns v. Bader, 663 F.3d at 1181 (emphasis in original).  The Tenth Circuit asserted that, if it were that there were no constitutional violation then the Tenth Circuit could "simply reverse," but that "the answer to that question isn't so clear in this

case." Kerns v. Bader, 663 F.3d at 1181.  Instead, the Tenth Circuit remanded the case as "the issue is close and the briefing on appeal less than entirely satisfactory," emphasizing that many considerations counseling "in favor of proceeding directly to the second qualified immunity element . . . also counsel in favor of remanding to ensure the district court addresses the second element before we begin to tangle with a case on appeal." Kerns v. Bader, 663 F.3d at 1182.  With respect to the dissent's analysis of the qualified immunity question, the Tenth Circuit stated that the dissent relies on "a single sentence in the district court's self-described 'analysis' section," which "[b]y its own terms doesn't purport to issue any holding on the second qualified immunity question." Kerns v. Bader, 663 F.3d at 1182.  The Tenth Circuit emphasized that the Supreme Court has instructed courts "not to define clearly established law at a high level of generality" and that "[t]he general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Kerns v. Bader, 663 F.3d at 1183 (citing Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2084 (2011)).  It asserted that a court must ask whether "'every reasonable official would have understood that what he [did] violate[d] that right.'" Kerns v. Bader, 663 F.3d at 1183 (alterations in original)(emphasis in original)(quoting Ashcroft v. al-Kidd, 131 S.Ct. at 2083).  It stated that the "relevant question the district court needed to address . . . was . . . whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification," and that to address the question the Court "needed to address the officers' claim that exigent circumstances existed (based on a belief that someone who had just shot down a helicopter might be hiding in or near the home) and their claim that their intrusion was justified in part because of the consent Ms. Zisser supplied." Kerns v. Bader, 663 F.3d at 1183.

The Honorable William J. Holloway, Jr., Senior United States Circuit Judge for the Tenth

Circuit, wrote in dissent.  Senior Judge Holloway stated that he "would affirm the district court's denial of the Officers' motion for summary judgment sought on grounds of qualified immunity." Kerns v. Bader, 663 F.3d at 1191 (Holloway, J., dissenting).  He commented that the Defendants "contend that the district court erred in its application of the legal standards enunciated in United States v. Najar, 451 F.3d 710 (10th Cir. 2006)," but that "their argument rests on rejection of the district court's holding that the jury must decide questions of fact pertaining to whether a reasonable officer would have perceived an immediate need to protect himself or others under the circumstances."  Kerns v. Bader, 663 F.3d at 1191.  He asserted that, on the facts as the Tenth Circuit must take them,

> the answer to the first question surely is easy: An entry into the home is unlawful when there is neither a warrant nor probable cause and when the purported exigency is not one that would cause a reasonable to believe that someone inside the home was either an imminent threat to others or was herself in imminent danger.

Kerns v. Bader, 663 F.3d at 1191.  Senior Judge Holloway disagreed with the majority's finding that the Court did not address the second prong of the qualified-immunity analysis.  See Kerns v. Bader, 663 F.3d at 1191.  He noted that the Defendants "made only a conclusory assertion that the Plaintiffs had not shown the violation of a clearly established right" and that the "district judge prefaced his analysis with a thorough discussion of the applicable law."  Kerns v. Bader, 663 F.3d at 1192.  He stated:

> The district court merely held that, depending on what facts are found by the jury, the Officers may have entered the Plaintiffs' home when no reasonable officer would have perceived any imminent danger to anyone.  Such an entry would violate the clearly established law that the district judge had surveyed.

Kerns v. Bader, 663 F.3d at 1192.  He emphasized that "general statements of the law are not inherently incapable of giving fair and clear warning."  Kerns v. Bader, 663 F.3d at 1192 (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)).  Senior Judge Holloway stated:

-36-

> The question is not a difficult one in my view, and so I disagree with the majority's decision to remand the matter to the district court to rule again on this strictly legal question.   The Officers had neither a warrant nor probable cause.   If the circumstances they encountered did not support a reasonable belief that danger to someone was imminent, then the armed, nighttime entry into the home violated clearly established Fourth Amendment law.

Kerns v. Bader, 663 F.3d at 1192.

Senior Judge Holloway also found the majority's instruction that the Court must consider the Defendants' "claim that their intrusion was justified in part because of the consent Ms. Zisser supplied" surprising, because the Defendants did not make that argument on appeal.   Kerns v. Bader, 663 F.3d at 1193.   He stated:

> More importantly, the majority's instruction to the district court that it should consider this is very problematic because the issue appears to be one that the district court must resolve against the Officers.   Ms. Zisser testified that she was unaware of the Officers until they had already crossed the threshold.   Obviously being unaware of their entry, she did not consent to it.   Encountering armed officers inside the home in the middle of the night, Ms. Zisser did not tell them to leave immediately. . . . Barring a concession by the Plaintiffs that Ms. Zisser's consent was voluntarily given, which seems most unlikely giver her testimony, I believe that . . . the district court must regard the Officers' continued presence in the home as being without consent.

Kerns v. Bader, 663 F.3d at 1193.

With respect to White, the majority analyzed the clearly established prong of the qualified immunity analysis and gave the Court some insight into how the Tenth Circuit applies that test.   The Tenth Circuit recognized that, in Douglas v. Dobbs, 419 F.3d 1097 (10th Cir. 2005), it "accepted that a patient has a privacy interest in medical records held by a third party medical services provider," but pointed out that it had explained that "statutes requiring disclosure of those records to 'law enforcement' may not always violate the Fourth Amendment."   Kerns v. Bader, 663 F.3d at 1184 (majority opinion).   It emphasized that it had noted that the "question whether, in the absence of a statute, 'a warrant is required for [law enforcement] to conduct an investigatory search

-37-

of [medical] records [held by a third party] . . . is an issue that has not been settled.'" Kerns v. Bader, 663 F.3d at 1184 (alterations in original). The Tenth Circuit noted J. Kerns' reliance on Ferguson v. City of Charleston, 532 U.S. 67 (2001), but noted that "in that case the Supreme Court expressly declined to answer the question posed in this one." Kerns v. Bader, 663 F.3d at 1184. It held that, "[a]ccording to the terms of Ferguson itself, then, it hardly placed the Fourth Amendment question before us beyond debate." Kerns v. Bader, 663 F.3d at 1185. Discussing J. Kerns' and the dissent's reliance on Lankford v. City of Hobart, the Tenth Circuit noted that it noted only a "possible" Fourth Amendment violation in "somewhat similar circumstances" and that, "[a]t best, Lankford's equivocation declined to foreclose the possibility of a Fourth Amendment violation." Kerns v. Bader, 663 F.3d at 1185 n.2 (emphasis in original). With respect to the Fourteenth Amendment, the Tenth Circuit noted that, "[c]onfirming the lack of a clear answer here, most of the cases Mr. Kerns cites involve state actors who publicly disclosed a citizen's private information, not law enforcement officers who requested the voluntary production of records held by a third party for use in legitimate law enforcement efforts." Kerns v. Bader, 663 F.3d at 1186 (emphasis in original). The Tenth Circuit found that there was a meaningful difference between those situations. See Kerns v. Bader, 663 F.3d at 1186. It stated: "If we could be sure that the distinction between public disclosure of government access without a valid purpose, on the one hand, and more limited government access for otherwise legitimate purposes, on the other, is a trivial one we would rule in Mr. Kerns's favor." Kerns v. Bader, 663 F.3d at 1186-87. It asserted that the Supreme Court's cases and "the logic of our own cases preclude such a conclusion and acknowledge instead that such a distinction might make a constitutional difference" such that J. Kerns had "failed to identify clearly established law rendering beyond debate that the Sheriff's conduct was unlawful as of 2005."

-38-

Kerns v. Bader, 663 F.3d at 1187 (emphasis in original).[32]

### 5.    Briefing on Remand.

On January 26, 2012, the Court issued a Minute Order requesting that the parties outline their suggested procedures for how the Court should proceed in this matter.  See Doc. 287.  On February 6, 2012, the City Defendants wrote the Court, and suggested that the Court should address "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  Letter from Stephanie Griffin to the Court at 2 (dated February 6, 2012), filed February 6, 2012 (Doc. 288)("Feb. 6, 2012 Griffin Letter").  The City Defendants asserted that the Court needs to address; (i) the officers' claim that exigent circumstances existed; and (ii) their claim that their intrusion was justified because Zisser provided consent.  See Feb. 6, 2012 Griffin Letter at 2.  The Kerns also wrote the Court and suggested "that the most efficient way to resolve the outstanding factual and legal issues is for the District Court to grant the Kerns leave to file an additional brief that will address the Circuit Court's concerns."  Letter from Mark Lowry to the Court at 2 (dated February 6, 2012), filed February 6, 2012 (Doc. 289)("Feb. 6, 2012 Lowry Letter").  They asserted that, once additional briefing was completed, the Court would be in a position to rule on the matters which the Tenth Circuit remanded to it.  See Feb. 6, 2012 Lowry Letter at 2.  The City Defendants suggested that the parties simultaneously submit supplemental briefs of no more than ten pages.  See Letter from Stephanie Griffin to the Court at 2 (dated February 7, 2012), filed February 7, 2012 (Doc. 293).  The Court then requested that the City Defendants file a supplemental brief, after which the Kerns

---

[32]In a footnote, the Tenth Circuit stated that it preferred constitutional rights can be decided in future cases in which there is no qualified immunity question.  The Tenth Circuit held: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  Kerns v. Bader, 663 F.3d at 1187 n.5.

could respond, and the City Defendants reply.  See Minute Order, filed February 17, 2012 (Doc. 291).

On March 5, 2012, the City Defendants filed the City Defendants Drew Bader, Matthew Thompson, and Russell Carter's Supplemental Brief to Their Motion for Summary Judgment and Memorandum in Support Thereof [Doc. 117], Requesting Dismissal of Counts I, X, and XII of Plaintiffs' First Amended Complaint [Doc. 5].  See Doc. 295 ("Defendants' Supplement").  The City Defendants emphasize that qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Defendants' Supplement at 2 (citing Ashcroft v. al-Kidd, 131 S.Ct. at 2085).  They argue that the Supreme Court has provided:

> The operation of the qualified immunity standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified.  For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates clearly established right.  Much the same could be said of any other constitutional or statutory violation.  But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of Harlow. . . . It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

Defendants' Supplement at 2-3 (quoting Anderson v. Creighton, 483 U.S. 635, 639-40 (1987)). Applying these standards, the City Defendants argue that, "even if one were to presume a constitutional violation on the part of City Defendants, City Defendants would not have been on notice that their conduct was unlawful," because "it is well settled in federal jurisdictions throughout the country that officers can reasonably search for victims upon reports of gunfire."  Defendants' Supplement at 3.  They further assert that it is well-settled that "[o]fficers do not need ironclad proof

of 'a likely serious, life-threatening' injury to invoke the emergency aid exception."  Defendants'

Supplement at 4 (citing <u>Michigan v. Fisher</u>, 130 S.Ct. 546, 549 (2009)).  They point out that the

"Plaintiffs have not cited any case in their response brief which holds that officers faced with the

same or similar circumstances should have ignored the unusual scene at the Kerns' residence and

presumed that no one was in harm's way."  Defendants' Supplement at 4.

    The City Defendants contend that the officers had "every indication that someone was

present inside the Kerns' residence when they were there looking for the shooting suspect."

Defendants' Supplement at 4.  They admit that, when considering the circumstances the officers

confronted in isolation, the facts may appear innocent, but argue that, "when viewing this

information objectively and in totality, there is cause for concern."  Defendants' Supplement at 5

(citing <u>Ryburn v. Huff</u>, 132 S.Ct. 987, 990 (2012)(per curiam)).  They assert that there must be some

authority which existed on August 6, 2005, which would have made it readily apparent that an

officer would act objectively reasonable if that officer ignored the unusual scene and that "[t]here

is no such authority, because viewing the totality of the circumstances in the present controversy

caused City Defendants reasonably, yet mistakenly, to conclude that the unresponsiveness to their

knock and announcements mean that persons inside the residence could have been injured."

Defendants' Supplement at 5.

    On March 24, 2012, the Kerns filed the Plaintiffs' Response to Drew Bader, Matthew

Thompson, and Russell Carter's Supplemental Brief to Their Motion for Summary Judgment

Requesting Dismissal of Counts I, X, and XIII of Plaintiffs' First Amended Complaint.  <u>See</u> Doc.

297 ("Supplement Response").  The Kerns first argue that Zisser's consent to search the residence

was involuntary and failed to justify the City Defendants' illegal entry into the Kerns' home.  <u>See</u>

Supplement Response at 2.  They assert that, even if the Court finds that Zisser's consent was

voluntary, her permission was "unconstitutionally tainted by the City Defendants' unlawful, armed

entry into the house."  Supplement Response at 2.  They contend:

> It has been clearly established law for decades that when "a consensual search is preceded by a Fourth Amendment violation, the government must prove not only (1) the voluntariness of the consent under the totality of the circumstances, but the government must also establish (2) a break in the causal connection between the illegality and the evidence thereby obtained."

Supplement Response at 3 (citing United States v. Carter, 360 F.3d 1235, 1243 (10th Cir. 2004)).

They argue that Zisser's consent was involuntary and point to United States v. Medlin, 842 F.32d

1194, in which the Tenth Circuit held that "it seems reasonable that Medlin would have believed

when faced by federal and state officers with guns drawn that he had no right to resist" a search.

Supplement Response at 4.  The Kerns further assert that, even if the consent was voluntary, it was

immediate consequence of an unconstitutional entry.  See Supplement Response at 4.

The Kerns next argue that the law regarding exigent circumstances was clearly established

at the appropriate level of generality when the City Defendants searched the Kerns' home.  See

Supplement Response at 5.  They assert that the City Defendants "agree that the proper level of

generality to analyze the exigent circumstances exception to the warrant requirement for the Fourth

Amendment in this case is that of law enforcement officers reasonably searching for victims when

gunshots are reported."  Supplement Response at 5.  They contend that the City Defendants "fail to

grasp the fact that in each one of the cases cited by them there existed an objectively real and

substantial nexus between the actual location of the shots that were fired and the dwelling that was

searched."  Supplement Response at 5.  They argue that there were no reliable reports of gunshots

in the area and that the officers knew that J. Kerns had left the home after the helicopter was shot

down.  See Supplement Response at 6.  The Kerns assert that there was no nexus between the

emergency the City Defendants allege existed and the Kerns' home.  See Supplement Response at

6.  They emphasize that the cases to which the City Defendants cite all underscore the point that, in a shots-fired case, exigent circumstances are constitutional only if the police have information confirming that the gunshots are intimately associated with the precise residence being searched. See Supplement Response at 7.  They assert that, in Mincey v. Arizona, 437 U.S. 385 (1978), the Supreme Court declined to hold that "the seriousness of the offense under investigation itself creates exigent circumstances of the kind that under the Fourth Amendment justify a warrantless search." Supplement Response at 8.  The Kerns argue that, in United States v. Davis, 290 F.3d 1239 (10th Cir. 2002), the Tenth Circuit recognized that "there must be some reasonable basis approaching probable cause, to associate an emergency with the area or place to be searched."  Supplement Response at 9.  They contend that, on August 5, 2005, the City Defendants "knew beyond debate, that in order to search a house without a warrant to find an armed suspect or to protect citizens from an armed individual, that they had to associate the armed suspect that they were looking for with the specific residence to be searched."  Supplement Response at 9.  The Kerns point out that the Court is not compelled to find a precise match to conclude that the law was clearly established.  See Supplement Response at 10 (citing Wiegel v. Broad, 544 F.3d 1143, 1153 (10th Cir. 2008)).

On April 4, 2012, the City Defendants filed the City Defendants Drew Bader, Matthew Thompson, and Russell Carter's Supplemental Reply Brief to Their Motion for Summary Judgment and Memorandum in Support [Doc. 117], Requesting Dismissal of Counts I, X, and XIII of Plaintiffs' First Amended Complaint [Doc. 5].  See Doc. 298 ("Supplement Reply").  The City Defendants disagree that the purpose of the remand is twofold and assert that the Tenth Circuit "simply found that this court left the clearly established inquiry unanswered in its analysis." Supplement Reply at 1.  They assert that "the officers' entry into the home was reasonable because they had an objectively reasonable belief that there could be an imminent threat to the safety of

-43-

others." Supplement Reply at 1. The City Defendants admit that they "have never argued that Michelle Zisser's consent authorized the entry." Supplement Reply at 1-2. They argue that, "instead of citing clearly established law, Plaintiffs attempt to distinguish each case cited in Defendants' supplemental brief which shows that officers can reasonably search for victims upon reports of gunfire." Supplement Reply at 3. They state that it is "curious" that the Kerns dispute the location of the gunfire, as J. Kerns reported that he heard a noise at or near his property, and directed the police to his property. Supplement Reply at 3. The City Defendants contend that gunfire in the area indicated that the shooter was also in the area and that it was not unreasonable for the City Defendants to presume that the shooter could have been inside the Kerns' residence, because it was unsecured. See Supplement Reply at 3. They argue that it does not matter that, in retrospect, the officers were mistaken. See Supplement Reply at 4 (citing Armijo ex rel. Armijo Sanchez v. Peterson, 601 F.3d 1065, 1072 (10th Cir. 2010)).

**6.      Post-Remand Hearing.**

On April 10, 2012, the Court held a hearing. The Court stated that, in its view, it decided that the exigency law was clearly established and, although the Tenth Circuit requires a more detailed analysis, the question is whether it should change its view. See Transcript of Hearing at 3:12-21 (April 10, 2012)(Court)("Tr.").[33] The City Defendants responded that, in their view, the Tenth Circuit held that the Court's decision regarding the clearly established prong was too broad and that the law must be clearly established within the specific context of the case. See Tr. at 3:22-4:9 (Griffin). The Court asked from where in the Tenth Circuit's opinion the City Defendants draw their analysis that the Court wrongly decided the issue. See Tr. at 4:14-17 (Court). The City

_____

[33]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

Defendants asserted that the Court's analysis was done in broad strokes, but that the Court did not determine whether the officers were on notice that their specific conduct would violate the Fourth Amendment.  See Tr. at 4:18-5:1 (Griffin).  They argued that the Court did not reach that question.  See Tr. at 5:1-3 (Griffin).  The Court asked whether, realistically, any exigent circumstances cases will closely resemble one another and how close the Court should slice those differences.  See Tr. at 5:4-21 (Court, Griffin).  The City Defendants pointed to the Tenth Circuit's 2006 opinion in United States v. Najar, where the Tenth Circuit stated it was deciding under what circumstances the Fourth Amendment permits the police to enter a home with a warrant to investigate a reasonable belief that a person within is endangered.  See Tr. at 6:1-7 (Griffin).  They noted that, in a footnote, the Tenth Circuit noted that there have been inconsistencies in how courts have treated exigent circumstances and that the Tenth Circuit acknowledges in that footnote that cases have "been all over the map."  Tr. at 6:8-20 (Griffin).  The City Defendants also argued that the Tenth Circuit acknowledged that the Supreme Court, in Brigham City, Utah v. Stuart, 547 U.S. 398 (2006), changed the test under which it analyzes exigent circumstances and recognized that probable cause was not a requirement.  See Tr. at 6:21-7:12 (Griffin).  They asserted that, in United States v. Porter, 594 F.3d 1251 (10th Cir. 2010), the Tenth Circuit held that exigent circumstances require less than probable cause and that a reasonable belief does not require absolute certainty.  See Tr. at 8:2-13 (Griffin).

The Kerns asserted that the case was rightly decided and that the mandate directs the Court to consider the City Defendants' argument that exigent circumstances existed based on a belief that the person who had shot down the helicopter might be hiding in or near the home.  See Tr. at 13:24-14:20 (Lowry).  They argued that Senior Judge Holloway correctly decided this issue and noted that the City Defendants have conceded that Zisser's consent did not justify the initial entry.  See Tr. at

14:21-15:5 (Lowry).  The Court asked whether, when the Tenth Circuit inserts a fact that the Court must consider such as the finding that the police entered based on a belief that the shooter was in or near the home, the Court was forced to find that exigent circumstances existed.  See Tr. at 15:17-16:3 (Court).  The Kerns responded that the exigency with which the Tenth Circuit is concerned is the fleeing-felon exception and argued that there must be hot pursuit.  See Tr. at 16:14-17:4 (Lowry).  They contended that, here, there is no pursuit.  See Tr. at 17:5-6 (Lowry).  They asserted that there was a chicken-and-egg problem, because the officers assert that they thought the shooter had taken refuge in the home and they had to believe that the shooter was in the area.  See Tr. at 17:7-15 (Lowry).  The Kerns argued that the officers never saw the shooter, never found evidence indicating that the shooter was in the area, and that Johnston admitted that he was not looking for a person.  See Tr. at 17:16-18:2 (Lowry).  They emphasized that, when analyzing these facts under an objective reasonableness standard, no reasonable officer would have believed that the shooter had taken refuge in the Kerns' home.  See Tr. at 18:3-15 (Lowry).  They asserted that, if the Court objectively analyzes the officers' behavior, it reveals that they were not concerned about a shooter, because they never searched A. and M. Kern's bedroom.  See Tr. at 19:12-23 (Lowry).  The Kerns pointed to Armijo ex rel. Armijo Sanchez v. Peterson, in which the Tenth Circuit was clear that a reasonable officer will check every room to ensure that all the occupant's are safe.  See Tr. at 19:23-20:3 (Lowry).  With respect to the level of generality, the Kerns asserted that there was unlikely to be another case where a helicopter was shot from the sky and that such a strict requirement is unrealistic.  See Tr. at 20:25-21:3 (Lowry).  They stated their belief that the difficulty in finding a similar case is why the City Defendants are relying on the gunshots-fired cases, rather than the fleeing-felon cases.  See Tr. at 21:3-6 (Lowry).  They also reiterated that, if the officers were concerned with the safety of the homes' inhabitants, the officers would have checked the entire

house.  See Tr. at 22:1-25 (Lowry).

The Court then stated that the Tenth Circuit, in their analysis of White's qualified immunity, does not appear to be allowing much generality and asked whether the Tenth Circuit was signaling its intent to require a case closely on point to defeat qualified immunity.  See Tr. at 23:9-24:4 (Court).  The Kerns acknowledged that there was some tension in the law about the level of generality at which to analyze the clearly established law prong, but that the Court is not required to find a case perfectly on point.  See Tr. at 24:5-17 (Lowry).  They also conceded that the majority had emphasized that courts should not make constitutional matters out of small cases.  See Tr. at 25:25-26:16 (Lowry).  They argued that, if the courts continued to avoid constitutional decisions, the law will never become clearly developed, and the police will always be entitled to qualified immunity.  See Tr. at 27:2-14 (Lowry).  With respect to the gunshots-fired cases on which the City Defendants have relied, the Kerns contended that those cases put the constitutional question beyond debate, because in each of those cases, the shots fired were tied directly to the specific dwelling that was searched.  See Tr. at 27:15-28:7 (Lowry).  They asserted that J. Kerns reported a pop-noise in the distance -- not a gunshot -- and that no one in the neighborhood confirmed that report.  See Tr. at 28:8-20 (Lowry).  They argued that a reasonable officer would not have credited J. Kerns' report and would have had no reason to believe that a shot was fired in that neighborhood.  See Tr. at 28:20-24 (Lowry).  They also emphasized that, even under the standard discussed in Pearson v. Callahan, 555 U.S. 223 (2009), some areas of law are so clear that they do not need decisional law on point and that the idea that the police cannot enter a home because something happened down the block, unless the police have a reason to associate the exigency with that home, is one such area. See Tr. at 29:15-30:2 (Lowry).  The Kerns conceded that, after an extensive search, they could not find a case like this one, where an officer entered a house because shots were fired elsewhere and

-47-

that the reason is that, as Senior Judge Holloway stated, a court does not have to have a case directly on point.  <u>See</u> Tr. at 30:1-15 (Lowry).  They reiterated that an implied predicate to the gunshots-fired cases were a fleeing felon, which does not exist here.  <u>See</u> Tr. at 30:17-31:5 (Lowry).  They emphasized that the police in this case acted on nothing more than a hunch and that the officers could not articulate any fact that made them think the suspect might be inside.  <u>See</u> Tr. at 31:6-32:1 (Lowry).  They asserted that there was no hot pursuit and that the decisional law clearly establishes a hot-pursuit requirement under a fleeing-felon exigency.  <u>See</u> Tr. at 32:8-33:8 (Lowry).

The City Defendants asserted that the Court should look to <u>Anderson v. Creighton</u> and ask whether the officers made a reasonable yet mistaken belief.  <u>See</u> Tr. at 36:3-10 (Griffin).  They argued that the Supreme Court's opinions in the last three years indicate that a court's clearly-established-law analysis was supposed to be in the specific context of the issue before the court. <u>See</u> Tr. at 36:11-37:2 (Griffin).  They suggested that the Court take a close look at the <u>Armijo ex rel. Armijo Sanchez v. Peterson</u> case, because it was based on a bomb threat where the officers had to act immediately and the threat was not at the person's home.  <u>See</u> Tr. at 37:4-12 (Griffin).  They contended that the officers in this case were in a situation similar to the officers in <u>Armijo ex rel. Armijo Sanchez v. Peterson</u> and that, in <u>Armijo ex rel. Armijo Sanchez v. Peterson</u>, the Tenth Circuit indicated that the officers should be given a certain amount of deference in a rapidly evolving situation.  <u>See</u> Tr. at 37:13-38:17 (Griffin).  The City Defendants further asserted that, had they left, and someone was in the home, the officers would face a lawsuit for failure to protect.  <u>See</u> Tr. at 38:9-13 (Griffin).  They argued that Zisser's consent goes only to the scope of the search question, because the officers were already inside the house when they made contact with Zisser. <u>See</u> Tr. at 38:22-39:18 (Griffin).  The Court then asked whether the City Defendants were arguing under the fleeing-felon prong of exigent circumstances.  <u>See</u> Tr. at 39:20-24 (Court).  The City

Defendants responded that they were not and that the case that most closely resembles this one is Armijo ex rel. Armijo Sanchez v. Peterson. See Tr. at 39:25-40:10 (Griffin). They asserted that they were not arguing hot pursuit and that they were not sure that their argument fit into a specific category, but that exigent circumstances means that the officers had a reasonable belief that somebody inside the home was in danger. See Tr. at 40:17-41:4 (Griffin). The City Defendants argued that exigent circumstances no longer have to fit into a particular category after United States v. Najar and that the officers have to show only a non-investigatory motive. See Tr. at 41:11-20 (Griffin).

The Court asked whether, in the gunshots-fired cases, there has to be a direct connection between the shots and the house to be searched. See Tr. at 41:21-25 (Court). The City Defendants responded that it does not lessen the threat that the gunshots originated off-premises, because they were fired in the area of the home and J. Kerns pointed the officers to his home. See Tr. at 42:1-20 (Griffin). The Court then asked why there were exigent circumstances for J. Kerns' home, but not the house next door, because the principle that the City Defendants outline would seem to open all of those houses to a search. See Tr. at 42:21-43:2 (Court). The City Defendants argued that there were certain facts specific to J. Kerns' home that distinguished it, such as: (i) the unsecured garage door; (ii) the items outside the residence; (iii) the residents' unresponsiveness; and (iv) the lights on inside the residence. See Tr. at 43:3-12 (Griffin). The Court asked what the City Defendants believe is incorrect with Senior Judge Holloway's analysis. See Tr. at 44:4-10 (Court). The City Defendants asserted that Senior Judge Holloway's analysis was still in general terms, that he did not focus on the totality of the circumstances, and that he did not state which cases would provide the officers with notice that their conduct was unlawful. See Tr. at 44:21-45:5 (Griffin). The Court asked why the officers did not search the entire house if they suspected a hostage situation. See Tr.

at 45:6-10 (Court).  The City Defendants argued that, once they were inside the home, they were

able to observe Zisser and, based on their conversations with and observations of her, they dispelled

their suspicions.  <u>See</u> Tr. at 45:11-46:7 (Griffin).

The Kerns emphasized that Senior Judge Holloway did not believe that this was a case that

required much particularity to establish a violation of clearly established law.  <u>See</u> Tr. at 46:23-47:5

(Lowry).  They reiterated that, if the officers were concerned about the house's occupants, the

officers could have contacted J. Kerns, with whom they were in radio contact.  <u>See</u> Tr. at 47:18-

48:11 (Lowry).  The Kerns also asserted that it would be inappropriate for the Court to grant

summary judgment on the state-law claims based on the federal law analysis.  <u>See</u> Tr. at 48:25-49:3

(Lowry).  The Court asked whether, if it decides to grant the MSJ on the federal claims, it should

dismiss without prejudice the state-law claims.  <u>See</u> Tr. at 51:12-15 (Court).  The Kerns agreed that

such a procedure would be appropriate.  <u>See</u> Tr. at 51:16-18 (Lowry).  The Court also asked about

the Tenth Circuit's discussion about a bullet at the bottom of a trash can in the Kerns' home.  <u>See</u>

Tr. at 51:19-52:3 (Court).  The Kerns asserted that this fact was not relevant to the claims before the

Court on remand.  <u>See</u> Tr. at 53:21-23 (Court, Lowry).  The Court asked whether there were any

additional pieces of evidence or arguments that the Court should consider.  <u>See</u> Tr. at 53:24-54:5

(Court).  The Kerns responded that the Court appropriately found that there were many facts in

dispute and that the way the Tenth Circuit wrote its opinion was a "tacit recognition" that the Fourth

Amendment issues were too complex.  Tr. at 54:6-55:5 (Lowry).

The Court then asked the City Defendants whether it should dismiss without prejudice the

state claims, if it grants summary judgment on the Fourth Amendment claim.  <u>See</u> Tr. at 57:8-11

(Court).  The City Defendants agreed that the Court's proposal was acceptable.  <u>See</u> Tr. at 57:12

(Griffin).  The Court then asked whether there was any other evidence or arguments that the Court

should consider.  See Tr. at 57:13-24 (Court).  The City Defendants asserted that they could not respond without examining their briefs.  See Tr. at 58:3-5 (Griffin).  The Court stated that the City Defendants should report to the Court if there are any facts with which they disagree.  See Tr. at 58:6-9 (Court).  The City Defendants stated that they did not think such a review was necessary, because of the limited nature of the remand.  See Tr. at 58:10-15 (Griffin).  The Court stated that the parties should write the Court a letter discussing the facts the Court should add to its factual background section.  See Tr. at 59:19-22 (Court).

Following the hearing, the parties responded to the Court's request regarding factual disputes.  On April 11, 2012, the City Defendants wrote the Court concerning nine additional facts that the Court should consider.  See Letter from Stephanie Griffin to the Court (dated April 11, 2012), filed April 11, 2012 (Doc. 300).  On April 25, 2012, the Kerns filed the Plaintiffs' Supplemental Factual Support in Opposition to the City Defendants' Motion for Summary Judgment, which disputes those facts.  See Doc. 301.  The Court, after reviewing these documents and the original briefing in this case, has now addressed all of the facts that the City Defendants have put forth.[34]

---

[34]Although the majority of the factual background section remains unchanged -- the Court merely expanded on its analysis of how it determined whether a fact was specifically controverted in accordance with the local rules -- the Court added some new facts that the parties emphasized in their filings following remand.  The Court has not found any case law that would indicate that its previous recitation of the facts binds it on remand.  "The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc., No. 11-8026, 2012 WL 1354071, at *5 (10th Cir. 2012)(unpublished).  The Tenth Circuit has held that the law of the case doctrine does not apply to interlocutory orders.  See Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1252 (10th Cir. 2011)("In any event, [Wilson v. Merrell Dow Pharmaceuticals, Inc., 160 F.3d 625 (10th Cir. 1998)] ruled law of the case doctrine was inapplicable to reconsideration of interlocutory orders in the district court without regard to the basis for reconsideration."), and orders denying qualified immunity are interlocutory orders, Pueblo Neighborhood Health Ctrs., Inc. v. Losavio, 847 F.2d 642, 645 (10th Cir. 1988)("Furthermore, this court has recognized that qualified

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden

---

immunity is a defense of a different character by allowing appeals from interlocutory orders denying qualified immunity based summary judgment motions."). Additionally, the Tenth Circuit has held that, where a district court reconsiders new facts, the law of the case doctrine does not apply. See Trujillo v. Bd. of Educ. of Albuquerque Pub. Schs., 212 F.App'x 760, 766 (10th Cir. 2007)(unpublished)("Because this case involves the district court's consideration of new facts and does not involve a change in the district court's application of any rule of law, the law of the case doctrine is not applicable."). Furthermore, the Court notes that the Tenth Circuit did not make any decision based on the facts before it, with respect to the MSJ, and instead reserving decision on both aspects of the qualified immunity question. Even if there were a doctrine which made the Court's prior determinations of fact binding, the Court does not believe it would apply in this case, because the Tenth Circuit did not decide whether there were exigent circumstances or clearly established law based on the facts before it. See Copart, Inc. v. Admin. Review Bd., 495 F.3d 1197, 1201 (10th Cir. 2007)(explaining that the law fo the case doctrine applies where a court has decided a rule of law; not where an order does not explicitly decide an issue). The Court finds that there is no barrier to the Court reconsidering the facts in its Oct. 5, 2009 MOO or considering new facts. Most of the facts that the Court has added do not materially affect its analysis of the clearly-established-law question. The Court did, however, resolve whether J. Kerns commented that he heard a gunshot, whether the lights were on in the home, whether the music suddenly turned off, and whether the officers knocked on the Kerns' door.

of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.

1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving

party may not rest on its pleadings but must set forth specific facts showing that there is a genuine

issue for trial as to those dispositive matters for which it carries the burden of proof." (internal

quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely

disputed must support the assertion by . . . . citing to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only), admissions, interrogatory

answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a

properly supported motion for summary judgment to "rest on mere allegations or denials of his [or

her] pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of

Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th

Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing

party may not rest on the allegations contained in his complaint, but must respond with specific facts

showing the existence of a genuine factual issue to be tried.'" (citation omitted)). Nor can a party

"avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific

facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D.

Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452

F.3d 1193, 1199 (10th Cir. 2006)). "In responding to a motion for summary judgment, 'a party

cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary

judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer,

2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either party."

Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid

summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby,

Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the factfinder could

reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251

(quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v.

Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely

colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson

v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact,

considering the record as a whole, could not find for the non-moving party, there is no genuine issue

for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three

principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue

whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby,

Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor

of the non-moving party, and construe all evidence in the light most favorable to the non-moving

party.  See Hunt v. Cromartie, 526 U.S. at 550-55; Anderson v. Liberty Lobby, Inc., 477 U.S. at 255

("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn

in his favor.").  Third, the court cannot decide any issues of credibility.  See Anderson v. Liberty

Lobby, Inc., 477 U.S. at 255.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise

their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. at 232 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)). "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001). When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden." Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001). The plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged unlawful activity. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

### 1.     Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a

qualified-immunity defense.  In <u>Pearson v. Callahan</u>, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in <u>Saucier v. Katz</u> will often be beneficial.  <u>See</u> <u>Pearson v. Callahan</u> 555 U.S. at 241.  In rejecting a mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise." <u>Pearson v. Callahan</u>, 555 U.S. at 237. The Supreme Court also recognized that a mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." <u>Pearson v. Callahan</u>, 555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  Once the plaintiff has established the inference that the defendant's conduct violated a clearly established constitutional right, a qualified-immunity defense generally fails. <u>See</u> <u>Cannon v. City & Cnty. of Denver</u>, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognized seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis:

> [W]hen (1) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (2) "it appears that the question will soon be decided by a higher court"; (3) deciding the constitutional question requires "an uncertain interpretation of state law"; (4) "qualified immunity is asserted at the pleading stage" and "the precise factual basis for the . . . claim . . . may be hard to identify"; (5) tackling the first element "may create a risk of bad decisionmaking" due to inadequate briefing; (6) discussing both

-56-

> elements risks "bad decisionmaking" because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (7) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question because "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."

Kerns v. Bader, 663 F.3d at 1180-81 (quoting Pearson v. Callahan, 555 U.S. at 236-42).  Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern where guidance on the constitutionality of the challenged conduct is necessary and the conduct is only likely to face challenges in the qualified-immunity context.  Camreta v. Greene, 131 S.Ct. 2020, 2031-32 & n.5 (2011).  See Kerns v. Bader, 663 F.3d at 1181.  "In general, courts should think hard, and then think hard again, before turning small cases into large ones."  Camreta v. Greene, 131 S.Ct. at 2032.  Accord Kerns v. Bader, 663 F.3d at 1181.  The Supreme Court has also recently emphasized in the qualified immunity context: "Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"  Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2080 (2011).  The Tenth Circuit will normally remand a case to the district court for further consideration when the district court has given cursory treatment to the qualified immunity issue.  See Kerns v. Bader, 663 F.3d at 1182.

## 2.    Clearly Established Rights in the Qualified-Immunity Analysis.

In evaluating whether a right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  A clearly established right is generally defined as a right so

thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned." Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). See Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "In determining whether the right was 'clearly established,' a court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court further clarified what a plaintiff must show to satisfy the clearly established requirement in Ashcroft v. al-Kidd. The Supreme Court held that, while a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S.Ct. at 2083. Conflicting or unclear case law can be the basis for concluding that a right is not clearly established. See Reichle v. Howards, 132 S.Ct. 2088, 2096-97 (2012)(noting that a circuit court decision from the circuit where the conduct occurred had "injected uncertainty into the law governing retaliatory arrests, particularly in light of" that

decision's "rationale and the close relationship between retaliatory arrest and prosecution claims," and that the "uncertainty was only confirmed by subsequent appellate decisions that disagreed over whether the" decision's "reasoning . . . applied similarly to retaliatory arrests").  "The operation of this [clearly established] standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."  Anderson v. Creighton, 483 U.S. at 639.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."  Ashcroft v. al-Kidd, 131 S.Ct. at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit, in Kerns v. Bader, focused on the Supreme Court's language in Ashcroft v. al-Kidd in its analysis of qualified immunity.  In that case, which dealt with a search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  Kerns v. Bader, 663 F.3d at 1183.  The Tenth Circuit reiterated that "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing law," but held that, where distinctions "might make a constitutional difference," the law is not clearly established.  Kerns v. Bader, 663 F.3d at 1187 (emphasis in original).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  In Casey v. City of Federal Heights, 509 F.3d 1278 (10th Cir. 2007), the Tenth Circuit re-emphasized its sliding scale approach: "The more obviously egregious the conduct in light of prevailing constitutional principles, the less

specificity is required from prior case law to clearly establish the violation."  509 F.3d at 1284

(citing Pierce v. Gilchrist, 359 F.3d at 1298).  Thus, "when an officer's violation . . . is particularly

clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly

establish the law."  Casey v. City of Fed. Heights, 509 F.3d at 1284.  Furthermore, "general

statements of law are not inherently incapable of giving fair and clear warning . . . ." Hope v. Pelzer,

536 U.S. 730, 741 (2002).

### 3.    **Factual Disputes in the Qualified-Immunity Analysis.**

In determining whether the plaintiff has met his or her burden of establishing a constitutional

violation that was clearly established, a court construes the facts in the light most favorable to the

plaintiff as the non-moving party.  See Scott v. Harris, 550 U.S. 372, 378-80 (2007); Riggins v.

Goodman, 572 F.3d at 1107 (noting that the Tenth Circuit "accept[s] the facts as the plaintiff alleges

them").  In Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), the Tenth Circuit

explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation,
> a plaintiff's version of the facts must find support in the record: more specifically,
> "[a]s with any motion for summary judgment, when opposing parties tell two
> different stories, one of which is blatantly contradicted by the record, so that no
> reasonable jury could believe it, a court should not adopt that version of the facts[.]"
> York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott [v.
> Harris], 550 U.S. at 380); see also Estate of Larsen ex. rel Sturdivan v. Murr, 511
> F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312.  "The Tenth Circuit, in Rhoads v. Miller, explained

that the blatant contradictions of the record must be supported by more than other witnesses'

testimony[.]"  Lymon v. Aramark Corp., 728 F.Supp.2d 1222, 1249 (D.N.M. 2010)(Browning,

J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take
> the facts "in the light most favorable to the party asserting the injury."  Scott v.

Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380.  In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events.  550 U.S. at 379.  Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony.  There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury.  And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility. . . . Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistence or provocation.  If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F.App'x 289, 291-92 (10th Cir. 2009)(unpublished).  See Lymon v. Aramark Corp., 728 F.Supp.2d at 1249-50 (quoting Rhoads v. Miller, 352 F.App'x at 291-92).  In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court" before inquiring into whether there are genuine issues of material fact for resolution by the jury.  584 F.3d at 1326-27 (Holmes, J. concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts")).

### 4.    Effect of Qualified Immunity on Discovery.

"Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, 2009 WL 1329834, at *10.  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  Mitchell v.

Forsyth, 472 U.S. 511, 526 (1985).  Issues of qualified immunity are best resolved at the "earliest

possible stage in litigation."  Pearson v. Callahan, 555 U.S. at 232.  The Supreme Court has

suggested that, to avoid unnecessary exposure to burdensome discovery, the preferred practice is

for the government officials to move to dismiss the action based on qualified immunity before

discovery is ordered:

> When a plaintiff files a complaint against a public official alleging a claim that
> requires proof of wrongful motive, the trial court must exercise its discretion in a
> way that protects the substance of the qualified immunity defense.  It must exercise
> its discretion so that officials are not subjected to unnecessary and burdensome
> discovery or trial proceedings.

Crawford-El v. Britton 523 U.S. 574, 598 (1998).  When a court permits discovery, the Supreme

Court has emphasized that "Rule 26 vests the trial judge with broad discretion to tailor discovery

narrowly and to dictate the sequence of discovery."  Crawford-El v. Britton 523 U.S. at 598.  "There

are, however, exceptions to the rule that no discovery be allowed when government officials claim

qualified immunity."  Todd v. Montoya, No. 10-0106, 2011 WL 5238900, at *4 (D.N.M. Oct. 4,

2011)(Browning, J.).  The officials are not protected from all discovery, "'but only from discovery

which is either avoidable or overly broad.'"  Garrett v. C.A. Stratman, 254 F.3d 946, 953 (10th Cir.

2001)(quoting Maxey v. Fulton, 890 F.2d 279, 282 (10th Cir. 1989)).

## RELEVANT LAW ON THE FOURTH AMENDMENT

The Fourth Amendment to the United States Constitution "protects '[t]he right of the people

to be secure in their person, houses, papers, and effects, against unreasonable searches and

seizures.'"  United States v. Thompson, 524 F.3d 1126, 1132 (10th Cir. 2008)(quoting U.S. Const.

amend. IV).  It also commands that "no Warrants shall issue, but upon probable cause, supported

by Oath or affirmation, and particularly describing the place to be searched, and the persons or

things to be seized."  U.S. Const. amend. IV.  "The security of one's privacy against arbitrary

intrusion by the police -- which is at the core of the Fourth Amendment -- is basic to a free society."
Wolf v. Colorado, 338 U.S. 25, 27 (1949), overruled on other grounds by Mapp v. Ohio, 367 U.S.
643 (1961).

"[T]he Fourth Amendment protects people, not places," and the Supreme Court has
vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place
searched is a "constitutionally protected area." Katz v. United States, 389 U.S. 347, 351 (1967).
The proper inquiry is whether the defendant had an expectation of privacy in the place searched and
whether that expectation was objectively reasonable. See Katz v. United States, 389 U.S. at 351
("What a person knowingly exposes to the public, even in his own home or office, is not a subject
of Fourth Amendment protection. But what he seeks to preserve as private, even in an area
accessible to the public, may be constitutionally protected."); Katz v. United States, 389 U.S. at 361
(Harlan, J., concurring)("My understanding of the rule that has emerged from prior decisions is that
there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation
of privacy and, second, that the expectation be one that society is prepared to recognize as
'reasonable.'").

There is no doubt, however, that a citizen has a reasonable expectation of privacy, and a
particularly strong one, in his own home. The "chief evil" from which the Fourth Amendment
protects citizens is unwanted police entry into the home, and the "principal protection" is "the Fourth
Amendment's warrant requirement." United States v. Thompson, 524 F.3d at 1132. See Kyllo v.
United States, 533 U.S. 27, 31 (2001)("'At the very core' of the Fourth Amendment 'stands the right
of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"
(quoting Silverman v. United States, 365 U.S. 505, 511 (1961))); Payton v. New York, 445 U.S.
573, 586 (1980)("[S]earches and seizures inside a home without a warrant are presumptively

unreasonable.").

Not all searches require a warrant.  The Supreme Court has instructed that, when assessing the reasonableness of a warrantless search, a court must begin "with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.'"  Arizona v. Gant, 556 U.S. 332, 338 (2009)(citing Katz v. United States, 389 U.S. at 357).  See Payton v. New York, 445 U.S. at 586.  As the Tenth Circuit stated in United States v. Cos, 498 F.3d 1115 (10th Cir. 2007): "A warrantless search of a suspect's home is per se unreasonable under the Fourth Amendment unless the government can show that it falls within 'one of a carefully defined set of exceptions.'"  498 F.3d at 1123 (quoting Coolidge v. New Hampshire, 403 U.S. 443, 474 (1971)).  See United States v. Thompson, 524 F.3d at 1132.

"One exception to the warrant requirement is when police reasonably believe an emergency exists that makes it infeasible to obtain a warrant."  United States v. Gambino-Zavala, 539 F.3d 1221, 1225 (10th Cir. 2008).  "The government bears the burden of proving the exigency exception to the warrant requirement applies."  United States v. Najar, 451 F.3d 710, 717 (10th Cir. 2006)(citing United States v. Wicks, 995 F.2d 964, 970 (10th Cir. 1993)).  "That burden is especially heavy when the exception must justify the warrantless entry of a home."  United States v. Najar, 451 F.3d at 717 (citation omitted).  Generally, a warrantless entry under the exigent-circumstances exception requires probable cause and exigent circumstances.  See Kirk v. Louisiana, 536 U.S. 635, 638 (2002); Manzanares v. Higdon, 575 F.3d 1135, 1142-43 (10th Cir. 2009).  With respect to the standard of review on the existence of exigent circumstances, the Tenth Circuit has stated: "The existence of exigent circumstances is a mixed question of law and fact.  Although we accept underlying fact findings unless they are clearly erroneous, the determination of whether those facts

satisfy the legal test of exigency is subject to de novo review."  United States v. Davis, 290 F.3d

1239, 1241 (10th Cir. 2002).

Additionally, the Tenth Circuit appears to have recognized a subset of exigent-circumstances

cases -- "emergency-aid" cases -- that do not require probable cause.  United States v. Najar, No.

03-0735, 2004 WL 3426123, at *6 (D.N.M. Sept. 3, 2004)(Browning, J.), aff'd, 451 F.3d 710 (10th

Cir. 2006).  As the Court stated in United States v. Najar:

> For probable cause in the usual [evidence-of-crime] sense not to be needed, the
> police must be responding to a true emergency rather than a crime, and the police
> must reasonably believe a person inside needs immediate assistance, and entry is
> needed to protect or preserve life, or to avoid serious injury.

United States v. Najar, 2004 WL 3426123, at *6 (alteration in original).  The Court's September 3,

2004 opinion in United States v. Najar reconsidered an earlier opinion in which the Court had

granted the motion to suppress.  Compare United States v. Najar, 2004 WL 3426123, at *8 ("Thus,

based upon the totality of the circumstances confronting the officers, the Court finds that the United

States has satisfied the standards set forth by the Supreme Court and the Tenth Circuit regarding

warrantless entries based upon emergency circumstances.") with United States v. Najar, No. 03-

0735, 2004 WL 3426122, at *4 (D.N.M. July 6, 2004)(Browning, J.)("Because the Court, after

reviewing precedent from both the Supreme Court and the Tenth Circuit, believes that the exception

applies to warrantless entries based upon probable cause plus exigent circumstances, it will grant

Najar's motion to suppress.").  The Court originally held that Fourth Amendment law required the

exigent-circumstances exception to the warrant requirement required probable cause and an exigent

circumstance.  See United States v. Najar, 2004 WL 3426122, at *4.  It then reconsidered, and the

Tenth Circuit later affirmed this decision, and held that, in cases involving emergency situations,

the Supreme Court required only a reasonable belief that a person within a residence needs

immediate aid.  See United States v. Najar, 2004 WL 3426123, at *2.  The Court rejected the approach that the United States Court of Appeals for the Eleventh Circuit adopted, in United States v. Holloway, 290 F.3d 1331 (11th Cir. 2002), that retained a probable cause requirement for exigent circumstances, but held that a reasonable belief that a person was in danger satisfied the probable cause requirement.  See United States v. Najar, 2004 WL 3426123, at *4.  Instead, the Court found that the Supreme Court had eliminated the probable cause requirement for the emergency-aid exception and that this finding was consistent with Tenth Circuit precedent.  See United States v. Najar, 2004 3426123, at *6-7 (citing United States v. Rhiger, 315 F.3d at 1288).  In the Tenth Circuit's opinion in United States v. Najar, the Tenth Circuit held that the exigent-circumstances exception to the warrant requirement authorized a warrantless police entry in an emergency-aid situation without a showing of probable cause.  In so doing, the Tenth Circuit noted that the Supreme Court in Brigham City, Utah v. Stuart, which was determining "whether the risk of personal danger created exigent circumstances," did not "require probable cause in this type of exigent circumstances."  United States v. Najar, 451 F.3d at 718 (emphasis added).

In such emergency-aid situations, the Tenth Circuit employs a two-pronged test to determine whether emergency circumstances justify a warrantless entry into a home, which examines: "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable."  United States v. Najar, 451 F.3d at 717-18.  A court is "guided by the realities of the situation presented by the record," and should consider the facts from the viewpoint of "prudent, cautious, and trained officers."  United States v. Porter, 594 F.3d 1251, 1258 (10th Cir. 2010)(citation omitted).  "Reasonable belief does not require absolute certainty; the standard is more lenient than the probable cause standard."  United States v. Porter, 594 F.3d at 1258 (citation

omitted).  "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception."  United States v. Porter, 594 F.3d at 1258 (citation omitted).  A court must also, however, remember that officers cannot create their own exigent circumstances to justify a warrantless entry.  See United States v. Flowers, 336 F.3d 1222, 1230 (10th Cir. 2003).  In the limited circumstances where the risk of danger to the officers or others gives rise to the exigent circumstance, the court does not require a separate showing of probable cause.  See United States v. Najar, 451 F.3d at 718.

## ANALYSIS

The Tenth Circuit has instructed the Court to examine whether it was clearly established in 2005 that exigent circumstances did not exist and that a reasonable officer would have understood that his conduct violated the law.  The Court finds that the law was not clearly established, because the facts of this case resemble the facts of cases in which the Tenth Circuit found exigent circumstances, such that the officers would not have had notice that their conduct violated the law. Accordingly, the Court will grant the MSJ with respect to Count I.  Because a federal claim -- Count VI -- remains pending before the Court, however, the Court will continue to exercise supplemental jurisdiction over the state-law claims.

## I.    THE COURT'S TASK ON REMAND IS TO EXAMINE WHETHER A REASONABLE OFFICIAL WOULD HAVE UNDERSTOOD THAT HIS PARTICULAR CONDUCT WOULD VIOLATE CLEARLY ESTABLISHED LAW.

The Tenth Circuit, in Kerns v. Bader, directed the Court to "finish the work of analyzing the second qualified immunity question," and to "address the officers' claim that exigent circumstances existed (based on a belief that someone who had just shot down a police helicopter might be hiding in or near the home)."  663 F.3d at 1182-83.  The Tenth Circuit warned that, although the Supreme Court permits federal courts to "avoid avoidance," courts "should think hard, and then think hard

-67-

again, before turning small cases into large ones."  Kerns v. Bader, 663 F.3d at 1181 (quoting

Camreta v. Greene, 131 S.Ct. at 2032).[35]  The Tenth Circuit held that, if the Court's reference to

---

[35]While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases. 131 S.Ct. at 2032. As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small." It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment. Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job. The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way. Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts. The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice. The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance. Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S.Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S.Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S.Ct. 1235 (2012). In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation. See 132 S.Ct. at 2092, 2097. In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 S.Ct. at 1660, 1668. In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error. See 132 S.Ct. at 1241, 1250. The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant. See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

-68-

Payton v. New York was intended to be a holding on the clearly established question, "it is simply inadequate to the that task." Kerns v. Bader, 663 F.3d at 1182. The majority did not, however, analyze the clearly established question. Senior Judge Holloway, in dissent, analyzed the clearly established question and found that, although some "cases do indeed require a more particularized inquiry," this case "is not one of them" and held that, "[i]f the circumstances [the officers] encountered did not support a reasonable belief that danger to someone was imminent, then armed nighttime entry into the home violated clearly established Fourth Amendment law." Kerns v. Bader, 663 F.3d at 1192 (Holloway, J., dissenting).

The Court finds itself in an awkward position given that only Senior Judge Holloway analyzed the clearly established law prong of the qualified immunity analysis, and he found that the Court had found the law clearly established and that the case law was clearly established. See Kerns v. Bader, 663 F.3d at 1192 (Holloway, J., dissenting). He voted to affirm the Court. See Kerns v. Bader, 663 F.3d at 1192 ("The district judge's ruling denying summary judgment for the Officers should be affirmed."). Neither the majority nor the dissent questioned the Court's analysis of the first qualified-immunity prong, although the majority indicated that they "reserve decision on both aspects of the qualified immunity question in this case." Kerns v. Bader, 663 F.3d at 1182 (majority opinion).[36] The majority, however, determined that the Court had not decided the second qualified-

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention. A trial judge can overwork a "large" case. It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

[36]In footnote 5 of the majority's opinion, the Tenth Circuit stated: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." Kerns v. Bader, 663 F.3d

at 1187 n.5.  While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:

> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . . The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, exception that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violation where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding:  Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test.  See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy.  Commentators have noted that, "[o]ver the past three decades, the Supreme Court has

immunity question and instructed the Court to examine the particular circumstances of this case to

determine whether the City Defendants violated clearly established law.  In its Oct. 5, 2009 MOO,

the Court noted that the "Kerns have a Fourth Amendment expectation of privacy in their own home

that is well-established."  Oct. 5, 2009 MOO at 13 (citing Payton v. New York, 445 U.S. at 585).

The Tenth Circuit emphasized that, "when it comes to deciding the second qualified immunity

question, it is 'not enough to look at,' and declare a law enforcement officer liable based on such

'generalized principles.'"  Kerns v. Bader, 663 F.3d at 1182.  The Tenth Circuit found: "[If] the

district court's formulaic statement of a general legal proposition was intended as a holding on the

clearly established law question, it is simply inadequate to the task."  Kerns v. Bader, 663 F.3d at

1182.   The Tenth Circuit then went on to hold that the court must ask whether "every reasonable

official would have understood that what he [did] violate[d] that right."  Kerns v. Bader, 663 F.3d

_____

drastically limited the availability of remedies for constitutional violations in" exclusionary rule
litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau,
The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).   Some
commentators have also encouraged the courts to drop the suppression remedy and the legislature
to provide more -- not less -- civil remedies for constitutional violations.  See Christopher Slobogin,
Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91
(1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police
into behaving. . . . These theories also suggest that a judicially administered damages regime . . .
would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey,
Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the
exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006),
the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when
it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth
Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at
596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983
seems the better and preferable alternative to a motion to suppress.  It is interesting that the current
Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal
defendants go free, than have police pay damages for violations of innocent citizens' civil rights.
It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims;
it seems strange to punish society for police violating unclear law in criminal cases, but protect
municipalities from damages in § 1983 cases.

at 1183 (alterations in original)(emphasis in original)(citing Ashcroft v. al-Kidd, 131 S.Ct. at 2083).

The Supreme Court and the Tenth Circuit have repeatedly stated that it is unnecessary to scour the case law for a case on point and that, in some cases, generalized principles will suffice to be clearly established law. See, e.g., Hope v. Pelzer, 536 U.S. at 741 ("But general statements of the law are not inherently incapable of giving fair and clear warning . . . ."); United States v. Lanier, 520 U.S. 259, 271 (1997)("[I]n other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'"); Anderson v. Creighton, 483 U.S. at 640 ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful."); Anderson v. Blake, 469 F.3d 910, 913 (10th Cir. 2006)("This means that there need not be precise factual correspondence between earlier cases and the case at hand . . . ."); Snell v. Tunnell, 920 F.2d 673, 699 (10th Cir. 1990)("[P]recise factual correlation between then-existing law and the case at-hand is not required."). It seems that, if these statements are ever true, it would be in the area of exigent circumstances. While an officer like White could take his time requesting medical records of a suspect or procuring a search warrant, or perhaps consult with the district attorney before acting, a police officer dealing with a potential exigent circumstance does not have such a luxury. The Court thinks this area is a good one to apply general principles, because a police officer needs simple, clear principles to apply quickly. There are so many possible exigent circumstances; it is difficult to find and, in a quick moment, remember all the factual circumstances of a similar case. It seems that a sliding scale might be best to take full account of the Supreme Court's statements in the qualified immunity context: when a government agent has plenty of time to consult a lawyer and case law, the clearly established analysis can be more nuanced, but when the decision requires split-second decisions, general principles may be the

best tools.

> The Tenth Circuit, however, foreclosed this approach.  The Tenth Circuit held that:

> Of course, Mr. Kerns (like everyone else) has a well-established privacy interest in his home.  But the Supreme Court and we have explained that, when it comes to deciding the second qualified immunity question, "it is not enough to look at," and declare a law enforcement officer liable, based on such "generalized principles."

Kerns v. Bader, 663 F.3d at 1182 (citing Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1497-98

(10th Cir. 1992)).  The Tenth Circuit's holding that the Court may not analyze the second qualified-

immunity prong using "such" generalized principles and that the Court's reliance on Payton v. New

York was too general; the Tenth Circuit has said there has to be increased specificity.  This language

alone may leave some room for the Court's proposed sliding-scale analysis.   The Supreme Court's

holding in Payton v. New York stands for the principle that the threshold of a home may not be

crossed without a warrant, absent exigent circumstances.  See 445 U.S. at 590.  One could interpret

the Tenth Circuit's language regarding "generalized principles" to mean that articulating the general

principle expressed in Payton v. New York and discussing the law regarding exigent circumstances

would be specific enough to meet the clearly-established prong.  In other words the Court might be

more specific than its references to  Payton v. New York and still not have to find on point factual

cases.  The Tenth Circuit, however, went on to emphasize that:

> [F]or any court to reach a determination that a violation of clearly established law has taken place a "more particularized" inquiry is required.  Anderson [v. Creighton], 483 U.S. at 640.  The court must ask whether "every reasonably officer would have understood that what he [did] violate[d] that right."  Ashcroft [v. al-Kidd], 131 S.Ct. at 2083 (emphasis added).

Kerns v. Bader, 663 F.3d at 1183.  This holding and the Tenth Circuit's interpretation of Anderson

v. Creighton, convinces the Court that its proposed sliding scale is foreclosed.

> Although exigent circumstances might be an area of the law where a higher level of

generality makes sense, because, practically speaking, police officers do not have time to analyze a situation at such a specific level before making decisions, in the end, the Court concludes that the Supreme Court's decision in Anderson v. Creighton, and the Tenth Circuit's interpretation of it, suggests that only a factual analysis of the case could satisfy the clearly-established prong.  The majority, in Kerns v. Bader, stated that the Supreme Court has "vigorously underscored this point" and that it has reminded lower courts "with some apparent exasperation" not to define "clearly established law at a high level of generality."  Kerns v. Bader, 663 F.3d at 1182-83.  In Anderson v. Creighton, decided in 1987, the Supreme Court, in an opinion written by Justice Antonin Scalia, found that the United States Court of Appeals for the Eighth Circuit's "brief discussion of qualified immunity consisted of little more than an assertion that a general right Anderson was alleged to have violated -- the right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances -- was clearly established."  483 U.S. at 640.  The Supreme Court noted that the Eight Circuit "specifically refused to consider the argument that it was not clearly established that the circumstances with which Anderson was confronted did not constitute probable cause and exigent circumstances."  Anderson v. Creighton, 483 U.S. at 640-41 (emphasis in original).  It held that such a refusal was erroneous and that it "does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that Anderson's search was objectively legally unreasonable."  Anderson v. Creighton, 483 U.S. at 641.  The Supreme Court emphasized that whether exigent circumstances supported a search "will often require an examination of the information possessed by the searching officials," and "whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed."  Anderson v. Creighton, 483

-74-

U.S. at 641.  While it is not clear how specific the Court must be, the Court feels obliged, in an effort

to faithfully follow the Tenth Circuit's instructions and the Supreme Court's guidance in Anderson

v. Creighton, to get into the facts of the Supreme Court's and Tenth Circuit's cases regarding exigent

circumstances decided before August 6, 2005.

While the Court greatly appreciates Senior Judge Holloway's support, and continues to

believe there was both a violation and violation of clearly established law, the Tenth Circuit has

found the Court's clearly established analysis inadequate, and the Court must faithfully follow the

Tenth Circuit's decision and judgment.  The Court also concludes that Senior Judge Holloway's

clearly established law analysis is inconsistent with the Supreme Court's requirements in Anderson

v. Creighton.  Senior Judge Holloway's clearly established law analysis is as follows:

> The Officers had neither a warrant nor probable cause.  If the circumstances they
> encountered did not support a reasonable belief that danger to someone was
> imminent, then the armed, nighttime entry into the home violated clearly established
> Fourth Amendment law.  The district judge's ruling denying summary judgment for
> the Officers should be affirmed.

Kerns v. Bader, 663 F.3d at 1192 (Holloway, J., dissenting).  Senior Judge Holloway's analysis

suffers from the same flaw, according to the Supreme Court's analysis in Anderson v. Creighton,

as the Court's proposed sliding-scale analysis.  The Tenth Circuit has, relying on Anderson v.

Creighton, apparently, rejected this level of generality with its holding:

> [I]t is "not enough to look at," and declare a law enforcement officer liable, based
> on such "generalized principles." . . . Instead, for any court to reach a determination
> that a violation of clearly established law has taken place a "more particularized"
> inquiry is required.  The court must ask whether "every reasonable officer would
> have understood that what he [did] violate[d] that right."

Kerns v. Bader, 663 F.3d at 1182 (majority opinion)(alterations in original)(emphasis in original).

While it is tempting to say that the majority did not decide the clearly-established-law prong, and

Senior Judge Holloway did, such that the Court should adopt the reasoning of the one Tenth Circuit

judge that has analyzed this question, in the end, the Court concludes that both it and Senior Judge Holloway have lost this battle, and the Court must provide a more specific analysis. Even in the split-second circumstances of an exigent circumstances analysis, the Court must find factually similar cases with this case, not just rely on general exigent circumstances principles.

Accordingly, the Court will analyze the City Defendants' conduct to determine whether it violated clearly established law, as it stood in August of 2005.

## II.   IN 2005, IT WAS NOT CLEARLY ESTABLISHED THAT EXIGENT CIRCUMSTANCES DID NOT EXIST TO JUSTIFY THE ENTRY INTO J. KERNS' HOME.

The City Defendants argue that, "even if one were to presume a constitutional violation on the part of City Defendants, City Defendants would not have been on notice that their conduct was unlawful," because "it is well settled in federal jurisdictions throughout the country that officers can reasonably search for victims upon reports of gunfire." Defendants' Supplement at 3. They further assert that it is well-settled that "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." Defendants' Supplement at 4 (citing Michigan v. Fisher, 130 S.Ct. 546, 549 (2009)). They contend that there must be some authority which existed on August 6, 2005 which would have made it readily apparent that an officer would act objectively if that officer ignored the unusual scene and that "[t]here is no such authority, because . . . City Defendants reasonably . . . conclude[d] that the unresponsiveness to their knock and announcements mean that persons inside the residence could have been injured." Defendants' Supplement at 5. The Kerns argue that the law regarding exigent circumstances was clearly established at the appropriate level of generality when the City Defendants searched the Kerns' home. See Supplement Response at 5. They contend that the City Defendants "fail to grasp the fact that in each one of the cases cited by them there existed an objectively real and substantial nexus

between the actual location of the shots that were fired and the dwelling that was searched." Supplement Response at 5.  They argue that there were no reliable reports of gunshots in the area and that the officers knew that J. Kerns had left the home after the helicopter was shot down.  See Supplement Response at 6.  They assert that, on August 5, 2005, the City Defendants "knew beyond debate, that in order to search a house without a warrant to find an armed suspect or to protect citizens from an armed individual, that they had to associate the armed suspect that they were looking for with the specific residence to be searched."  Supplement Response at 9.

Construing the facts in the light most favorable to the Kerns, the material facts related to the exigent circumstances question are as follows.  On August 6, 2005, a helicopter was shot down at approximately 12:00 a.m.  At the scene, J. Kerns informed Sauer, an officer, that he knew where the shot came from and later described the sound as a pop noise.  When APD officers arrived, J. Kerns said that the noise was so loud that it made his ear ring and that he heard the sound of gravel kick up as he watched the helicopter at the edge of his property.  J. Kerns then directed officers to his home and the officers searched the area.  Bader, one of the officers to whom J. Kerns originally spoke, and Carter and Thompson were among the officers sent to J. Kerns' home.  None of J. Kerns' neighbors reported hearing any gunshots.  At J. Kerns's house, the officers viewed multiple cars and miscellaneous items strewn in the yard.  There were lights on in the home and inside music was playing loud enough for the officers outside to hear it.  The officers also observed a broken window, but did not observe a golf ball alongside the window or that the break did not go completely through the glass.  During this time, the officers were in radio contact with J. Kerns.  After making multiple attempts to contact anyone inside the residence, the officers entered the home.

Exigent circumstances can justify a warrantless entry into a home.  "Examples of exigent circumstances include a threat to officer safety, an ongoing 'hot pursuit' of a fleeing suspect, or the

possible imminent destruction of evidence." United States v. Martin, 613 F.3d 1295, 1299 (10th Cir. 2010).  Another exigent circumstance is based on the fear that a person inside the home may be in imminent danger and is known as the emergency-aid exception.  See United States v. Martinez, 643 F.3d 1292, 1296 (10th Cir. 2011).  "The emergency aid exception depends on 'an objectively reasonable basis for believing that a person within the house is in need of immediate aid.'"  United States v. Martinez, 643 F.3d at 1296 (citing Michigan v. Fisher, 130 S.Ct. 546, 548 (2009)).

The Supreme Court introduced the concept of exigent circumstances in Warden v. Hayden, 387 U.S. 294 (1967).  There, the Supreme Court held that there was no Fourth Amendment violation, because "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others."  387 U.S. at 298-99.  The Supreme Court also recognized other exigencies, such as the destruction of evidence, see Schmerber v. California, 384 U.S. 757 (1966), and hot pursuit, see United States v. Santana, 427 U.S. 38 (1976).  One of the earliest Supreme Court cases to discuss the emergency-aid exception was Mincey v. Arizona, decided in 1978.  In that case, an officer went to an apartment to make an undercover drug buy, and, when the officers returned to arrest the occupants, an officer was killed.  See Mincey v. Arizona, 437 U.S. at 387.  After the shooting, officers entered the apartment and located other occupants.  See Mincey v. Arizona, 437 U.S. at 388.  When the suspects and victims were removed, the agents then spent four days searching the entire apartment.  See Mincey v. Arizona, 437 U.S. at 388.  The Supreme Court recognized "the right of police to respond to emergency situations," but that the second entry could not be justified as a response to an emergency, because all the persons in the apartment had been located before the officers began their search.  Mincey v. Arizona, 437 U.S. at 392-93.  In Michigan v. Tyler, 436 U.S. 499 (1978), the Supreme Court stated that "[a] burning building presents an exigency of sufficient proportions to

render a warrantless entry 'reasonable.'" 436 U.S. at 509.[37]

Before August 6, 2005, the Tenth Circuit had decided few cases in which it was asked to determine whether the emergency aid exigent circumstance justified a warrantless police search of a home.  In United States v. Bute, the Tenth Circuit held that exigent circumstances must be based on more than speculation.  See 43 F.3d at 539.  It held that "[w]e simply cannot accept the notion that an open door of a commercial building at night is, in and of itself, an occurrence that reasonably and objectively creates the impression of an immediate threat to person or property to justify a warrantless search."  United States v. Bute, 43 F.3d at 539.  In Walker v. Disner, 50 F.App'x 908 (10th Cir. 2002)(unpublished), the officers were called to a residence on reports of an unwanted person entering the apartment and, when they knocked on the door, no one answered.  See 50 F.App'x at 909.  The officers then entered the apartment.  See Walker v. Disner, 50 F.App'x at 909. The Tenth Circuit found that, "[b]ecause the officers had received a burglary call, and upon arriving at the apartment, observed signs of a burglary, Officer Disner's entry into, and brief search of, the apartment were lawful pursuant to the emergency exception to the warrant requirement."  Walker v. Disner, 50 F.App'x at 910.  In United States v. Rhiger, 315 F.3d 1293 (10th Cir. 2003), the officers entered a home based on their knowledge that iodine, phosphorus, ice, and cotton balls had been purchased, coupled with the odor of methamphetamine emanating from the home.  See 315 F.3d at 1288.  The Tenth Circuit held that the purchase of such materials, the strong odor, and the officers' knowledge of the dangerousness of a methamphetamine laboratory established that

---

[37]The Supreme Court did not delve into what circumstances would satisfy the emergency-aid exception until recently, and after the conduct at issue in this case.  See J. Fisher, "Lowering Standards: The Simultaneous-School-Bombing-and-Shooting-Threat Exception of Armijo ex rel. Armijo Sanchez v. Peterson," 41 N.M. L. Rev. 69, 116 (2011)("[T]he first mention of an emergency-aid exception appears to be in Mincey v. Arizona, and the Supreme Court did not actually apply it until 2006, in Brigham City v. Stuart, and 2009, in Michigan v. Fisher.").

"reasonable grounds existed for the agents to believe there was an immediate need to protect the public by entering the home and discontinuing the lab's production."  United States v. Rhiger, 315 F.3d at 1289-90.  Following United States v. Rhiger, the Tenth Circuit, in United States v. Roof, 103 F.App'x 652 (10th Cir. 2004)(unpublished), held that officers had no reasonable basis to suspect a methamphetamine laboratory, because the district court "specifically found that the deputies could not smell methamphetamine from outside."  103 F.App'x at 659.  There, the officers had only a six-month old uncorroborated tip from an unproven confidential information and the Tenth Circuit held that there were no exigent circumstances to justify the officers' search.  See United States v. Roof, 103 F.App'x at 659.  In United States v. Thomas, 372 F.3d 1173 (10th Cir. 2004), the Tenth Circuit found that exigent circumstances existed where the officers had just broken up a heated argument in which a firearm was brandished, one of the participants had disobeyed the officers orders and hidden his gun, and it was unclear how many people were inside the home.  See 372 F.3d at 1177-78.  It held that the officers had reasonable grounds to believe there was an immediate need to ensure their safety and the safety of others.  See United States v. Thomas, 372 F.3d at 1178. In April 2005, the Tenth Circuit found that exigent circumstances existed, based on the emergency-aid exception, where the police were called to a home for underage drinking.  See Galindo v. Town of Silver City, 127 F.App'x 459, 466 (10th Cir. 2005)(unpublished).  The officers were aware that: (i) a teenage girl was inside the home; (ii) she had been drinking at the home on other occasions; (iii) the occupants of the home did not respond to the officers knocks; and (iv) two minors could be seen inside the house.  See Galindo v. Town of Silver City, 127 F.App'x at 466.  The Tenth Circuit found that, under those circumstances, there was an "immediate threat of death or severe physical harm," because the officers feared alcohol poisoning, and that it was objectively reasonable for the officers

to enter the home.  Galindo v. Town of Silver City, 127 F.App'x at 466.[38]

 With respect to gunshots-fired cases, the City Defendants cite to cases from a variety of circuits which establish that a report of gunfire can constitute exigent circumstances to look in the area for victims.  In Tamez v. City of San Marcos, Texas, 118 F.3d 1085 (5th Cir. 1997), officers entered a home after: (i) the neighbors reported gunshots at 9:30 p.m.; (ii) a man, known as a burglary suspect, exited the house and denied any shots had been fired; and (iii) the officers heard a television or music playing in the house.  See 118 F.3d at 1092.  The United States Court of Appeals for the Fifth Circuit held that "an officer in Misinasek's position reasonably could have believed that the safety of the general public, or even the safety of the police officers, created exigent circumstances."  Tamez v. City of San Marcos, Tex., 118 F.3d at 1095.  The Fifth Circuit noted that other circuits have also held that "the firing of a weapon in a residential neighborhood at night creates exigent circumstances."  Tamez v. City of San Marcos, Tex., 118 F.3d at 1095 (citing United States v. Arcobasso, 882 F.2d 1304 (8th Cir. 1989)).  It found that exigent circumstances existed, because "[t]he officers had not located the gun used to fire the reported shots, nor had they conclusively determined that there were no shooting victims or hostages in the house."  Tamez v. City of San Marcos, Tex., 118 F.3d at 1096.  In United States v. Holloway, 290 F.3d 1331 (11th Cir. 2002), officers received 911 calls reporting of gunshots and arguing at 10:22 p.m., and, when officers arrived at the area, they observed the defendant and his wife on the front porch, which did not dissuade the officers of the veracity of the 911 calls.  See 290 F.3d at 1338.  The United States Court of Appeals for the Eleventh Circuit held that, under those circumstances, "the officers

---

 [38]The Court has also struggled with the contours of the emergency-aid exception and, in its two cases in United States v. Najar, first suppressed evidence discovered in a warrantless search, before finding that the emergency-aid exception applies.  See United States v. Najar, 2004 WL 3426123, at *6; United States v. Najar, 2004 WL 3426122, at *4.

reasonably believed an emergency situation justified a warrantless search of Appellants' home for victims' of gunfire." United States v. Holloway, 290 F.3d at 1338.  In United States v. Collins, 110 F.App'x 701 (7th Cir. 2004)(unpublished), the officers: (i) responded to gunshots at an apartment complex; (ii) heard loud music coming from Apartment 7; (iii) arrested the resident of Apartment 7 when he pushed an officer; and (iv) three minutes later the officers returned and entered the apartment.  See 110 F.App'x at 702.  The United States Court of Appeals for the Seventh Circuit found that it was a close question, because the defendant correctly argued that there was nothing to distinguish his apartment from others in the complex as a source of the gunfire.  See United States v. Collins, 110 F.App'x at 704.  The Seventh Circuit found the defendant's unusually aggressive behavior significant and that the officers reasonably believed a victim might be inside the apartment. See United States v. Collins, 110 F.App'x at 705.

The plaintiff in a qualified immunity case has the burden to establish that a right is clearly established.  See Holland ex rel Overdorff v. Harrington, 268 F.3d at 1186.  Additionally, to be clearly established, a right must be so thoroughly developed and defined as to be "indisputable" and "unquestioned."  Zweibon v. Mitchell, 702 F.2d at 172-73.  Rather than point to factually similar cases in which the Supreme Court or Tenth Circuit has found that exigent circumstances do not exist, the Kerns argue that, in this case, there were no reliable reports of gunshots in the area. See Supplement Response at 6.  Although the Kerns need not show a case where the very conduct in question has been found unlawful, they must show that the unlawfulness of the search was apparent in light of preexisting law.  See Mimics, Inc. v. Village of Angel Fire, 394 F.3d 836, 842 (10th Cir. 2005).  They assert that, in 2005, the officers were required to show a reasonable basis to associate an emergency with the area or place to be searched.  See Supplement Response at 9 (citing United States v. Davis, 290 F.3d 1239, 1242 (10th Cir. 2002)).  Officers are, however, still

protected under qualified immunity when they have "reasonable, but mistaken, beliefs as to the facts

establishing the existence of probable cause or exigent circumstances." Saucier v. Katz, 533 U.S.

at 206.  Moreover, "[i]f an officer's mistake regarding the application of the law to a set of factual

circumstances viewed from the officer's perspective is reasonable, qualified immunity still applies."

James v. Chavez, 830 F.Supp.2d 1208, 1268 (D.N.M. 2011)(Browning, J.)(citing Saucier v. Katz,

533 U.S. at 205).

The undisputed facts, construed in the light most favorable to the Kerns, establish that J.

Kerns informed the officers that, while he was standing at the edge of his property line, he heard a

pop noise that sounded "like an engine blowback or maybe a rifle report, like the sound of a gun

going off," and heard rocks kick up.  J. Kerns Depo. at 157:19-25, 162:6-8.  Accord Written

Statement of Jason Kerns at 1.  There was, therefore, a reason to associate the gunfire with J. Kerns'

property.  Circumstances, including the music and the lights, indicated that there were individuals

inside the house, but no one answered the door after repeated attempts to contact them.  There was

a broken window, which resembled a bullet hole, and the door was unlocked.  Moreover, officers

were operating in circumstances where someone was skilled enough to shoot down a helicopter at

night.  The Court upon its first examination of these facts found that there were factual issues which

precluded summary judgment.  See Oct. 5, 2009 MOO at 16.  Focusing exclusively on the Tenth

Circuit's analysis in United States v. Bute, the Court held:

> [A] reasonable fact finder could find that Bader, Thompson, and Carter acted on little
> more than speculation.  In the canvassing of the neighborhood, Bader, Thompson,
> and Carter, and the other police officers dispatched to the area, had some information
> that might lead them to believe that the offender was in the area.  After they arrived,
> however, their initial investigation did not produce much information that supported
> the lead from J. Kerns.  The citizens in the neighboring homes with whom the
> officers spoke did not hear a gunshot, nor did they realize that a helicopter had
> crashed nearby.  They did not discover a gun, shell casings, or signs of a shoot.  A
> reasonable fact finder might also conclude that the presence of music playing from

> the Kerns' home, miscellaneous items in the yard, and a possible open garage door, did not suggest danger.  A reasonable fact finder might not find these circumstances to be particularly suggestive, given that Bader, Thompson, and Carter knew that the residence belonged to one of the witnesses back at the golf course, with whom Johnston was in contact via the police radio.  A reasonable fact finder might conclude that these circumstances could be more readily and reasonably explained as attributable to a person who had left his home in a hurry after witnessing a helicopter crash. . . .  The Court finds that a reasonable fact finder might conclude that it was conjecture for Bader, Thompson, and Carter to make the leap that these were sign of an intruder into the Kerns' home.

Oct. 5, 2009 MOO at 14-15.  Having concluded that, depending on the jury's view of the facts, exigent circumstances may not exist, the Court found there may be a constitutional violation under the first prong of the qualified-immunity analysis.  The Court's analysis established that a jury could find that the facts confronting the officers was too speculative to support a reasonable belief that someone inside the apartment was in danger or that the shooter might be hiding inside.

The second prong of the qualified immunity analysis has a different focus, and asks whether that violation was clearly established such that an officer would be aware that his conduct violated the law.  Thus, while the Court can believe, as it does believe, that a reasonable jury might find that the officers did not have exigent circumstances and violated the Kerns' civil rights, they may still not have violated clearly established law.  In other words, it had to be pretty clear, to every reasonable officer, they were violating clearly established law.  As articulated by the Supreme Court and the Tenth Circuit, the Court must say that every reasonable officer would have known that they were violating the Kerns' civil rights when they entered the home.  See Ashcroft v. al-Kidd, 131 S.Ct. at 2083 ("A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.");  Kerns v. Bader, 663 F.3d at 1180.  "In making this determination, the 'relevant inquiry . . . is whether it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted." Ealum v. Schirard, 46 F.App'x 587, 590 (10th Cir. 2002)(quoting Saucier v. Katz, 533 U.S. at 202).  The Court must also construe the facts -- even though disputed -- in the light most favorable to the non-moving party; here, the Kerns.  See Hunt v. Cromartie, 526 U.S. at 551.  Because the officers in this case could reasonably have believed that their conduct was lawful under the circumstances, even construing the facts in the light most favorable to the Kerns, they are entitled to qualified immunity. Given the state of the law and the facts with which the officers were presented, it was not unreasonable for the officers to believe that they had exigent circumstances under the emergency-aid exception.  Even though the Court indicated that a jury could find that their actions unduly speculative, qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.  Looking to Tenth Circuit precedent in 2005, the officers could draw parallels between this case and Galindo v. Town of Silver City, and reasonably believe that there were exigent circumstances.  In both cases, the occupants of the home were unresponsive.  See 127 F.App'x at 466.  Additionally, in both cases, there were vague reports of a danger that the officers' observations supported.  In Galindo v. Town of Silver City, the officers were told that parents suspected underage drinking at the home, and the officers observed two sleeping teenagers, leading to fears of alcohol poisoning.  Here, the officers were given information that the gunshot which took out the helicopter came from nearby, and observed a broken window and unlocked door, leading to fears that the shooter or an injured person might be inside.  While, ultimately, the officers had less information on which to base their decision in this case, because they did not personally view the occupants, an officer could reasonably believe that the circumstances were sufficiently similar to justify a warrantless entry.

-85-

Similarly, in United States v. Rhiger, the officers had exigent circumstances to enter a home based on nothing more than their knowledge that the residents had purchased items used to make methamphetamine and the odor of methamphetamine from the home.  See 315 F.3d at 1289-90.  A gunman with the skills to shoot down a helicopter at night arguably represents a more immediate public threat than a methamphetamine laboratory, and the officers could reason that a broken window and unresponsive residents provided evidence that the residents might be in danger similar to the smell of methamphetamine in United States v. Rhiger.  Again the officers in United States v. Rhiger had more concrete knowledge, but an officer is entitled to qualified immunity despite "the officer's mistake as to what the law requires."  Smith v. Wampler, 108 F.App'x 560, 566 (10th Cir. 2004)(unpublished)(citation omitted).  It was not unreasonable for Carter, Bader, and Thompson to believe that they had exigent circumstances based on United States v. Rhiger, given the level of danger and the broken window.  Tamez v. City of San Marcos, Texas provides further support for the proposition that the law was not clearly established, because there the Fifth Circuit held that the officers were permitted to enter the home, after reports of gunshots, where "[they] had not yet located the gun used to fire the reported shots, nor had they conclusively determined that there were no shooting victims or hostages in the house."  118 F.3d at 1096.  The officers reported similar fears in this case, because they had not yet identified the shooter or his location, J. Kerns' had identified the area surrounding his home as the locus of the shots, and, although people appeared home, none came to the door.  An officer could look at these cases and determine, in the heat of the moment, that he or she was justified in a warrantless entry to the Kerns' home.  A jury could determine that the officers acted based on speculation, but to establish that the law was clearly established, the Kerns must "overcome a claim that the official made a reasonable 'mistake of law' . . . , a reasonable 'mistake of fact,' or a reasonable 'mistake based on mixed questions of law and fact.'"  Deutsch v.

Jordan, 618 F.3d 1093, 1099 (10th Cir. 2010).

Furthermore, looking at the case law today, the Court does not believe the Kerns could meet the clearly established prong of the qualified immunity test as the Tenth Circuit has articulated that analysis in Kerns v. Bader and as the Supreme Court has applied the clearly established law analysis in Anderson v. Creighton.  In United States v. Gambino-Zavala, 539 F.3d 1221 (10th Cir. 2008), the Tenth Circuit recognized that "it is well settled that officers can reasonably search for victims upon reports of gunfire."  539 F.3d at 1226.  The Tenth Circuit made that comment in the context of a case where officers were responding to witness reports of gunshots from an apartment complex, and, at the scene, witnesses identified the apartment searched, said the occupants were known to have guns, and identified two vehicles as belonging to the occupants in the parking lot.  See United States v. Gambino-Zavala, 539 F.3d at 1226.  An officer could reasonably construe the Tenth Circuit's statements in that case as justifying a search where a witness identified shots as coming from near his home, there was a window with a hole resembling a bullet in it, and, despite indications that the occupants were home, no one answered the door.  In 2010, in Armijo ex rel. Armijo Sanchez v. Peterson, the Tenth Circuit recognized that officers had exigent circumstances to search a home where a bomb threat had been made to a high school and where Armijo fit the description of the person who made the threat.  See 601 F.3d at 1072.  The Tenth Circuit found that an urgent need to protect the high school justified the officer's search to ensure that no dangerous persons were in the home.  See Armijo ex rel. Armijo, 601 F.3d at 1073.  The Armijo ex rel. Armijo Sanchez v. Peterson case seems particularly on point with this case and demonstrates that the City Defendants, had they entered the Kerns' home today, could reasonably believe that their conduct was lawful.  Both cases involved the hunt for a dangerous individual who posed a threat, and arguably the shooter in this case was more dangerous, because he had already carried out a crime.  Furthermore, the information

about  from where the danger came was similarly vague.  In this case, the officers had J. Kerns'

report that the shots came from near his home.  In <u>Armijo ex rel. Armijo Sanchez v. Peterson</u>, the

police had a report that the person who made the bomb threat was a male named Chris who was a

member of the East Siders gang and who had formerly attended the school.  <u>See</u> 601 F.3d at 1068.

In both cases, the officers had certain facts wrong.  In this case, the officers believed the broken

window was the result of a bullet, and, in <u>Armijo ex rel. Armijo Sanchez v. Peterson</u>, Armijo had

never attended the rival high school and was not a gang member.  Nevertheless, the Tenth Circuit

found that the officers in <u>Armijo ex rel. Armijo Sanchez v. Peterson</u> were entitled to qualified

immunity.  Accordingly, the Court believes that, even under current law, the violation would not be

of clearly established law.

The Supreme Court has emphasized that courts must take into account the officers' on-scene

perspective in gaging the reasonableness of their conduct as to the application of the exigent-

circumstances doctrine.  <u>See</u> <u>Saucier v. Katz</u>, 533 U.S. at 205.  Although certain factual questions

remain, the officers' actions were not unreasonable in light of the clearly established law, and they

are thus entitled to qualified immunity.  The "principles of qualified immunity shield an officer from

personal liability when an officer reasonably believes that his or her conduct complies with the law."

<u>Pearson v. Callahan</u>, 555 U.S. at 244.  Bader, Thompson, and Carter were operating within an

emergency situation.  The Supreme Court has recently admonished judges to "be cautious about

second-guessing a police officer's assessment, made on the scene, of the danger presented by a

particular situation," and that "the calculus of reasonableness must embody allowance for the fact

that police officers are often forced to make split-second judgments -- in circumstances that are

tense, uncertain, and rapidly evolving."   <u>Ryburn v. Huff</u>, 132 S.Ct. 987, 992 (2012)(per

curiam)(finding that officers were entitled to qualified immunity where they responded to a threat

to "shoot-up" a school and entered the home of a suspect without a warrant).  In its opinion, the Tenth Circuit acknowledged that the second qualified immunity question "is close." Kerns v. Bader, 663 F.3d at 1182.  Given the case law as it stood in 2005, the Court finds that the law was not clearly established that police officers in these circumstances, taken in a light most favorable to the Kerns, did not have exigent circumstances to enter the Kerns' home.  Although the officers may have been mistaken as to the immediacy of the danger, given that the shots were not reported to have come from within the Kerns' home and the broken window was the result of a stray golf ball, an officer's reasonable mistake as to the facts will still entitle the officer to qualified immunity.  See Saucier v. Katz, 533 U.S. at 206.  The Kerns have pointed to no cases, and the Court could find none, where exigent circumstances did not exist under similar facts.  In fact, the Court had great difficulty locating many Tenth Circuit or Supreme Court cases addressing the emergency-aid exception before 2006.  In United States v. Najar, the Tenth Circuit cited Justice Clarence Thomas' dissent in Groh v. Ramirez, 540 U.S. 551 (2004), wherein he stated that "our cases stand for the illuminating proposition that warrantless searches are per se unreasonable, except, of course, when they are not." United States v. Najar, 451 F.3d at 713 n.1 (citing Groh v. Ramirez, 540 U.S. at 573 (Thomas, J., dissenting)).  Given the similarity between the cases to which the Court has cited and the facts of this case -- a dangerous situation, where the occupants of a home are unresponsive, and indications that something might be wrong in the home -- the Court concludes that the right the Kerns assert was not "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier v. Katz, 533 U.S. at 202.  Furthermore, given these cases, the officers could have made a reasonable mistake of law with respect to exigency based on the speculative information before them.  See Deutsch v. Jordan, 618 F.3d at 1099 (stating that, to meet the clearly-established prong of the qualified immunity test, a plaintiff must overcome a defense that an official made a

reasonable mistake of law, reasonable mistake of fact, or reasonable mistake regarding a mixed question of law and fact).  When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden."  Medina v. Cram, 252 F.3d at 1128.  The Kerns have not established that the officers' violation, if any, was clearly established on August 6, 2005.

In the end, the Tenth Circuit and the Supreme Court law is not precise enough to give the courts, much less police officers, clear guidance on what is an exigent circumstance.  Moreover, the cases from other circuits are not much more precise, and the Court cannot say, given such guidance, that the law is so clearly established that every reasonable police officer would know that entering the Kerns' home violated their civil rights.  The swath of what may be constitutional -- while no doubt broader than what is unconstitutional -- remains broad.  See Groh v. Ramirez, 540 U.S. at 573 (Thomas, J., dissenting)("That is, our cases stand for the illuminating principle that warrantless searches are per se unreasonable, except, of course, when they are not.").  The Court cannot say that every reasonable officer would have though what they were doing was unconstitutional.  While a jury would have to resolve the disputed facts to determine whether the officers acted constitutionally, the clearly established prong is more protective than the first prong, and protects officers even when there are genuine issues of material fact.

The Kerns argue that the clearly established law required a connection between the Kerns' home and the gunshots.  They also emphasize that Montoya, at the conclusion of the investigation, asserted that J. Kerns' perception of events was, at best, "not solid," and at worst, "misleading."  Montoya Depo. at 58:17-25.  The Court does not believe it was unreasonable, however, for the officers to rely on J. Kerns' statements in this rapidly evolving situation and finds it difficult for the Kerns to argue that the police should have known not to rely on what he reported.  Furthermore, the

Kerns point to no case law establishing that J. Kerns' statements were insufficient to connect the gunshots to his property.  The case law requires "some reasonable basis" to associate an emergency with the area to be searched, and the Kerns point to no cases in which a homeowner's report of gunshots near his property was insufficient to connect the gunshots to that property.  The burden is on the Kerns to demonstrate a violation of clearly established law, and the Court finds that the Kerns have not met their burden.  "In order to satisfy his or her burden to show that the law was clearly established, the plaintiff need not produce a factually identical case, but may instead show that there is a Supreme Court or Tenth Circuit opinion on point."  Axson-Flynn v. Johnson, 356 F.3d 1277, 1299 (10th Cir. 2004).  The Kerns have not pointed to an "on-point" opinion in which the Supreme Court or Tenth Circuit found that exigent circumstances did not exist. Instead, the Kerns focus on distinguishing the cases that the City Defendants set forth.  Because the Kerns did not produce an "on-point" case, they have not satisfied their burden with respect to the qualified-immunity analysis.  Accordingly, the Court will grant the MSJ with respect to Count I.

In the end, and at least for the foreseeable future, it may be difficult for plaintiffs in § 1983 cases to overcome qualified immunity defense in exigent circumstances cases.  Like in baseball, ties go to the runner, see Coleman v. McLaren, 631 F.Supp. 749, (N.D. Ill. 1985)("In the legal version of baseball's 'ties go to the runner,' the party that fails to satisfy its burden of proof (here plaintiff) must lose."); in the exigent circumstances area, ties and even close calls go to the police, or other government official.  Only the most extreme cases will go to the jury.  Perhaps this what the Supreme Court intended, however, when it said: "Qualified immunity . . . protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 131 S.Ct. at 2085 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  Despite the broad language of § 1983, all other innocent citizens will be without a remedy when their constitutional rights -- less well-

established -- are violated.

### III. UNDER CLEARLY ESTABLISHED LAW, ZISSER'S CONSENT TO THE SEARCH DOES NOT JUSTIFY THE OFFICERS' INTRUSION, BECAUSE THE OFFICERS HAD ALREADY ENTERED THE HOME AND HER CONSENT WAS NOT <u>VOLUNTARY</u>.

The Tenth Circuit also directed the Court to determine whether the intrusion was justified, because Zisser consented to the search, "at least after the first incursion was made." <u>Kerns v. Bader</u>, 663 F.3d at 1183.  On remand, the City Defendants have asserted that they "have never argued that Michelle Zisser's consent authorized the entry."  Supplement Reply at 1-2.  First, Zisser's consent could not have justified the officers' initial entry, because she encountered them only after they had entered the house.  <u>See</u> Thompson Ans. at 2.  Zisser's after-acquired consent could not justify the earlier entry, because, assuming that there were no exigent circumstances, the Fourth-Amendment violation had already occurred.  Second, Zisser's consent could not justify any further intrusion, because her consent was not voluntary.  Relevant considerations for consent to search include: "physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons."  <u>United States v. Sawyer</u>, 441 F.3d 890, 895 (10th Cir. 2006).  Bader, Thompson, and Carter encountered Zisser in the hallway with their weapons drawn late at night, after their radios woke her up, and Zisser did not feel that she could refuse their request to search the home.  <u>See</u> Zisser Depo. 46:19-25.  In <u>United States v. Medlin</u>, 842 F.2d 1194 (10th Cir. 1988), the Tenth Circuit held that "it seems reasonable that Medlin would have believed when faced by federal and state officers with guns drawn that he had no right to resist Deputy Carter's investigation" and suppressed evidence found during the search.  842 F.2d at 1198.  In <u>Kaupp v. Texas</u>, 538 U.S. 626 (2003), the Supreme Court recognized that a juvenile's response --

"Okay" -- to a group of police officers rousing him in the middle of the night and saying "'we need to go and talk,'" presents no option but to go and that there was no reason to think that the response was anything more than "a mere submission to a claim of lawful authority."  538 U.S. at 631. Similarly, Zisser woke to a strange noise in her house and was confronted by three police officers with guns drawn who had entered the home without consent.  See United States v. Dillard, 438 F.3d 675, 682 (6th Cir. 2006)("[A] consent form, signed after a Fourth Amendment violation, cannot be relied upon to cure an otherwise illegal search . . . .").  It is unsurprising that Zisser felt she had no choice but to consent tot the officers' search.  The officers entry into the home was a coercive show of authority, which combined with the late hour, the presence of multiple officers, and the brandishing of weapons would, lead a reasonable person to believe that they had no choice but to consent to the search.  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010)(finding that consent was involuntary where officer seized a woman when he stopped her car, identified himself as a police officer, entered the car, and then directed her to a nearby parking lot).  Accordingly, Zisser's consent does not provide a separate justification for the officers' presence in the Kerns' home.

IV.     **BECAUSE A FEDERAL CLAIM -- COUNT VI -- REMAINS PENDING BEFORE THE COURT, THE COURT WILL RETAIN JURISDICTION OVER THE REMAINING STATE LAW CLAIMS.**

        At the April 12, 2012 hearing, the parties agreed that, if the Court granted the MSJ, all of the federal claims would be resolved and that the Court should dismiss without prejudice the state law claims.  See  Tr. at 51:12-18 (Court, Lowry); id. at 57:8-12 (Court, Griffin).  Despite this agreement, the Court finds that one federal claim remains pending before it -- Count VI.  Accordingly, the Court will continue to exercise supplemental jurisdiction over the pending state law claims.

**A.    COUNT VI REMAINS BEFORE THE COURT FOR A DETERMINATION OF DAMAGES.**

On October 5, 2009, before the Court decided the City Defendants' MSJ, the remaining Counts and Defendants were: (i) Count I -- illegal entry without a warrant -- asserted against Bader, Carter, and Thompson; (ii) Count II -- unlawful search and seizure -- asserted against Lindley; (iii) Count III -- unlawful search and seizure of medical information and deprivation of medical privacy contrary to the Fourth Amendment, the Fourteenth Amendment, and the Federal Privacy Act, 5 U.S.C. § 552A(b)(7) --  asserted against White; (iv) Count IV -- false arrest/false imprisonment of J. Kerns under the Fourth Amendment -- asserted against Lindley, Koren, and Haag; (v) Count V -- malicious prosecution under the Fourth Amendment -- asserted against Lindley, Koren, and Haag; (vi) Count VI -- municipal liability against the Board of Commissioners of Bernalillo County for the violations White was alleged to have committed in Count III; (vii) Count VIII -- false detention/arrest/imprisonment of J. Kerns under the New Mexico Tort Claims Act, N.M.S.A. 1978, §§ 41-4-1 to -30 ("NMTCA") -- asserted against Lindley, Koren, and the County; (viii) Count IX -- malicious abuse of process under the NMTCA -- asserted against Lindley, Koren, and Bernalillo County; (ix) Count X -- deprivation of property rights and trespass under the NMTCA -- asserted against Lindley, Bader, Thompson, Carter, and Bernalillo County; and (x) Count XI -- deprivation of property rights and conversion under the NMTCA -- asserted against Lindley and Bernalillo County.  The Tenth Circuit's opinion in Kerns v. Bader reversed the Court's March 31, 2010 Order and April 12, 2010 MO, and directed that the Court grant dismissal of the claims against White, Lindley, Koren, and Haag on the basis of qualified immunity.  See 663 F.3d at 1190; Tenth Circuit Judgment at 4-5.  Additionally, the Court has now determined that Bader, Carter, and Thompson are entitled to qualified immunity.  Accordingly, Counts I, II, III, IV, and V have now been resolved in favor of the Defendants.

In its March 31, 2010 Order, the Court granted the Plaintiff's Motion for Summary Judgment as to Liability on Counts III & VI of the First Amended Complaint, filed July 17, 2009 (Doc. 180). See March 31, 2010 Order at 4.[39]  In Count III, the Kerns asserted a claim for unlawful search and seizure of medical information, and deprivation of medical privacy, in violation of the Fourth and Fourteenth Amendments against White.  See April 12, 2010 MO at 38.  In Count VI, the Kerns asserted a claim for municipal liability against the Board of County Commissioners of Bernalillo County, based on the underlying constitutional violation asserted in Count III.  See April 12, 2010 MO at 38.  The Court found that "the Plaintiffs have met their burden of demonstrating that White violated J. Kerns' constitutionally protected right to privacy."  April 12, 2010 MO at 102.  See April 12, 2010 MO at 122.  On appeal, the Tenth Circuit determined that this violation was not clearly established and that White was entitled to qualified immunity on Count III, but did not reverse the Court's determination that White violated J. Kerns' right to privacy.  See Kerns v. Bader, 663 F.3d at 1183 ("Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.").  Accordingly, the Court's determination that White violated J. Kerns' right to privacy stands.

In the April 12, 2010 MO, the Court also found that the Board of Commissioners of Bernalillo County were liable, under a theory of municipal liability, for White's constitutional violation and entered summary judgment on Count VI.  See April 12, 2010 MO at 124.  The Court found that "White was the moving force behind the request without consent of J. Kerns' private

---

[39]On July 14, 2009, the Kerns stipulated to the dismissal of Count VI, with the "single exception of municipal liability for the Board of Commissioners of Bernalillo County and Sheriff Darren White under Count VI concerning the conduct alleged in Count III."  Stipulated Dismissal of Defendants Bernalillo County Board of Commissioners as to Count VI, with Prejudice, with the Exception of Municipal Liability as It Relates to Count III, filed July 14, 2009 (Doc. 176).

medical records" and that "he is the official policy-maker for law-enforcement policies for the Bernalillo County Sheriff's Department." April 12, 2010 MO at 123. The Tenth Circuit did not address the Court's determination that the Kerns' were entitled to summary judgment on Count VI.[40] The Tenth Circuit's determination that White is entitled to qualified immunity does not impact the Court's decision that the Kerns were entitled to summary judgment on the municipal liability claim against the Board of Commissioners of Bernalillo County. In Cordova v. Aragon, 569 F.3d 1183 (10th Cir. 2009), the Tenth Circuit dealt with a similar situation. The Tenth Circuit found that the officer was entitled to qualified immunity, because the law was not clearly established. See Cordova v. Aragon, 569 F.3d at 1193. It recognized, however, that "the same qualified immunity analysis does not apply to municipalities" and that, because it had found "a genuine issue of material fact as to whether a constitutional violation occurred," it had to remand the case "unless we find that the Cordovas have failed to create a genuine issue of material fact as to whether a municipal policy or custom was the moving force behind the constitutional deprivation." Cordova v. Aragon, 569 F.3d at 1193. Thus, a court's finding that an officer is entitled to qualified immunity based on the clearly established prong, does not bar a finding of municipal liability. The United States Court of Appeals for the Eleventh Circuit has similarly held that a finding of qualified immunity does not preclude municipal liability based on the alleged constitutional violation. See Cooper v. Dillon, 403 F.3d 1208, 1223 (11th Cir. 2005). There the Eleventh Circuit held:

---

[40]On September 15, 2010, the Tenth Circuit entered an order dismissing the Board of Commissioners for Bernalillo County as a party on appeal. See Order, filed September 15, 2010 (Doc. 284)("Appellate Order"). The Tenth Circuit stated: "The unopposed motion by Appellants-Defendants to dismiss Defendant Board of County Commissioners of Bernalillo County ('Board') as an 'appellant' in this appeal is **GRANTED**. Only Appellant-Defendant Board is **DISMISSED**. This appeal shall proceed with Appellants-Defendants Darren White, Brian Lindley, and Lawrence Koren." Appellate Order at 1 (emphasis in original).

> Because the statute's unconstitutionality was not clearly established prior to its enforcement, Dillon is entitled to qualified immunity . . . . However, as a municipal officer with firm policymaking authority as to law enforcement matters, Dillon did expose the City of Key West to § 1983 liability by choosing to enforce the statute against Cooper.

Cooper v. Dillon, 403 F.3d at 1223.  Accordingly, the Tenth Circuit's determination that White is entitled to qualified immunity does not effect the Court's determination that the Board of Commissioners for Bernalillo County were subject to municipal liability and its entry of summary judgment on Count VI in favor of the Kerns.  Count VI thus remains pending before the Court and awaits a trial on damages.

> **B.      BECAUSE COUNT VI REMAINS BEFORE THE COURT, THE COURT WILL CONTINUE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE STATE-LAW CLAIMS AND THE COURT'S DECISION IN THE OCT. 5, 2009 MOO, REGARDING THE STATE-LAW CLAIMS, STANDS.**

In its Oct. 5, 2009 MOO, the Court held that Bader, Carter, and Thompson, "as law enforcement officers, do not have immunity for deprivation of property rights and trespass."  Oct. 5, 2009 MOO at 17.  The Court found that there "is evidence that Bader, Thompson, and Carter entered the Kerns' home without a warrant and without an exception to the warrant requirement, and, in doing so, they may not say they have immunity from tort liability."  Oct. 5, 2009 MOO at 17-18.  The Court then denied summary judgment for Bader, Thompson, and Carter on Count X.  See Oct. 5, 2009 MOO at 18.[41]  In its March 31, 2010 Order, the Court found that, "because genuine issues of fact regarding the County Defendants' intent remain, the Court finds that the County Defendants' asserted probable-cause defense to the NMTCA tort claims in Counts [V]III and IX

---

[41]At the April 12, 2010 hearing, the Kerns argued that it would be inappropriate for the Court to grant summary judgment on the state-law claims based on the federal-law analysis.  See Tr. at 49:25-50:3 (Lowry).  The Court has, however, already denied summary judgment on Count X against Bader, Carter, and Thompson.  See Oct. 5, 2009 MOO at 18.

remains unsettled," and denied summary judgment on those counts.  March 31, 2010 Order at 3.

The Court also granted summary judgment in favor of Lindley and the Board of Commissioners of

Bernalillo County on Counts X and XI.  See March 31, 2010 Order at 3.  Accordingly, the remaining

state law claims are: (i) Count VIII -- false detention/arrest/imprisonment of J. Kerns under the New

Mexico Tort Claims Act, N.M.S.A. 1978, §§ 41-4-1 to -30 ("NMTCA") -- asserted against Lindley,

Koren, and the County; (ii) Count IX -- malicious abuse of process under the NMTCA -- asserted

against Lindley, Koren, and Bernalillo County; and (iii) Count X -- deprivation of property rights

and trespass under the NMTCA -- asserted against Bader, Thompson, Carter.  The Tenth Circuit did

not address these state law claims, and the Court's memorandum opinions and orders on these issues

stand.  The Tenth Circuit vacated the Oct. 5, 2009 MOO with respect to the "order denying qualified

immunity," but did not otherwise disturb the Court's holdings in that opinion.  Kerns v. Bader, 663

F.3d at 1190.  Likewise the Tenth Circuit did not review the March 31, 2010 Order with respect to

the state-law claims, focusing instead on the qualified-immunity analysis.  These state-law claims

remain unresolved and should proceed to trial.  Because Count VI is a federal claim and remains

pending before the Court, the Court will continue to exercise supplemental jurisdiction over the

state-law claims.  See Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005)("[I]t

is well established -- in certain classes of cases -- that, once a court has original jurisdiction over

some claims in the action, it may exercise supplemental jurisdiction over additional claims that are

part of the same case or controversy.").

   **IT IS ORDERED** that Defendants Drew Bader, Matthew Thompson, and Russell Carter's

Motion for Summary Judgment and Memorandum in Support, Requesting Dismissal of Counts I,

X, and XIII of Plaintiffs' First Amended Complaint [Doc. 5], filed February 17, 2009 (Doc. 117),

is granted with respect to Count I.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Marc M. Lowry
Carolyn M. Nichols
Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu, LLP
Albuquerque, New Mexico

   *Attorneys for the Plaintiffs*

Daniel J. Macke
Robles, Rael, & Anaya, P.C.
Albuquerque, New Mexico

   *Attorneys for Defendants Board of Commissioners of*
      *Bernalillo County, Bernalillo County Sheriff Darren*
      *White, Bernalillo County Sheriff's Detectives Brian Lindley,*
      *and Bernalillo County Sheriff's Deputy Lawrence Koren*

Stephanie M. Griffin
  Assistant City Attorney
Albuquerque City Attorney's Office
Albuquerque, New Mexico

   *Attorneys for Defendants Albuquerque Police*
      *Department Officers Drew Baden, Matt Thompson,*
      *Russell Carter, and Metropolitan Forensic Science*
      *Center Firearm and Tool Mark Examiner Mike Haag.*